Case No. 23-cv-308-SE-AJ

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW HAMPSHIRE

William Soler Justice

v.

Aaron Belanger

Eric Barbaro

## OBJECTION TO REPORT AND RECOMMENDATION

I would like to assert all my due process claims and do not believe that the hardship of being retaliated against for asking a guard the name of his sister warranted 2 weeks of 23 hour a day solitary confinement. I was not provided with a disciplinary hearing or even an explanation of the reason for moving me to solitary confinement. I was not provided what convicted prisoners receive with a right to a hearing, I believe this is disability discrimination.

I am including with this objection exhibits and materials I have found that support my position.

Civilly committed patients have certain rights, including the right to treatment in the least restrictive environment appropriate to their needs. This principle is rooted in the idea that patients should not be subjected to more restrictive conditions than necessary for their treatment and safety.

Regarding solitary confinement, it is generally considered inappropriate for civilly committed patients unless absolutely necessary for safety reasons. The use of solitary confinement can be highly detrimental to mental health, and there are legal and ethical standards aimed at minimizing its use.

Casey v. Lewis, 834 F. Supp. 1477, 1548 (D. Ariz. 1993) (noting that "both the plaintiffs' and defendants' experts agreed that it was inappropriate to house acutely psychotic inmates in [isolation] for more than three days"

**New Hampshire RSA 151:21**

- VI. The patient shall be encouraged and assisted throughout the patient's stay to exercise the patient's rights as a patient and citizen. The patient may voice grievances and recommend changes in policies and services to facility staff or outside representatives free from restraint, interference, coercion, discrimination, or reprisal.
- VIII. The patient shall be free from emotional, psychological, sexual and physical abuse and from exploitation, neglect, corporal punishment and involuntary seclusion.
- IX. The patient shall be free from chemical and physical restraints except when they are authorized in writing by a physician for a specific and limited time necessary to protect the patient or others from injury. In an emergency, restraints may be authorized by the designated professional staff member in order to protect the patient or others from injury. The staff must promptly report such action to the physician and document same in the medical records.

Exhibit A

**New Hampshire RSA 642:9.** According to this statute, an "inmate" is defined as:

- A person committed by law to the custody of the commissioner of the Department of Corrections.
- A person in pretrial confinement.
- Any person incarcerated in a local detention facility operated by a county department of corrections.

Classifying a mentally ill person who is civilly committed as an inmate without a conviction raises significant constitutional concerns. The U.S. Supreme Court has recognized that civilly committed individuals have certain substantive liberty rights under the Due Process Clause of the Fourteenth Amendment. These rights include:

Therefore, classifying a civilly committed individual as an inmate without a conviction could violate their due process rights, especially if the conditions of their confinement are similar to convicted inmates and do not account for their specific needs and rights as civilly committed individuals.

Sending a civilly committed patient to solitary confinement without a hearing or evidence of dangerous behavior can violate the Constitution in several ways:

1. **Substantive Due Process**: The Fourteenth Amendment's Due Process Clause protects individuals from arbitrary and unreasonable government actions. Civilly committed patients have a right to conditions of reasonable care and safety, and confinement must be reasonably nonrestrictive. Solitary confinement, especially without a hearing or evidence of dangerous behavior, can be seen as an unreasonable and excessive measure that does not align with these protections.

2. **Procedural Due Process**: Procedural due process requires that individuals be given notice and an opportunity to be heard before being deprived of significant liberty interests. Placing a civilly committed patient in solitary confinement without a hearing denies them this fundamental right, making the action constitutionally suspect.

3. **Cruel and Unusual Punishment**: Although the Eighth Amendment's prohibition against cruel and unusual punishment primarily applies to convicted prisoners, courts have extended similar protections to civilly committed individuals under the Fourteenth Amendment. Solitary confinement can have severe psychological effects and using it without justification or procedural safeguards can be considered cruel and unusual treatment.

4. **Equal Protection**: The Equal Protection Clause of the Fourteenth Amendment requires that individuals in similar situations be treated equally under the law. Arbitrarily placing civilly committed patients in solitary confinement without due process could be seen as discriminatory, especially if other patients are not subjected to the same treatment without cause.

    The U.S. Supreme Court has indeed recognized that civilly committed individuals have substantive liberty rights under the Due Process Clause of the Fourteenth Amendment.

**Addington v. Texas (1979):** The Court held that civil commitment for mental illness requires a standard of "clear and convincing evidence" to meet due process requirements. This case emphasized the need for a higher standard of proof to protect individuals' liberty interests.

**Youngberg v. Romeo (1982):** This landmark case established that involuntarily committed individuals have substantive rights to adequate food, shelter, clothing, medical care, and safe conditions. The Court ruled that these rights are protected under the Due Process Clause.

**O'Connor v. Donaldson (1975):** The Court ruled that a state cannot constitutionally confine a non-dangerous individual who is capable of surviving safely in freedom by themselves or with the help of willing and responsible family or friends. This case highlighted the substantive liberty interest in freedom from unnecessary confinement.

These cases collectively underscore the Court's recognition of the substantive liberty rights of civilly committed individuals, ensuring their protection under the Due Process Clause.


In New Hampshire, the right of incarcerated prisoners to a hearing on disciplinary issues is outlined in **RSA 651-A:22**. This statute ensures that prisoners are afforded due process, including the right to a hearing where they can present their case, call witnesses, and provide evidence in their defense. I asked for a hearing but was not provided one.

Exhibit B


July 8, 2014: Pittsburgh, PA – A lawsuit filed in federal court in the Western District of Pennsylvania claims that Pennsylvania Department of Corrections (DOC) Secretary John Wetzel and other officials in charge of the State Correctional Institution (SCI) Cresson "created and sustained conditions of solitary confinement that subjected Brandon Palakovic to torture, causing him to take his own life on July 17, 2012, at the age of 23.

The case sheds light on the life-and-death consequences of solitary confinement, seeking accountability for illegal conditions of confinement that are increasingly recognized as torture.

Exhibit C

SCI Cresson was under investigation by the DOJ at the time of Brandon's suicide for holding prisoners with mental illness and intellectual disabilities in solitary confinement and depriving them of mental health treatment. The DOJ found that SCI Cresson's use of solitary confinement on the mentally ill and intellectually disabled constituted cruel and unusual punishment and unlawful discrimination under the Americans with Disabilities Act.

Exhibit D The DOJ report

Exhibit E Harvard Law review Article

Exhibit F Congressional Report

I believe many of New Hampshire's laws surrounding the placement of mentally ill civilly committed patients, within the New Hampshire State prison for men (NHSP) – Concord; under the control of the New Hampshire Department of Corrections (DOC), are at best un-ethical and worst unconstitutional. I therefore seek to challenge these practices and policies in a federal court as state laws are considered constitutional until deemed unconstitutional by a court of law. I believe I have been deprived of many rights guaranteed to me by New Hampshire state law, New Hampshire and US Constitutions.

Under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States is guilty of violating **18 U.S.C. §242. Deprivation of rights under color of law.**

**William Justice,** prose

51 Storrs St. Apt 310

Concord, NH 03301

603-931-6357

gentlegiant03301@yahoo.com

# TITLE XI
# HOSPITALS AND SANITARIA

## CHAPTER 151
## RESIDENTIAL CARE AND HEALTH FACILITY LICENSING

### Patients' Bill of Rights

### Section 151:21

**151:21 Patients' Bill of Rights.** –
The policy describing the rights and responsibilities of each patient admitted to a facility, except those admitted by a home health care provider, shall include, as a minimum, the following:

I. The patient shall be treated with consideration, respect, and full recognition of the patient's dignity and individuality, including privacy in treatment and personal care and including being informed of the name, licensure status, and staff position of all those with whom the patient has contact, pursuant to RSA 151:3-b.

II. The patient shall be fully informed of a patient's rights and responsibilities and of all procedures governing patient conduct and responsibilities. This information must be provided orally and in writing before or at admission, except for emergency admissions. Receipt of the information must be acknowledged by the patient in writing. When a patient lacks the capacity to make informed judgments the signing must be by the person legally responsible for the patient.

III. The patient shall be fully informed in writing in language that the patient can understand, before or at the time of admission and as necessary during the patient's stay, of the facility's basic per diem rate and of those services included and not included in the basic per diem rate. A statement of services that are not normally covered by medicare or medicaid shall also be included in this disclosure.

IV. The patient shall be fully informed by a health care provider of his or her medical condition, health care needs, and diagnostic test results, including the manner by which such results will be provided and the expected time interval between testing and receiving results, unless medically inadvisable and so documented in the medical record, and shall be given the opportunity to participate in the planning of his or her total care and medical treatment, to refuse treatment, and to be involved in experimental research upon the patient's written consent only. For the purposes of this paragraph "health care provider" means any person, corporation, facility, or institution either licensed by this state or otherwise lawfully providing health care services, including, but not limited to, a physician, hospital or other health care facility, dentist, nurse, optometrist, podiatrist, physical therapist, or psychologist, and any officer, employee, or agent of such provider acting in the course and scope of employment or agency related to or supportive of health care services.

V. The patient shall be transferred or discharged after appropriate discharge planning only for medical reasons, for the patient's welfare or that of other patients, if the facility ceases to operate, or for nonpayment for the patient's stay, except as prohibited by Title XVIII or XIX of the Social Security Act. No patient shall be involuntarily discharged from a facility because the patient becomes eligible for medicaid as a source of payment.

VI. The patient shall be encouraged and assisted throughout the patient's stay to exercise the patient's rights as a patient and citizen. The patient may voice grievances and recommend changes in policies and services to facility staff or outside representatives free from restraint, interference, coercion, discrimination, or reprisal.

VII. The patient shall be permitted to manage the patient's personal financial affairs. If the patient authorizes the facility in writing to assist in this management and the facility so consents, the assistance shall be carried out in accordance with the patient's rights under this subdivision and in conformance with state law and rules.

VIII. The patient shall be free from emotional, psychological, sexual and physical abuse and from exploitation, neglect, corporal punishment and involuntary seclusion.

IX. The patient shall be free from chemical and physical restraints except when they are authorized in writing by

a physician for a specific and limited time necessary to protect the patient or others from injury. In an emergency, restraints may be authorized by the designated professional staff member in order to protect the patient or others from injury. The staff member must promptly report such action to the physician and document same in the medical records.

X. The patient shall be ensured confidential treatment of all information contained in the patient's personal and clinical record, including that stored in an automatic data bank, and the patient's written consent shall be required for the release of information to anyone not otherwise authorized by law to receive it. Medical information contained in the medical records at any facility licensed under this chapter shall be deemed to be the property of the patient. The patient shall be entitled to a copy of such records upon request. The charge for the copying of a patient's medical records shall not exceed $15 for the first 30 pages or $.50 per page, whichever is greater; provided, that copies of filmed records such as radiograms, x-rays, and sonograms shall be copied at a reasonable cost.

XI. The patient shall not be required to perform services for the facility. Where appropriate for therapeutic or diversional purposes and agreed to by the patient, such services may be included in a plan of care and treatment.

XII. The patient shall be free to communicate with, associate with, and meet privately with anyone, including family and resident groups, unless to do so would infringe upon the rights of other patients. The patient may send and receive unopened personal mail. The patient has the right to have regular access to the unmonitored use of a telephone.

XIII. The patient shall be free to participate in activities of any social, religious, and community groups, unless to do so would infringe upon the rights of other patients.

XIV. The patient shall be free to retain and use personal clothing and possessions as space permits, provided it does not infringe on the rights of other patients.

XV. The patient shall be entitled to privacy for visits and, if married, to share a room with his or her spouse if both are patients in the same facility and where both patients consent, unless it is medically contraindicated and so documented by a physician. The patient has the right to reside and receive services in the facility with reasonable accommodation of individual needs and preferences, including choice of room and roommate, except when the health and safety of the individual or other patients would be endangered.

XVI. The patient shall not be denied appropriate care on the basis of age, sex, gender identity, sexual orientation, race, color, marital status, familial status, disability, religion, national origin, source of income, source of payment, or profession.

XVII. The patient shall be entitled to be treated by the patient's physician of choice, subject to reasonable rules and regulations of the facility regarding the facility's credentialing process.

XVIII. The patient shall be entitled to have the patient's parents, if a minor, or spouse, or next of kin, unmarried partner, or a personal representative chosen by the patient, if an adult, visit the facility, without restriction, if the patient is considered terminally ill by the physician responsible for the patient's care.

XIX. The patient shall be entitled to receive representatives of approved organizations as provided in RSA 151:28.

XX. The patient shall not be denied admission to the facility based on medicaid as a source of payment when there is an available space in the facility.

XXI. Subject to the terms and conditions of the patient's insurance plan, the patient shall have access to any provider in his or her insurance plan network and referral to a provider or facility within such network shall not be unreasonably withheld pursuant to RSA 420-J:8, XIV.

XXII. The patient shall not be denied admission, care, or services based solely on the patient's vaccination status.

XXIII. (a) In addition to the rights specified in paragraph XVIII, the patient shall be entitled to designate a spouse, family member, or caregiver who may visit the facility while the patient is receiving care. A patient who is a minor may have a parent, guardian, or person standing in loco parentis visit the facility while the minor patient is receiving care.

(b)(1) Notwithstanding subparagraph (a), a health care facility may establish visitation policies that limit or restrict visitation when:

(A) The presence of visitors would be medically or therapeutically contraindicated in the best clinical judgment of health care professionals;

(B) The presence of visitors would interfere with the care of or rights of any patient;

(C) Visitors are engaging in disruptive, threatening, or violent behavior toward any staff member, patient, or another visitor; or

(D) Visitors are noncompliant with written hospital policy.

(2) Upon request, the patient or patient's representative, if the patient is incapacitated, shall be provided the reason for denial or revocation of visitation rights under this paragraph.

(c) A health care facility may require visitors to wear personal protective equipment provided by the facility, or provided by the visitor and approved by the facility. A health care facility may require visitors to comply with reasonable safety protocols and rules of conduct. The health care facility may revoke visitation rights for failure to comply with this subparagraph.

(d) Nothing in this paragraph shall be construed to require a health care facility to allow a visitor to enter an operating room, isolation room, isolation unit, behavioral health setting or other typically restricted area or to remain present during the administration of emergency care in critical situations. Nothing in this paragraph shall be construed to require a health care facility to allow a visitor access beyond the rooms, units, or wards in which the patient is receiving care or beyond general common areas in the health care facility.

(e) The rights specified in this paragraph shall not be terminated, suspended, or waived by the health care facility, the department of health and human services, or any governmental entity, notwithstanding declarations of emergency declared by the governor or the legislature. No health care facility licensed pursuant to RSA 151:2 shall require a patient to waive the rights specified in this paragraph.

(f) Each health care facility licensed pursuant to RSA 151:2 shall post on its website:

(1) Informational materials explaining the rights specified in this paragraph;

(2) The patients' bill of rights which applies to the facility on its website; and

(3) Hospital visitation policy detailing the rights and responsibilities specified in this paragraph, and the limitations placed upon those rights by written hospital policy on its website.

(g) Unless expressly required by federal law or regulation, the department or any other state agency shall not take any action arising out of this paragraph against a health care facility for:

(1) Giving a visitor individual access to a property or location controlled by the health care facility;

(2) Failing to protect or otherwise ensure the safety or comfort of a visitor given access to a property or location controlled by the health care facility;

(3) The acts or omissions of any visitor who is given access to a property or location controlled by the health care facility.

**Source.** 1981, 453:1. 1989, 43:1. 1990, 18:1-6; 140:2, XI. 1991, 365:10. 1992, 78:1. 1997, 108:6; 331:3-8. 1998, 199:2; 388:5, 6. 2001, 85:1, eff. Aug. 18, 2001. 2009, 252:1, eff. Sept. 14, 2009. 2013, 265:3, eff. Jan. 1, 2014. 2019, 332:6, eff. Oct. 15, 2019. 2020, 39:61, 62, eff. Jan. 1, 2021. 2022, 52:1, eff. May 20, 2022; 304:2, eff. July 1, 2022.

Case No. 23-cv-308-SE-AJ

# TITLE LXII
# CRIMINAL CODE

## CHAPTER 651-A
## PAROLE OF PRISONERS

### Section 651-A:2

**651-A:2 Definitions. –**

As used in this chapter:

I. "Prisoner" means any adult person who has been committed to the custody of the commissioner of corrections.

II. "Parole" means a conditional release from the state prison which allows a prisoner to serve the remainder of his term outside the prison, contingent upon compliance with the terms and conditions of parole as established by the parole board.

III. "Board" means the adult parole board.

IV. "Commissioner" means the commissioner of corrections.

V. "Department" means the department of corrections.

VI. "Violent crime" shall include those defined as violent crimes in RSA 651:5, XIII and the following:

(a) RSA 173-B:9, violation of protective order.

(b) RSA 631:2, second degree assault.

(c) RSA 631:3, felony reckless conduct.

(d) RSA 631:4, criminal threatening involving the use of a deadly weapon.

(e) RSA 633:3-a, stalking.

(f) RSA 635:1, burglary.

(g) RSA 641:5, tampering with witnesses and informants.

(h) RSA 650-A:1, felonious use of firearms.

VII. "Intermediate sanction program" means a community-based day or residential program that is designed for use as a swift and certain sanction for a parole violation, in lieu of parole revocation.

**Source.** 1983, 461:16. 2010, 247:5, eff. July 1, 2010. 2021, 48:3, eff. May 25, 2021.

# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLANIA

RENEE AND DARIAN PALAKOVIC as                   :
Administrators of the Estate of BRANDON         :
PALAKOVIC,                                      :
                                                :
    Plaintiffs,                                 :
                                                :
          v.                             :    Case No.
                                                :
JOHN WETZEL, KENNETH CAMERON,                   :
JAMIE BOYLES, JAMEY LUTHER, JAMES               :
HARRINGTON, DR. RATHORE,                        :
MICHELLE HOUSER, MORRIS                         :
HOUSER, FRANCIS PIROZZOLA, JOHN                 :
DOE #1, #2, JOHN DOES #3-6, MHM; Inc.,          :
                                                :
                                                :    ELECTRONICALLY FILED
    Defendants.                                 :
                                                :
                                                :
                                                :
                                                :    JURY TRIAL DEMANDED
                                                :

## Complaint

Plaintiffs Renee and Darian Palakovic, administrators of the Estate of Brandon Palakovic, by and through their undersigned counsel, file the following Complaint.

## Jurisdiction and Venue

1.    This is an action for monetary relief for violations of the Eighth and Fourteenth Amendments of the United States Constitution, 42 U.S.C. § 1983; Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134; and also brought pursuant to 42 Pa.C.S.A. §§ 8301 and 8302.

Exhibit C

Case 1:23-cv-00308-SE-AJ    Document 7    Filed 10/11/24    Page 11 of 115
Case 3:05-mc-02025    Document 58    Filed 07/08/14    Page 2 of 25
Case No. 23-cv-308-SE-AJ

2.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4). The Plaintiff further invokes the supplemental jurisdiction of this Court under 28 U.S.C. Section 1367(a) to hear and adjudicate state law claims.

3.      Plaintiffs, as Administrators of the Estate of Decedent Brandon Palakovic, and as his surviving Parents, are entitled to bring this action under the Pennsylvania Wrongful Death Act, 42 Pa.C.S.A. § 8301.

4.      Plaintiffs are entitled to bring this action on behalf of the Decedent, Brandon Palakovic, under the Survival Act, 42 Pa.C.S.A. § 8302.

5.      This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims occurred in the Western District of Pennsylvania, principally at the State Correctional Institution  at Cresson in Cambria County.

## Parties

6.      Plaintiffs Renee and Darian Palakovic are citizens and residents of Spring Hill, Tennessee. Mr. and Mrs. Palakovic are the natural parents of Decedent, Brandon Palakovic. On July 7, 2014, the Register of Wills of Perry County, Pennsylvania granted Letters of Administration on the Estate of Brandon Palakovic to Mr. and Mrs. Palakovic. Mr. and Mrs. Palakovic bring this action in their capacity as Administrators of the Estate of Brandon Palkakovic.

7.      Defendant John Wetzel is and at all relevant times hereto was Secretary of the Pennsylvania Department of Corrections (PADOC). Defendant Wetzel is sued in his individual and official capacity.

8.      Defendant Kenneth Cameron was Superintendent at the State Correctional Institution  Cresson ("SCI Cresson"") at all relevant times hereto. Defendant Cameron is sued in his individual and official capacity.

Exhibit C

9.      Defendant Jamie Boyles was Deputy Superintendent for Facilities Management at SCI Cresson at all relevant times hereto. Defendant Boyles is sued in his individual and official capacity.

10.     Defendant Jamey Luther was Deputy Superintendent for Centralized Services at SCI Cresson at all relevant times hereto. Defendant Luther is sued in her individual and official capacity.

11.     Defendant Dr. James Harrington was Chief Psychologist at SCI Cresson at all relevant times hereto, and currently is a regional psychologist overseeing mental health services at seven prisons operated by the PADOC. Defendant Harrington is sued in his individual and official capacity.

12.     Defendant Dr. Rathore was the head of psychiatric care at SCI Cresson at all relevant times hereto. He was employed by MHM, Inc. for purposes of mental health management of prisoners in custody of the PADOC. Defendant Rathore is sued in his individual and official capacity.

13.     Defendant Michelle Houser was a Unit Manager in SCI Cresson's Secure Special Needs Unit (SSNU) and Special Needs Unit (SNU) at all relevant times hereto. Defendant Houser is sued in her individual and official capacity.

14.     Defendant Morris Houser was a manager of the Mental Health Unit (MHU) at SCI Cresson at all relevant times hereto. Defendant Houser is sued in his individual and official capacity.

15.     Defendant Francis Pirozzola was Security Captain at SCI Cresson at all relevant times hereto. Defendant Pirozzola is sued in his individual and official capacity.

16.     Defendant Shawn Kephart is Director of the Treatment Services Bureau of the PADOC, and at all relevant times was responsible directing, monitoring, and assisting SCI Cresson in the delivery of prisoner treatment programs, including mental health care programs. Defendant Kephart is sued in his individual and official capacity.

Exhibit C

3
3

17.     Defendant John Doe #1 was upon information and belief a Correctional Officer at SCI Cresson who issued Brandon Palakovic the misconduct report prior to his death. Defendant John Doe #1 is sued in his individual and official capacity.

18.     Defendant John Doe #2 was upon information and belief a Hearing Examiner at SCI Cresson who sentenced Brandon Palakovic to solitary confinement in the RHU prior to his death in disregard of Brandon's mental health and the minor nature of the offense. Defendant Doe #2 is sued in his individual and official capacity.

19.     Defendants John Does #3-6 were Correctional Officers employed in the RHU at SCI Cresson at all relevant times hereto who participated in creating hostile living conditions characterized by verbal and physical abuse, punitive behavior modification policies and practices, and deliberate refusal to aid prisoners in obtaining needed mental health care. Defendant John Does are sued in their individual and official capacities.

20.     Defendant MHM, Inc. is under contract with the PADOC to provide mental health care services to prisoners throughout the system, including at SCI Cresson at all relevant times hereto. Defendant MHM, Inc. is sued in its individual and official capacity

## Statement of Facts

### *Death of Brandon Palakovic*

21.     Brandon Palakovic ("Brandon" or Palakovic") was convicted of burglarizing an occupied structure in Perry County, Pennsylvania and sentenced to 16-48 months of imprisonment. Brandon was sent to SCI Cresson, located in Cambria County, in June 2011.

22.     For 13 months, Brandon was repeatedly subjected to solitary confinement via placement in the prison's Restricted Housing Unit (RHU),[1] characterized by extreme deprivations of

---

[1] The terms "solitary confinement," "isolation," and "Restricted Housing Unit (RHU)" are used interchangeably in this complaint and refer to the same conditions of confinement.

social interaction and environmental stimulation, abusive staff, and inadequate to non-existent mental health care.

23.     PADOC Secretary John Wetzel and subordinate officials and personnel were aware that such conditions cause severe psychological harm, exacerbate pre-existing mental health problems, and generated the majority of suicides, suicide attempts, and acts of self-harm at SCI Cresson and throughout the entire PADOC.

24.     Defendants created and sustained conditions of solitary confinement in the RHU that subjected Brandon Palakovic to torture, causing him to take his own life on July 17, 2012, at the age of 23. Defendants transformed a 16-48 month term of imprisonment into a death sentence.

25.     Brandon had a history of mental health issues as a child. He had been institutionalized for mental health reasons on four occasions since age 11. He had been given the following diagnoses during his childhood: Depressive Disorder; Oppositional Defiant Disorder; Attention-Deficit Hyperactivity Disorder; Parent-Child Relational Problems; Disruptive Behavior Disorder; Mood Disorder; Bi-Polar Disorder. Brandon also had a learning disability.

26.     While incarcerated at SCI Cresson, Brandon was on the mental health roster, indicating that he had a need for mental health care.

27.     Brandon was prescribed the anti-depressant Celexa while at SCI Cresson.

28.     According to clinical studies, suicidal thoughts and impulses are some of Celexa's side effects.

29.     Brandon spent multiple 30-day stints in solitary confinement in the RHU during his incarceration at SCI Cresson.

30.     Upon information and belief, Brandon was repeatedly placed in solitary confinement without any objective assessment of whether he posed a security risk to other prisoners or staff.

Exhibit C

5
5

Case 1:23-cv-00308-SE-AJ    Document 7    Filed 10/11/24    Page 15 of 115
Case 3:05-mc-02025   Document 58   Filed 07/08/14   Page 6 of 25
Case No. 23-cv-308-SE-AJ

31.     Prisoners with mental health needs such as Brandon were routinely placed in solitary confinement for non-violent, less serious rule violations.

32.     Mentally ill, psychologically vulnerable prisoners were routinely placed in solitary confinement without any objective assessment of their actual security risk.

33.     In the RHU, where Brandon was confined leading up to and at the time of his death, prisoners were held in solitary confinement in small cement cells for approximately 23-24 hours each day. Solitary confinement cells at Cresson were less than 100 square feet in size, with a steel door that contained a slot in the middle that food and other items were passed through. There are small slit-windows in the middle of the doors, allowing minimal visibility onto the cellblock.

34.     Prisoners in the RHU for disciplinary reasons are not permitted phone calls. Property is limited to one record-center box.

35.     Social interaction and environmental stimulation are severely reduced in the RHU.

36.     RHU prisoners are permitted one hour of exercise time in an outdoor cage slightly larger than their cell five days a week.

37.     Although Brandon had "a history of self-harm and suicide attempts, he continued to be placed in isolation, eventually leading to his death." *See SCI Cresson Findings Letter* at 13, U.S. Dept. of Justice, May 31, 2013 (hereafter *"DOJ Cresson Report"*).

38.     Brandon experienced decompenation during his times in solitary confinement, as he was unable to cope with the conditions in the RHU due to his mental health needs, causing psychological deterioration.

39.     Less than two weeks before his death, Brandon requested one-on-one counseling with a psychiatrist. The psychiatrist ignored Brandon's request and did not provide Brandon with any treatment. *Id.* at 13

Exhibit C

6
6

40.      Psychology staff visited Brandon in December of 2011 and May of 2012. He was ordered for a June psychiatric visit, but this visit did not occur until 11 days before his suicide on July 16. *Id.*

41.      Brandon also expressed concern that his medications were not working. *Id.*

42.      The level of mental health care provided to Brandon was grossly deficient, manifesting a deliberate indifference to his serious medical need for mental health care. Interviews in clinically appropriate settings were inadequate or non-existent.

43.      Mental health staff only provided Brandon with medication for his mental health needs, refusing other forms of necessary treatment.

44.      Prisoners reported that Brandon had started talking to non-existent people and that other prisoners had given him the nickname "Suicide."

45.      Four days before his death, Brandon was again placed in solitary confinement for a minor rules violation that was eligible for informal resolution instead of disciplinary time.

46.      Defendants John Does 1 and 2 were responsible for sentencing Brandon to the RHU prior to his suicide despite his having a mental health condition that placed him at heightened risk of harm when held in solitary confinement.

47.      These Defendants placed him in solitary confinement although Brandon did not pose a threat to the safety or security of staff or prisoners.

48.      Defendants John Does 1 and 2 failed to take into account the extent that Brandon's behavior was the consequence of serious mental illness.

49.      Placing Brandon in the RHU deprived him of access to services, program opportunities, and other activities accorded to general population prisoners.

Exhibit C

7
7

Case 1:23-cv-00308-SE-AJ    Document 7    Filed 10/11/24    Page 17 of 115
Case 3:05-mc-02025    Document 58    Filed 07/08/14    Page 8 of 25
Case No. 23-cv-308-SE-AJ

50.     Defendants John Doe #1 and #2 failed to make a reasonable accommodation of Brandon's serious mental illness, such as allowing for consideration of a prisoner's mental health status in prison disciplinary proceedings.

51.     Defendants Wetzel, Cameron, Boyles, Luther, and Harrington all upheld policies and practices of sentencing prisoners to solitary confinement based on behavior that was caused by mental illness and intellectual disability.

52.     These Defendants discriminated against the mentally ill and intellectually disabled by depriving them of access to services, programs, and other activities accorded to general population prisoners.

53.     Defendants' policies and practices failed to make a reasonable accommodation for prisoners with serious mental illness and intellectual disability, such as allowing for consideration of a prisoner's mental health status in prison disciplinary proceedings.

54.     On July 16, 2012, Brandon Palakovic committed suicide in the RHU at SCI Cresson by hanging. He was pronounced dead on July 17, 2012 at Altoona Regional Hospital in Blair County.

## *United States Department of Justice Investigation of SCI Cresson – Systemic Constitutional Violations of the Rights of the Mentally Ill in Solitary Confinement*

55.     On December 1, 2011, the United States Department of Justice (DOJ) announced that it was opening an investigation into "allegations that SCI Cresson provided inadequate mental health care to prisoners who have mental illness, failed to adequately protect such prisoners from harm, and subjected them to excessively prolonged periods of isolation, in violation of the Eighth

Exhibit C

Amendment to the U.S. Constitution."[2] Brandon Palakovic was confined at SCI Cresson when the DOJ launched its investigation, and he would die before it was completed.

56.     The DOJ investigation was carried out by the Special Litigation Section of the Civil Rights Division pursuant to its authority under the Civil Rights of Institutionalized Persons Act (CRIPA). The investigation put each Defendant on notice of the serious harm inflicted on mentally ill prisoners at SCI Cresson.

57.     PADOC officials were told at the outset that the focus of the investigation "was on whether Cresson engages in a pattern or practice of subjecting prisoners with serious mental illness to unnecessarily long periods of isolation, failing to prevent suicide and other self-harm, and failing to provide prisoners with adequate mental health treatment." *DOJ Report* at 4.

58.     The DOJ conducted a site visit from March 19-22, 2012, interviewing administrative staff, security staff, medical and mental health staff, and prisoners. They reviewed copious documentation pertaining to the subject of the investigation. DOJ met with PADOC leadership and Defendant Cameron on October 10, 2012 to report their concerns. *Id.* at 4-5

59.     Defendants had received notice after notice of unconstitutional conditions at SCI Cresson, yet even by October 2012 the PADOC had failed to address the DOJ's "central concerns." *Id.*

60.     Brandon, who had a serious mental illness and was repeatedly subjected to solitary confinement, committed suicide more than 7 months after Defendants were placed under investigation for precisely the type of treatment that caused Brandon's death.

61.     This was not the first suicide in SCI Cresson's RHU. Fourteen months earlier, on May 6, 2011, a prisoner who had been diagnosed by the PADOC with "delusional disorder and

---

2 Department of Justice Office of Public Affairs, "Justice Department Opens Investigation into Two Western Pennsylvania State Correctional Institutions," December 1, 2011.

Exhibit C

Case 3:22-cv-02308-GPC-J Document 7 Filed 7/04/1/24 Page 10 of 115
**Case 3:05-mc-02025 Document 58 Filed 07/08/14 Page 10 of 25**
Case No. 23-cv-308-SE-AJ

personality disorder with paranoid and narcissistic features" committed suicide in SCI Cresson's RHU after being warehoused for approximately nine consecutive months in solitary confinement in two PADOC prisons.

62.     One month prior, on April 6, 2011, this prisoner had threatened self-harm and suicide. Nevertheless, "he received virtually no out-of-cell time." Although a psychiatrist described him as "still paranoid delusional" during a cell-side visit, he was not provided any treatment. Ten days after the cell-side visit, he committed suicide. *Id.* at 9-10.

63.     In addition to the May 2011 suicide, Defendants were further put on notice of the obvious nature of the harms inflicted on mentally ill prisoners when placed in solitary confinement and denied mental health treatment. In 2011, 14 of the 17 documented suicide attempts at SCI Cresson occurred in the solitary confinement units. Further, "[SCI] Cresson's records show that in 2011, there were dozens of incidents involving prisoners on the mental health roster engaging in self-harm in the isolation units, while just two such incidents occurred in the general population." *Id.* at 9.

64.     The DOJ investigation discovered a wide array of policies and practices that were responsible for systemic deficiencies in SCI Cresson's treatment of mentally ill and intellectually disabled prisoners. These policies and practices include:

>   a.   Serious mental illness was "punished rather than treated" at SCI Cresson. Staff working in the solitary confinement units were "encouraged to use punitive behavior modification plans to address behaviors that are derivative of prisoners' serious mental illness." *Id.* at 15.

>   b.   Deprivations of basic human needs were frequently employed by staff as a response to behaviors caused by mental illness, including deprivations of mattresses, warm food, reading materials, out-of-cell time, showers, phone calls and visits. *Id.* at 16.

>   c.   A culture of abuse flourished in the solitary confinement units, as "officers and staff [were] frequently hostile and cruel toward prisoners, even while knowing that these prisoners are more vulnerable because of their serious

Exhibit C

mental illnesses or intellectual disabilities." This cruelty includes SCI Cresson officials "countenanc[ing] the frequent, unnecessary, and excessive use of force on prisoners with serious mental illness housed in the isolation units." *Id.*

d. There was "a system-wide failure of security staff to consider mental health issues appropriately and a marginalization of the concerns of the mental health staff." This was a contributing causal factor to the "unconstitutional use of prolonged and extreme isolation on prisoners with serious mental illness." *Id.* at 20.

e. The mental health care program was "fragmented and ineffective." There was "a dearth of mental health treatment for prisoners throughout [SCI Cresson]; the absence of a secure residential treatment unit for prisoners who require such placement; and inadequate coordination among mental health care providers." *Id.* at 23.

f. The prison was insufficiently staffed with enough mental health professionals to meet the mental health care needs of the prisoner population. *Id.*

g. SCI Cresson suffered from "[p]oor screening and diagnostic procedures" that contributed to "system-wide inadequacies." Mental health needs of prisoners on the mental health roster were "routinely understated" and "under-classified" in such a manner as to diminish or deny the seriousness of their condition. *Id.* at 24.

h. Psychiatric and psychology staff were not integrated, utilized different and overlapping records, held duplicative meetings, and failed to transcribe or memorialize meetings and decisions made therein, thus contributing to a dysfunctional system that undermined continuity of care. *Id.* at 25.

i. Deficient oversight mechanisms, including the failure to collect necessary information on critical incidents, such as acts of self-harm, impaired SCI Cresson's ability to remedy patterns of harm. "The severity of the harm and its concentration in the isolation units should have prompted the Prison to track this information." *Id.* at 26.

65. These systemic deficiencies were responsible for SCI Cresson's failure to adhere to the minimal components of a constitutional prison mental health care system. SCI Cresson did not have:

a. A systematic program for screening and evaluating prisoners to identify those in need of mental health care;

Exhibit C

Case 1:23-cv-00308-SE-AJ   Document 7   Filed 10/11/24   Page 21 of 115
Case 3:05-mc-02025   Document 58   Filed 07/08/14   Page 12 of 25
Case No. 23-cv-308-SE-AJ

b. A treatment program that involves more than segregation and close supervision of mentally ill prisoners;
c. Employment of a sufficient number of trained mental health professionals;
d. Maintenance of accurate, complete and confidential mental health treatment records;
e. Administration of psychotropic medication only with appropriate supervision and periodic evaluation; and
f. A basic program to identify, treat, and supervise prisoners at risk for suicide.

66.    All Defendants were aware of the risks presented and harms inflicted by an inadequate system of mental health care based on the record of self-harm, suicide attempts, and suicides in the solitary confinement units at SCI Cresson, along with the obvious nature of the risks and harms of depriving seriously mentally ill and intellectually disabled prisoners of social interaction, environmental stimulation, and mental health care.

67.    The PADOC's Access to Mental Health Care Policy explicitly states that "placement in RHU/SMU/LTSU [i.e. solitary confinement]" could increase the potential for suicide due to the inherent stress of such confinement. Access to Mental Health Care, Policy 13.8.1, § 2.H(1)(c)(8).

68.    Despite this awareness, Defendants failed to take remedial measures, instead displaying a deliberate indifference and engaging in willful misconduct.

69.    SCI Cresson's lack of a systematic program for screening and evaluating prisoners in need of mental health care caused officials to understate, delay, and ignore Brandon Palakovic's need for mental health care during his confinement at SCI Cresson.

70.    SCI Cresson substituted solitary confinement for treatment by repeatedly placing Brandon Palakovic in solitary confinement in the RHU on account of his serious mental illness.

71.    SCI Cresson failed to employ sufficient numbers of mental health professionals to provide mental health treatment to prisoners in need. As a consequence, Brandon Palakovic was deprived of needed treatment.

Exhibit C

72.     For months at a time Brandon was denied any meaningful or clinically appropriate interaction with mental health staff. The occasions that he did engage in an interview with mental health staff were rendered meaningless by the lack of subsequent, sustained treatment.

73.     SCI Cresson failed to keep appropriate records of the mental health needs of prisoners, including Brandon Palakovic. Records were dispersed, duplicative, and not shared with all necessary staff members. The failure to properly maintain an integrated system of records available to critical mental health and security staff was a contributing cause in Brandon Palakovic being placed in solitary confinement on account of his mental health status.

74.     SCI Cresson failed to administer medication under appropriate supervision and periodic evaluation. Brandon Palakovic was provided medication without periodic evaluation. Although Brandon Palakovic told staff that he did not think his medication was working, this report was ignored.

75.     SCI Cresson did not have a basic program to identify, treat, and supervise prisoners at risk for suicide. Brandon Palakovic had a history of self-harm and suicide attempts and he was not provided treatment or supervision. The lack of a suicide prevention program was a contributing cause in the death of Brandon Palakovic.

## *Discrimination on the Basis of Disability*

76.     SCI Cresson denied prisoners with serious mental illnesses and intellectual disabilities the opportunity to participate in and benefit from a variety of prison services and activities, such as classification, security, housing, and mental health services. These same prisoners were also unnecessarily provided with unequal, ineffective, and different or separate opportunities to benefit from classification, security, housing, and mental health services. *Id.* at 31.

Exhibit C

Case 1:23-cv-00308-SE-AJ   Document 7   Filed 10/11/24   Page 23 of 115
Case 3:05-mc-02025   Document 58   Filed 07/08/14   Page 14 of 25
Case No. 23-cv-308-SE-AJ

77.    Brandon Palakovic was denied access to prison services and activities, including classification, security, housing, and mental health services on account of his serious mental illness and intellectual disability.

78.    SCI Cresson unlawfully isolated and warehoused prisoners with serious mental illness and/or intellectual disabilities in solitary confinement units, failing to individually assess such prisoners concerning the risk they actually and objectively pose to others. *Id.* at 31.

79.    Brandon Palakovic was repeatedly warehoused in solitary confinement without any individual assessment as to whether he posed an actual and objective risk to others.

80.    SCI Cresson failed to reasonably modify its policies, practices, and procedures in order to avoid discriminating against prisoners on the basis of disability. *Id.* at 31.

81.    Brandon Palakovic was discriminated against on the basis of his disabilities.

## *Role of Defendants in Unconstitutional Conduct*

82.    Defendant John Wetzel is the Secretary of PADOC. Defendant Wetzel was responsible for authorization, implementation, and oversight of the policies and practices governing the PADOC, including those policies and practices pertaining to solitary confinement and the RHU, disciplinary proceedings and punishment, medical and mental health care, staffing, and suicide prevention.

83.    Defendant Wetzel was aware of the psychologically painful conditions in SCI Cresson's solitary confinement units, the high rate at which prisoners with mental illness were placed there, the high rate of self-harm, suicide attempts and suicides, and the lack of adequate if any mental health treatment.

84.    Defendant Wetzel was aware and approved of the widespread policy and practice throughout the PADOC, including SCI Cresson, of warehousing prisoners in solitary confinement in the RHU on account of their mental illness and/or intellectual disability.

Exhibit C                                    14

85. Despite his knowledge of the risks and harms posed by these policies, practices, and conditions, Defendant Wetzel deliberately failed to take necessary corrective action.

86. Defendant Kenneth Cameron was Superintendent at the State Correctional Institution (SCI) Cresson. Defendant Cameron was responsible for authorization, implementation, and oversight of the policies and practices governing SCI Cresson, including those policies and practices pertaining to solitary confinement and the RHU, disciplinary proceedings and punishment, medical and mental health care, staffing, and suicide prevention.

87. Defendant Cameron was aware of the psychologically painful conditions in SCI Cresson's solitary confinement units, the high rate at which prisoners with mental illness were placed there, the high rate of self-harm, suicide attempts and suicides, and the lack of adequate if any mental health treatment.

88. Defendant Cameron was aware and approved of the policy and practice at SCI Cresson of warehousing prisoners in solitary confinement on account of their mental illness and/or intellectual disability.

89. Despite his knowledge of the risks and harms posed by these policies, practices, and conditions, Defendant Cameron deliberately failed to take necessary corrective action.

90. Defendant Jamie Boyles was Deputy Superintendent for Facilities Management at SCI Cresson. Defendant Boyles was responsible for implementation and oversight of the policies and practices governing SCI Cresson, including those policies and practices pertaining to solitary confinement and the RHU, disciplinary proceedings and punishment, medical and mental health care, staffing, and suicide prevention.

91. Defendant Boyles was a member of the Program Review Committee (PRC), which was responsible for oversight of the RHU, including review of the appropriateness of placement in the RHU for individual prisoners.

92.     Defendant Boyles was aware of the psychologically painful conditions in SCI Cresson's solitary confinement units, the high rate at which prisoners with mental illness were placed there, the high rate of self-harm, suicide attempts and suicides, and the lack of adequate if any mental health treatment.

93.     Defendant Boyles was aware and approved of the policy and practice at SCI Cresson of warehousing prisoners in solitary confinement on account of their mental illness and/or intellectual disability.

94.     Despite his knowledge of the risks and harms posed by these policies, practices, and conditions, Defendant Boyles deliberately failed to take necessary corrective action.

95.     Defendant Jamey Luther was Deputy Superintendent for Centralized Services at SCI Cresson. Defendant Luther was responsible for implementation and oversight of the policies and practices governing SCI Cresson, including those policies and practices pertaining to solitary confinement and the RHU, disciplinary proceedings and punishment, medical and mental health care, staffing, and suicide prevention.

96.     Defendant Luther was a member of the Program Review Committee (PRC), which was responsible for oversight of the RHU, including review of the appropriateness of placement in the RHU for individual prisoners.

97.     Defendant Luther was aware of the psychologically painful conditions in SCI Cresson's solitary confinement units, the high rate at which prisoners with mental illness were placed there, the high rate of self-harm, suicide attempts and suicides, and the lack of adequate if any mental health treatment.

98.     Defendant Luther was aware and approved of the policy and practice at SCI Cresson of warehousing prisoners in solitary confinement on account of their mental illness and/or intellectual disability.

Exhibit C

16
16

99.     Despite her knowledge of the risks and harms posed by these policies, practices, and conditions, Defendant Luther deliberately failed to take necessary corrective action.

100.    Defendant Dr. James Harrington was Chief Psychologist at SCI Cresson. As Chief Psychologist, Defendant Harrington was responsible for policies and practices of psychological services throughout the entire prison, including in the RHU.

101.    Defendant Harrington authorized and enforced policies and practices of warehousing mentally ill and/or intellectually disabled prisoners in solitary confinement, depriving them of necessary treatment, understating and under-classifying mental health needs, inadequate supervision and monitoring of prisoners on the mental health roster, and responding to requests for mental health care.

102.    Defendant Harrington instructed his subordinates to abide by such policies and practices, and prohibited mental health staff from speaking with prisoners in solitary confinement for more than 1-2 minutes at a time through solid steel doors.

103.    Despite his knowledge of the risks and harms posed by these policies, practices, and conditions, Defendant Harrington deliberately failed to take necessary corrective action.

104.    Defendant Rathore was the head of psychiatric care at SCI Cresson. He was employed by MHM, Inc. for purposes of mental health management of prisoners in custody of the PADOC.

105.    As Chief Psychiatrist, Defendant Rathore was responsible for policies and practices of psychiatric services throughout the entire prison, including in the solitary confinement units.

106.    Defendant Rathore authorized and enforced policies and practices of warehousing mentally ill and/or intellectually disabled prisoners in solitary confinement, depriving them of necessary treatment, understating and under-classifying mental health needs, inadequate supervision

Exhibit C

and monitoring of prisoners on the mental health roster, and responding to requests for mental health care.

107. Defendant Rathore failed to provide mental health treatment and psychiatric care to prisoners at SCI Cresson, instead replacing such necessary care with inadequately supervised medication regimens.

108. Defendant Rathore conducted his job in accordance with MHM, Inc.'s policy that limited his role to dispensing medication.

109. Despite his knowledge of the risks and harms posed by these policies, practices, and conditions, Defendant Rathore deliberately failed to take necessary corrective action.

110. Defendant Michelle Houser was a Unit Manager in SCI Cresson's Secure Special Needs Unit (SSNUU) and Special Needs Unit. Defendant Houser authorized and enforced a system of warehousing the mentally ill and/or intellectually disabled in the SSNU.

111. Defendant Houser enforced policies and practices that failed to identify or respond to mental health needs of prisoners, failed to identify, treat, and supervise prisoners on the mental health roster, and failed to operate a suicide prevention program.

112. Defendant Houser authorized and encouraged a culture of abuse wherein staff would engage in physical and verbal abuse of prisoners, subject them to deprivations of basic human needs, and deprive them of necessary mental health care.

113. By overseeing dysfunctional and non-therapeutic units that were purportedly treatment units, Defendant Houser played a contributing causal role in the unavailability of mental health treatment at SCI Cresson, which harmed prisoners such as Brandon Palakovic.

114. Despite her knowledge of the risks and harms posed by these policies, practices, and conditions, Defendant Houser deliberately failed to take necessary corrective action.

Exhibit C

18
18

115.    Defendant Morris Houser was a manager of the Mental Health Unit at SCI Cresson. Defendant Houser was responsible for policies and practices pertaining to the identification, tracking, treatment, and supervision of prisoners on the mental health roster at SCI Cresson.

116.    Defendant Houser authorized and enforced policies and practices of warehousing mentally ill and/or intellectually disabled prisoners in solitary confinement, depriving them of necessary treatment, understating and under-classifying mental health needs, inadequate supervision and monitoring of prisoners on the mental health roster, and responding to requests for mental health care.

117.    Despite his knowledge of the risks and harms posed by these policies, practices, and conditions, Defendant Houser deliberately failed to take necessary corrective action.

118.    Defendant Francis Pirozzola was Security Captain at SCI Cresson. Defendant Pirozzola authorized and enforced policies and practices of warehousing mentally ill and/or intellectually disabled prisoners in solitary confinement.

119.    As head of Security, Defendant Pirozzola played a substantial role in implementing and shaping the prison's RHU policies and practices. Defendant Pirozzola enforced a punitive approach to the mentally ill and intellectually disabled that subjected them to isolation on the basis of their disability.

120.    As head of Security, Defendant Pirozzola did not permit mental health concerns to influence classification practices, resulting in psychologically vulnerable prisoners being subjected to 23-24 hour per day solitary confinement.

121.    Defendant Pirozzola participated in the culture of abuse that thrived in the solitary confinement units at SCI Cresson, authorizing and permitting excessive use of force, deprivation of basic human needs, and deprivation of mental health care for prisoners in solitary confinement.

Exhibit C

122.     Despite his knowledge of the risks and harms posed by these policies, practices, and conditions, Defendant Pirozzola deliberately failed to take necessary corrective action.

123.     Defendant Shawn Kephart is Director of the Treatment Services Bureau of the PADOC, and at all relevant times was responsible for directing, monitoring, and assisting SCI Cresson in the delivery of prisoner treatment programs, including mental health care programs.

124.     Defendant Kephart was responsible for policies and practices of mental health care throughout the entire PADOC, including in the solitary confinement units.

125.     Defendant Kephart authorized and enforced policies and practices of warehousing mentally ill and/or intellectually disabled prisoners in solitary confinement in the RHU, depriving them of necessary treatment, understating and under-classifying mental health needs, inadequate supervision and monitoring of prisoners on the mental health roster, inadequate response to requests for mental health care, and an inadequate suicide prevention program.

126.     Despite his knowledge of the risks and harms posed by these policies, practices, and conditions, Defendant Kephart deliberately failed to take necessary corrective action.

127.     Defendant John Doe #1 was upon information and belief a Correctional Officer at SCI Cresson who issued Brandon Palakovic the misconduct report prior to his death.

128.     Defendant John Doe #1 issued the misconduct that sent Brandon to the RHU without taking into consideration Brandon's mental illness, or whether Brandon presented an objective threat to others.

129.     Despite his knowledge of the risks and harms posed to mentally ill prisoners in solitary confinement, John Doe #1 failed to take necessary corrective action.

130.     Defendant John Doe #2 was upon information and belief a Hearing Examiner at SCI Cresson who sentenced Brandon Palakovic to solitary confinement in the RHU prior to his death in disregard of Brandon's mental health and the minor nature of the offense.

Exhibit C

131.    Despite his knowledge of the risks and harms posed to mentally ill prisoners in solitary confinement, John Doe #2 failed to take necessary corrective action.

132.    Defendants John Does #3-6 were Correctional Officers employed in the RHU at SCI Cresson at all relevant times hereto who participated in creating hostile living conditions characterized by verbal and physical abuse, punitive behavior modification policies and practices, and deliberate refusal to aid prisoners in obtaining needed mental health care.

133.    Despite their knowledge of the risks and harms posed to prisoners subjected to such hostile living conditions, John Does #3-6 failed to take necessary corrective action.

134.    Defendant MHM, Inc. is under contract with the PADOC to provide mental health management services to prisoners throughout the system, including at SCI Cresson at all relevant times hereto.

135.    Defendant MHM, Inc. was responsible for policies and practices of psychiatric care throughout the entire PADOC, including in the solitary confinement units.

136.    Defendant MHM, Inc. authorized and enforced policies and practices of warehousing mentally ill and/or intellectually disabled prisoners in solitary confinement, depriving them of necessary treatment, understating and under-classifying mental health needs, inadequate supervision and monitoring of prisoners on the mental health roster, inadequate response to requests for mental health care, and an inadequate suicide prevention program.

137.    Defendant MHM, Inc. authorized and enforced policies that failed to provide mental health treatment to prisoners. Instead of treatment or psychiatric care, MHM, Inc. merely dispensed medication, failing to supervise prisoners, performing perfunctory and clinically inappropriate interviews, and ignoring the obvious risks of harm such policies and practices entail.

138.    Defendant MHM, Inc. authorized and enforced policies that enabled and permitted prisoners to be discriminated against on the basis of disability, denying them mental health services

Exhibit C

and subjecting them to solitary confinement in lieu of treatment. Despite its knowledge of the risks and harms posed by these policies, practices, and conditions, Defendant MHM, Inc. deliberately failed to take necessary corrective action.

# Causes of Action

## COUNT I – Deliberate Indifference to the Deprivation of Basic Human Needs

139.    Plaintiffs re-allege paragraphs 1-138 as if fully stated herein.

140.    All Defendants violated Brandon Palakovic's right to be free from cruel and unusual punishment under the Eighth and Fourteenth amendments of the U.S. Constitution by placing him in conditions of solitary confinement that are known to cause harm to psychologically vulnerable individuals like Brandon. On account of his mental health vulnerabilities, Brandon's solitary confinement deprived him of the basic human needs of environmental stimulation, social interaction, mental health, and physical health. All Defendants were deliberately indifferent to these deprivations.

## COUNT II – Deliberate Indifference to Serious Medical Needs

141.    Plaintiffs re-allege paragraphs 1-138 as if fully stated herein.

142.    All Defendants violated Brandon Palakovic's right to be free from cruel and unusual punishment under the Eighth and Fourteenth amendments of the U.S. Constitution through their deliberate indifference to his serious medical need for mental health care.

## COUNT III – Discrimination on the Basis of Disability

143.    Plaintiffs re-allege paragraphs 1-138 as if fully stated herein.

144.    All Defendants violated Brandon Palakovic's rights under the Americans with Disabilities Act by denying him access to services, programs, and activities available at SCI Cresson on account of his serious mental illness.

Exhibit C

145.    All Defendants violated Brandon Palakovic's rights under the Americans with Disabilities Act by refusing to make a reasonable accommodation that would enable Brandon to have access to services, programs, and activities available to prisoners without serious mental illness.

## COUNT IV – Wrongful Death

146.    Plaintiffs re-allege paragraphs 1-138 as if fully stated herein.

147.    The following individuals are eligible to recover damages as a result of Brandon Palakovic's death pursuant to 42 Pa. C.S.A. § 8301: Renee and Darian Palakovic.

148.    During his lifetime, Brandon Palakovic did not commence any action for the injuries that caused his death and no other action has been filed to recover damages for the wrongful death of decedent.

149.    At all relevant times, all Defendants committed acts of willful misconduct and acted with reckless indifference, carelessness, and negligence in regard to the rights of Brandon Palakovic.

150.    As the direct and proximate result of the acts and omissions of all Defendants, Plaintiffs have suffered the following damages:

  a.  Expenses of administration related to Brandon Palakovic's death; and

  b.  All other damages permissible in a wrongful death action.

151.    As a direct and proximate result of Defendants' acts and omissions described in this complaint, Plaintiffs seek punitive damages.

## COUNT V – Survival Action

152.    Plaintiffs re-allege paragraphs 1-138 as if fully stated herein.

153.    Plaintiffs brings this survival action pursuant to 20 Pa. C.S.A. § 3373 and 42 Pa. C.S.A. § 8302.

154.    As a direct and proximate result of Defendants' acts and omissions, all Defendants are liable for the following damages:

Exhibit C

23
23

    a.   Brandon Palakovic's pain and suffering during his confinement in the

        PADOC, including prior to and at the time of his death;

    b.   Brandon Palakovic's total estimated future earning power;

    c.   Brandon Palakovic's loss of retirement and Social Security income;

    d.   Brandon Palakovic's other financial losses suffered as a result of his death;

    e.   Brandon Palakovic's loss of the enjoyment of life.

## Prayer for Relief

WHEREFORE, Plaintiffs request that the Court grant the following relief:

    A.    Award compensatory damages;

    B.    Award punitive damages;

    C.    Grant attorneys' fees and costs;

    D.    Such other relief as the Court deems just and proper.

## Jury Trial Demand

Plaintiffs demand trial by jury in all claims so triable.

Respectfully submitted,

*/s/ Bret D. Grote*
Bret D. Grote
PA I.D. No. 317273
Dustin McDaniel
PA I.D. No. 314618
Abolitionist Law Center
P.O. Box 8654
Pittsburgh, PA 15221
Telephone: (412) 654-9070
**bretgrote@abolitionistlawcenter.org**

Exhibit C

Case 3:05-mc-02025   Document 58   Filed 07/08/14   Page 25 of 25
Case 1:23-cv-00308-SE-AJ   Document 10   Filed 10/11/24   Page 34 of 115
Case No. 23-cv-308-SE-AJ

Healey and Hornack:

*/s/ Michael Healey*_____

By: Michael J. Healey
PA I.D. No. 27283
Jules Lobel, of counsel
Healey & Hornack
247 Ft. Pitt Boulevard, 4th Floor
Pittsburgh, PA 15222
Telephone: (412) 391-7711
**mike@unionlawyers.net**

*Attorneys for Plaintiffs*

Dated:  July 8, 2014

Exhibit C

25
25

**U.S. Department of Justice**



*Washington, DC 20530*

**MAY 3 1 2013**

The Honorable Tom Corbett
Governor's Office
225 Main Capitol Building
Harrisburg, PA 17120

Re:   Investigation of the State Correctional Institution at Cresson and Notice of
        Expanded Investigation

Dear Governor Corbett:

The Civil Rights Division has completed its investigation into the conditions of
confinement at Pennsylvania State Correctional Institution at Cresson ("Cresson"), conducted
pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997.
CRIPA authorizes the Department of Justice to seek equitable relief where prison conditions
violate the constitutional rights of prisoners in state correctional facilities.  Consistent with the
statutory requirements of CRIPA, we write to inform you of our findings.

After carefully reviewing the evidence, we conclude that the manner in which Cresson
uses isolation on prisoners with serious mental illness violates the Eighth Amendment of the U.S.
Constitution.  We also conclude that Cresson uses isolation in a way that violates the rights of
prisoners with serious mental illness, as well as prisoners with intellectual disabilities, under
Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134.

The manner in which Cresson uses prolonged isolation on prisoners with serious mental
illness subjects them to a risk of serious harm.[1]  Cresson routinely locks prisoners with serious
mental illness in their cells for roughly 23 hours per day for months, even years, at a time.  At
Cresson, the prolonged isolation is all the harder for many prisoners with serious mental illness
to endure because it involves harsh and punitive living conditions and, often, unnecessary staff-
on-prisoner uses of force.  Cresson often places prisoners with serious mental illness in isolation
automatically because of their mental illness, and it fails to ensure that such placements are
reviewed by mental health staff.  Once in these units, prisoners often receive inadequate mental
health care, with some receiving no therapy at all, and are often unreasonably denied access to
other services and programs.  The combination of these conditions and deprivations subjects

---

[1]  Cresson is a medium-security facility that uses isolation on prisoners with mental illness in the
Restricted Housing Unit, the Secure Special Needs Unit, and the Psychiatric Observation Cells.  In
Section IV.C. of this letter, we discuss the harsh conditions in each of Cresson's isolation units in greater
detail.

these prisoners with serious mental illness to unnecessary and excessive risks, and many prisoners at Cresson in these conditions have suffered physical and psychological harms, such as psychosis, trauma, severe depression, serious self-injury, or suicide.

Neither the interests of the Pennsylvania Department of Corrections ("PDOC") nor those of the Commonwealth of Pennsylvania are well served when one of its prisons subjects prisoners to conditions that deny prisoners with psychiatric disabilities the benefit of mental health treatment and exacerbate their mental illnesses. When the mental health of prisoners deteriorates, when their episodes of paranoia and psychosis intensify, and when they engage in behaviors more dangerous to themselves and others, taking care of them becomes more difficult and more dangerous for correctional officers and more expensive for the Commonwealth. Moreover, those living outside the prison's walls feel the negative impact of the prison's mistreatment of prisoners with serious mental illness when these prisoners return to the community.

We recently learned that PDOC may close Cresson later this year. Even if Cresson does close, we remain concerned about the PDOC policies and practices that allowed the violations of federal law to occur there. These same policies and practices may lead to similar problems at other facilities. Indeed, in the course of our investigation, we reviewed information suggesting that other PDOC facilities may inappropriately use prolonged isolation, under conditions similar to Cresson's, on prisoners with serious mental illness and intellectual disabilities. Therefore, in addition to informing you of our findings, this letter serves as notice of our intent to expand our investigation into the use of prolonged isolation on prisoners with serious mental illness and intellectual disabilities at PDOC's other facilities. We describe the scope of our investigation and our plan for conducting it efficiently and expeditiously at the conclusion of this letter.

Secretary John Wetzel, Superintendent Kenneth Cameron, and other PDOC officials have fully cooperated with our investigation. They have displayed a genuine interest in working constructively with us, and we look forward to working with them in the coming months.

## I.    SUMMARY OF FINDINGS

We have made the following determinations regarding the manner in which Cresson uses isolation:

- **Cresson's use of prolonged isolation on prisoners with serious mental illness has caused serious and obvious harm in many cases:** Over a hundred prisoners on the Facility's own mental health roster have spent several months at a time in isolation, while roughly two dozen have spent years in isolation. The manner in which Cresson uses prolonged isolation on prisoners with serious mental illness places them at risk of, and destabilizes their condition and leads to, various serious psychological and physiological harms. Though less than 10 percent of the Prison's total population is housed in one of the isolation units, in the last year and-a-half, 2 of the Prison's 3 suicides and 14 of 17 suicide attempts occurred there.

- **Cresson's use of prolonged isolation on prisoners with serious mental illness results in inadequate mental health treatment:** Cresson's use of prolonged isolation prevents prisoners with serious mental illness from obtaining the mental health treatment they need. This denial of adequate mental health care has led to serious harms, including trauma, decompensation, psychosis, physical injuries, and death.

- **Cresson subjects prisoners with serious mental illness to excessive force and other harsh conditions, resulting in an extreme form of isolation:** Cresson's isolation units are unnecessarily harsh punitive environments where prisoners with serious mental illness suffer under chaotic conditions and are frequently subjected to excessive uses of force.

- **Cresson's use of isolation discriminates against prisoners with serious mental illness:** Cresson unnecessarily and inappropriately places prisoners in solitary confinement because they have serious mental illness. Isolating prisoners on the basis of their mental illness constitutes impermissible discrimination where it unjustifiably denies those prisoners access to services and programs provided to most other prisoners.

- **Cresson's use of isolation also violates the rights of prisoners with intellectual disabilities:** Many of Cresson's prisoners with serious mental illness also have intellectual disabilities. There are also some prisoners who have intellectual disabilities, but no diagnoses of serious mental illness. Cresson has failed to make reasonable modifications to its policies, procedures, and practices to meet the needs of prisoners with intellectual disabilities in the general population, resulting in Cresson essentially warehousing them in one of the isolation units. Indeed, in the last two years, Cresson has subjected almost half of the prisoners it has identified as having intellectual disabilities to three or more continuous months of solitary confinement where they are denied meaningful services or activity.

- **Numerous systemic deficiencies contribute to the extensive use of isolation on prisoners with serious mental illness:** Cresson resorts to placing prisoners with serious mental illness in prolonged isolation in unnecessarily restrictive conditions primarily because of system-wide deficiencies that interfere with its ability to provide adequate mental health treatment. Too often, instead of providing appropriate mental health care, Cresson's response to mental illness is to confine vulnerable prisoners in its isolation units without meaningful services or activity. This approach has resulted in Cresson disproportionately placing prisoners with serious mental illness in inappropriate and unnecessarily restrictive environments. At the time of our investigation, prisoners with mental illness comprised less than 30 percent of the Facility's overall prisoner population but represented more than 60 percent of those housed in the isolation units. Thus, the prisoners at Cresson who suffer the most in isolation and are the most ill-suited to it are precisely the ones subjected to isolation most often.

The systemic deficiencies that lead the Facility to resort to isolating those with serious mental illness include:

- A system-wide failure of security staff to consider mental health issues appropriately and a marginalization of the concerns of the mental health staff;

- A mental health treatment program that fails to identify prisoners requiring treatment, lacks adequate staffing, functions in a disjointed and fragmented manner, has little in the way of treatment programming, and lacks a functioning secure residential treatment unit; and

o Oversight mechanisms that fail to monitor or address whether harm may result from Cresson's isolation practices and lack of treatment for prisoners with serious mental illness.

These factual findings give us reason to conclude that Cresson's practices violate the Eighth Amendment's prohibition against "cruel and unusual punishments." "Prisoners retain the essence of human dignity inherent in all persons." *Brown v. Plata*, 131 S. Ct. 1910, 1928 (2011). The Eighth Amendment requires prisons to provide humane conditions of confinement, and prison officials cannot be deliberately indifferent to serious medical and mental health needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1978). Embodying "broad and idealistic concepts of dignity, civilized standards, humanity, and decency," *id.* at 102, the Amendment prohibits officials from disregarding conditions of confinement that subject prisoners to an excessive risk of harm. *Farmer v. Brennan*, 511 U.S. 825, 843 (1970).

The practices described in this letter also violate the ADA's requirement that qualified individuals with disabilities, including prisoners, not be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a). Further, among others, the ADA's Title II regulations require correctional entities to administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified prisoners with disabilities and to make reasonable modifications to policies, practices, and procedures when necessary to avoid discrimination on the basis of disability. *See* 28 C.F.R. §§ 35.130(b)(7), (d) (1991); *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998); *Chisolm v. McManimon*, 275 F.3d 315, 324-25 (3d Cir. 2001). Cresson's practices identified in this letter violate these provisions.

## II.    INVESTIGATION

On December 1, 2011, we notified you that we were opening an investigation into the conditions of confinement at Cresson. The focus of our investigation was on whether Cresson engages in a pattern or practice of subjecting prisoners with serious mental illness to unnecessarily long periods of isolation, failing to prevent suicide and other self-harm, and failing to provide prisoners with adequate mental health treatment. In the course of the investigation, other issues of concern came to our attention, including unnecessary uses of force by staff on prisoners with serious mental illness and the use of isolation on prisoners with intellectual disabilities.

On March 19-22, 2012, we conducted an on-site inspection of Cresson with an expert consultant in mental health treatment and suicide prevention and an expert consultant in corrections security. We interviewed administrative staff, security staff, medical and mental health staff, and prisoners. We reviewed an extensive number of documents, including policies and procedures, medical and mental health records, cell histories, incident reports, investigative reports, disciplinary reports, administrative audit reports, prisoner grievances, unit logs, orientation materials, and training materials. We observed prisoners in various settings throughout the Facility. Consistent with our commitment to provide technical assistance and conduct a transparent investigation, we conducted exit conferences upon the conclusion of our visit.

We met with PDOC leadership and Superintendent Cameron on October 10, 2012, to share our consultants' concerns about information we received during our investigation and to receive an update on PDOC's and Cresson's response to the deficiencies outlined at the end of our March visit.  PDOC and Cresson provided us with information regarding new initiatives to improve the mental health and suicide prevention programs at Cresson and throughout the PDOC system.  While we commend PDOC and Cresson for considering these initiatives, most are still in the early planning stage, and our central concerns have not yet been addressed.

## III.    BACKGROUND

Cresson, which formerly served as a center for prisoners with serious mental illness, opened in 1987 as a medium-security male correctional institution.  At the time of our investigation, Cresson housed approximately 1,600 prisoners.  Of those, approximately 250 were housed in specialized housing units.

Three of the specialized housing units operate as isolation units.  **For purposes of this document, the terms "isolation" or "solitary confinement" mean the state of being confined to one's cell for approximately 22 hours per day or more, alone or with other prisoners, that limits contact with others.** *Compare Wilkinson v. Austin*, 545 U.S. 209, 214, 224 (2005) (describing solitary confinement as limiting human contact for 23 hours per day); *Tillery v. Owens*, 907 F.2d 418, 422 (3d Cir. 1990) (21 to 22 hours per day).  An isolation unit means a unit where either all or most of those housed in the unit are subjected to isolation.

Cresson's three isolation units are:

- **The Restricted Housing Unit ("RHU"):**  Prisoners are housed in the RHU for violating prison rules (disciplinary segregation) or threatening the security of others (administrative segregation), or to protect them from significant threats to their own safety (protective custody).  Regardless of why they find themselves in the RHU, prisoners housed there are subjected to conditions that, taken together, have a punitive effect.  For approximately 23 hours per day, they are locked down in small cement cells (usually they are on their own, but sometimes, because of overcrowding, two prisoners must share the same RHU cell).  Severe restrictions are placed on their ability to engage in even basic activities, such as reading, and to have contact, even by phone, with loved ones and friends.  Prisoners are also exposed to intensive security measures, such as routine cell searches.  When we toured the Facility, 95 prisoners were housed in Cresson's RHU.

- **The Secure Special Needs Unit ("SSNU"):**  Cresson officials only house prisoners in the SSNU if they have serious mental illness, have had a number of placements in the RHU, and would otherwise be housed in the RHU.  Although the SSNU is supposed to be a therapeutic unit designed to address the serious mental health needs of prisoners who also require a more secure environment, very little mental health treatment is provided there.  Roughly two-thirds of the prisoners at the SSNU are confined to their individual cells for approximately 22 to 23 hours per day.  Generally, housing and living conditions in the SSNU are even more austere than in the RHU.  The SSNU housed 20 prisoners during our visit to the Facility.  At the time of our investigation, Cresson's SSNU was the second largest of the seven SSNUs in the PDOC system.

- **The Psychiatric Observation Cells ("POC"):**  Cresson houses prisoners who are mentally decompensating to the point of being considered a danger to themselves, other prisoners, and/or property in one of several POC cells.  Prisoners are confined to these cells for nearly 24 hours per day.

In the RHU and SSNU, cells are all less than 100 square feet in size.  Each cell contains a steel sink, a steel toilet, a steel desk, and a steel bed frame with a mattress.  The POC cells are similar to those in the RHU and SSNU but have no desks or sinks.  All of the isolation cells have solid metal doors with narrow slots at shoulder level, wide enough for food trays to pass through, and small plastic windows facing into the housing unit's common area.  At the RHU and POC, the cells have small exterior windows, but at the SSNU, there are no such windows, and cells have no natural light.[2]

The remaining two specialized housing units, both of which are *not* isolation units, are the following:

- **The Mental Health Unit ("MHU"):**  The MHU is for prisoners needing short-term inpatient mental health care.  Certified by the Pennsylvania Department of Public Welfare, the MHU receives admissions via the Pennsylvania civil commitment process and serves prisoners from other prisons in the region in addition to Cresson prisoners. The MHU housed eight prisoners during our visit.  Several other MHUs exist throughout the PDOC system.

- **The Special Needs Unit ("SNU"):**  The SNU is for prisoners who, as a result of their mental illness or other disability, are vulnerable and require additional support and/or protection.  Two-thirds of the prisoners housed there are double-celled; the other third are single-celled.  The SNU is considered general population housing in terms of security operations, permissible property, and out-of-cell time.  The SNU housed 130 prisoners during our visit.

Finally, a few additional terms used throughout this letter are defined as follows:

- **Serious Mental Illness:**  In the context of this letter, we rely on PDOC's own definition of what constitutes serious mental illness.  PDOC currently defines serious mental illness as "a substantial disorder of thought or mood that significantly impairs judgment, behavior, [or] capacity to recognize reality or cope with the ordinary demands of life." Pennsylvania Department of Corrections, *Policy 13.8.1.*, Section 2, Delivery of Mental Health Services § A.1.a.(2) (2010).

- **Intellectual Disability** is a disability characterized by a significant impairment in cognitive functioning and deficits in adaptive behaviors, such as communication, social skills, personal independence, and school or work functioning.

- **Intellectual Deficit** refers to preliminary indications of a potential intellectual disability, often on the basis of a low IQ, a review of documents, and/or observations of the prisoner.

---

[2]  In Section IV.C. of this letter, we discuss the harsh conditions in each of Cresson's isolation units in greater detail.

## IV.   THE MANNER IN WHICH CRESSON USES ISOLATION ON VULNERABLE PRISONERS VIOLATES THE EIGHTH AMENDMENT TO THE U.S. CONSTITUTION

Cresson uses isolation on prisoners with serious mental illness in a manner that violates their rights under the Eighth Amendment.  The Eighth Amendment prohibits prison officials from acting with deliberate indifference to conditions of confinement presenting a substantial risk of serious harm to prisoners.  *Farmer*, 511 U.S. at 828.  Deliberate indifference can be inferred where the risk of serious harm is obvious.  *Id.* at 842; *see also Hope v. Pelzer*, 536 U.S. 730, 738, 745 (2002) (finding officials deliberately indifferent where handcuffing prisoners to hitching posts for long hours resulted in an obvious and substantial risk of harm to prisoners); *Conn v. City of Reno*, 572 F.3d 1047, 1062 (9th Cir. 2009) (holding that officers may be liable for prisoner's suicide under deliberate indifference standard).  Our understanding of what constitutes serious harm is not static, and the Amendment therefore requires us to consider "the evolving standards of decency that mark the progress of a maturing society."  *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981); *see also Davenport v. De Robertis*, 844 F.2d 1310, 1314-15 (7th Cir.) (1988), *cert. denied*, 488 U.S. 908.

Cresson has ignored obvious and serious risks in its approach to the use of isolation on prisoners with serious mental illness.  It has done so by:  (A) unnecessarily placing them into isolation for prolonged periods of time despite clear evidence in numerous cases that such conditions pose risks; (B) denying them adequate mental health care while they languish in prolonged isolation; and (C) combining prolonged isolation with other extreme conditions and unnecessary uses of force.  These practices violate the Eighth Amendment.

### A.   Cresson's Use of Prolonged Isolation Subjects Prisoners with Serious Mental Illness to a Risk of Serious Harm

Cresson's practice of subjecting prisoners with serious mental illness to prolonged periods of isolation under the conditions described in this letter has resulted in harm, including trauma, bouts of hysteria and extreme paranoia, severe depression, psychosis, serious self-injury and mutilation, and suicide.  Though Cresson is aware of numerous serious harms suffered by prisoners with serious mental illness in its isolation units, it nonetheless continues to use the same dangerous isolation units for these same vulnerable prisoners for months, sometimes years, at a time.

Solitary confinement and other forms of isolation are increasingly being practiced across the nation.  The forms of isolation, the conditions in which prisoners are held, the availability of mental stimulus, physical activity, and access to treatment and social interaction vary greatly.  Prison authorities run afoul of the Eighth Amendment when they are "deliberately indifferent to the serious risks posed by subjecting [prisoners with serious mental illness] to confinement in [isolation] for extended periods of time."  *Ruiz v. Johnson*, 37 F. Supp. 2d 855, 915 (S.D. Tex. 1999), *rev'd on other grounds*, 243 F.3d 941 (5th Cir. 2001), *adhered to on remand*, 154 F. Supp. 2d 975 (S.D. Tex. 2001).

While the potentially harmful effects of subjecting prisoners to certain forms of solitary confinement have long been recognized, *see, e.g.*, *In re Medley*, 134 U.S. 160, 168 (1890) (Supreme Court discussing prisoners who were held in extreme forms of solitary confinement without access to other human beings and noting that, "[a] considerable number of prisoners fell, after even a short confinement [in isolation], into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed

suicide"),[3] more recently, courts have noted that special risks may exist when those placed in prolonged isolation have certain serious mental illnesses that make them especially vulnerable to such conditions. *Madrid v. Gomez*, 889 F. Supp. 1146, 1265-66 (N.D. Cal. 1995) (discussing particular conditions of isolation, and holding that some prisoners had mental health conditions that made them especially vulnerable to prolonged isolation, such that subjecting them "to conditions that are 'very likely' to render them psychotic or otherwise inflict a serious mental illness or seriously exacerbate an existing mental illness cannot be squared with evolving standards of humanity or decency"). As one court has put it, using prolonged isolation on prisoners who are, because of their serious mental illness, "at a particularly high risk for suffering very serious or severe injury to their mental health" can be "the mental equivalent of putting an asthmatic in a place with little air to breathe." [4] *Id.* Mental health experts, opining in the profession's standards of practice, have recognized that "[p]rolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates." American Psychiatric Association, *Position Statement on Segregation of Prisoners with Mental Illness* (2012); *see also* American Bar Association, *Standards for Criminal Justice Standards: Treatment of Prisoners* ("ABA Standards") §§ 23-1.0(o), 23-2.8(a) (2011) (stating that prisoners diagnosed with serious mental illness should not be placed in isolation for more than 30 days because of its damaging effects); *Casey v. Lewis*, 834 F. Supp. 1477, 1548 (D. Ariz. 1993) (noting that "both the plaintiffs' and defendants' experts agreed that it was inappropriate to house acutely psychotic inmates in [isolation] for more than three days").

Moreover, long-term segregation of prisoners with mental illness may often be counterproductive to prison security or public safety. A commission chaired by former United States Attorney General Nicholas Katzenbach and Third Circuit Judge John J. Gibbons concluded: "The increasing use of high-security segregation is counter-productive, often causing violence inside facilities and contributing to recidivism after release."[5] Instead, General Katzenbach and Judge Gibbons recommended: "Caring for those who cannot be housed in the general prisoner population requires investing in secure therapeutic units inside prisons and jails staffed by mental health professionals who can handle troubled individuals without locking them in their cells all day." *Id.* at 61.

Notwithstanding the serious risks that may result from subjecting prisoners with serious mental illness to prolonged isolation, Cresson's staff routinely subject prisoners they have

---

[3] More recently, the Third Circuit has also recognized that that "prison authorities may [not] turn a blind eye to the mental and emotional state of prisoners" housed in isolation. *Peterkin v. Jeffes*, 855 F.2d 1021, 1030 (3d Cir. 1988) (nevertheless finding that conditions were not unconstitutional); *see also Jones 'El v. Berge*, 164 F. Supp. 2d 1096, 1117 (W.D. Wis. 2001) ("Prisoners in [isolation] who have no history of serious mental illness and who are not prone to psychiatric decompensation (breakdown) often develop . . . diagnoses such as paranoid delusional disorder, dissociative disorder, schizophrenia and panic disorder."); *Ruiz*, 37 F. Supp. 2d at 907 ("[Isolation] units are virtual incubators of psychoses–seeding illness in otherwise healthy inmates . . . .").

[4] *See also* Jules Lobel, *Prolonged Solitary Confinement and the Constitution*, 11 U. PA. J. CONST. L. 115 (2009).

[5] John J. Gibbons and Nicholas de B. Katzenbach, *Confronting Confinement, A Report of the Commission on Safety and Abuse in America's Prisons*, 14 (2006), http://www.vera.org/sites/default/files/resources/downloads/Confronting_Confinement.pdf.

already identified as having serious mental illness to months, even years of solitary confinement. From January 2010 to March 2012, 125 prisoners on Cresson's active mental health roster spent 90 days or more in isolation,[6] and 27 of those spent one year or more in isolation. At the SSNU, a unit specifically designed to house prisoners with serious mental illness, each of the 28 prisoners who exited the SSNU in the two years preceding our review (2010-2012) spent an average of more than 656 days in isolation.[7]

Not only is the isolation often objectively long, but for prisoners at Cresson's SSNU, the isolation feels like it will never end. These prisoners are surrounded by others like them who almost never make it out of isolation (since 2010, only 5 of the 48 prisoners in Cresson's SSNU program have "graduated" out of isolation). According to our mental health consultant, prisoners "are provided no information about what is specifically expected of them to advance [out of isolation] and often remain 'stuck' . . . ." Our consultant went on to opine that advancement "appears to be based upon the subjective assessment of staff" with no "objective criteria . . . such as completion of a particular course of treatment or a specific time period without rule infractions." As one of the prisoners we spoke to told us, confinement at the SSNU "feel[s] like it will last for the rest of [your] life." A grossly disproportionate amount of the self-harm at Cresson occurs in its isolation units. Although Cresson houses most of its prisoners with serious mental illness in one of the non-isolation units, most of the self-harm involving prisoners with serious mental illness occurs in the isolation units. For instance, in 2011, 14 of the Prison's 17 documented suicide attempts occurred in the isolation units. In the last two years, two of the three prisoners who committed suicide were housed in one of the isolation units when they took their lives. Moreover, Cresson's records show that in 2011, there were dozens of incidents involving prisoners on the mental health roster engaging in self-harm in the isolation units, while just two such incidents occurred in the general population.

Below are examples of prisoners at Cresson who have suffered serious harm after prolonged periods of solitary confinement and inadequate treatment:

- On May 6, 2011, prisoner AA,[8] diagnosed by PDOC with delusional disorder and personality disorder with paranoid and narcissistic features, committed suicide after

---

[6] Based on a review of documents that include records of diagnoses, we and our expert consultant in mental health are confident that most of these prisoners have serious mental illness. Cresson separates its active mental health roster into two categories: (1) those prisoners designated as having "the most serious need for mental health services;" and (2) those designated as having a "present mental health need." Our expert consultant was clear that not only may prisoners in both of these categories have serious mental illness, but that Cresson far under-designates those having the most serious need for mental health services. The vast majority of the prisoners on the mental health roster who spent extended periods of time in isolation have a serious mental illness, and the proportion increases as the duration in isolation increases, further demonstrating the use of isolation in response to challenging behaviors associated with mental illness.

[7] For most of those with serious mental illness at Cresson who have spent more than 30 days in solitary confinement, their time in isolation is spent entirely in Cresson's isolation units. However, for a minority, the time in isolation consists of periods of confinement in both Cresson's isolation units and the isolation units of other PDOC facilities. The average indicated for those in the SSNU does *not* include time spent in the isolation units of other PDOC facilities. For some of prisoners, their time in Cresson's SSNU followed lengthy periods of isolation at other facilities.

[8] To protect the identity of prisoners, we use coded initials throughout this letter.

spending roughly nine months in isolation, consisting of three months at Cresson's RHU and six months at the RHU of another PDOC prison. After reviewing his records, our consultant told us that, following an April 6, 2011, POC placement for threatening suicide and self-harm, he received virtually no out-of-cell time. During a cell-side visit by a psychiatrist, he was described as "still paranoid delusional" but, despite the prisoner's active psychosis, the plan was merely to "re-check in 1 month." Ten days later, while still in isolation in the RHU, he committed suicide.

- In October 2010, prisoner BB, diagnosed by PDOC with schizoaffective disorder and major depressive disorder with psychotic features, tore open his scrotum with his fingernail while housed at the RHU after experiencing isolation and a lack of adequate treatment there for three months. In the three days preceding this incident, BB cut his arm with a staple, smeared feces on himself while complaining of hearing voices, and tore off a fingernail. After the incident involving BB injuring his scrotum, he told staff that "mental health won't listen to me so I'm pulling my nuts out." Instead of responding to this incident and the other instances of self-harm by providing him with the long-term treatment he needed, Cresson returned him to isolation after less than a month of treatment. Ten days later, he cut his wrists with a razor.

- Prisoner CC has been diagnosed by PDOC with schizophrenia and has a past diagnosis of an intellectual disability, a history of psychiatric hospitalization starting at age eight, and an IQ of 55. In July 2011, after spending nearly a year and-a-half in isolation, he had decompensated to the point of becoming an immediate threat to himself or others and was transferred to the inpatient treatment unit at the MHU (his third admission to the MHU in that year and-a-half). Nonetheless, ignoring CC's history of decompensation while in isolation, after three weeks at the MHU, Cresson officials returned him to isolation at the SSNU. There, his condition deteriorated again. He ingested objects such as sandwich bags and spoons. He cut his wrists. He tied a sheet around his neck. Cresson staff inappropriately minimized these serious acts of self-injury as "behavioral issue[s]." Then, when he swallowed a nurse's lancet (a plastic device containing a spring loaded needle), he had to be hospitalized and undergo surgery for the serious injuries he sustained. Again ignoring CC's extensive history of self-harm and decompensation while in isolation, after one month at the infirmary, staff again returned CC to isolation at the SSNU and failed to provide him with adequate treatment. CC remained desperate to get out of isolation, telling one of the staff psychologists, "I'm sick in the head, I'm psycho. . . . I'm just sitting in a dark cell with nothing to do."

- In December 2011, prisoner DD, who has an IQ of 70 and was diagnosed by PDOC with multiple mental illnesses, attempted to cut his throat with a razor after nearly five consecutive months in isolation at the RHU. DD had made several other suicide attempts and engaged in other instances of self-harm before this incident, including an August 2010 hanging attempt in an SSNU strip cage and an April 2010 hanging attempt at the SNU. Despite DD's suicide attempts and self-harm while in isolation and his multiple diagnoses, after placing him in the inpatient treatment unit at the MHU for a month, Cresson officials ignored these repeated warning signs regarding the risk of harm to the prisoner and returned him to an isolation cell at the RHU, where he remained at the time of our tour. At the SSNU, DD told us, "Here [in isolation] there's a lot of emptiness filled by other people's noises. The others prey on us – the [prisoners with serious

mental illness], the weak." There is "nothing to occupy your mind, just inmates and [corrections officers] taunting you."

- PDOC has diagnosed prisoner EE as having a schizoaffective disorder and an intellectual disability. When we toured in March 2012, EE was on his fifteenth month of isolation at Cresson. He had threatened or attempted self-harm or suicide at least 15 times during that period. In July 2011, after EE was in isolation for seven months, staff reported instances of him banging his head on the cell wall, smearing feces all over the cell, tearing the dressing off a hip wound, and digging his fingers into it to get it to bleed. Despite the prisoner's repeated self-harm while in isolation and his diagnoses, authorities held him in isolation for another eight months. Altogether, EE has spent roughly 7 of the last 12 years in isolation in PDOC facilities. EE told us that "isolation makes me want to rip my face off."

By not taking reasonable steps to address the risks described above, prison officials at Cresson have been deliberately indifferent.

## B. Prisoners Subjected to Prolonged Isolation at Cresson Are Denied Adequate Mental Health Treatment

By subjecting prisoners with serious mental illness to prolonged periods of isolation, Cresson routinely prevents them from receiving adequate mental health treatment. Cresson officials cannot ignore conditions of confinement that have the obvious effect of preventing prisoners with serious mental illness from obtaining the mental health care they need. *See Estelle*, 429 U.S. at 103-05; *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 763 (3d Cir. 1979). At Cresson, prisoners with serious mental illness cannot receive adequate mental health care while in solitary confinement for extended periods of time. *Coleman v. Wilson*, 912 F. Supp. 1282, 1320-21 (E.D. Cal. 1995) (adopting the magistrate judge's conclusion that "inmates are denied access to necessary mental health care while they are housed in [isolation]"); *see also Plata*, 131 S. Ct. at 1933 (acknowledging the concern that prolonged isolation results in inappropriate delays of mental health care); *Griffin v. Vaughn*, 112 F.3d 703, 709 (3d Cir. 1997) (noting availability of mental health treatment as a critical factor for assessing constitutionality of prolonged isolation but finding no violation where prisoner did not have mental illness).

According to our consultant on mental health and corrections, isolating prisoners with serious mental illness for prolonged periods often prevents them from receiving the therapeutic treatment they need at Cresson. Specifically, providing adequate mental health care to prisoners with serious mental illness requires meaningful out-of-cell activities, such as individual and group therapy, peer and other counseling, or skills building, as well as unstructured activities, such as showers, recreation, or eating out-of-cell.

The severe form of isolation used at Cresson – which often involves isolating the prisoner for 23 hours per day or more and depriving them of mental health care and other human interaction – prevents prisoners with serious mental illness from receiving even a fraction of the out-of-cell activities they need. At Cresson's RHU, prisoners identified by Cresson as having serious mental illness are offered zero hours of structured out-of-cell therapeutic activity and at most five hours of unstructured out-of-cell activity per week. Our consultant told us that the

Case No. 23-cv-308-SE-AJ

prisoners with serious mental illness she observed at the RHU were "provided no treatment whatsoever except psychotropic medications (if they agreed to take them)."[9]

Prisoners placed into Cresson's POC, ostensibly to monitor them for suicidality or self-injurious behavior, often arrive there from and quickly return to another isolation unit. Conditions in the POC simply make placement there a part of prisoners' longer period of isolation. Many prisoners who experience this cycling through the POC are identified by Cresson as having serious mental illness and continue to be offered zero out-of-cell hours, despite their obvious need for treatment and other activities. Our consultant concluded that Cresson provides grossly inadequate mental health treatment at the POC and makes no effort to truly stabilize the prisoner before returning him to another isolation unit, where he will continue to deteriorate. She explained that, in the POC, "[t]here is little [therapeutic] intervention provided to inmates other than a psychiatric assessment within 72-hours of admission, monitoring by nursing staff and observation by correctional officers."

Even though all of the prisoners in Cresson's SSNU program have serious mental illness, prisoners there typically receive fewer than two hours of structured therapy per week, though many receive none. For unstructured out-of-cell activity, roughly half receive fewer than four hours per week.[10] Former mental health staff told us that SSNU management actively prevented them from providing meaningful treatment, instructing them to shorten the number and length of therapy sessions and to conduct "drive-bys."

Notably, one of Cresson's own psychiatrists explained to us the effect isolation has on his ability to provide adequate treatment. He told us that isolation can create "animal-like" characteristics in prisoners. He also admitted that at least some of the therapy the prisoners needed could not be provided to them while they remained in solitary confinement. According to this psychiatrist, individuals he treats at a nearby forensic hospital fare much better than his patients at Cresson because the hospital's patients are not in solitary confinement and can more readily access mental health care.

Staff are also inhibited in their ability to identify prisoners who are decompensating or at risk for suicide. *See Coleman*, 912 F. Supp. at 1298 n.10 (noting that identifying prisoners at risk of suicide is one of the six basic components of a minimally adequate prison mental health care delivery system); *see also Madrid*, 889 F. Supp. at 1259 (emphasizing the need for "adequate monitoring . . . on far more than just isolated occasions, particularly in the [isolation units]"). At Cresson, the practice of routinely leaving prisoners with serious mental illness locked away in cells behind solid doors with small cell-front windows interferes with mental health staff's ability to adequately identify and monitor those with acute symptoms in need of intervention.

---

[9] Much of the mental health therapy prisoners with serious mental illness at Cresson receive is provided during cell-side visits. These visits in no way make up for the absence of meaningful out-of-cell therapeutic activity. Cell-side visits at Cresson involve mental health staff standing outside prisoner cells attempting to speak to the prisoners through cracks in door frames or food tray slots, amid the commotion on the unit. Such visits typically last for only a few minutes at a time, lack confidentiality, and cannot, on their own, be equated with structured, out-of-cell activity.

[10] The data about out-of-cell hours in this paragraph remains true nearly seven months after our expert consultant provided Cresson staff with her assessment of their mental health program following our tour.

The following examples illustrate how prisoners in prolonged isolation at Cresson often were unable to obtain the mental health treatment they need:

- On July 16, 2012, prisoner FF committed suicide at the RHU where he had been placed a few days earlier for minor infractions.[11] Since his admission to Cresson in June 2011, he had spent multiple 30-day stays in isolation and, despite a history of self-harm and suicide attempts, he continued to be placed in isolation, eventually leading to his death. Less than two weeks before the suicide, a psychiatry note recorded that FF had requested and felt he could benefit from "one to one counseling." Ignoring both this request and FF's destabilized condition, the psychiatrist neither ordered the counseling nor referred him to Psychology. Psychology staff visited him in December 2011 but did not see him again until May 2012. His recommended June 2012 psychiatric visit did not occur until July 5, 2012, 11 days before his suicide.

- Between June 2011 and September 2012, prisoner GG, identified by PDOC as having an intellectual disability and impulse control disorder, attempted suicide four times and threatened self-harm six times while in isolation for all but one and-a-half months of that period. After reviewing his records, our consultant told us that GG was provided no continuity of mental health care, that staff simply react crisis by crisis, and that after a crisis he is returned to isolation where he receives inadequate follow-up care.

  As a specific example, on June 21, 2011, after attempting suicide by hanging in which his face turned blue in asphyxiation at the RHU, he was placed in the POC for a week and then returned to isolation at the RHU. Over the next month, he received no out-of-cell therapeutic activity and psychology staff conducted only three brief cell-side visits. After the last of these visits, a psychology staff member noted that GG was hearing voices. On July 27, 2011, he again was placed in the POC after attempting self-harm and threatening suicide. Nevertheless, he was then returned to isolation at the RHU on July 29, 2011, where he again received no mental health therapy and grossly inadequate follow-up psychiatric care. Four months later, still in isolation, GG again attempted to hang himself, this time by tying a sheet around his neck and anchoring it to a rail.

- PDOC has diagnosed prisoner HH with paranoid schizophrenia. For most of his time at Cresson, staff have housed him in an isolation unit instead of providing him the mental health care he needs. While isolated for extended periods of time, HH has experienced episodes of profound decompensation. For instance, in November 2011, after three months in isolation at Cresson's SSNU, staff found HH lying in the fetal position in his cell, mumbling incoherently to himself. Though staff responded by briefly moving HH to the MHU, where he received improved mental health treatment, in this instance (as with other instances like it), staff returned HH to isolation at the SSNU without stabilizing his condition and despite his history of decompensating in isolation.

---

[11] FF received a misconduct for "refusing to obey an order" and for "presence in an unauthorized area" after an officer ordered him to return to his cell and he refused. According to PDOC policy, both of these constitute less serious misconducts and are even eligible for an informal resolution rather than disciplinary time.

These examples illustrate how Cresson's practice of subjecting prisoners with serious mental illness to prolonged isolation routinely prevents them from receiving the treatment they need.

### C. Cresson Combines Prolonged Isolation With Other Harsh Conditions, Resulting in an Extreme Form of Isolation, Especially Harmful to Prisoners with Serious Mental Illness

Cresson combines prolonged isolation with other harsh conditions. Those conditions include forced idleness through the stripping away of stimuli, punitive behavior modification plans, and excessive uses of force by staff. The combining of these conditions leads to an extreme form of isolation that is especially harmful to the psyche of prisoners with serious mental illness.

A condition of confinement such as isolation may combine with other harsh conditions to produce a single, identifiable unconstitutional threat to a prisoner's mental health. *See Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (holding that when conditions of confinement combine to "have a mutually enforcing effect that produces the deprivation of a single, identifiable human need" they violate the Eighth Amendment). In other words, a combination of dehumanizing conditions may lead to an extreme form of isolation manifestly at odds with the Eighth Amendment's "evolving standards of decency." *See Young v. Quinlan*, 960 F.2d 351, 363-65 (3d Cir. 1992) (citing *Hutto v. Finney*, 437 U.S. 678, 685-87 (1978)) (holding that, under the totality of the circumstances, staff violated the Eighth Amendment when they placed a prisoner in isolation for four days, deprived him of running water, taunted him, and threatened to restrain him to a steel slab).

At Cresson, prisoners with serious mental illness are often subjected to a toxic combination of conditions that include: prolonged isolation, harsh housing conditions, punitive behavior modification plans, and excessive uses of force. These conditions, intended to control these prisoners' behavior, serve only to exacerbate their mental illness. Frequently, these conditions combine to do serious harm in the following way: a prisoner with serious mental illness is placed in isolation with inadequate mental health care, causing him to decompensate and behave negatively; staff respond by subjecting the prisoner to harsher living conditions, denying him stimuli, and/or using excessive force against him; the prisoner's mental health continues to deteriorate, and he begins to engage in self-injurious conduct (e.g., banging his head hard and repeatedly against a concrete wall, ingesting objects, or hurling himself against the metal furnishings of his room) or attempts to kill himself; staff eventually respond by placing him in the MHU – a unit where a limited amount of treatment is provided; as soon as the prisoner begins to stabilize, he is returned to isolation, and the prisoner's mental health again spirals downward.

Below we review the conditions that, *in combination,* make isolation at Cresson extreme:

**Baseline housing conditions in the isolation units are harsh.** The prison cell itself defines the contours of the prisoner's life. In the RHU and SSNU, cells are all less than 100 square feet in size. Each of the cells is barely large enough to contain its furnishings, consisting of a steel sink, a steel toilet, a steel desk, and a steel bed frame with a mattress. The POC cells are similar to those in the RHU and SSNU but have no desks or sinks. All of the isolation cells have solid metal doors with narrow slots at shoulder level wide enough for food trays to pass through, and small plastic windows, facing into the housing unit's common area. At the RHU

and POC, the cells have small exterior windows, but at the SSNU, there are no such windows, and cells have no natural light. While in their cells, prisoners hear other prisoners in the unit who are actively psychotic banging on doors or yelling. The banging and yelling they hear is frequent, loud, cacophonous, and stress-inducing.[12] The units also often reek of urine and feces, particularly in the SSNU.

In the isolation units, the out-of-cell conditions are also harsh. In the RHU and SSNU, staff allow most prisoners to have limited access to small, individualized, and caged exercise pens (the ones we observed in the SSNU were roughly 28 by 8 feet in size). In the isolation units, when a prisoner with serious mental illness receives out-of-cell therapy, the therapy is generally provided to the prisoner while he sits in a small cage roughly the size of a telephone booth. When moving between their cells and these out-of-cell facilities, prisoners are at all times escorted by officers and have their arms and legs shackled together.

Typically, staff prevent those in isolation, including those with serious mental illness, from having access to anything that could distract them from their idleness. None have access to television, most have no access to radio, and severe restrictions are placed on the amount of reading material a prisoner can have at any given time. One of the prisoners we spoke to in the SSNU – a prisoner who has attempted suicide on multiple occasions while in solitary confinement – told us he suffers in isolation, in large part, because he has absolutely nothing to do. He explained that while staff give him access to books, they are of no use to him because his intellectual disability prevents him from being able to read. For this prisoner, and others with serious mental illness, being left in a small cement cell, entirely alone with their thoughts, for months at a time, is mentally torturous and routinely leads to psychosis and a serious worsening of their mental health.

Most of the prisoners housed in the isolation units experience little in the way of human interaction. The typical prisoner rarely speaks to or sees others, except for when an officer peers through the prisoner's cell window during rounds, or the occasional mental health staff member asks about how he is doing. Facility staff severely limit the opportunities prisoners have to speak to friends or loved ones by telephone or during non-contact visits. The only human touch prisoners usually experience is when they are placed in handcuffs or restraints.

**Punitive approach to symptoms makes conditions in the isolation units even worse.** At Cresson, staff working in the isolation units are encouraged to use punitive behavior modification plans to address behaviors that are derivative of prisoners' serious mental illness. Our consultant severely criticized the Prison for over-relying on aversives, explaining that Cresson staff "have a misunderstanding that all behavior, even that which flows from untreated or under-treated serious mental illness is intentional misbehavior that must be punished rather than treated."

---

[12] Further contributing to the chaotic conditions at the SSNU is the placement there of some "RHU overflow prisoners" without mental illness because of a lack of space in the RHU. This blending of populations is harmful to both groups of prisoners. The RHU prisoners without mental illness yell at and abuse the SSNU prisoners with mental illness, while the RHU overflow prisoners are exposed to the unpleasant conditions that pervade the SSNU, especially the noise, odors, and frenzy that result from prisoners with serious mental illness becoming acutely symptomatic in the absence of mental health treatment.

Witnesses we spoke to, including members of the Facility's mental health staff, told us that aversives staff have used in response to behaviors mostly or entirely derivative of mental illness include: forcing the prisoner to sleep on cement slabs without a mattress; denying the prisoner access to warm food and instead giving him nothing but "food loaf" to eat;[13] denying access to reading materials; denying the prisoner access to the caged, exercise pens; denying the prisoner access to showers; and restricting or eliminating the prisoner's already limited ability to make phone calls or engage in non-contact visits with loved ones or friends.

Also, by policy and practice, SSNU staff routinely respond to the prisoner engaging in behaviors associated with serious mental illness (such as shouting, throwing feces, or banging his head against a wall) by further restricting or even eliminating whatever minimal amounts of therapeutic unstructured and structured out-of-cell time a prisoner has. This practice punishes the sickest of prisoners by depriving them of adequate treatment and other out-of-cell opportunities when they need it most. In the words of our consultant, "[t]he SSNU ... system actually withholds treatment from the most ill inmates. . . . On its face, this mental health program is set up backwards: sicker inmates should get the most intensive treatment."

**Staff hostility toward vulnerable prisoners with serious mental illness aggravates conditions in the isolation units.** The punitive approach to prisoners in the isolation units has risen to a level where officers and staff are frequently hostile and cruel toward prisoners, even while knowing that these prisoners are more vulnerable because of their serious mental illnesses or intellectual disabilities. For instance, three of Cresson's psychology staff told us that they had witnessed a senior member of the staff telling SSNU prisoners with intellectual disabilities that they had to sing, "I'm a little teapot" if they wanted to improve their living conditions and obtain more mental health treatment. When we asked one of the alleged victims about being required to sing in this way, the victim looked embarrassed and sad, and explained, "I just couldn't remember the song." Witnesses also told us that certain officers working in the SSNU withheld toilet paper from the prisoners, and that officers there tell prisoners to "go ahead and hang it up," encouraging them to commit suicide. One prisoner told us that he had seen officers make fun of another prisoner by demanding he tell them a certain number before giving him his food. "It was like they were testing his IQ, but in a mean way." Another prisoner said he is routinely called a "retard" by officers. Finally, many prisoners we interviewed described that officers would routinely withhold their food, spit in their food, or throw their food on the floor simply to taunt or provoke them. This hostility adds yet another layer of extremeness to the prolonged isolation prisoners with serious mental illness at Cresson are forced to endure.

**In the isolation units, staff's frequent use of unnecessary force on prisoners with serious mental illness also aggravates the harmful effects of solitary confinement.** Cresson officials have countenanced the frequent, unnecessary, and excessive use of force on prisoners with serious mental illness housed in the isolation units. *Cf. Hope*, 536 U.S. at 738-45 (holding that Alabama prison officials violated the Eighth Amendment and acted with deliberate indifference to a prisoner's health or safety when, despite the absence of an emergency, they knowingly subjected the prisoner to a substantial risk of physical harm and to unnecessary risk of physical pain by handcuffing his hands above shoulder height to a metal restraining post or "hitching post" for a seven-hour period, depriving him of bathroom breaks, exposing him to the heat of the sun, and taunting him). Many of the applications of force on prisoners with serious

---

[13] Food loaf is a bland mixture of vegetables, meat, and grains baked into a solid loaf.

mental illness at Cresson could be avoided entirely if the prisoners currently housed in isolation units were instead housed in therapeutic units providing adequate mental health treatment.

Among the unnecessary uses of force occurring in Cresson's isolation units are the excessive use of restraints and other practices involving prison officials acting with deliberate indifference toward prisoner safety. *Cf. Caldwell v. Luzerne Cnty. Corr. Facility Mgmt.*, 732 F. Supp. 2d 458, 471 (M.D. Pa. 2010) (involving placement of prisoners in five-point restraints for many hours). Full-body restraints that bind the prisoner's arms and legs to a stationary object, such as a bed or chair, are of particular concern because, under the best of conditions, they risk subjecting the prisoner to pain and mental stress, and when misapplied can easily result in cardiac difficulties, aspiration (breathing in of vomit), and positional asphyxia (death by respiratory obstruction).[14]

Because of the dangers associated with using full-body restraints, professional standards have been developed to delineate the scope of their use.[15] These standards require staff to only use full-body restraints in exigent circumstances, and only for the briefest time necessary to ensure the safety of the subject prisoner or those around him. As with all uses of force, staff have an obligation to explore alternatives to the use of full-body restraints as a means for controlling a prisoner's behaviors. Those alternatives include engaging in de-escalation techniques, giving the prisoner medicine, and/or providing additional mental health treatment.[16] Under current norms for using full-body restraints, their use should be closely and directly supervised and monitored by medical/mental health professionals, especially when they are used on prisoners with serious mental illness and for lengthy periods of time.

Departing from the well-established standards and alternatives noted above, correctional officers working in Cresson's isolation units use full-body restraints on the prisoners with serious mental illness not only to prevent imminent harm, but also to discipline or punish prisoners by using the restraints to cause discomfort or pain. We have good reason to believe full-body restraints are being misused in this way for a number of reasons.[17]

First, at Cresson, the average length of time that staff subject prisoners with serious mental illness to restraint chairs or four-point restraints is excessive. Our review of existing records concerning the use of full-body restraints in 2011 in Cresson's specialized units reveals

---

[14] Am. Psychiatric Ass'n, *Use of Restraint and Seclusion in Correctional Mental Health Care* (Dec. 2006).

[15] *See* ABA Standards (*citing Joint Comm'n on Accreditation of Healthcare Orgs., Preventing Restraint Deaths* (Nov 18, 1998)), http://www.jointcommission.org/assets/1/18/SEA_8.pdf; *Gen. Accounting Office, Mental Health: Improper Restraint or Seclusion Use Places People at Risk*, GAO/HEH-99-176 (1999).

[16] ABA Standards.

[17] At Cresson, two different restraint procedures may be used: security restraints and psychiatric restraints. While a shift commander authorizes security restraints, a psychiatrist must order psychiatric restraints. By policy, psychiatric restraints require face-to-face contact by a psychiatrist within 2 hours, constant monitoring by security staff, assessments by nursing staff every 15 minutes, and authorization by a psychiatrist to extend beyond 4 hours. Security restraints entail far less medical supervision and can be used for longer periods. Our mental health consultant found that at Cresson security restraints are often inappropriately substituted for psychiatric restraints for prisoners with serious mental illness.

that numerous prisoners with serious mental illness were placed in restraints for an average of 10.5 hours at a time, and on at least two occasions prisoners were held in restraint chairs for closer to 20 hours. When restrained, the prisoners typically were held in one fixed position in a windowless cement cell, were sometimes required to urinate while still in restraints, and wore only light smocks that left most of their bodies bare and exposed to the cold.

Second, at Cresson, restraints are oftentimes used when a prisoner with serious mental illness is already under control or not in a position to do further harm to himself or others. In 2011, staff video-recorded the initial application of restraints on a number of prisoners with serious mental illness, and we have reviewed a sampling of these recordings. Some of the recordings show that the prisoner involved was calm and compliant during the time period immediately preceding his placement in the full-body restraint. In other instances, documents indicate that the prisoner involved was in no condition to cause harm, having already seriously injured himself or just barely survived an attempted suicide. In such instances, the appropriate response is to take the prisoner to the clinic where he can receive medical and/or mental health treatment, not to place the prisoner in a restraint chair.

Third, we identified instances of officers applying additional force to prisoners with serious mental illness already in full-body restraints. These prisoners were clearly in no position to harm themselves or others. The willingness of officers to use additional force on immobilized prisoners by, for example, tasering them, suggests that the restraints and the other force tools used on the prisoners were employed to punish and cause pain, not to prevent imminent harm.

Finally, Cresson departs significantly from established protocols by routinely failing to have mental health professionals supervise or direct the use of full-body restraints on prisoners with serious mental illness. Mental health professionals are the only ones who have the ability to assess the effect of continued use of a full-body restraint on a prisoner with serious mental illness and whether another intervention, such as medication or additional mental health treatment at the MHU, would be more appropriate. Nonetheless, at Cresson, at most, mental health professionals are merely consulted when restraints are first applied on a prisoner with serious mental illness and are routinely left out of the decision to use restraints altogether. For example, we found that in 2011, 52 percent of the time that restraints were used, a mental health professional was not even at the Facility when full-body restraints were used on a prisoner with serious mental illness.

Below are examples of uses of full-body restraints that were excessive and unnecessary:

- Staff responded with force to numerous instances of self-harm involving prisoner JJ, who has depressive disorder and an extensive history of self-harm, between January and February 2011. This force included the use of unsupervised restraints in response to an attempted suicide by hanging while in the MHU, even after he vomited and gasped for air, and restraints lasting more than eight hours in response to cutting while in the POC. In response to self-harm on another occasion in an RHU overflow cell in the SSNU, officers placed JJ into four-point medical restraints. When JJ requested a mattress for the bed before being placed in restraints, officers took this as a sign of non-compliance and forcibly placed him onto the bed, deploying a handheld electronic body immobilization device ("EBID"), or tasing device, on JJ's back. JJ continued to struggle and harm himself, and he coughed repeatedly, but this did not prompt medical attention. On the video of the restraint, an officer observing JJ bang his head against the metal bed can be

heard saying that he is going to "place a fucking helmet on his fucking head." JJ remained in four-point restraints for nearly 15 hours.

- On July 21, 2010, prisoner KK, who has an extensive history of self-injury and was diagnosed with a depressive disorder, ran headfirst into his cell door in the POC. Officers found KK unresponsive and lying on his back. After a brief medical evaluation, officers placed him into a restraint chair and deploying an EBID twice during the placement. While restraining him in the restraint chair, officers "exercised" KK – a process during which one limb at a time is removed from restraints. When KK's left leg was exercised, he began kicking. Officers responded by twice applying a handheld EBID. Later, during another exercise, a handheld EBID was applied again when he had only one limb removed. A third time, during exercise, officers applied a handheld EBID four times and deployed pepper spray on his face twice while he had only one limb removed. It appears KK's total time in the restraint chair neared 24 straight hours.

- CC (see above) has told staff that being "locked down" causes him to engage in self-injurious behavior, but staff have largely dismissed his behaviors as "malingering" and often respond to self-harm by using force. On July 4, 2011, he was placed into a restraint chair for more than 19 hours after banging his head against the wall in POC and threatening self-harm. On five previous occasions between February and March 2011, he was placed in the restraint chair for periods lasting between 7 and 15 hours.

The uses of force described above and others like them are cruel and unnecessary. Instead of increasing compliance with prison rules, Cresson's use of excessive force on prisoners with serious mental illness without any meaningful mental health supervision or intervention has the effect of further traumatizing the prisoners, intensifying their psychotic episodes, and exacerbating their mental illness. Subjecting prisoners with mental illness to ever harsher treatment in response to behaviors derivative of their illness does nothing but accelerate their mental deterioration and intensify their mental torment and anguish.

The experience of prisoner LL while he was housed at the SSNU shows how mutually reinforcing conditions at Cresson combine to subject prisoners with serious mental illness to an extreme form of isolation. Prisoner LL, who has an IQ of 70 and was diagnosed by PDOC with schizoaffective disorder, spent two and-a-half years in isolation at Cresson's SSNU, beginning in January 2009. In December 2009, LL told psychology staff that officers were taunting him for days in a row by opening his tray slot but not delivering his evening meal. He alleged that taking his medications on an empty stomach was causing him to vomit. Soon after, an officer then allegedly dropped his food on purpose, causing it to spray all over his cell. LL told a staff member that he did "go off" and break his tray because he "could not take it anymore, how they were messing with my meals." The officers responded by placing him in an SSNU concrete observation cell, though officers claimed they placed him there because he was threatening to harm himself.

He was placed in this cell for roughly a week with no mattress or pillow and only a suicide smock and blanket. Instead of regular meals, he was given food loaf. According to the psychology records, he was also denied out-of-cell visits by psychology staff. One psychology staff member told us that he had asked officers to permit him to speak with LL outside of the cell on at least four occasions, but each time his request was denied.

Even after LL returned to a regular SSNU isolation cell, security staff denied a psychology staff request to counsel LL out-of-cell, allegedly because LL had been kicking his cell door earlier in the day. When a psychology staff member spoke to LL, LL explained that he had kicked the door only because he desperately wanted toilet paper to avoid having to use his hand to clean himself after defecating.

A staff member told us that in February 2010, after LL left a treatment meeting with mental health and security staff, the chief psychologist allegedly mocked LL, saying to the unit manager, "Oh, please don't mess up my 43 IQ."

Between March and July 2011, Cresson management formally implemented a behavioral modification plan severely restricting LL's access to stimuli and making his housing conditions harsher. The plan noted that LL's "acting out behavior" was a "result of significant psychosocial, emotional and cognitive deficits," but nonetheless required that he be stripped of everything but a suicide smock and that he receive food loaf "to safely alter his behavior." Then the plan outlined that over time if he acts "with positive adjustment," he can be given an anti-suicide blanket, regular meal tray, a jump suit, boxers, a mattress, a pillow, socks, shoes, and bed linen, but only in increments appropriate to alter his behavior.

During these five months, LL fell into the downward spiral described at the beginning of this section. Staff reported to us that at no time during that period was he offered group therapy, one-on-one therapy, or therapeutic materials. By May 2011, he was smearing feces on the wall of his cell. By July 2011, he was threatening self-harm. On July 2, 2011, he tied a sheet around his neck after other prisoners told him to do so. On July 5, 2011, he was found banging his head on his cell walls. Cresson responded by placing him in a restraint chair for 10 and-a-half hours in the concrete observation cell. After being released from the restraint chair, Cresson kept him in the concrete cell without a mattress wearing only a smock for six days. A mental health staff member who was allowed to visit him at that time told us that LL's condition had deteriorated to the point of him having virtually no ability to lift himself up or talk. On July 13, 2011, LL refused to wear his suicide smock, went to his treatment review meeting naked, and later smeared feces in his cell while naked. Cresson transferred him out of its Facility three weeks later in August 2011.

This example shows psychological and physiological damage resulting from Cresson's use of extreme isolation in combination with a lack of adequate treatment.

## V. SYSTEMIC DEFICIENCIES GIVE RISE TO CRESSON'S OVERRELIANCE ON ISOLATION AS A MEANS OF CONTROLLING ITS PRISONERS WITH SERIOUS MENTAL ILLNESS

The unconstitutional use of prolonged and extreme isolation on prisoners with serious mental illness described above has come about because of systemic deficiencies relating to Cresson's mental health care program. Instead of having systems in place to ensure it is providing adequate mental health care throughout the Facility, Cresson uses isolation to control and warehouse prisoners with mental illness as they become more ill and less stable.

The deficiencies at Cresson include: (A) a system-wide failure of security staff to consider mental health issues appropriately and a marginalization of the concerns of the mental health staff; (B) a fragmented and ineffective mental health care program; and (C) ineffective mechanisms for assessing the quality of the mental health care program and the level of risk to prisoners with serious mental illness. These significant and obvious deficiencies have not only led to the unconstitutional use of isolation on prisoners with serious mental illness, they also pose a direct and serious risk of harm to the Facility's prisoners. *See Estelle*, 429 U.S. at 103-05; *Inmates of Allegheny Cnty. Case*, 612 F.2d at 761-63 (Eighth Amendment prohibits deliberate indifference to prisoners' serious mental health care needs).

### A.   Cresson Creates Excessive Risk of Serious Harm by Marginalizing Mental Health Staff and Failing To Appropriately Account for Mental Health Considerations

At Cresson, no meaningful collaboration exists between security staff and mental health staff. Consequently, too often security staff fail to solicit or adequately consider the opinions of mental health staff when making decisions impacting the conditions of confinement of prisoners with serious mental illness. This marginalization occurs in a variety of contexts, including the process for deciding: (1) whether and for how long to place prisoners with serious mental illness in isolation at the RHU; and (2) which prisoners have to share RHU cells.

#### 1.   Cresson fails to take mental health care considerations into account appropriately in the course of disciplinary hearings held to determine whether to subject prisoners to isolation at the RHU

Cresson ignores the serious risks associated with failing to consider the role mental illness may play in causing prisoners to engage in disciplinary infractions. As a result, Cresson ends up punishing some prisoners with serious mental illness for the uncontrollable outward manifestations and symptoms of their mental illness by placing them in solitary confinement instead of providing them with adequate mental health care. For instance, when prisoners with serious mental illness cut themselves as a result of their illness, Cresson often punishes them for doing so by placing them in prolonged or otherwise dangerous solitary confinement and restricting their access to mental health treatment. *Cf. Arnold on behalf of H.B. v. Lewis*, 803 F. Supp. 246, 256 (D. Ariz. 1992) (holding that isolating a prisoner "as punishment for the symptoms of [his] mental illness and as an alternative to providing mental health care" violates the Eighth Amendment).

At Cresson, when the prisoner has been identified by the Facility as having serious mental illness, mental health staff have no formal role in determining the appropriateness of disciplining the prisoner with RHU time. Consequently, the hearing examiner and others involved in placement determinations routinely decide the prisoner's fate with an insufficient understanding of the extent to which mental illness or disability played a role in the prisoner committing the infraction at issue, resulting in the prisoner being punished with isolation for conduct over which the prisoner had little or no control. Specifically, a PDOC policy statement provides that mental health staff may "recommend that the sanction be reduced" for those on the mental health roster, but no guidance is provided regarding when mental health staff should weigh in during the disciplinary process or whether placement into isolation may pose a serious risk to the mental health of the prisoner. The hearing examiner told us that mental health staff never participate directly in the disciplinary process, though sometimes correctional staff relay to

him, on an informal and inconsistent basis, information they have obtained about the mental health of the prisoner whose conduct is under consideration.

Even in cases in which the prisoner is found to have willfully violated a prison rule that justifies punishment, failing to consider mental health issues as part of the disciplinary placement process subjects prisoners with serious mental illness to an excessive risk of serious harm. The failure to obtain input from mental health staff means that the hearing examiner and others involved in the placement process may routinely commit prisoners to extended periods of isolation without fully appreciating the serious harm that will be done to the prisoners' mental health because of it.

### 2. Cresson fails to account for mental illness when deciding which prisoners have to share RHU cells

Special concerns are raised when double-celling in isolation prisoners whom the facility has identified as having serious mental illness and may therefore be vulnerable. Cresson fails to properly assess whether a prisoner faces a substantial risk of harm as a result of double-celling. *Tillery*, 907 F.2d at 427 (holding that one relevant factor in determining the constitutionality of double-celling is when "violent, delusional and predatory inmates are often placed with inmates who are unable to protect themselves") (internal quotations omitted); *Clark v. California*, 739 F. Supp. 2d 1168, 1181 (N.D. Cal. 2010) (holding that, under the ADA, the prison must take extra caution before double-celling where prisoner is especially vulnerable because of a disability). Unfortunately, Cresson's current procedures and practices compromise proper screening.

First, when the Facility considers double-celling a prisoner on the mental health roster with someone not on the roster, mental health staff are not explicitly asked to assess the suitability for double-celling of the prisoner not on the roster or the potential for victimization of the prisoner on the roster. Double-celling decisions are therefore made without fully assessing whether the behavior associated with the prisoner's mental illness would be viewed by the cellmate as odd, irritating, or antagonistic, or whether the prisoner with serious mental illness is easily manipulated, submissive, or unlikely to report threats or harm.

Second, when mental health staff weigh in on double-celling decisions at the RHU, their opinions are not given appropriate weight. The circumstances leading to a March 2011 incident involving the beating, hogtying, and sodomizing of a prisoner with serious mental illness by his RHU cellmate speak to how the Facility marginalizes mental health staff when making double-celling placement decisions at the RHU. In that case, the records show that a member of the psychology staff repeatedly warned against keeping the victim, prisoner II, double-celled with prisoner QQ, who ultimately assaulted II. Prior to the assault, the psychologist emphasized the need to transfer the threatening prisoner to his own cell. In writing, he warned prison authorities that he believed prisoner QQ "presented as anxious & agitated," and that "concerns exist that this [prisoner] might actually act out in a lethal manner." The assault occurred, in large part, because the views of the mental health professional were ignored.

Cresson's marginalization of mental health considerations in the context of decisions to isolate and double-cell prisoners are but two manifestations of a facility-wide problem. Mental health staff we spoke to alleged that, at Cresson, the priorities of those working in security routinely trump important mental health considerations. Too often decisions are made through the prism of maintaining order in the manner most convenient to security, without adequately considering the implications of those decisions on prisoner mental health.

**B.** **System-Wide Deficiencies in the Mental Health Treatment Program Pose a Serious Risk of Harm to Prisoners and Cause Cresson To Resort to Using Prolonged Isolation on Prisoners with Serious Mental Illness**

The inadequacies of the mental health treatment program at Cresson subject prisoners to excessive risk of serious harm and cause staff to resort to prolonged and extreme isolation in the absence of treatment options. Resorting to what amounts to warehousing prisoners in isolation, instead of providing them with the mental health treatment they need, results in serious harm, and the Eighth Amendment prohibits this type of deliberate indifference to prisoners' serious mental health care needs. *See Inmates of Allegheny Cnty. Case*, 612 F.2d at 761-63. Systemic deficiencies in Cresson's mental health care program include: (1) a dearth of mental health treatment for prisoners throughout the Facility; (2) the absence of a functioning secure residential treatment unit for prisoners who require such placement; and (3) inadequate coordination among mental health care providers.

> **1.** **The grossly inadequate mental health care Cresson provides to prisoners in the general population leads to psychiatric deterioration and placements in the isolation units**

Inadequate mental health treatment at Cresson has significantly compromised the mental health of many of Cresson's prisoners and led to a higher incidence of self-injury. In the course of our review, we came across many cases where the absence of mental health care contributed to decompensation, self-injury, and/or a behavior leading to a transfer to an isolation unit. For example, in the case of prisoner RR, the absence of appropriate mental health treatment while he was housed with the general population probably contributed to his death. RR committed suicide in March 2012. Our consultant reviewed the suicide and concluded that his case "illustrates the absence of any mental health care other than psychotropic medications which were prescribed without clear diagnostic indications or objective measures of any response. Psychiatric follow-up lacked even a modicum of continuity of care."

Care at Cresson is inadequate largely because there are not enough mental health professionals to service such a large pool of prisoners with mental illness. Our consultant concluded, and psychology staff confirmed, that the psychology staffing complement is far too low given that over a quarter of Cresson's 1,600 prisoners are on the mental health roster. *See Inmates of Allegheny Ctny. Case,* 612 F.2d at 63 (noting that "[t]he key factor in determining whether a system for psychological or psychiatric care in a jail or prison is constitutionally adequate is whether inmates with serious mental or emotional illnesses or disturbances are provided reasonable access to medical personnel qualified to diagnose and treat such illnesses or disturbances"). In the view of our consultant, because of staffing shortages, the Facility's mental health professionals simply do not have enough time to provide adequate care. *Cf. Plata*, 131 S. Ct. at 1933 (noting that "shortfall of resources relative to demand contributes to significant delays in treatment"). She noted that prisoners in general population, regardless of their need, receive, at most, monthly visits by psychology staff and very little programming. When we toured, Cresson's leadership conceded that they had serious staffing shortages and expressed a desire for more mental health staff contacts with prisoners.

At the SNU, the mental health care programming is no better than the programming provided to those housed in the rest of general population. While there are some organized activities for the SNU prisoners, none of them are led by mental health staff or qualify as mental health treatment.

The institution has also unnecessarily exposed prisoners with mental illness housed in the SNU to stigmatization and harassment by other prisoners. Specifically, the institution's failure to provide medications at the SNU means that SNU prisoners can only obtain their medications by standing in line for them with prisoners from general population who routinely harass and tease them. As a consequence, SNU prisoners often avoid getting their medications, which in turn leads to them decompensating and cycling through various isolation units and the MHU. As with other services, medications should be brought to the SNU if SNU prisoners cannot safely visit other parts of the Prison to access them.

Poor screening and diagnostic procedures also contribute to system-wide inadequacies in mental health care. Our consultant found that Cresson routinely understated the mental health care needs of those on its mental health roster. She is of the view that the majority of the 450 prisoners on the roster have serious mental illness but that many have had their conditions "under-classified" in ways that significantly understate the severity of their mental illness. Cresson's practice of under-classifying prisoners' mental illness leads to management underestimating the amount of mental health care, programming, and staffing needed at the Facility.

### 2. In the absence of a functioning secure residential treatment unit, Cresson resorts to using isolation on prisoners with serious mental illness when it cannot safely house them in the Prison's general population

Cresson, which has a large population of prisoners with serious mental illness, should have a secure residential treatment unit for those whose condition prevents them from being housed with the general population. Instead, Cresson punishes such prisoners with isolation either in the SSNU or the RHU, and torments them with punitive behavior modification plans.

Cresson's obligation under the Eighth Amendment to provide adequate mental health care exists irrespective of whether prisoners have serious mental illnesses that preclude them from being housed in a less secure general population environment. *See Madrid*, 889 F. Supp. at 1259 (noting that mental health care must be adequately provided no matter where prisoners are housed); *see also Young*, 960 F.2d at 363-65 ("The touchstone is the health of the inmate."). Moreover, as discussed above, Cresson must make reasonable modifications to its policies, practices, and procedures so that these prisoners can avail themselves of the same services, programs, and activities available to prisoners without disabilities. *See Chisolm*, 275 F.3d at 324-25.

Cresson must commit the necessary resources, including: adequate therapy staff for therapeutic group and recreational programs; psychiatric nurses, psychology staff, social workers, psychiatrists, and unit management staff sensitive to the needs of prisoners with mental illness; correctional officers with specialized training on how to work with prisoners with serious mental illness and a demonstrated history of compassion, flexibility, and professionalism; adequate private office space for treatment records; cells that afford adequate observation and

communication; indoor and outdoor recreational facilities; and secure group program space adjacent to prisoner cells.[18]

Currently, Cresson has nothing that even resembles a functioning secure residential treatment unit. The SSNU falls far short for many reasons. First, in the absence of clear PDOC policies concerning how long prisoners at the SSNU can be placed in solitary confinement, Cresson management has adopted procedures that have led to prolonged periods of isolation for most of those housed in the unit. Instead of treatment, the overwhelming majority of the prisoners at Cresson's SSNU experience only extreme isolation, punitive behavior modification plans, and unnecessary uses of force. Second, by PDOC policy, prisoners can only be placed in the SSNU after they have had repeated placements in isolation at one or more of PDOC's RHUs. No meaningful treatment unit would condition treatment on months of solitary confinement. And third, PDOC has not committed the resources required to make the SSNU a fully functioning secure residential treatment unit.

### 3. Cresson's mental health providers fail to coordinate their efforts, resulting in placement in isolation and mental decompensation

The lack of coordination among the various providers of mental health care at the Facility leads to dangerous placements of vulnerable prisoners into isolation, disrupts treatment, and results in a lack of continuity of care.

#### a. Mental health staff fail to coordinate their efforts

While Cresson may have justifiable reasons for contracting for psychiatric staff while using PDOC psychology staff, it has not integrated them well. Instead, care is provided on parallel tracks, which undermines continuity of care. There are myriad meetings among the various mental health staff, but they are duplicative and are not transcribed or memorialized. Also problematic, psychiatrists are regarded as "consultants" rather than treatment team leaders. Thus, psychiatrists' authority is essentially limited to prescribing psychotropic medication and initiating the MHU commitment process.

The disconnect between psychiatry and psychology staff has contributed toward dangerous discharges from the MHU to the SSNU. The psychiatry administrator, who oversees the MHU, did not know that almost all of those discharged from the MHU to the SSNU are then placed in solitary confinement. He believed he could stabilize prisoners on the MHU and discharge them to the SSNU to continue their treatment and out-of-cell programming. His limited understanding of the extent of the mental health care provided to prisoners at the SSNU has resulted in discharges from the MHU to the SSNU that have caused serious harm to prisoners with serious mental illness.

Deficiencies in the way in which mental health staff document their work contributes to the lack of coordination between mental health providers. Mental health staff document their interventions and observations in different places, creating a fragmented picture of each prisoner's needs and program of care. For example, psychology staff document their interactions with prisoners in the Inmate Cumulative Adjustment Record ("ICAR"). Sometimes, the identical information is entered into the prisoner's medical record, but other times, it is not. Contract

---

[18] Charles L. Scott, HANDBOOK OF CORRECTIONAL MENTAL HEALTH 461 (2d ed. 2010).

psychiatry staff, on the other hand, have access to and document all of their interactions in the medical record, not the ICAR. Certain units use other files and charts. For example, there is a separate record for prisoners in the MHU and a separate "green file" for prisoners in the SSNU. This disjointed approach compromises communication and treatment planning, creates confusion, and leads to dangerous discharges from the MHU.

The failure of Cresson's mental health providers to adequately coordinate their efforts as well as the various other system-wide deficiencies in mental health care discussed above not only directly lead to serious harm by causing deterioration in the mental health of prisoners, they also lead to the security staff resorting to extreme isolation as a method for maintaining order in the Facility. This response to mental illness merely accelerates the downward spiral of psychiatric decompensation, inevitably leading to serious injury and death.

C.  **Deficient Oversight Mechanisms Prevent the Prison From Adequately Addressing Systemic Failures in its Mental Health Program and the Harmful Effects of Its Use of Isolation on Prisoners with Serious Mental Illness**

Deficient oversight mechanisms have undermined Cresson's ability to recognize and address the harmful effects of its use of isolation, as well as systemic problems concerning its provision of mental health care. Cresson neither collects necessary information, including critical incidents and information about the use of isolation, nor properly reviews and responds to the information it does have. The Prison's response to suicides and suicide risk is especially problematic. This flawed oversight system inhibits Cresson's ability to identify and respond to trends or patterns of harm.

1.  **Cresson's failure to report critical information hinders the Prison's ability to identify underlying systemic problems relating to its use of isolation**

Because Cresson fails to report critical information in tracking documents, the Prison has an incomplete understanding of the levels of harm occurring there. The severity of the harm and its concentration in the isolation units should have prompted the Prison to track this information.

First, threats of suicide and incidents of self-harm are not reported in the primary incident tracking document (Extraordinary Occurrence Reports or "EORs") and therefore not tracked to assess potential trends, such as whether such harm is occurring in particular units. Only when the incident rises to the level of a "suicide attempt" is it reported in the EOR. For example, we discovered the self-castration attempt at the RHU by prisoner BB in October 2010 not by reviewing data but because a prisoner told us about it. Other incidents not reported in the EORs included a prisoner banging his head against the wall at the SSNU, resulting in a POC admission and, a prisoner threatening suicide accompanied by a hunger strike resulting in 18 missed meals.

Second, the failure to report serious incidents in the EORs also hinders the Prison's ability to assess the adequacy of mental health care in the non-isolation units. For example, recent incidents in the SNU involving a prisoner with serious mental illness diving into a concrete landing, a prisoner with serious mental illness and an intellectual disability taking 29 pills, and a prisoner with serious mental illness and intellectual deficits injuring his neck with a pen were not tracked.

Third, many instances of prisoner-on-prisoner violence are likewise not reported in the EORs and are therefore not available for the Prison to assess trends and patterns to prevent further harm, particularly where vulnerable prisoners are involved. In one case, on June 14, 2011, prisoner SS was found bloody and unconscious in his RHU cell with cellmate TT. In another in the SNU, on July 11, 2011, prisoner UU – who is diagnosed with schizophrenia – poured boiling water on prisoner VV – who is diagnosed with paranoid schizophrenia and post-traumatic stress disorder and has an IQ of 48 – causing blistering. We only learned about these incidents by piecing together non-electronic documentation that is unlikely to be thoroughly reviewed by Cresson officials.

Finally, Cresson fails to accurately report lengths of stay in Cresson's SSNU in its tracking document, the semi-annual reports. It is often impossible to determine from the reports whether prisoners are spending consecutive stays in isolation, or if those stays are broken up by less restrictive periods. Similarly, information is not collected regarding the amount of time prisoners with serious mental illness are held in the RHU. The lack of such critical information weakens the Facility's ability to assess areas for improvement in the mental health treatment program serving especially vulnerable prisoners in especially harsh conditions. The supervisory mental health staff told us that they view isolation as an appropriate practice, even when prisoners show serious signs of decompensation. In other words, the Prison's mental health program does not consider periods of isolation or even signs of decompensation to be important information the Prison should collect and assess.

**2. Cresson's failure to properly review and respond to critical information prevents it from properly identifying or correcting its overreliance on isolation and inadequate mental health treatment**

To the extent that Cresson staff review serious incidents, their reviews often ignore or gloss over key issues regarding the Prison's isolation practices and mental health treatment program. Prison officials have an obligation to "cure [their] own lack of attention and unresponsiveness to inmate complaints and other indicators of serious problems." *Tafoya v. Salazar*, 516 F.3d 912, 917 (10th Cir. 2008) (reversing grant of summary judgment in case where female prisoner alleged sexual assault by officer, and prison leadership failed to have an active presence at the jail or to address known deficiencies); *see also A.M. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 583 (3d Cir. 2004) (concluding that evidence of the lack of policy for reviewing and following up on incident reports supported plaintiff's deliberate indifference claim). This flawed review process complicates PDOC and Cresson's ability to identify trends and correct problematic processes or policies regarding isolation, risk of harm, and mental health treatment.

**a. The harmful effects of Cresson's use of isolation on prisoners with serious mental illness and other systemic problems concerning Cresson's mental health program have gone undetected by Cresson, in part, because of deficient reviews of suicides and suicide attempts**

The Prison's reviews of suicides are inadequate, and suicide attempts are not reviewed at all. Consequently, the Prison cannot accurately assess underlying systemic deficiencies, including the excessive use of isolation and inadequate mental health treatment that place prisoners at risk of such serious harm. Our consultant noted that the suicide prevention program "is highly problematic in a number of areas that include unsafe POC cells, incorporation of

placement in RHU as a component of the treatment program, failure to intensify treatment efforts and intensity following crisis, [and] failure to provide adequate mental health care and critically review suicides and serious suicide attempts to identify areas for improvement." As a preliminary matter, while we commend the Deputy Superintendent for attempting to provide appropriate oversight, the clinical review should not be led by someone who has no clinical background.

We are especially concerned, however, that a general belief exists at the Prison that the suicides that occur at the Facility are essentially inevitable and could not have been prevented. This message is then transmitted to staff. Without first understanding the contributing factors that can lead to suicide and the realities of serious mental illness, the Prison cannot take effective steps toward a solution. Thus, the internal reviews conclude that none of the Prison's own missteps could have led to the suicide, even though the evidence is clear that Cresson is doing many things wrong. The culture regarding suicide prevention must change.

It does not appear that the Prison has done a comprehensive assessment of suicide risks. Instead, its assessment occurs on a suicide-by-suicide basis. We observed suicide hazards in the RHU and POC. In the RHU, the coat hook, which is supposed to break away under pressure, was stuck. In the POC, poor visibility and blind spots in the cells and tie-off points on the beds remain. Also, based on documents we reviewed, officers sometimes responded to attempted hangings by securing prisoners with handcuffs before cutting the prisoner down. This demonstrates a need for training.

Each of the suicide reviews conducted since 2011 suffered from numerous serious deficiencies:

- **May 2011:** As our consultant noted with respect to the suicide in May 2011, "The institution's suicide review was critical of correctional observation/monitoring in the RHU but didn't even mention the serious problems with mental health care." For example, "[t]he mental health review neglected to mention [AA's] numerous previous POC admissions; the lack of follow-up after the April Cresson POC admission; the assessment of the inmate by the psychiatrist only at cell-front; the lack of any other mental health contacts except during rounds at cell-front; the observation that the inmate was not only delusional but acting on the content of his delusional belief system in his interactions with prison correctional staff." The review did not consider the potential role of isolation in AA's condition.

    Even the review's treatment of correctional practices was problematic, as it minimized the possible link between AA's death and the delay in officers' response. There is no medical support for the review's assumption that this delay did not contribute to the death. We are concerned that, while staff were disciplined, the response did not match the failure, as the failure was not given due weight. Specifically, the Prison identified the failure to immediately investigate the prisoner not responding to requests to take down a covering he had placed over his cell window and the decision to instead continue rounds, as well as the failure to bring a radio outside once staff did investigate, thus requiring the officer to return to the unit to call for help and delaying medical response. Security staff

also conducted cursory rounds, even though they knew many of the prisoners had serious mental health needs.[19]

- **March 2012:** While the review of prisoner RR's March 2012 suicide, which occurred in the general population, was somewhat more thorough with respect to mental health treatment, it included significant flaws. We are especially troubled by the attitude of the Deputy Superintendent who led the review that the Prison received no "red flags" and that the suicide could not have been prevented. It is inappropriate to send this message to the staff when a prison is short-staffed and when the prisoner did, in fact, communicate his own depression to staff.

  The conclusions that no "warning signs" existed and that the prisoner "voiced no concerns" were simply untrue. So was the finding that RR had been seen regularly by clinical staff. The review also minimized the lack of continuity of care and the impact of deviation from policy requirements on the frequency of visits by mental health staff even while acknowledging that RR was twice "seen out of the 90 day rule" for prisoners on the mental health caseload and despite recent changes in his diagnosis, increases in his medication, and reports that he was having nightmares about stabbings in prison.

- **July 2012:** The most recent suicide review – that of prisoner FF – had similar deficiencies. The review emphasized that there were no warning signs that FF intended to commit suicide, noting "the inmate was a person of average intelligence so he could have asked for help if he felt the need." In fact, FF clearly did ask for help. The review notes that FF expressed concern that his medications were not working but makes no mention that he specifically requested counseling. Rather than acknowledging FF's own requests, the review credits the accounts of other prisoners describing a happy and laughing FF the day he committed suicide. In doing so, the review fails to recognize that prisoners often mask their anxieties from other prisoners for fear of revealing their weaknesses.

  The review also emphasized an unusual event in FF's life as the trigger for his suicide without acknowledging that prisoners with mental health concerns need added support so that they can confront these inevitable challenges. Had FF received timely and better continuity of care that facilitated building a meaningful clinical relationship, or had he received out-of-cell therapy or been diverted from isolation, he might have had the therapeutic resources to deal with his serious personal issue.

  The review overstates the amount and quality of treatment provided to FF and does not consider the potential effects of isolation. According to the review, FF "was being seen regularly by psychology, psychiatry and his counselor." The review groups the staff together when, in fact, visits by each staffing complement were infrequent. Indeed, the review notes that psychiatry visited him only "sporadically." Moreover, the review minimizes the untimeliness of the June psychiatric visit by stating that he was still "seen

---

[19] These failures in security and supervision practices, identified by Cresson itself, also demonstrate a lack of training for security officers regarding proper response to warning signs by prisoners with serious mental illness, including immediately involving mental health staff and conducting proper rounds, particularly in units housing prisoners with serious mental illness.

within a 90 day period which was within policy and exceeds the standard of community care." However, if a psychiatrist orders a 60-day visit to more closely monitor a patient, then the standard is that the patient should be seen as clinically indicated. Finally, the insufficient quality of most of the visits, including their lack of privacy, was also omitted.

These suicide reviews are a critical tool for assessing weaknesses in the Prison's practices and taking appropriate corrective action to prevent further harm. Cresson's flawed review process significantly compromises its ability to take a full accounting of such issues and protect its most vulnerable prisoners.

### b. Prisoner-on-prisoner abuse is not properly reviewed, leading to failures in accurately assessing procedures placing prisoners in danger, especially in the isolation units

Prisoner-on-prisoner violence involving prisoners with serious mental illness may also escape adequate review to address potential systemic deficiencies. As a result, prisoners will continue to be subjected to a heightened risk of harm in the already-dangerous isolation units.

In the course of reviewing the incident involving prisoner II, the RHU prisoner who had serious mental illness and was hogtied and assaulted by his cellmate, Cresson staff identified a number of problems with the way they determine whether a prisoner's background precludes him from sharing a cell. However, the review failed to identify and/or address a number of key issues:

- The review did not identify problems with the response to the incident, including an admission by an officer that he had "actually turned off the camera" while recording the response.

- The review does not question how it was possible that staff in the RHU did not hear the assault, given the length of time that must have lapsed as II was attacked, punched, kicked, stripped, and tied up.

- The staff's handling of the investigation and of coordination with law enforcement was not addressed critically, even though there were clear indications that the rape kit was not properly administered, and dual investigations created the potential for interference with a criminal investigation.

- The review minimized the aggressor's history of assaultive behavior.

- The review does not describe the psychology staff's reasons for recommending that the aggressor be placed into a single cell rather than be double-celled with another prisoner.

- The counselor expressed suspicion that the aggressor was not sincere in his threats and was instead manipulating staff, yet the review did not assess the legitimacy of the counselor's suspicion in light of the psychology staff's assessment.

- The Prison's policy requires that those staff who vote "no" on a recommendation against double-celling must explain such a vote. Yet key votes against double-celling did not provide justification, and this deficiency was not noted in the review.

While we understand that the Prison has made some changes to its policies regarding double-celling, the review process itself is flawed and must be improved to ensure adequate protection from similar harm to other prisoners.

### c. Use of force is not properly reviewed, especially in the isolation units and the MHU

Cresson fails to provide proper oversight of staff's use of force, particularly in the isolation units and the MHU. As a result, prisoners in the isolation units and the MHU are subjected to uses of force that traumatize them, destabilize their conditions, and interfere with their ability to return to a less restrictive housing setting.

No early warning system exists by which the Prison could assess the relative frequency with which different staff engage in the use of restraints or other force, and it appears that little or no assessment is conducted to determine whether the force was appropriate. The frequency and duration of the use of restraints alone evidence the failure to properly review the practice from a systemic perspective. Staff failed to document efforts to deescalate situations prior to resorting to restraints. In some instances, the use of force was not properly recorded. Even the release from restraints was not always indicated, nor was exercising the prisoner. Security restraints, rather than psychiatric restraints, are used extensively with far less clinical supervision and oversight than needed and no understanding of the appropriate limitations on the duration of their use. Without such protections in place, prisoners who are at risk of having their mental health compromised by harsh treatment will continue to be subjected to unnecessary or excessive placement in restraints.

## VI.    CRESSON'S PRACTICES VIOLATE THE AMERICANS WITH DISABILITIES ACT

The Department of Justice is charged with enforcing and implementing Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134. The Justice Department may conduct investigations and compliance reviews of covered public entities, enter into voluntary compliance agreements, and enforce compliance through litigation. *See* 28 C.F.R. §§ 35.172-35.174. The Justice Department is authorized to issue a Letter of Findings under Title II, which includes findings of fact, conclusions of law, and remedies for violations found. 28 C.F.R. § 35.172(c)(1)-(3).

The Department has determined that Cresson violates Title II in a variety of ways. 42 U.S.C. § 12132. Cresson denies many of its prisoners with disabilities, including those with serious mental illness or intellectual disabilities, the opportunity to participate in and benefit from a variety of correctional services and activities, such as classification, security, housing, and mental health services, or unnecessarily provides prisoners with psychiatric and intellectual disabilities unequal, ineffective, and different or separate opportunities to participate or benefit from Cresson's classification, security, housing, and mental health services. 28 C.F.R. § 35.130(b)(1)(i)-(iv). Cresson unlawfully segregates and warehouses prisoners with serious mental illness and/or intellectual disabilities in isolation units, and fails to individually assess such prisoners concerning the risk they actually and objectively pose to others. 28 C.F.R. § 35.130(d). Cresson also fails to reasonably modify its policies, practices, and procedures, which is necessary for Cresson to avoid discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(7).

## A. Cresson Unnecessarily Segregates and Isolates Prisoners with Disabilities and Fails To Reasonably Modify its Policies and Practices

Cresson denies prisoners with serious mental illness and intellectual disabilities the opportunity to participate in and benefit from general population housing, security, and classification systems, and their benefits, such as out-of-cell time and interaction with other prisoners, and routinely and unnecessarily segregates and isolates prisoners with serious mental illness and intellectual disabilities. Such unnecessary isolation constitutes unlawful discrimination under Title II of the ADA.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II extends to all of the prison's services, programs, and activities, including classification, housing, recreation, and medical and mental health treatment, among others, for which prisoners are otherwise qualified. *See Pa. Dep't of Corr.*, 524 U.S. at 209-10, 213 (finding, without exception, that Title II "unmistakably includes State prisons and prisoners within its coverage" and discussing "recreational activities" and "medical services" as covered under Title II to find a motivational boot camp to be a covered entity); *Alexander v. Choate*, 469 U.S. 287, 301 (1985) (under Section 504 of the Rehabilitation Act, recipients of federal financial assistance must ensure "meaningful access" to prison programs and activities).

Both serious mental illness and intellectual disabilities, as defined here, qualify as disabilities under the ADA. 42 U.S.C § 12102 (including "mental" impairments under definition of "disability" where they substantially limit major life activities).

The regulation implementing Title II of the ADA requires public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d); 28 C.F.R. § 35.152(b)(2) (requiring that prisoners with disabilities be housed in the most integrated setting appropriate to their needs under the program access obligation); *see also Olmstead v. L.C.,* 527 U.S. 581, 592, 597 (1999) ("Unjustified isolation, we hold, is properly regarded as discrimination on the basis of disability."). The Justice Department explained in the 1991 Preamble to the Title II regulation: "Integration is fundamental to the purposes of the Americans with Disabilities Act. Provision of segregated accommodations and services relegates persons with disabilities to second-class status." 28 C.F.R. pt. 35, App. A. Moreover, a covered entity, such as Cresson, may not provide unequal services to individuals with disabilities, 28 C.F.R. § 35.130(b)(1)(ii), and may not provide different or separate services to people with disabilities unless the different or separate services are necessary in order to afford those individuals an equal benefit. 28 C.F.R. § 35.130(b)(1)(iv).

Under the ADA, a prison must "take certain proactive measures to avoid discrimination." *Chisolm*, 275 F.3d at 324-25 (holding that facility may have violated the ADA and discriminated against a deaf prisoner when it gave the prisoner pencil and paper instead of an American Sign Language interpreter, and failed to provide the prisoner a device to allow him to place telephone calls in private). The Title II regulation requires the Prison to reasonably modify its policies, practices, and procedures when necessary, as here, to avoid discrimination against prisoners with serious mental illness and intellectual disabilities. 28 C.F.R. § 35.130(b)(7).

Prisoners with disabilities thus cannot be automatically placed in restrictive housing for mere convenience. If prisoners with serious mental illness can be housed in general population by being provided adequate care, the prison may not house such prisoners in segregated housing without showing that it is necessary to make an exception. *See also* 28 C.F.R. § 35.130(b)(3)(i)-(ii) (prohibiting the prison from utilizing "criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; . . . [or] have the purpose or effect of defeating or substantially impairing accomplishments of the entity's program with respect to individuals with disabilities"). While those identified by the Facility as having mental illness are roughly 28 percent of the Prison's population, they represent over 60 percent of those placed in solitary confinement. Moreover, almost all of those who have been in solitary confinement for more than six months at Cresson have serious mental illness. The overrepresentation of prisoners with serious mental illness, as well as the direct indicators discussed above, indicates that individuals with serious mental illness are intentionally, and discriminatorily, being directed to solitary confinement because of their disabilities. Moreover, the inadequacy and inappropriateness of the services provided in solitary confinement for individuals with serious mental illness and the failure to adequately consult with mental health professionals on such placement, indicate that this placement is not necessary to accommodate individuals with serious mental illness.

Individuals with intellectual disabilities are also overrepresented in solitary confinement. As discussed above, in the last two years, Cresson has subjected almost half of the prisoners it has identified as having intellectual disabilities to three or more continuous months of solitary confinement. The overrepresentation of prisoners with intellectual disabilities in solitary confinement for prolonged periods raises serious questions about whether this disparity has a legitimate explanation, or if it means that the Prison is using isolation to manage these prisoners. Instead of any meaningful attempt at assessing the needs of these prisoners and providing the services to meet these prisoners' needs, the Prison has resorted to placement in highly restrictive housing. The Prison could protect prisoners with intellectual disabilities in a less restrictive setting.

Further compounding the mistreatment of prisoners with intellectual disabilities, the Prison has diverted many of them to the SSNU, a unit designed for prisoners with serious mental illness. As a result, prisoners with intellectual disabilities are exposed to the intense and chaotic environment of the SSNU, where dozens of prisoners languish without mental health treatment and engage in frightening and disturbing psychotic behaviors. This becomes virtually the only human contact that prisoners on the SSNU have. Prisoners with intellectual disabilities are forced to bear these conditions without any other meaningful opportunity for stimulation or relationships, and without even basic modifications geared toward their disabilities. The inadequacy and inappropriateness of solitary confinement and the services provided on the segregated units for individuals with intellectual disabilities clearly indicate that these placements are not intended or designed to accommodate those individuals or that such placement is necessary to provide effective services to those individuals.

The investigative evidence thus reflects methods of administration that have the effect of subjecting prisoners with serious mental illness or intellectual disabilities to discrimination on the basis of disability and of defeating or substantially impairing accomplishment of the objectives of the Prison's programs with respect to such individuals. *See* 28 C.F.R. § 35.130(b)(3). Cresson must modify its policies and practices so prisoners with serious mental illness or intellectual disabilities are not automatically or categorically housed in segregation and

instead receive the services they need. Cresson must ensure that qualified prisoners with serious mental illness or intellectual disabilities have as equal an opportunity as other prisoners to participate in and benefit from its housing and classification services, programs, and activities, and the benefits that flow from them, such as out-of-cell time, interaction with other prisoners, and movement outside of confined environments.[20]

## B. Cresson Fails to Properly Assess Prisoners on an Individual Basis To Determine Whether Segregation is Appropriate Housing

Cresson may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities, including classification, housing, and mental health services. 28 C.F.R. § 35.130(h). But Cresson "must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities." *Id.*; *see also* 28 C.F.R. § 35.139 (affirmative defense of direct threat); *Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 278-88 (1987) (finding direct threat under Section 504, which was codified at 28 C.F.R. § 35.139 for Title II, requires a showing of a "significant risk to the health or safety of others that cannot be eliminated or reduced to an acceptable level by the public entity's modification of its policies, practices, or procedures"). The burden on public entities in denying an individual with a disability the opportunity to participate in and benefit from services, programs, and activities on the basis of direct threat is considered a "heavy burden," and the same would be true of legitimate safety criteria. *See Lockett v. Catalina Channel Express, Inc.*, 496 F.3d 1061, 1066 (9th Cir. 2007); *Doe v. Deer Mt. Day Camp, Inc.*, 682 F. Supp. 2d 324, 347 (S.D.N.Y. 2010); *Celano v. Marriott Int'l, Inc.*, No. 05-4004 PJH, 2008 U.S. Dist. LEXIS 6172 at *51 (N.D. Cal. Jan. 28, 2008).

Cresson cannot categorically deny prisoners with serious mental illness or intellectual disability the opportunity to participate in and benefit from housing, classification, and mental health services. Instead, Title II requires Cresson to make individualized assessments of prisoners with serious mental illness or intellectual disabilities, and their conduct, relying on current medical or best available objective evidence, to assess: (1) the nature, duration, and severity of the risk; (2) the probability that the potential injury will actually occur; and (3) whether reasonable modifications of policies, practices, or procedures will mitigate or eliminate the risk. 56 Fed. Reg. 35,701 (1991); 75 Fed. Reg. 56,180 (2010); *Arline*, 480 U.S. at 287-88. The Department explained in the preamble to the original Title II regulation in 1991 that "[s]ources for medical knowledge include guidance from public health authorities." 56 Fed. Reg. 35,701; *see also Bragdon v. Abbott*, 524 U.S. 624, 636, 650 (1998) (explaining that, while not necessarily conclusive in all circumstances, "the views of public health authorities, such as the U.S. Public Health Service, CDC, and National Institutes of Health, are of special weight and authority").

---

[20] The American Correctional Association Standards similarly provide:

> The institution may be required to take remedial action, when necessary, to afford program beneficiaries and participants with disabilities an opportunity to participate in and enjoy the benefit of services, programs, or activities. Remedial action may include, but is not limited to: . . . making reasonable modifications to policies, practices, or procedures.

ACA, Standards for Adult Correctional Institutions § 4-4429 (4th ed. 2003 and Supp. 2010).

Applying the *Arline* factors, the individualized assessment should, at minimum, include a determination of whether the individual with a disability continues to pose a risk, whether any risk is eliminated after mental health treatment (e.g., whether the individual was denied medications, which resulted in the threat in the first place), and whether the segregation is medically indicated.[21]

Fundamentally, the individualized assessment should consider the views of mental health providers as to the prisoners' mental health needs and the appropriateness of the placement. *See Scherer v. Pa. Dep't of Corr.*, No. 3:2004-191 2007 WL 4111412 at *44 (W.D. Pa. Nov. 17, 2007) (finding that because the prisoner's misconduct may have been a result of his mental illness, "the lack of modification of its disciplinary procedures to account for . . . [his] mental illness . . . possibly resulted in a violation of the ADA"); *Purcell v. Pa. Dep't of Corr.*, No. 50-181J 2006 WL 891449 at *13 (W.D. Pa. Mar. 31, 2006) (finding that a genuine issue of material fact existed as to whether a "reasonable accommodation" was denied when the DOC refused to

circulate a memo to the staff concerning a prisoner's disability (Tourette's Syndrome) that explained that some of his behaviors were related to his condition, not intentional violations of prison rules).[22]

At Cresson, even when the prisoner has been identified by the Facility as having serious mental illness or intellectual disability, placement decisions may be automatic, and mental health staff have no role in determining or reviewing the appropriateness of placing the prisoner in the RHU. The hearing examiner and others involved in placement determinations routinely decide the prisoner's fate with an insufficient understanding of the implications of the prisoner's mental illness or disability. A PDOC policy statement provides that mental health staff may "recommend that the sanction be reduced" for those on the mental health roster, but no guidance is provided regarding when mental health staff should weigh in during the disciplinary or placement process. The hearing examiner told us that mental health staff never participate directly in disciplinary hearings. He noted that sometimes correctional staff relay to him information they have obtained about the mental health of the prisoner whose conduct is under consideration, but only on an informal and inconsistent basis. The failure to obtain input from mental health staff before prisoners with serious mental illness or intellectual disability are placed in solitary confinement for long periods means that the placement of the prisoner may occur without any consideration of that prisoner's mental health history or needs.

---

[21] *See, e.g.*, Position Statement on Segregation of Prisoners with Mental Illness, Am. Psychiatric Association (Dec. 2012), http://www.psychiatry.org/File%20Library/Learn/Archives/ps2012_PrisonerSegregation.pdf ("Placement of inmates with a serious mental illness in these settings can be contraindicated because of the potential for the psychiatric conditions to clinically deteriorate or not improve. Inmates with a serious mental illness who are a high suicide risk or demonstrating active psychotic symptoms should not be placed in segregation housing as previously defined and instead should be transferred to an acute psychiatric setting for stabilization.").

[22] Even before a prisoner enters the disciplinary process, at least one court has held that "[t]he ADA also requires that prison staff try to counsel [prisoners with intellectual disabilities], rather than subjecting them to the disciplinary process, when they break prison rules that they do not understand." *Clark*, 739 F. Supp. 2d at 1179 (also holding that program modifications for prisoners with intellectual disabilities should enable the prison to effectively communicate with such prisoners as part of the disciplinary process).

We viewed many instances in which Cresson failed to adequately consider mental health issues in the course of placement decisions, including the following:

- Prisoner MM received disciplinary time totaling 880 days of isolation at the RHU in a three-and-a-half-month period in late 2011 and early 2012. Records show that the nursing supervisor understood that MM's behavior was a product of untreated mental illness and resulted in disciplinary write-ups, but no one suggested reviewing his disciplinary history or advocated reducing his time in the RHU.

- On June 2, 2011, prisoner NN, diagnosed by PDOC with schizoaffective disorder and having spent several years at the SSNU, spat on an officer. NN received a misconduct for the assault. He pleaded guilty to the offense but stated, "I have health problems. I just snapped." The hearing officer sentenced NN to the full 90 days of disciplinary time in segregated housing, but the record does not reflect any input from mental health staff.

- OO, who has a 55 IQ and was diagnosed by PDOC with paranoid schizophrenia, accumulated more than 1,305 days in disciplinary time. Two-thirds of this disciplinary time has been for failure to obey orders or failure to stand for count, misconduct likely linked to his mental illness. However, 270 days of that time is for two incidents that occurred at Cresson's MHU – one in which OO reacted aggressively to a forced medication and one in which he spontaneously punched a staff member. Other information strongly suggests that OO's behavior was the result of his acute mental illness. OO's clinical record after the assault indicates that he "had little recall of the events." OO did not participate in his hearing for either incident, though his condition would have required an advocate to act on his behalf. Clinicians described him at the time as severely paranoid, withdrawn, unkempt, and unable to provide basic self-care. Records note that it took several weeks of medication after his transfer to Rockview's MHU for OO even to realize he was incarcerated. The disciplinary record does not reflect any input from mental health staff before his extended placement in segregated housing.

- Staff charged PP, a prisoner who has a 71 IQ and was diagnosed by PDOC with an anxiety disorder and antisocial personality disorder, with two misconducts following an April 2011 suicide attempt: one for "Tattooing, or other forms of self-mutilation" and another for "[d]estroying, altering, tampering with, or damaging property." The hearing examiner reviewed the charges at a disciplinary hearing held three days after the suicide attempt. The examiner decided to punish PP with 30 days of disciplinary time in segregated housing at the RHU for the attempted suicide. She also charged him $24.12 for damaging a towel in the course of trying to kill himself. No member of the mental health staff participated in the hearing.

To be sure, a public entity may, however, impose neutral rules or criteria that screen out, or tend to screen out, individuals with disabilities if the criteria are necessary for the safe operation of the program, provided that safety requirements must be based on actual risks and not on speculation, stereotypes, or generalizations about individuals with disabilities. Cresson has provided no evidence to make that showing here. Accordingly, Cresson must modify its policies and practices of automatically placing prisoners with serious mental illness or intellectual disabilities in segregation and conduct regular individualized analyses of such prisoners. Each individualized analysis must evaluate whether the prisoner poses a health or

safety risk to others, based on objective and medical evidence, including treating mental health professionals, and whether modifications that do not result in automatic segregation will eliminate or reduce the risk to an acceptable level.

**C.  Even When It Is Necessary To Remove Prisoners From General Population, Prisoners With Disabilities Cannot Be Denied or Provided Unequal Mental Health Services or Other Participation in or Benefit From Services, Programs, or Activities**

Cresson fails to ensure that prisoners placed in segregated housing by reason of a disability still receive adequate programs and services.  We found many prisoners with serious mental illness were not provided mental health treatment or access to other programs or services while they were in isolation.  For those prisoners with serious mental illness or intellectual disabilities who cannot be integrated into the general population, the Facility still has an obligation to provide the prisoners with the opportunity to participate in and benefit from mental health services and activities, and other services, programs, and activities to which prisoners without disabilities have access.  *See* 28 C.F.R. § 35.130(b).

**VII.    CONCLUSION AND NOTICE OF EXPANDED INVESTIGATION**

We recognize that this letter comes as PDOC actively downsizes Cresson as part of its plan to close the Facility by June 30, 2013.  Nonetheless, our findings have implications going forward.  First, we want to ensure that, for however long Cresson remains open, steps are taken to address the unconstitutional and otherwise unlawful conditions we identified there.

Second, our findings compel us to expand our investigation.  In the course of our investigation into Cresson, we received information indicating that similar conditions may exist throughout the PDOC system.  Specifically, we identified system-wide policies and individual instances that may reflect inappropriate placements of prisoners with serious mental illness into prolonged isolation.  Therefore, this letter also serves to inform you that, pursuant to our authority under CRIPA and the ADA, we are expanding our investigation into the conditions of confinement regarding prisoners with serious mental illness and/or intellectual disabilities housed in the RHU and other isolation units at the other PDOC prisons.  We will also focus on the denial of adequate mental health treatment and any substantial risk of serious harm resulting from the inappropriate use of prolonged isolation.  We recognize that PDOC faces enormous challenges at Cresson and throughout its prison system because an increasing percentage of its prison population has mental illness.  Since 1999, statewide the percentage of prisoners on PDOC's mental health roster increased by more than 50 percent to more than a fifth of all prisoners.  At Cresson, the percentage increased by more than a third since just 2007, to 28 percent of the prison population.

PDOC is by no means the only state prison system confronting these sorts of challenges.  For decades, states have increasingly turned to their prison systems to take on a task they are not naturally equipped to handle – namely, to serve as caregivers for those with serious mental illness.  Investigations conducted by the Civil Rights Division indicate that a burgeoning population of prisoners with mental illness may be connected to a state's failure to adequately care for individuals with mental illness.[23]  These individuals need to be cared for in our

---

[23]  Recent investigations have led to findings or complaints alleging that police departments in Portland and Seattle engaged in a pattern or practice of using unreasonable force during interactions with individuals who have or are perceived to have mental illness; that the practices of a city, county, state, and

communities in ways that are effective and safe, and that prevent them from unnecessarily becoming enmeshed in the state's criminal justice system.

While we recognize that PDOC likely has been left with the unenviable burden of having to take care of many individuals with mental illness who should not have ended up in the criminal justice system to begin with, we cannot excuse the unnecessarily restrictive conditions and lack of adequate mental health care imposed on this population as a result of their inappropriate placement into prolonged isolation. PDOC must meet the challenges presented by the prison population it now serves by ensuring that prisoners with serious mental health needs receive appropriate mental health treatment and making reasonable modifications for those with mental illness and intellectual disabilities.

While we have gathered a substantial amount of information about policies and practices that affect prisons across the PDOC system, we have not reached any conclusions about the subject matter of the expanded investigation. During the course of our expanded investigation, we will consider all relevant information, and, where appropriate, will offer recommendations on ways to improve prison conditions. If we find no systemic constitutional or ADA violations, we will notify you that we are closing the investigation.

On the other hand, if we find violations, we will inform you of the findings and attempt to work with PDOC to remedy any such violations. In addition, we will identify any financial, technical, or other assistance the United States may be able to provide to assist PDOC in correcting the identified deficiencies. In our many years of enforcing CRIPA, the good faith cooperation we receive from state or local jurisdictions frequently enables us to resolve our claims without resort to contested litigation.

We encourage PDOC to cooperate with our investigation and can assure you that we will seek to minimize any potential disruption our investigation may have on its operations. To be clear, we do not anticipate touring or visiting most of the 26 prisons in the PDOC system, nor do we anticipate conducting the kind of extensive document review conducted in the Cresson matter. Instead, we hope to work collaboratively with PDOC to efficiently and expeditiously collect the information we need.

We commend Secretary Wetzel and his staff for the cooperation they have already shown us and their receptivity to our concerns. Now that we are expanding our investigation, we look forward to continuing to work with PDOC in a collaborative manner.

Please note that this findings letter is a public document. It will be posted on the Civil Rights Division's website. The lawyers assigned to this investigation will be contacting the PDOC attorney to discuss this matter in further detail. If you have any questions, please feel free

---

youth court in Mississippi combine to create a "school-to-prison pipeline" that disproportionately affects youth who have disabilities; and that the states of Delaware, Mississippi, New Hampshire, and Georgia have unnecessarily institutionalized, and placed at risk of unnecessary institutionalization, individuals with mental illness. We have settled nearly every one of these cases and continue to pursue others.

to contact Jonathan Smith, the Chief of the Special Litigation Section, at (202) 514-6255, Special Litigation Counsel Avner Shapiro, at (202) 305-1840, or the lead attorney on the matter, Aaron Zisser, at (202) 305-3355.

                                        Sincerely,


Thomas E. Perez                          David J. Hickton
Assistant Attorney General               United States Attorney
United States Department of Justice       United States Attorney's Office
Civil Rights Division                     Western District of Pennsylvania


cc:    John E. Wetzel
       Secretary
       Pennsylvania Department of Corrections

       Kenneth Cameron
       Superintendent
       State Correctional Institution at Cresson

       Theron Perez
       Acting Chief Counsel
       Governor's Office of General Counsel

CIVIL RIGHTS — EIGHTH AMENDMENT — THIRD CIRCUIT
HOLDS PARENTS OF MENTALLY ILL YOUNG MAN HELD IN SOLI-
TARY CONFINEMENT STATED CLAIMS OF CRUEL AND UNUSUAL
PUNISHMENT. — *Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017).

Today, tens of thousands of Americans with serious mental illness
live in tiny concrete cells[1] — alone and largely forgotten.[2] They have
almost no engagement with or even sight of any other human beings,
sometimes with the exception of muffled mental health interviews across
sealed steel doors.[3] Many have lived like this not for days, but for
decades on end.[4] A practice described by the Supreme Court over a
century ago as a "terror and peculiar mark of infamy,"[5] solitary
confinement, or segregation,[6] has made a resurgence in American
prisons since the 1980s, and it has disproportionately affected people
with serious mental illness.[7] Though there is virtually universal medical

---

[1] *See* THE LIMAN PROGRAM, YALE LAW SCH. & ASS'N OF STATE CORR. ADM'RS, TIME-
IN-CELL: THE ASCA-LIMAN 2014 NATIONAL SURVEY OF ADMINISTRATIVE SEGREGATION
IN PRISON 3 (2015), https://law.yale.edu/system/files/documents/pdf/asca-liman_administrative_
segregation_report_sep_2_2015.pdf [https://perma.cc/YM48-LFDZ] (estimating 80,000 to 100,000
people were in solitary confinement in fall 2014); Keramet Reiter & Thomas Blair, *Punishing Men-
tal Illness: Trans-institutionalization and Solitary Confinement in the United States*, *in* EXTREME
PUNISHMENT 177, 181 (Keramet Reiter & Alexa Koenig eds., 2015) (noting that up to half of all
people in solitary confinement have a serious mental illness. A serious mental illness is "a major
mental disorder . . . usually characterized by psychotic symptoms and/or significant functional im-
pairments." Jeffrey L. Metzner & Jamie Fellner, *Solitary Confinement and Mental Illness in U.S.
Prisons: A Challenge for Medical Ethics*, 38 J. AM. ACAD. PSYCHIATRY & L. 104, 104–05 (2010).

[2] *See, e.g.*, Davis v. Ayala, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) ("Prisoners are
shut away — out of sight, out of mind.").

[3] *See, e.g.*, Palakovic v. Wetzel, 854 F.3d 209, 216–17, 228 (3d Cir. 2017); *Reassessing Solitary
Confinement: Hearing Before the Subcomm. on the Constitution, Civil Rights & Human Rights of
the S. Comm. on the Judiciary*, 112th Cong. 75–77 (2012) [hereinafter *Senate Hearing*] (statement
of Dr. Craig Haney) (describing typical conditions of solitary confinement).

[4] *See, e.g.*, OFFICE OF THE INSPECTOR GEN., U.S. DEP'T OF JUSTICE, REVIEW OF THE
FEDERAL BUREAU OF PRISONS' USE OF RESTRICTIVE HOUSING FOR INMATES WITH MEN-
TAL ILLNESS, at ii (2017), https://oig.justice.gov/reports/2017/e1705.pdf [https://perma.cc/RVD6-
6AFS].

[5] *In re* Medley, 134 U.S. 160, 170 (1890) (quoting Murder Act 1751, 25 Geo. 2 c. 37, § 1 (Eng.)).
For a literary account from almost fifty years before *In re Medley*, see CHARLES DICKENS,
AMERICAN NOTES 111 (Patricia Ingham ed., Penguin Books 2000) (1842): "[T]here is a depth of
terrible endurance in it which none but the sufferers themselves can fathom, and which no man has
a right to inflict upon his fellow creature. I hold this slow and daily tampering with the mysteries
of the brain, to be immeasurably worse than any torture of the body . . . ."

[6] While terminology varies, the practice generally involves prisoners spending an average of
twenty-three hours a day alone in "windowless or nearly windowless" small cells. *Senate Hearing*,
*supra* note 3, at 75.

[7] Reiter & Blair, *supra* note 1, at 179–81 (referring to the rise in prison populations and deinsti-
tutionalization as contributing factors).

1481

1482                    *HARVARD LAW REVIEW*                    [Vol. 131:1481

agreement[8] and growing judicial acknowledgment[9] that solitary confinement's disturbing harms are exacerbated for people with serious mental illness, the practice of segregating these individuals remains constitutional in just about every jurisdiction today.[10]  This may be changing.  Recently, in *Palakovic v. Wetzel*,[11] the Third Circuit held that the parents of a seriously mentally ill young man who was repeatedly placed in solitary confinement sufficiently stated multiple types of Eighth Amendment "cruel and unusual punishment" claims.[12]  The panel articulated forceful, broadly applicable reasoning for why segregation was a major, if not sufficient, factor in two of these types of claims.  Especially given the recent chorus of voices characterizing segregation as inconsistent with "evolving standards of decency,"[13] *Palakovic*'s reasoning lays a compelling doctrinal foundation for a future holding that segregating individuals with serious mental illness is per se unconstitutional.

The story of *Palakovic* begins with a twenty-two-year-old man with serious mental illness being convicted of burglary; it ends about a year later[14] with that same young man — described by his parents as "funny, vibrant, handsome, intelligent and loving" — hanging himself with a bedsheet,[15] alone in his "tiny cement cell."[16]  Upon entering state prison, Brandon Palakovic was diagnosed with multiple serious mental illnesses, including impulse control disorder, antisocial personality disorder, and alcohol dependence.[17]  During Brandon's[18] incarceration, guards repeatedly sent him to thirty-day stints in solitary confinement,

---

[8] *See, e.g.*, Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 CRIME & DELINQ. 124, 130–32, 142 (2003).

[9] *See, e.g.*, Madrid v. Gomez, 889 F. Supp. 1146, 1265–66 (N.D. Cal. 1995) (stating that segregating people with serious mental illness is "the mental equivalent of putting an asthmatic in a place with little air to breathe," *id.* at 1265).

[10] *See* Jessica Knowles, Note, *"The Shameful Wall of Exclusion": How Solitary Confinement for Inmates with Mental Illness Violates the Americans with Disabilities Act*, 90 WASH. L. REV. 893, 911–14 (2015).  The few exceptions stem from district court cases holding that segregating people with serious mental illness, or mental illness more generally, violates the Eighth Amendment.  *See, e.g.*, Ruiz v. Johnson, 37 F. Supp. 2d 855, 915 (S.D. Tex. 1999), *rev'd on other grounds and remanded sub nom.* Ruiz v. United States, 243 F.3d 941 (5th Cir. 2001); *Madrid*, 889 F. Supp. at 1265–66.

[11] 854 F.3d 209.

[12] U.S. CONST. amend. VIII; *Palakovic*, 854 F.3d at 234.

[13] Trop v. Dulles, 356 U.S. 86, 99–101 (1958) (plurality opinion) (holding that punishments contravening "evolving standards of decency," *id.* at 101, violate the Eighth Amendment).

[14] *Palakovic*, 854 F.3d at 215–17.

[15] *Statement from the Palakovic Family*, ABOLITIONIST L. CTR. (July 6, 2014), http:// abolitionistlawcenter.org/2014/07/07/statement-from-the-palakovic-family [https://perma.cc/VYN4-TF6E].

[16] *Palakovic*, 854 F.3d at 217.

[17] *Id.* at 216.

[18] This piece adopts the panel's practice of referring to the late Brandon Palakovic by his first name and to his parents as the "Palakovics"; to wholeheartedly echo the court, this is "[f]or purposes of clarity, and intend[s] no disrespect." *Id.* at 215 n.2.

allegedly in response to behaviors caused by his illness.[19]  There, in a cement cell of less than 100 square feet with slits as windows, he was isolated for twenty-three to twenty-four hours a day, with only five hours of weekly exercise in an "outdoor cage."[20]  Despite disclosing previous suicide attempts and being nicknamed "Suicide" by fellow inmates, Brandon received no counseling or group therapy.[21]  Instead, he received mental health interviews for one to two minutes at a time through the slit in his steel cell door.[22]  One summer day, Brandon was sent to solitary confinement again for a "minor rules violation."[23]  Four days later, he committed suicide.[24]  In response, his parents, Renee and Darian Palakovic, sued the prison's officials in district court.[25]

The Palakovics' complaint alleged that officials violated the Eighth Amendment in two ways: by acting with "deliberate indifference" to the prison's inhumane conditions of confinement and to its inadequate mental health care.[26]  The U.S. District Court for the Western District of Pennsylvania dismissed both types of claims.[27]  It held that, because "the ultimate harm alleged" was suicide, the "vulnerability to suicide" framework applied.[28]  This framework is narrower in scope than those typically associated with the two types of claims brought by the Palakovics, as it considers only facts surrounding a person's suicide, not the broader conditions the person endured while alive.[29]  The court ultimately found a failure to state facts sufficient to satisfy this framework for both types of claims.[30]  It further reasoned that the Palakovics were unable to claim inadequate mental health care because some care was provided to Brandon.[31]  The Palakovics then filed an amended complaint that set forth vulnerability-to-suicide claims, as well as a related failure-to-train claim; after dismissals,[32] the Palakovics appealed to the Third Circuit.[33]

---

[19] *Id.* at 216–17, 225.
[20] *Id.* at 217.
[21] *Id.* at 216.
[22] *Id.* at 216, 228.
[23] Palakovic v. Wetzel, No. 3:14-145, 2015 WL 3937499, at *1 (W.D. Pa. June 26, 2015).
[24] *Id.*
[25] *Id.*
[26] *Id.* at *1, *3.
[27] *Id.* at *13.
[28] *Id.* at *4.
[29] *See Palakovic*, 854 F.3d at 224–25.
[30] *Palakovic*, 2015 WL 3937499, at *6–7, *8–9.
[31] *Id.* at *8–9.
[32] Palakovic v. Wetzel, No. 3:14-145, 2016 WL 707486, at *5–8 (W.D. Pa. Feb. 22, 2016).
[33] *Palakovic*, 854 F.3d at 219.

The Third Circuit vacated and remanded to the district court.[34] Writing for a unanimous panel, Chief Judge Smith[35] held that it was legal error to dismiss the first complaint's inhumane conditions of confinement and inadequate mental health care claims as deficient under the vulnerability-to-suicide framework.[36] The panel noted that the Palakovics were seeking to hold officials accountable for Brandon's experience over the course of his time living in prison, not for failing to prevent his death.[37] As such, the district court was wrong to require that the two types of claims fit the vulnerability-to-suicide framework; the Palakovics should not have been precluded from moving forward on their claims because Brandon committed suicide.[38] The court then evaluated the claims, applying the two-pronged "deliberate indifference" test in light of the plausibility standard for surviving a motion to dismiss.[39]

The panel first found that the Palakovics sufficiently stated their claim of inhumane conditions of confinement.[40] It concluded that the first, objective prong of the deliberate indifference test — the existence of a substantial risk of serious harm — was met, referencing the "growing consensus" regarding segregation's potential to "cause severe and traumatic psychological damage."[41] Turning to the second, subjective prong — that prison officials had knowledge of the risk but recklessly disregarded it — the panel noted that officials' diagnoses of Brandon indicated knowledge of his illness, and that past issues of other inmates' self-harm indicated knowledge of the risks of segregation.[42] It concluded that those facts, "in light of the increasingly obvious reality" that extended segregation causes serious mental health damage, were "more than sufficient" to state a claim.[43]

The court also found that the Palakovics sufficiently stated their claims of inadequate mental health care.[44] The panel recognized that the "substantial risk of serious harm" prong, represented by a "serious medical need" for inadequate care claims, was uncontested.[45] In considering the "reckless disregard" prong, it refuted the district court's reasoning by noting that even if a prison provides some care, that care can be so inadequate that it amounts to recklessness.[46] The panel identified

---

[34] *Id.* at 234.
[35] Chief Judge Smith was joined by Judges Jordan and Shwartz.
[36] *Palakovic*, 854 F.3d at 225.
[37] *Id.* at 224.
[38] *Id.* at 224–25.
[39] *Id.* at 219–20.
[40] *Id.* at 226.
[41] *Id.* at 225.
[42] *Id.* at 226.
[43] *Id.*
[44] *Id.* at 229.
[45] *Id.* at 227 n.23.
[46] *Id.* at 227–28.

issues with Brandon's "minimal treatment"[47] and system-wide problems, like the substitution of punishment for treatment.[48] It emphasized the "final, key component" of the claim "which [took] it from the realm of mere negligence to a potential claim of constitutional magnitude": the officials allowed Brandon, in his "fragile" state, "to be repeatedly subjected to the harsh and unforgiving confines of solitary confinement."[49] In doing so, they allegedly "affirmatively contributed" to the deterioration of his condition.[50]    Separately, the panel concluded that the Palakovics sufficiently stated their vulnerability-to-suicide and failure-to-train claims, citing evidence of officials ignoring suicide warning signs and noting the reasonable possibility that staff training could have prevented the death.[51]

In *Palakovic*, the Third Circuit laid out a legal blueprint for establishing that solitary confinement of individuals with serious mental illness is a per se Eighth Amendment violation.  Though the panel did not go so far as to state a per se holding, its analysis paved two potential avenues to such a holding and lent credence to a third.  The panel's reasoning that segregating people with serious mental illness creates a severe and "obvious" risk of harm[52] can be used to argue that the practice always meets the deliberate indifference test for inhumane conditions of confinement claims.  And its reasoning that the practice can be the "key component"[53] in finding reckless disregard of serious medical needs can be used to argue that the practice always meets the deliberate indifference test for inadequate mental health care claims.  These two arguments are even more potent when combined with a third rationale, hinted at by the panel, that segregating those with serious mental illness defies "evolving standards of decency."[54]    Overall, the reasoning in *Palakovic* has the force to dismantle the constitutionality of placing Americans with serious mental illness in solitary confinement, and to weaken the legal foundations of solitary confinement altogether.

One pathway to per se constitutional liability advanced by the Third Circuit is the concept that segregating people with serious mental illness amounts to deliberate indifference to inhumane conditions of confinement.  First, the panel — notably "[b]efore . . . turn[ing] to the Palakovics' particular allegations"[55] — established that there is a severe risk of harm *inherent* in segregation.  In describing this risk as independent

---

[47] *Id.* at 228.

[48] *Id.* at 228–29.

[49] *Id.* at 229.

[50] *Id.*

[51] *Id.* at 229–34.

[52] *Id.* at 226.

[53] *Id.* at 229.

[54] Trop v. Dulles, 356 U.S. 86, 101 (1958) (plurality opinion).

[55] *Palakovic*, 854 F.3d at 225.

1486                    HARVARD LAW REVIEW              [Vol. 131:1481

of case-specific facts, it supported the argument for per se satisfaction
of the deliberate indifference test's first prong — a substantial risk of
serious harm — for conditions of confinement claims. Further, courts
sometimes distinguish long-term segregation in their analyses,[56] but the
time Brandon spent in segregation — multiple thirty-day periods over
about a year — is not considered "long-term,"[57] meaning the panel did
not cabin its reasoning to this category. Second, the panel provided a
rationale for per se satisfaction of the recklessness prong, which often
equips officials with impermeable defenses.[58] Its key assertion was that
the risk of harm is "increasingly obvious."[59] This claim — combined
with the principle, articulated by the Supreme Court in *Farmer v.
Brennan*,[60] that knowledge can be inferred by establishing that a risk of
harm is obvious[61] — supports a way for future plaintiffs to show reck-
lessness without having to prove facts about actual knowledge. To be
sure, the panel did not fully embrace a per se rule; its recklessness anal-
ysis briefly noted facts specific to Brandon's case.[62] Nevertheless, its
conclusions about the serious, obvious nature of the risk in general ad-
vances the theory that segregating people with serious mental illness is
itself sufficient to violate the Constitution.

The court also cleared a second, more inventive path to per se liabil-
ity: the theory that segregating people with serious mental illness
amounts to deliberate indifference to serious medical needs. Courts
have widely held that adequate treatment of serious mental illness is a
serious medical need, satisfying the deliberate indifference test's first
prong.[63] *Palakovic*'s innovation is its characterization of Brandon's seg-
regation, given his fragile state, as the "key component" that elevated
officials' care to recklessness under the second prong.[64] Though courts

---

[56] *See, e.g.*, Hutto v. Finney, 437 U.S. 678, 688 (1978) (affirming a district court order's thirty-day time limit for segregation).

[57] *See* ABA STANDARDS FOR CRIMINAL JUSTICE: TREATMENT OF PRISONERS 23-1.0(o) (3d ed. 2011) (defining "long-term" as exceeding or expected to exceed thirty days).

[58] *See, e.g.*, Wilson v. Seiter, 501 U.S. 294, 310 (1991) (White, J., concurring in the judgment) (predicting that a subjective intent prong "likely will prove impossible to apply in many cases" because prison conditions are the result of "cumulative actions and inactions"); Holly Boyer, Comment, *Home Sweet Hell: An Analysis of the Eighth Amendment's "Cruel and Unusual Punishment" Clause as Applied to Supermax Prisons*, 32 SW. U. L. REV. 317, 332–33 (2003) (stating that it can be "next to impossible," *id.* at 333, to satisfy the subjective prong); *see also* Scarver v. Litscher, 434 F.3d 972, 975–76 (7th Cir. 2006) (finding no recklessness even though officials possessed an article about the harms of segregating those with serious mental illness).

[59] *Palakovic*, 854 F.3d at 226.

[60] 511 U.S. 825 (1994).

[61] *Id.* at 842; *see* Beers-Capitol v. Whetzel, 256 F.3d 120, 135 (3d Cir. 2001). The *Palakovic* panel cited to this concept in a footnote. 854 F.3d at 225 n.17.

[62] *See Palakovic*, 854 F.3d at 226.

[63] *See, e.g.*, Wellman v. Faulkner, 715 F.2d 269, 272 (7th Cir. 1983); Inmates of Allegheny Cty. Jail v. Pierce, 612 F.2d 754, 763 (3d Cir. 1979); Bowring v. Godwin, 551 F.2d 44, 47 (4th Cir. 1977).

[64] *Palakovic*, 854 F.3d at 229.

have historically been hesitant to second-guess prison care,[65] new routes have been created over time for plaintiffs to demonstrate recklessly inadequate care, including by showing a lack of individualized care.[66] *Palakovic* builds on this trend — and potentially unlocks segregation challenges as a route for future plaintiffs with serious mental illness — by suggesting that segregation is fundamentally incompatible with the treatment needs of a person suffering from serious mental illness. Moreover, a defendant's only safe harbor — arguing lack of knowledge of a person's serious mental illness — is increasingly impeded by the growing judicial view that adequate mental health care requires adequate screening for mental illness.[67] As such, though it noted other issues with Brandon's care,[68] the Third Circuit's emphasis on segregation as the linchpin of a recklessness finding forms a powerful second theory of per se liability under the inadequate mental health care claim.

A third and more direct avenue to per se liability, to which language in *Palakovic* lends support, is the theory that segregating people with serious mental illness is unconstitutional because it contravenes "evolving standards of decency that mark the progress of a maturing society."[69] In determining these standards, the Supreme Court has emphasized state legislative action, while also looking to factors like professional consensus, history, and international norms.[70] Starting with state policy, several states have banned or severely restricted the practice of segregating people with serious mental illness.[71] *Palakovic* touched on the professional consensus and history factors, as it detailed the "growing consensus — with roots going back a century" — that segregation can

---

[65] *See id.* at 227–28.

[66] *See, e.g.*, Roe v. Elyea, 631 F.3d 843, 862–63 (7th Cir. 2011) (considering as recklessly inadequate care "a failure to exercise medical — as opposed to administrative — judgment," *id.* at 863); Monmouth Cty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 346–49 (3d Cir. 1987) (considering as recklessly inadequate care the intentional refusal to provide individualized care).

[67] *See, e.g.*, Woodward v. Corr. Med. Servs., 368 F.3d 917, 927 (7th Cir. 2004); Gibson v. County of Washoe, 290 F.3d 1175, 1189 (9th Cir. 2002).

[68] *See Palakovic*, 854 F.3d at 228–29. In practice, many of these issues, like poor diagnostic procedures, generally exist when any person with serious mental illness is segregated, both because segregation's use is frequently an effect of inadequate resources and because its tight security "often preclude[s] meaningful and appropriate therapeutic contact." Haney, *supra* note 8, at 143.

[69] Trop v. Dulles, 356 U.S. 86, 101 (1958) (plurality opinion).

[70] *See* Atkins v. Virginia, 536 U.S. 304, 312–17, 316 n.21, 321 (2002) (referencing state statutes supported by medical expertise, religious views, and international norms in striking down capital punishment of individuals with mental disability); Thompson v. Oklahoma, 487 U.S. 815, 830–31, 838 (1988) (plurality opinion) (citing the views of "respected professional organizations," *id.* at 830, and other nations in striking down capital punishment of people younger than sixteen years old at the time of offense); Gregg v. Georgia, 428 U.S. 153, 176–77 (1976) (plurality opinion) (noting the historic acceptance of capital punishment for murder as "strongly support[ing]," *id.* at 176, the practice's constitutionality).

[71] Coleman v. Brown, 28 F. Supp. 3d 1068, 1106 n.50 (E.D. Cal. 2014) (noting seven states that had eliminated or severely restricted the practice, or had begun doing so, by 2014).

cause severe harm.[72] And looking internationally, there is considerable agreement that segregation can be a form of torture.[73] Adding context is the recent momentum in chipping away at the legal underpinnings of segregation generally, especially as it relates to youth[74] and long-term isolation of the general inmate population.[75] Ultimately, language in *Palakovic* — combined with these factors and the fact that the "evolving standards of decency" concept has spurred recent expansions of Eighth Amendment rights, including for people with mental disability[76] — supports a final route to per se unconstitutionality: segregation of people with serious mental illness, and perhaps segregation in general, violates the Eighth Amendment's central proscription of cruel and unusual punishment, independent of the deliberate indifference doctrine.

After filing their claims in 2014, Brandon's parents wrote about their aspirations:

> Brandon is finally at peace and can no longer be drugged, locked up and ignored, but we know there are others that are still enduring similar nightmares. We hope and pray that somehow, someway Brandon's death can bring attention to these serious issues within Pennsylvania State Correctional Institutions and save other prisoners and their families from this same pain.[77]

Perhaps the Palakovics' prayer is being answered. The Third Circuit listened carefully to Brandon's story, and its opinion may catalyze a long-elusive change to prison conditions in America. It advances legal theories which may compel a holding that solitary confinement of seriously mentally ill individuals is a per se Eighth Amendment violation. And the panel's powerful characterization of segregation's harmful effect on *all* people may even act as a stepping stone to a broader holding that solitary confinement is facially unconstitutional. Though the underlying failures to treat mental illness in prisons would persist, these holdings would uplift some of our society's most neglected individuals while honoring the Eighth Amendment's foundational value: human dignity.[78] And if it is true that the barometer of a civilization is how it treats its most vulnerable members,[79] these changes would be a heartening mark of progress in American society.

---

[72] *Palakovic*, 854 F.3d at 225 (citing Williams v. Sec'y of Pa. Dep't of Corr., 848 F.3d 549, 566–67 (3d Cir. 2017)).

[73] *See, e.g.,* Juan E. Méndez (Special Rapporteur of the Human Rights Council), *Interim Rep. on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,* ¶ 74, U.N. Doc A/66/268 (Aug. 5, 2011) (stating that segregation can violate the Convention Against Torture and the International Covenant on Civil and Political Rights).

[74] *See, e.g.,* V.W. *ex rel.* Williams v. Conway, 236 F. Supp. 3d 554, 582–85 (N.D.N.Y. 2017).

[75] *See, e.g.,* Ruiz v. Texas, 137 S. Ct. 1246, 1247 (2017) (Breyer, J., dissenting); Davis v. Ayala, 135 S. Ct. 2187, 2209–10 (2015) (Kennedy, J., concurring).

[76] *See, e.g.,* Atkins v. Virginia, 536 U.S. 304, 321 (2002).

[77] *Statement from the Palakovic Family, supra* note 15.

[78] Trop v. Dulles, 356 U.S. 86, 100 (1958) (plurality opinion).

[79] PEARL S. BUCK, MY SEVERAL WORLDS 337 (1954).



# Involuntary Civil Commitment: Fourteenth Amendment Due Process Protections

May 24, 2023

**Congressional Research Service**

https://crsreports.congress.gov

R47571



**Congressional Research Service**
Informing the legislative debate since 1914

SUMMARY

R47571

May 24, 2023

Hannah-Alise Rogers
Legislative Attorney

# Involuntary Civil Commitment: Fourteenth Amendment Due Process Protections

Involuntary civil commitment refers to the forced hospitalization of persons with serious mental illness (SMI). While this process is generally governed by state law, it also implicates constitutional concerns and constraints under the Fourteenth Amendment Due Process Clause of the U.S. Constitution, specifically with regard to the liberty interests of the confined patients.

The law concerning involuntary commitment for persons with SMI has evolved over time. Certain federal statutes address civil commitment, such as laws concerning federal prisoners with SMI and requirements for certain health care facilities that treat patients with SMI. In addition, the District of Columbia Hospitalization of the Mentally Ill Act governs inpatient hospitalization in the District.

The Fourteenth Amendment's Due Process Clause is interpreted by courts to provide both procedural and substantive due process protections for persons who are subject to involuntary civil commitment. Courts have recognized and applied due process rights when such persons face deprivations of liberty and property due to their mental health status, particularly in the context of involuntary hospitalization.

As to procedural due process rights for the civilly committed, there are well-established, constitutionally protected rights of notice of the confinement and a hearing. The Supreme Court has also established a minimum burden of proof for purposes of involuntary civil commitment, although some states have higher standards. Whether and to what extent an indigent person facing civil commitment has a right to counsel, a right to an independent expert to testify on his or her behalf, or a right to a jury trial are all unsettled areas of law. While many states protect these rights, the Supreme Court has never ruled that the Fourteenth Amendment guarantees any of these protections.

With respect to substantive due process protections, there are two types of constitutionally protected substantive due process rights that have been recognized for persons subject to involuntary hospitalization. The first is the liberty interest of all persons to be free from confinement; the second is related to the rights of confined persons to safe conditions. Other substantive due process rights of individuals with SMI include requisite standards of dangerousness before a state may involuntarily commit a person, as well as a committed person's rights to safe conditions, freedom of movement, and basic training. Legal issues related to a committed individual's right to receive or to refuse medical treatment during confinement also appear throughout the relevant case law.

# Contents

Introduction ........................................................................................................................... 1

History of U.S. Laws Regarding Involuntary Civil Commitment ...................................... 3

Select Federal Laws Related to Involuntary Civil Commitment........................................ 4

The Fourteenth Amendment's Due Process Clause: Protections for People with Serious
    Mental Illness .................................................................................................................. 6

    Procedural Due Process Requirements for Civil Commitment.................................... 7
        Notice and Hearing ................................................................................................ 7
        Burden of Proof ..................................................................................................... 10
        Right to Counsel .................................................................................................... 11
        Right to an Expert Witness at Trial ..................................................................... 14
        Right to a Jury Trial .............................................................................................. 15

    Substantive Due Process Protections for Individuals Subject to Involuntary Civil
        Confinement............................................................................................................ 17
        Showing of Requisite Conduct—"Dangerousness"............................................. 18
        The Rights to Safety and Freedom from Confinement ...................................... 21
        The Rights to Receive or Refuse Treatment ...................................................... 22

Considerations for Congress............................................................................................. 28

# Contacts

Author Information............................................................................................................ 30

# Introduction

Involuntary civil commitment, or the forced hospitalization of persons with serious mental illness (SMI),[1] is a type of mental health treatment that presents tension between an individual's liberty interests and the state's interests in protecting citizens from danger. According to the Substance Abuse and Mental Health Services Administration (SAMHSA),[2] a division of the U.S. Department of Health and Human Services (HHS), civil commitment is a legal intervention wherein a judge or jury may order a person with a mental illness who meets certain criteria to be confined to a psychiatric hospital, or to receive supervised outpatient treatment.[3]

While civil commitment is generally a matter of state law,[4] federal constitutional concerns and constraints can arise, especially with regard to the confined patient's liberty interests. These constitutional constraints limit state civil commitment laws in at least three ways. First, constitutional constraints affect how states may initially detain an individual suspected of experiencing SMI and transport that individual to a treatment facility.[5] Second, constitutional constraints affect how states may seek to commit such individuals to mental health facilities on a longer-term basis.[6] Third, they affect how states must treat civilly confined individuals and protect their rights during confinement.[7] Over the last 50 years, the U.S. Supreme Court has addressed these three areas in various civil commitment cases.

In recent years, involuntary civil commitment has garnered attention from stakeholders, as many states grapple with the use of involuntary civil commitment for vulnerable populations, including children and unhoused individuals.[8] With respect to the latter, changes in mental hygiene laws in states with large populations of unhoused persons, including New York, California, and Hawaii, have sparked debates about the rights of unhoused individuals with SMI and the most effective ways to assist them.[9] For example, in November 2022, New York City announced a new policy

---

[1] SAMHSA defines adults with SMI as "persons age 18 and over, who currently or at any time during the past year, have had a diagnosable mental, behavioral, or emotional disorder of sufficient duration to meet diagnostic criteria . . . that has resulted in functional impairment which substantially interferes with or limits one or more major life activities." 58 Fed. Reg. 29422 (May 20, 1993).

[2] For more information on SAMHSA, see CRS Report R46426, *Substance Abuse and Mental Health Services Administration (SAMHSA): Overview of the Agency and Major Programs*, by Johnathan H. Duff.

[3] SUBSTANCE ABUSE & MENTAL HEALTH ADMIN., OFF. OF THE CHIEF MEDICAL OFFICER, CIVIL COMMITMENT AND THE MENTAL HEALTH CARE CONTINUUM; HISTORICAL TRENDS AND PRINCIPLES FOR LAW AND PRACTICE 1 (2019) [hereinafter CIVIL COMMITMENT REPORT], https://www.samhsa.gov/sites/default/files/civil-commitment-continuum-of-care.pdf.

As explained in a recent report from the Treatment and Advocacy Center, there are different types of involuntary treatment for the mentally ill, including emergency psychiatric evaluation, inpatient civil commitment, and assisted outpatient treatment. States have different laws and procedures for each of the three types of treatment. For more information, see TREATMENT ADVOC. CTR., GRADING THE STATES: AN ANALYSIS OF U.S. PSYCHIATRIC TREATMENT LAWS (2020), https://www.treatmentadvocacycenter.org/storage/documents/grading-the-states.pdf. For purposes of this report, "involuntary civil commitment" generally refers to long term, in-patient commitment, unless otherwise stated.

[4] CIVIL COMMITMENT REPORT, *supra* note 3, at 1.

[5] *See, e.g., Ex parte* Bashinsky, 319 So. 3d 1240 (Ala. 2020).

[6] *See, e.g.,* O'Connor v. Donaldson, 422 U.S. 563 (1975); Vitek v. Jones, 445 U.S. 480 (1980).

[7] *See, e.g.,* Mills v. Rogers, 457 U.S. 291 (1982), Youngberg v. Romeo, 457 U.S. 307 (1982).

[8] *See, e.g.,* Donna St. George, *In Florida, Showing Mental Health Struggles Could Get a Child Detained,* WASH. POST., Mar. 16, 2023, https://www.washingtonpost.com/education/2023/03/16/florida-law-child-mental-health/?utm_campaign=ext_rweb&utm_medium=referral&utm_source=extension.

[9] *See* Teresa Wiltz, *'Gravely Disabled' Homeless Forced into Mental Health Care in More States,* PEW TRUSTS, Sept. 11, 2019, https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2019/09/11/gravely-disabled-homeless-forced-into-mental-health-care-in-more-states; Brittany Lyte, *Homeless Advocates Test Hawaii's New Forced-*
(continued...)

under Section 9.39 of its Mental Hygiene Law[10] that allows state authorities, including firefighters and police officers, to involuntarily commit unhoused individuals who are suspected of being a harm to themselves. The policy sparked controversy from stakeholder and advocacy groups over concerns that it could deprive unhoused persons of their liberty and further deter individuals with SMI from seeking mental health treatment.[11]

This report addresses how the Constitution's Due Process Clause of the Fourteenth Amendment protects the interests of persons with SMI who are subject to involuntary civil commitment. Where relevant, this report references other constitutional provisions implicated by involuntary civil commitment, such as the Seventh Amendment right to jury trial.[12] First, the report considers the history of involuntary commitment for persons with mental illness and discusses how the law has evolved around this issue over time. Next, the report highlights select federal laws and regulations related to civil commitment. Third, the report covers both procedural and substantive due process protections under the Fourteenth Amendment's Due Process Clause for persons who are subject to involuntary civil commitment.[13]

While the report does not cover every possible procedural due process protection available to persons with SMI, it discusses the procedural protections of notice, hearing, burden of proof, right to counsel, right to an expert witness, and the right to a jury trial. With respect to substantive due process protections, it addresses the requisite standard of dangerousness that a state must prove to involuntarily commit a person, as well as the committed patient's rights to safe conditions, freedom of movement, and basic training. The report concludes with a discussion of the rights of civilly committed patients both to receive and reject medical treatment during their confinement.

---

*Treatment Law*, HONOLULU CIVIL BEAT, Sept. 4, 2019, https://www.civilbeat.org/2019/09/homeless-advocates-test-hawaiis-new-forced-treatment-law/.

[10] N.Y. MENT. HYG. LAW § 9.39 (2022) (governing emergency involuntary hospitalization admissions of mentally ill patients for observation, examination, care, and treatment).

[11] *NYCLU on Mayor Adams' Expansion of Forcible Detentions and Hospitalizations for Mental Illness*, NYCLU, Nov. 29, 2022, https://www.nyclu.org/en/press-releases/nyclu-mayor-adamss-expansion-forcible-detentions-and-hospitalizations-mental-illness; Talal Ansari, *New York City Plan to Involuntarily Hospitalize Some Mentally Ill Homeless Faces Legal Challenge*, Wall Street Journal, (Dec. 8, 2022), https://www.wsj.com/articles/new-york-city-plan-to-involuntarily-hospitalize-some-mentally-ill-homeless-faces-legal-challenge.

[12] This report focuses on the constitutional protections stemming from the Fourteenth Amendment for involuntarily committed patients with SMI. Involuntary civil commitment and the processes leading up to it (e.g., detention by an officer) potentially implicate other constitutional protections. For example, the Second Circuit has suggested that the Fourth Amendment's prohibition on unreasonable searches and seizures was implicated when officers arrested a suspected individual with SMI pursuant to the New York Mental Hygiene law. *See* Kerman v. City of New York, 261 F.3d 229, 237 (2d Cir. 2001).

[13] This report focuses on Fourteenth Amendment protections for individuals with SMI who face any type of involuntary civil commitment; no distinction is drawn between an initial civil commitment and a long-term civil commitment. Moreover, the differences in state laws, which reflect varying ways of committing individuals, concerning these two types of civil commitment are generally omitted. Differences in the law include whether the proposed commitment is an emergency commitment or long-term commitment, who is authorized to initiate the commitment proceedings, how the need must be demonstrated, when the proposed patient can request a hearing, and what the standard is for the commitment itself. As an example, *compare* ARIZ. REV. STAT. § 36-520A (stating that "any responsible individual may apply for a court-ordered evaluation of a person . . . alleged to be, as a result of a mental disorder, a danger to self or to others"), *with* CONN. GEN. STAT. § 17a-498, which does not specify who can file a commitment application.

# History of U.S. Laws Regarding Involuntary Civil Commitment

English laws concerning mental illness began as early as the 13th century, and in the United States, formalized care in mental hospitals appeared in the late 18th and early 19th centuries.[14] There are two generally accepted legal bases under which a state may justify involuntary confinement of persons with SMI: *parens patriae* and state police power.[15] Under the *parens patriae* theory, the state is obligated to care for citizens who are unable to care for themselves; this theory assumes that such persons are unable to make informed decisions about their need for treatment, justifying state intervention.[16] The *parens patriae* power was primarily used to justify civil confinement until the mid-1970s, after which police power became more commonly used.[17] Under the police power theory, the state has a responsibility to maintain public order and safety and thus may confine people on the basis that they pose a threat to themselves or others.[18]

Until reforms began in the mid-1800s, Americans could be involuntarily confined to mental hospitals under questionable circumstances, and these hospitalizations were not necessarily for the benefit of the person suffering from mental illness. For example, in 1860, Ms. Elizabeth Parsons Ware Packard was committed to a state mental hospital under an Illinois law that allowed married women to be civilly committed at the behest of their husbands, without actual evidence of a mental health issue.[19] After her release, Ms. Packard led a reform movement to create judicial procedures that would prevent wrongful involuntary hospitalization, successfully changing state laws in Illinois, Iowa, Maine, and Massachusetts.[20] Ms. Packard also fought for patient's rights, including the right to untampered mail and better living conditions.[21] During this time, many states developed "semi-formal" procedures for the emergency detention and observation of patients with SMI, generally at the request of a family member, doctor, or the police.[22]

The late 1960s saw the beginnings of the "Patient Rights Movement," which brought changes in admission procedures and generally aimed to prevent unnecessary, rather than simply unjust, involuntary civil commitments.[23] The movement came about as the result of both lawyers and mental health clinicians calling attention to problematic aspects of involuntary confinement, including overcrowded hospitals, patient neglect and mistreatment, lack of available treatment in both inpatient and community-based settings, and unnecessary commitments.[24]

---

[14] CIVIL COMMITMENT REPORT, *supra* note 3, at 2. For a brief history of institutional care in the United States, *see* CRS In Focus IF10870, *Psychiatric Institutionalization and Deinstitutionalization*, by Johnathan H. Duff.

[15] Karl Menninger, Wrongful Confinement to a Mental Health or Developmental Disabilities Facility, 44 AM. JUR. PROOF OF FACTS 3d 217, 230 (1997).

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.* at 225. For more information about Elizabeth Packard and the specific reforms that she championed, *see* Mariana Brandman, *Elizabeth Packard, National Women's History Museum*, https://www.womenshistory.org/education-resources/biographies/elizabeth-packard (last accessed Feb. 27, 2023).

[20] Menninger, *supra* note 15, at 225.

[21] Brandman, *supra* note 19.

[22] Menninger, *supra* note 15, at 225.

[23] *Id.* For more comprehensive information on civil commitment reforms, *see* PAUL APPELBAUM, ALMOST A REVOLUTION: MENTAL HEALTH LAW AND THE LIMITS OF CHANGE (1994).

[24] Menninger, *supra* note 15, at 225. The lack of community-based (i.e., non-inpatient) facilities offering mental health (continued...)

In 1975, the U.S. Supreme Court recognized the constitutionally protected liberty interests of the involuntarily hospitalized, barring states from committing mentally ill patients who were not a danger to themselves or others.[25] Under the changing legal landscape during this time, many states shifted from a *parens patriae* justification for civil confinement to a police power view, which more closely aligns with the idea that dangerous persons with SMI can appropriately be involuntarily confined.[26] A few years later, in 1979, the Court established that the threshold burden of proof for civil commitment hearings was more than a mere civil preponderance standard, holding that the state must demonstrate its case for involuntary hospitalization with clear and convincing evidence.[27] During this time, actions from both Congress[28] and the Supreme Court led to many states updating and revising their civil commitment laws.[29]

# Select Federal Laws Related to Involuntary Civil Commitment

Standards under which individuals can be civilly committed are not widely defined by federal law or regulation and have generally been left to states, with each state having different procedures and processes.[30] There are some federal statutes that address involuntary commitment, a sampling of which are discussed in this section, including laws governing federal prisoners and patients' rights, and the D.C. Code.[31]

Many of the federal statutes that directly address civil commitment focus on commitment proceedings for federal prisoners.[32] In the 1980s, Congress began discussing prison reform, and

---

treatment was also an issue being discussed in the 1960s. *See, e.g.,* Lake v. Cameron, 267 F.Supp. 155 (Dist. Ct. D.C. 1967), wherein the D.C. District Court addressed the necessity of civil confinement in Saint Elizabeths Hospital for an unhoused patient. When assessing whether there were alternatives to inpatient care, the court noted that the patient required constant supervision for her safety. The court found that the hospital was the only facility that could provide the patient with the type of care she required, because there were insufficient public funds to place her in a nursing home, and no other community-based facilities were available. *Id.* at 158.

[25] O'Connor v. Donaldson, 422 U.S. 563 (1975).

[26] Menninger, *supra* note 15, at 230.

[27] Addington v. Texas, 441 U.S. 418 (1979).

[28] *See* discussion of the District of Columbia Hospitalization of the Mentally Ill Act, *infra* "Select Federal Laws Related to Involuntary Civil Commitment."

[29] Megan Testa & Sara West, *Civil Commitment in the United States*, 7 PSYCHIATRY 30, 33 (2010).

[30] *See also supra* "History of U.S. Laws Regarding Involuntary Civil Commitment."

[31] The D.C. Code is included in this section, because Congress, in conjunction with the D.C. Council, controls D.C. law. Congress's control of D.C. stems from the U.S. Constitution, which grants Congress the power to "exercise exclusive legislation" over a federal district, not to exceed 10 square miles, to "become the Seat of the Government in the United States." U.S. CONST., art. I, § 8, cl. 17. While civil commitment also arises in the context of agency regulations governing federal health care programs, the focus of this section is limited to federal statutes. It should be noted that other federal laws address the circumstances under which certain costs related to civil commitment may be covered by federal health programs. The Social Security Act, which authorizes the Medicare and Medicaid programs, excludes inpatient mental health care for patients under age 65 (commonly referred to as the "institutions for mental disease" or "IMD" exclusion).[31] 42 U.S.C. § 1396d(a)(B). *See also* CRS In Focus IF10222, *Medicaid's Institutions for Mental Disease (IMD) Exclusion*, by Alison Mitchell. States currently have a few options when seeking to use Medicaid funds to cover IMD services, including Section 1115 waivers. For more information about Section 1115 waivers and how they are used in the Medicaid IMD context, see MaryBeth Musumeci et al., *State Options for Medicaid Coverage of Inpatient Behavioral Health Services*, KAISER FAMILY FOUND., Nov. 9, 2019, https://www.kff.org/medicaid/report/state-options-for-medicaid-coverage-of-inpatient-behavioral-health-services/.

[32] In addition to those mentioned here, other federal statutes concern civil commitment of prisoners. *See, e.g.,* 34 U.S.C. (continued...)

as part of the FY1985 appropriations bill, Congress passed the Insanity Defense Reform Act of 1984 to provide the affirmative defense of insanity in federal criminal proceedings.[33] The Act was codified in 18 U.S.C. §§ 4241–4247 and outlines requirements related to the treatment of federal prisoners with SMI.[34] Other places in the criminal code also prohibit persons who have "been adjudicated as mental[ly] defective or who [have] been committed to a mental institution" from possessing firearms.[35]

Federal law also addresses standards and other requirements related to the civil commitment in regulations governing certain health care and other community-based settings. In 2000, Congress passed the Children's Health Act (CHA), which broadly limits the use of restraints and seclusion in hospitals, nursing facilities, and other health care and non-health care settings for individuals with SMI.[36] The CHA authorized SAMHSA to create and enforce federal protections for individuals subject to civil commitment, including ensuring that civilly committed patients are free from harsh conditions, physical and chemical restraints, abuse, seclusion, and other punishments.[37] The CHA further authorized SAMHSA to create and enforce similar protections for children and youth who are held in community-based, nonmedical facilities.[38] Other provisions of the CHA required SAMHSA to promulgate regulations to ensure that inpatient health care facilities[39] as well as community-based settings offering services for children with SMI[40] that receive federal funding follow data-reporting requirements and have treating staff who are appropriately trained in the use of restraints, both physical and chemical. The CHA states that facilities that do not follow these requirements will be ineligible to receive federal funding.[41]

---

§ 20971 (authorizing the Attorney General to make grants to states to support civil commitment programs for sexually dangerous persons); 18 U.S.C. § 4248 (outlining procedures for the civil commitment of a sexually devious prisoner). Additionally, Title 20 prohibits a Federal Pell Grant from being awarded to anyone subject to an involuntary civil commitment upon the completion of incarceration for a sexual offense. 20 U.S.C. § 1070a(b)(6).

[33] Joint Resolution making Continuing Appropriations for the Fiscal Year 1985, ch. IV, Pub. L. No. 98-473, 98 Stat. 1837, 2057 (1984) (codified as amended at 18 U.S.C. § 4241). Around the time of the Supreme Court's decision in *Vitek v. Jones*, which is discussed *infra* and deals with a prisoner who was subject to an involuntary transfer to a mental health facility, Congress began discussing prison reform. *See infra* "Right to Counsel."

[34] *See generally* 42 U.S.C. §§ 4243–4246. Notably, § 4243 discusses the involuntary hospitalization of persons found not guilty by reason of insanity, and § 4244 and § 4245 discuss the conditions under which prisoners can be subject to involuntary civil commitment. Section 4245 gives federal inmates who are subject to involuntary civil confinement the right to a hearing on their present mental condition and allows the court to order psychiatric and psychological examinations of prisoners. Section 4246 outlines the process to which a prisoner due for release is entitled prior to being subject to involuntary hospitalization upon release.

[35] 18 U.S.C. § 922(g)(4).

[36] Children's Health Act of 2000, Pub. L. No. 106-310; 114 Stat. 1101 (codified at 42 U.S.C. § 290ii). In addition to this discussion of the Children's Health Act of 2000, see also Protection and Advocacy for Individuals with Mental Illness Act of 1986, Pub. L. No. 99-319, 100 Stat. 478 (codified at 42 U.S.C. §§ 10801–10851).

[37] *See generally* 42 U.S.C. § 290ii (requirements for residents of inpatient facilities).

[38] *See generally id.* § 290jj (requirements for nonresidential, community-based facilities for children and youth).

[39] *Id.* §§ 290ii-1, -2(a)–(b).

[40] *Id.* §§ 290jj-1, -2(a)–(b). SAMHSA refers to children with SMI as children with "serious emotional disturbance" (SED). *See* 58 F.R. 29422 (May 20, 1993).

[41] *Id.* §§ 290ii-2(c), 290jj-2(c). *See also* 42 C.F.R. §§ 483.350–483.376, 66 Fed. Reg. 7161 (2001). HHS creates Conditions of Participation (often called CoPs) that health care providers must meet to receive funding from federal health programs like Medicare and Medicaid. For more information about CoPs, see *Conditions for Coverage & Conditions of Participation*, CTRS. FOR MEDICARE & MEDICAID SERVS., Dec. 1, 2021, https://www.cms.gov/Regulations-and-Guidance/Legislation/CFCsAndCoPs.

Congress also chose to directly regulate involuntary hospitalizations in D.C. through the District of Columbia Hospitalization of the Mentally Ill Act,[42] also known as the Ervin Act. In the context of involuntary confinement, the law requires proof of a mental illness as well as a showing that the proposed patient was at risk of harm to self or others, and it gave confined patients the rights to "medical and psychiatric care and treatment."[43] After its passage, the Ervin Act served as a model for other states to reform their civil commitment laws.[44] A statement by Senator Samuel J. Ervin, one of the primary drafters and proponents of the bill, suggested that he intended for the bill to resolve "a problem of serious national scope."[45] He stated: "Our concern has been to assure that when an individual is deprived of his liberty because he is mentally ill, he will receive appropriate attention and the treatment necessary to restore him to his place in society."[46] D.C. courts subsequently interpreting the bill and its provisions recognized the legislation's overall purpose as furthering civil and constitutionally protected rights to persons subject to involuntary confinement.[47]

# The Fourteenth Amendment's Due Process Clause: Protections for People with Serious Mental Illness

The Fourteenth Amendment's Due Process Clause[48] provides certain protections against laws that restrict an individual's life, liberty, or property.[49] While states can legislate as to the circumstances under which an individual with SMI may be deprived of life, liberty, or property, Due Process concerns often arise in these contexts, as patients' liberty is at stake when they are forcibly hospitalized. The deprivation of rights for patients with SMI can generally occur in a variety of ways, including involuntary civil commitment, forced outpatient mental health treatment, and in judicial proceedings challenging competency.[50]

The Fourteenth Amendment has been interpreted to extend to both procedural and substantive due process protections to individuals with SMI in a variety of ways, including how states may

---

[42] Congress later passed the District of Columbia Home Rule Act of 1973, which created the D.C. Council and gave D.C. residents more control over local government affairs. Prior to the passage of the Home Rule Act, Congress directly legislated for D.C. and enacted statutes, such as the Hospitalization of the Mentally Ill Act, which governed local affairs. For more information about the Home Rule Act and the D.C. government, see *D.C. Home Rule,* COUNCIL OF THE DIST. OF COLUMBIA, https://dccouncil.gov/dc-home-rule/ (last accessed Mar. 20, 2023).

[43] Hospitalization of the Mentally Ill Act, Pub. L. No. 88-597, 78 Stat. 944 (1964) (codified as amended in scattered sections of D.C. CODE §§ 21-, 32-).

[44] John L. Bohman, *Procedural Safeguards for the Involuntary Commitment of the Mentally Ill in the District of Columbia,* 28 CATH. U. L. REV. 855, 859 (1979).

[45] 110 CONG. REC. 21346 (1964).

[46] *Id.*

[47] *See, e.g., In re* Ballay, 482 F.2d 648, 660 (D.C. Cir. 1973).

[48] For more information on the Fourteenth Amendment's Due Process Clause, see Cong. Rsch. Serv., *Overview of Due Process in Civil Cases,* CONSTITUTION ANNOTATED, https://constitution.congress.gov/browse/essay/amdt14-S1-5-4-1/ALDE_00013750/ (last accessed Mar. 7, 2023).

[49] Cong. Rsch. Serv., *Liberty Deprivations and Due Process,* CONSTITUTION ANNOTATED, https://constitution.congress.gov/browse/essay/amdt14-S1-5-1/ALDE_00013747/ (last accessed Mar. 3, 2023).

[50] A patient who is involuntarily civilly committed is not necessarily deemed to be incompetent and in need of a guardian. The reforms of inpatient hospitalization in the 1960s emphasized patient autonomy in consenting to medical treatment, and some states require a judicial declaration of incompetence and the appointment of a guardian prior to forced treatment. A few states, such as Alabama, require incompetency for civil commitment, meaning persons who are able to make informed medical choices do not qualify for civil commitment. For more information, see CIVIL COMMITMENT REPORT, *supra* note 3, at 15.

---

initially detain a person suspected of experiencing SMI; how such a person may be civilly committed; and how the state must treat committed patients and patient rights during confinement.

The Due Process Clause provides that no state may "deprive any person of life, liberty, or property, without due process of law."[51] The concept of due process prevents states from making laws that unfairly deprive citizens of life, liberty, or property, and it allows a person to contest the basis upon which the state is seeking to curtail individual rights.[52] As the Supreme Court has explained: "Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property."[53]

When questions concerning the specific procedures needed to satisfy due process arise, the answer depends on the underlying facts and circumstances of each case. The Supreme Court prescribed a three-factor balancing test in *Mathews v. Eldridge* to evaluate the sufficiency of the government's procedures for purposes of compliance with due process in the context of civil cases.[54] The first factor looks at the private interest affected by the government's proposed action; the second weighs the likelihood that a deprivation of life, liberty, or property will occur if the government's procedure is used and the probable value of additional procedural safeguards.[55] The third factor evaluates the government's interest, including any fiscal or administrative burden in providing additional procedural safeguards.[56] Courts have applied these factors in a wide range of civil cases to balance the interests of the government against those of individuals. The *Mathews v. Eldridge* factors have also been used to evaluate the sufficiency of procedural due process protections in the context of individuals with SMI who are challenging an involuntary civil confinement.[57]

## Procedural Due Process Requirements for Civil Commitment

This section discusses the procedural due process rights of individuals with SMI and how courts have applied those rights when such persons face deprivations of liberty and property due to their mental health status, mainly in the context of involuntary hospitalization. The discussion first covers the well-established constitutional rights of notice of confinement and a hearing, highlighting how courts have recognized the right to these procedural protections for persons subject to involuntary commitment as well as incompetency proceedings. The state's requisite burden of proof for purposes of involuntary civil commitment is covered next, followed by a discussion of when and to what extent an indigent person facing civil commitment has a right to counsel and an independent expert to testify on his or her behalf. Finally, the section concludes with a discussion of whether the Due Process Clause affords an individual subject to involuntary confinement the right to a jury trial.

### Notice and Hearing

The hallmark protections afforded by the Due Process Clause are (1) an individual's right to notice of any action on the government's part to restrict his or her right to life, liberty, or property,

---

[51] U.S. CONST. amend. XIV, § 1.

[52] Fuentes v. Shevin, 407 U.S. 67, 81 (1972).

[53] Carey v. Piphus, 435 U.S. 247, 259 (1978).

[54] 424 U.S. 319, 335 (1976).

[55] *Id.*

[56] *Id.*

[57] *See, e.g.,* Addington v. Texas, 441 U.S. 418 (1979).

and (2) the right to a hearing. The Supreme Court has explained that notice is "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality," and that notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of action and afford them an opportunity to present their objections."[58] Much of how notice and hearing requirements are generally understood today was elaborated by the Supreme Court in the 1960s and 1970s. The Court has recognized that in order to comport with the Due Process Clause's requirements, notice must be structured in such a way that the person to whom it is directed receives it,[59] and it must clearly identify to the recipient what action is being proposed and what he or she may do to prevent it.[60]

In the context of involuntary confinement and incompetency proceedings, the Supreme Court first recognized the importance of notice and hearing requirements, as well as their limitations, in the 1901 case *Simon v. Craft*, where the Court found that due process required only actual notice.[61] The case concerned a "lunacy petition" for Ms. Simon, a widow.[62] Although a sheriff served a notice to Ms. Simon alerting her of the petition, her physician determined that her presence in the courtroom would be detrimental to her health, and she did not appear in court.[63] A jury found Ms. Simon of unsound mind, and the probate court appointed a guardian, who later sold her home.[64] Ms. Simon later challenged this action, arguing that the probate court's proceedings deprived her of liberty and property without due process of law.[65] The Court recognized the principle that "[t]he essential elements of due process of law are notice and opportunity to defend."[66] The Court held, however, that due process was satisfied because Ms. Simon was served with actual notice and "if she had chosen to do so, she was at liberty to make such defense as she deemed advisable."[67]

In 1980, the Supreme Court again took up the issue of the Due Process Clause's requirements of notice and hearing for persons facing involuntary civil commitment, applying those protections not only to situations involving ordinary citizens but also to prisoners.[68] In *Vitek v. Jones*, the Court confronted the question of whether the Fourteenth Amendment's Due Process Clause afforded any protection to a prisoner with SMI before he was involuntarily transferred to a mental hospital without his notice or consent.[69] The petitioner challenged the constitutionality of the transfer, arguing the prison violated his due process rights by declining to afford him notice and a hearing prior to his civil commitment.[70] The Court agreed with the prisoner that the state statute

---

[58] Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 314 (1950).

[59] Armstrong v. Manzo, 380 U.S. 545, 550 (1965).

[60] Goldberg v. Kelly, 397 U.S. 254, 267 (1970), *superseded by statute*, Personal Responsibility and Work Opportunity Reconciliation Act, 42 U.S.C. § 601 (1996), *as recognized in* Hudson v. Bowling, 752 S.E.2d 313 (W. Va. 2013).

[61] 182 U.S. 427 (1901). This case does not discuss involuntary confinement specifically, but rather concerns the due process requirements of adequate notice and hearing in the context of "lunacy petitions," which could sometimes lead to involuntary civil commitment. As was the case with Ms. Simon, when a court found a person to be of "unsound mind," state law allowed the appointment of a guardian over the subject and his/her personal property.

[62] *Id.*

[63] *Id.* at 429.

[64] *Id.* at 430.

[65] *Id.* at 437.

[66] *Id.* at 434.

[67] *Id.* at 436.

[68] Vitek v. Jones, 445 U.S. 480 (1980).

[69] *Id.* at 480. Under a state statute, prisoners who suffered from mental diseases for which they could not be treated while incarcerated could be transferred to a state mental hospital for treatment.

[70] *Id.* at 487.

---

created a liberty interest that entitled him to due process protections, and that even though the prisoner was already confined in prison, he was still "entitled to the benefit of procedures appropriate in the circumstances before he is found to have a mental disease and transferred to a mental hospital."[71]

The *Vitek* Court observed that because a liberty interest existed under the Due Process Clause, the state was required to provide the inmate with "effective and timely" written notice of his transfer, as well as afford him an opportunity for an adversarial hearing, where the state could present its evidence in favor of civil commitment and the prisoner could cross-examine the state's witnesses and call witnesses of his own.[72] The Court reasoned that the notice requirement was "essential to afford the prisoner an opportunity to challenge the contemplated action and to understanding the nature of what is happening to him."[73]

In the years following the Court's decision in *Vitek*, Congress also considered the procedural rights of involuntarily hospitalized federal inmates as part of a greater conversation about prison reform.[74] A 1983 Senate Judiciary Committee report about the Comprehensive Crime Control Act discusses the need for reform after the Court's holding in *Vitek*, clarifying that federal inmates were entitled to court hearings before being transferred to mental hospitals.[75] The Committee notes that the protective procedures outlined in what would eventually become 18 U.S.C. § 4245 were created "to insure that Federal prisoners continue to receive fair and just treatment."[76] In expressing its approval for such a measure, the Committee noted that involuntary hospitalization of federal inmates required more than mere administrative process and that judicial proceedings would better safeguard a prisoner's rights in a situation in which the prisoner did not wish to be transferred.[77]

Since *Vitek* was decided, other federal courts have elaborated on the sufficiency of the notice requirement in the context of civil commitment cases for ordinary citizens with SMI who are not federal prisoners. For example, in *Clark v. Cohen*, the Third Circuit held that the resident of a mental hospital was deprived of her liberty without due process when she was never given a hearing to challenge her commitment and was not released into a community living arrangement, as recommended by her health providers.[78] The court observed the petitioner had protested her detention for more than 28 years but was never given a hearing, despite her many requests for

---

[71] *Id.* at 488, 493. The state attempted to argue that the transfer of a prisoner to a mental hospital was within the scope of his prison sentence, but the Court disagreed. The Court stated: "None of our decisions hold[] that conviction for a crime entitles a State note only to confine the convicted person but also to determine that he has a mental illness and to subject him involuntarily to institutional care in a mental hospital. Such consequences accessed on the prisoner are qualitatively different from the punishment characteristically suffered by a person convicted of a crime." *Id.* at 493. The Court also observed that if the case had involved an "ordinary citizen," rather than a convicted felon serving a prison sentence, "it is undeniable that protected liberty interests would be unconstitutionally infringed absent compliance with the procedures required by the Due Process Clause." *Id.* at 492.

[72] *Id.* at 495. The district court also found that due process entitled a prisoner facing an involuntary civil commitment to legal representation, but the Supreme Court's holding did not extend this far. *Id.* at 496. Further discussion of the right to counsel in civil commitment hearings is provided, *infra* "Right to Counsel."

[73] *Vitek*, 445 U.S. at 496 (citing Wolff v. McDonnell, 418 U.S. 539 (1974)).

[74] *See generally* JOHN CONYERS, JR., INSANITY DEFENSE AND RELATED CRIMINAL PROCEDURE MATTERS (TO ACCOMPANY H.R. 3336), H.R. REP. NO. 98-577; COMM. ON THE JUDICIARY, COMPREHENSIVE CRIME CONTROL ACT OF 1983, S. REP. NO. 98-225 (1983).

[75] COMM. ON THE JUDICIARY, COMPREHENSIVE CRIME CONTROL ACT OF 1983, S. REP. NO. 98-225 at 40 (1983).

[76] *Id.*

[77] *Id.*

[78] Clark v. Cohen, 794 F.2d 79 (3d Cir. 1986).

one.[79] Moreover, the state never reviewed her case, even after the commitment law under which she was originally confined was found to be unconstitutionally vague.[80] The court held that the petitioner was entitled to periodic review of her commitment and that her due process rights had been violated because for "more than twenty-eight years she was never afforded a hearing before *any* decisionmaker with authority to resolve her dispute with those who were confining her."[81]

## Burden of Proof

In addition to the due process protections of notice and hearing, the Supreme Court has found that the Fourteenth Amendment also requires the state to show a higher burden of proof prior to the long-term civil commitment of a patient with SMI.[82] Generally, the greater the individual liberty that is being challenged in court, the higher the burden of proof. In most civil litigation, a litigant must prove his or her case by preponderant evidence, meaning that he or she must prove a fact is more likely than not true. In criminal cases, the state must present evidence proving the defendant's guilt beyond a reasonable doubt.[83]

In general, state legislatures have the authority to determine the applicable burden of proof in civil litigation.[84] However, the Supreme Court found in *Addington v. Texas* that to meet due process demands in a proceeding for involuntary civil commitment, the state must prove its case for commitment by clear and convincing evidence.[85] The Court reasoned: "The function of a standard of proof, as that concept is embodied in the Due Process Clause and the realm of fact-finding, is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication."[86] In other words, a higher burden of proof is warranted for civil commitment proceedings to ensure that the confinement is justified.

At the time *Addington* was decided, Texas was the only state in which a court had found that a preponderance of the evidence standard was sufficient to meet constitutional due process obligations.[87] Twenty other states already used a "clear and convincing evidence" standard, two used a "clear, cogent, and convincing evidence" standard, and two required "clear, unequivocal and convincing evidence."[88] The Court found that "unequivocal" evidence is not constitutionally required prior to a civil commitment, but that a state could require it if it so desired.[89]

In its reasoning for a heightened standard for involuntary civil commitment, the Court cited its prior holding in *Mathews v. Eldridge*, noting the state's interest in treating individuals with SMI, the individual's liberty interest, and the need to minimize unnecessary confinement.[90] The Court assessed the preponderance standard, finding that because it "creates the risk of increasing the number of individuals erroneously committed," the state's interests would not necessarily be

---

[79] *Id.*

[80] *Id.* (citing Goldy v. Beal, 429 F. Supp. 640 (M.D. Pa. 1976)).

[81] *Id.* at 86 (emphasis in original).

[82] Addington v. Texas, 441 U.S. 418 (1979).

[83] For a discussion of the various burdens of proof used in civil and criminal litigation, see *id.* at 423–24.

[84] *See* Hawkins v. Bleakly, 243 U.S. 210, 214 (1917).

[85] *Addington*, 441 U.S. at 418.

[86] *Id.* at 423.

[87] *Id.* at 426.

[88] *Id.* at 431–32.

[89] *Id.* at 432.

[90] *Id.* at 425.

furthered through its use in commitment proceedings.[91] Distinguishing involuntary civil commitment from prison, the Court disagreed with petitioner's assertion that evidence beyond a reasonable doubt was required for civil commitment.[92] The Court noted that the many layers of review of a patient's condition, as well as the care of friends and family, "provide continuous opportunities for an erroneous commitment to be corrected."[93] Moreover, the Court was concerned that, given the evolving understanding of mental illness, the state would be unable to ever prove a patient mentally ill beyond a reasonable doubt.[94]

## Right to Counsel

The Supreme Court has never directly addressed whether the Due Process Clause guarantees a noncriminal, civilly committed patient the right to counsel when challenging an involuntary civil commitment, but the Court has elaborated in other types of civil cases the circumstances under which the Due Process Clause guarantees a right to counsel. While representation by counsel is not an absolute right in all civil proceedings,[95] the Supreme Court established a presumption that the Due Process Clause gives an indigent litigant the right to appointed counsel when his or her physical liberty is being threatened.[96] However, in *Turner v. Rogers*, the Court clarified: "[T]he Due Process Clause does not *always* require the provision of counsel in civil proceedings where incarceration is threatened."[97]

The Supreme Court came close to recognizing an indigent, civilly committed person's right to counsel in *Vitek v. Jones*, which concerned a criminal defendant challenging his transfer from a state prison to a mental hospital.[98] Under state law, if a prison facility could not adequately treat a mentally ill prisoner, the state could transfer the prisoner to a mental hospital.[99] The prisoner challenged the state law under the Fourteenth Amendment's Due Process Clause, arguing his transfer was unconstitutional because he was not given notice, a hearing, or the opportunity to be represented by counsel.[100] On the subject of the Due Process Clause's requirement of counsel, the plurality noted it had not previously found an absolute right to counsel for an indigent prisoner facing "other deprivations of liberty," but that illiterate or uneducated prisoners "have a greater need for assistance in exercising their rights."[101] Four Justices observed that under those circumstances, "it is appropriate that counsel be provided to indigent prisoners whom the State

---

[91] *Id.* at 426.

[92] *Id.* at 427.

[93] *Id.* at 429.

[94] *Id.* The Supreme Court did not specify whether the clear-and-convincing standard, as set forth in *Addington*, was to be applied retroactively. In 1987, almost 10 years after *Addington* was decided, the D.C. District Court observed that many patients civilly committed under the lower "preponderance" standard were not given a hearing to determine whether their confinement was justified by "clear and convincing evidence." Streicher v. Prescott, 663 F. Supp. 335 (D.D.C. 1987). The court held that the patients were constitutionally "entitled to a review of their commitment according to constitutional standards." *Id.* at 342–43. The court reasoned that that although many of the patients in the class action had been confined in St. Elizabeths Hospital in D.C. for more than 20 years, they still had a constitutionally recognized liberty interest. *Id.* at 339. Many other lower courts have reached the same conclusion. *See, e.g.*, Clark v. Cohen, 613 F. Supp. 684 (E.D. Pa. 1985), *aff'd*, 794 F.2d 79 (3d Cir. 1986).

[95] Goldberg v. Kelly, 397 U.S. 254 (1970), *superseded by statute*, Personal Responsibility and Work Opportunity Reconciliation Act, 42 U.S.C. § 601 (1996), *as recognized in* Hudson v. Bowling, 752 S.E.2d 313 (W. Va. 2013).

[96] Lassiter v. Dep't of Soc. Servs., 452 U.S. 18, 25 (1981).

[97] Turner v. Rogers, 564 U.S. 431 (2011) (emphasis added).

[98] Vitek v. Jones, 445 U.S. 480 (1980).

[99] *Id.* at 480.

[100] *Id.* at 485.

[101] *Id.* at 496 (citing Gagnon v. Scarpelli, 411 U.S. 778 (1973)).

---

seeks to treat as mentally ill," but Justice Lewis Powell expressly disagreed, arguing that the prisoner was entitled only to "competent help" at the hearing, rather than counsel.[102]

Thirty years after the Court decided *Vitek*, the Justices were again confronted with the question of the circumstances under which an indigent individual was entitled to counsel in a civil hearing where a deprivation of liberty is at stake. In *Turner*, a parent who failed to pay child support was held in willful civil contempt and sentenced to 12 months in prison under state law.[103] In the proceeding which resulted in the defendant's eventual incarceration, neither parent was represented by counsel.[104] The defendant appealed the incarceration, arguing that he was entitled to representation by counsel under the Due Process Clause because the proceeding resulted in the deprivation of his liberty.[105] Applying the *Mathews v. Eldridge* balancing test, the Court found that even though the defendant was subject to incarceration, the Due Process Clause did not entitle him to counsel at the child support hearing.[106] In reaching this conclusion, the Court found it significant that neither party in the proceeding was represented by counsel, reasoning that if all defendants held in contempt for failure to pay child support were entitled to counsel, this could create "asymmetry of representation" if the opposing parent seeking the support were not also represented.[107] The Court also pointed out that "substitute procedural safeguards" could be put in place to "reduce the risk of an erroneous deprivation of liberty . . . without incurring some of the drawbacks inherent in recognizing an automatic right to counsel."[108]

Lower federal courts have also considered the circumstances under which civilly committed patients are entitled to representation by counsel. For example, the Tenth Circuit held in *Heryford v. Parker* that the Due Process Clause extends the right to counsel to a person challenging an involuntary civil commitment.[109] The case concerned a petitioner who was civilly committed as a child under Wyoming state law.[110] After being reconfined as an adult, the patient's family brought a habeas petition, alleging the patient had been denied his rights to counsel and confrontation at his initial commitment hearing.[111] Persuaded by the Supreme Court's reasoning in *In re Gault*, which concerned delinquency proceedings resulting in civil commitment, the Eighth Circuit found that the Due Process Clause entitled the petitioner to representation by counsel.[112] The court stated: "It matters not whether the proceedings be labeled 'civil' or 'criminal' or whether the subject matter be instability or juvenile delinquency. It is the likelihood of involuntary incarceration . . . [which] commands observance of the constitutional safeguards of due

---

[102] *Id.* at 497 (Powell, J., dissenting).

[103] Turner v. Rogers, 564 U.S. 431, 437 (2011).

[104] *Id.*

[105] *Id.* at 438.

[106] *Id.* at 446. *But see infra* note 108 (noting that the Court reversed on other grounds).

[107] *Id.* at 447.

[108] *Id.* Although the Supreme Court found the Due Process Clause did not guarantee the right to counsel, it did overturn the state supreme court's ruling on the basis that the state did not satisfy due process requirements because it failed to provide the defendant with "alternative procedures," such as notice signaling the significance of the situation and "fair opportunity to present, and to dispute, relevant information, and court findings." *Id.* at 448–49. Four Justices dissented, arguing that the beginning and end of the case rested on the premise that "the Due Process Clause of the Fourteenth Amendment does not provide a right to appointed counsel for indigent defendants facing incarceration in civil contempt proceedings." *Id.* at 450 (Thomas, J., dissenting).

[109] 396 F.2d 393 (10th Cir. 1968).

[110] *Id.* at 394.

[111] *Id.* at 395.

[112] *Id.* at 395–97 (discussing 387 U.S. 1 (1967)).

process."[113] The court found that when the state exercises its *parens patriae* power to deprive someone of their liberty, it is obligated to ensure due process, which "necessarily includes the duty to see that a subject of an involuntary commitment proceeding[] is afforded the opportunity to the guiding hand of legal counsel at every step of the proceedings, unless effectively waived by one authorized to act in his behalf."[114]

Many state courts have also considered whether patients challenging civil commitment are entitled to representation by counsel, and many have found that counsel is generally needed to ensure due process.[115] For example, the Alabama Supreme Court recently set aside a probate court's order appointing a temporary guardian for an allegedly incompetent widow with dementia because of a fundamental lack of due process.[116] The petitioner's business associates filed an emergency petition seeking a guardian and conservator for her estate.[117] During the initial hearing, the judge dismissed the petitioner's attorneys after finding they had a conflict of interest in the case and denied petitioner's motion for a continuance.[118] The court appointed a guardian without allowing petitioner an opportunity to question the testifying witnesses or call any of her own witnesses.[119]

Petitioner appealed to the Alabama Supreme Court, arguing that the probate court deprived her of procedural due process by dismissing her counsel and proceeding with the hearing without allowing her time to find new representation.[120] The Alabama Supreme Court agreed, holding that procedural due process under the Fourteenth Amendment "contemplates the rudimentary requirements of fair play," and that petitioner's procedural due process rights were violated when her counsel was dismissed and she was not granted a continuance to find new counsel.[121] The Alabama Supreme Court called the probate court's denial of a continuance "unfathomable," noting that the five-month delay between the hearings for the emergency and permanent petitions suggested that a true emergency did not exist.[122]

Other state courts have held that patients with mental illnesses are not constitutionally entitled to counsel. For example, the Minnesota Court of Appeals held that the Due Process Clause does not confer a right to counsel for an individual challenging a civil commitment proceeding in *Beaulieu v. Minnesota Department of Human Services*.[123] The case concerned a civilly committed prisoner claiming ineffective assistance of counsel after his attorney did not timely appeal his commitment order.[124] The court of appeals stated: "We naturally are disinclined to recognize a federal

---

[113] *Id.* at 396.

[114] *Id.*

[115] *See generally Ex parte* Bashinsky, 319 So. 3d 1240 (Ala. 2020); Jenkins v. Dir. of the Va. Ctr. for Behav. Rehab., 624 S.E.2d 453 (Va. 2006); *In re* Hop, 171 Cal. Rptr. 721, 623 P.2d 282 (1981); *In re* Fisher, 313 N.E.2d 851 (Ohio 1974); *In re* Beverly, 342 So. 2d. 481 (Fla. 1977), *superseded by statute*, FLA. STAT. § 394.467(1)(a)2.b (1999), *as recognized in* Craig v. State, 804 So. 2d 532, 534 (Fla. Dist. Ct. App. 2002). *But see* Beaulieu v. Dep't of Hum. Servs., 798 N.W.2d 542 (Minn. Ct. App. 2011) (declining to apply *Heryford*, 396 F.2d 393, to recognize a federal constitutional right to counsel under the Fourteenth Amendment Due Process Clause for a person challenging an involuntary civil commitment).

[116] *Bashinsky*, 319 So. 3d 1240.

[117] *Id.* at 1247.

[118] *Id.* at 1251.

[119] *Id.*

[120] *Id.* at 1254.

[121] *Id.* at 1263 (quoting *Ex parte* Weeks, 611 So. 2d 259, 261 (Ala. 1992).

[122] *Bashinsky*, 319 So. 3d at 1261.

[123] 798 N.W.2d 542 (Minn. Ct. App. 2011).

[124] *Id.* at 545.

constitutional right that has never been recognized by the United States Supreme Court, has not been recognized in 10 of the 11 regional federal circuits, and has not been adopted by the supreme courts of 48 of the 50 states."[125]

## Right to an Expert Witness at Trial

Because states require proof of mental illness and evidence that the patient is dangerous to himself or others prior to involuntary civil commitment,[126] expert testimony from a mental health provider is often introduced at trial. The Supreme Court has found that a state must provide indigent criminal defendants with a psychiatrist when the state challenges the defendant's sanity at the time of the offense in question, but the Court has never directly addressed the issue of whether an indigent individual subject to civil confinement has the right to a psychiatric expert.[127] Other federal courts have considered this issue, finding that due process concerns could arise under certain circumstances.

In *Goetz v. Crosson*, the Second Circuit addressed the requisite psychiatric expert assistance that a state must provide to an indigent patient subject to involuntary confinement.[128] In the case, an involuntarily confined patient brought a class action challenging confinement, in part on the basis that the state violated the committed patients' due process rights by failing to guarantee them a psychiatrist.[129] Under New York law, a patient subject to involuntary confinement had the right to counsel in all proceedings related to confinement; the court could also appoint two independent psychiatrists to assess the patient, but was not required to do so.[130] The petitioner argued that due process guaranteed indigent patients a right to both a consulting and independent psychiatrist, and the court addressed each in turn.[131]

The court first noted the difference in "consulting" and "independent" psychiatrists, namely that a consulting psychiatrist would assist a patient's counsel in preparation for and during a commitment hearing and could testify, while an independent psychiatrist, unassociated with the state, would offer testimony to ensure accuracy.[132] In finding that due process did not require appointment of a consulting psychiatrist in every situation, the court reasoned that the purpose of the psychiatrist would be to provide testimony favorable to noncommitment of the patient and to assist the patient's counsel in preparing the case.[133] However, the court observed that the functions of a consulting psychiatrist "are not of sufficient import to implicate due process in every proceeding."[134] The Second Circuit further distinguished civil and criminal confinement, citing the Supreme Court's comment in *Addington* that "a civil commitment proceeding can in no sense be equated to a criminal prosecution."[135] The court concluded that due process was not

---

[125] *Id.* at 549. The court of appeals recognized the 10th Circuit's ruling in *Heryford v. Parker*, 396 F.2d 393 (10th Cir. 1968), as well as the Supreme Court's plurality opinion in *Vitek v. Jones*, 445 U.S. 480 (1980). *Beaulieu*, 798 N.W.2d at 549.

[126] *See* discussion of O'Connor v. Donaldson, 422 U.S. 563 (1975), *infra* "Showing of Requisite Conduct—"Dangerousness"

[127] Ake v. Oklahoma, 470 U.S. 68, 83 (1985).

[128] Goetz v. Crosson, 967 F.2d 29 (2d Cir. 1992).

[129] *Id.* at 30–31.

[130] *Id.* at 32 (citing N.Y. JUD. LAW §§ 35(1)(a), 35(4)).

[131] *Goetz*, 967 F.2d at 33.

[132] *Id.* at 31, 36.

[133] *Id.*

[134] *Id.* at 34.

[135] *Id.* at 33 (quoting Addington v. Texas, 441 U.S. 418, 428 (1979)).

focused on decreasing the number of civil confinements in general, which could happen were every patient guaranteed an expert psychiatrist, but only erroneous civil confinements.[136] The court also observed that there was no basis for the assumption that a psychiatrist testifying on behalf of the state would be biased toward confinement.[137]

On the question of whether the Due Process Clause required the appointment of an independent psychiatrist for an indigent patient, the Second Circuit found that if a judge were to find that the testimony of an independent psychiatrist was needed, a due process concern could arise were such a psychiatrist not appointed.[138] The Second Circuit noted that in cases where judges request independent expert testimony, "the individual's interests in both freedom and self-protection are directly affected, and the failure to provide such testimony may implicate due process concerns."[139] The court further observed that "when the presiding judge determines that such testimony is necessary to a reliable assessment of a patient, an indigent individual should have the right to obtain the testimony of an independent psychiatrist."[140]

Many state courts have recognized the right of indigent patients with SMI to obtain a court-appointed expert witness when challenging their civil commitment. For example, a New Jersey state court found the Fourteenth Amendment guarantees the right to an "independent psychiatric examination" for indigent patients.[141] Pennsylvania has recognized a similar right.[142] Although many states allow indigent patients with SMI the right to a court-appointed expert, they do not entitle the patient to "shop around" for the most favorable expert.[143]

## Right to a Jury Trial

Although states may create the right to a jury trial for individuals facing civil commitment, neither the Sixth,[144] Seventh,[145] or Fourteenth Amendments have been interpreted to guarantee

---

[136] *Id.* at 34.

[137] *Id.*

[138] *Id.* at 36.

[139] *Id.*

[140] *Id.* at 37. The Second Circuit remanded the case to the district court to determine whether New York's procedures may not provide access to independent psychiatric testimony in some instances when a trial judge requests it. On remand, however, the parties agreed there was never a case in which a judge appointed an independent psychiatrist and the court was unable to provide one. Goetz v. Crosson, 838 F.Supp. 136, 140 (S.D.N.Y. 1993).

[141] *In re* Gannon, 301 A.2d 493 (N.J. Cnty. Ct. 1973). In *Gannon*, the court reasoned, "the presence of a lawyer at the commitment hearing is not a sufficient safeguard for the patient's rights. No matter how brilliant the lawyer may be, he is no position to effectively contest the commitment proceedings because he has no way to rebut the testimony of the psychiatrist from the institution who has already certified to the patient's insanity." *Id.* at 494.

[142] *Accord* Dixon v. Att'y Gen. of Pa., 325 F. Supp. 966 (M.D. Pa. 1971).

[143] *See, e.g.,* Naples v. United States, 307 F.2d 618 (D.C. Cir. 1962). In ruling on a motion for the government to pay the cost of a psychiatrist appointed by an indigent, mentally ill criminal defendant, the court stated it would not "permit any defendant, at Government expense, to employ a psychiatrist of his own choosing, which means that a defendant can shop around for a favorable expert witness, and then have the Government pay for it. I don't consider that good administration of justice." *Id.* at 623. *Accord* Proctor v. Harris, 413 F.2d 383 (D.C. Cir. 1969).

[144] The Sixth Amendment guarantees a federal criminal defendant the right to a jury trial, and both state and federal courts have made clear that it applies only to criminal prosecutions, declining to extend it to civil commitment cases. U.S. CONST. amend. VI. *See, e.g.,* White v. White, 196 S.W. 508 (Tex. 1917); United States v. Sahhar, 917 F.2d 1197, 1205–07 (9th Cir. 1990); *accord* Hernandez-Carrera v. Carlson, 547 F.3d 1237 (10th Cir. 2008).

[145] The Seventh Amendment guarantees the right to a jury trial in federal civil cases "at common law" seeking monetary damages in excess of $20. U.S. CONST. amend. VII. For more information about the Seventh Amendment right to a jury trial, see CRS Legal Sidebar LSB10883, *The Right to a Jury Trial in Civil Cases Part 1: Introduction and Historical Background,* by Wen W. Shen. The Supreme Court has never ruled on whether the Seventh Amendment (continued...)

such a right. The Supreme Court has never explicitly held that the Fourteenth Amendment's Due Process Clause extends the right to a jury trial to a person facing an involuntary civil commitment. The Court has historically interpreted the Fourteenth Amendment to provide states with significant discretion to decide whether to provide for jury trials in civil cases.[146] For example, in *Simon v. Craft*, the Court held that the Due Process Clause does not require a state court to provide a specific type of proceeding to an individual challenging a competency proceeding, as long as the state gives the affected person notice and the right to defend.[147] In *McKeiver v. Pennsylvania*, the Court declined to extend the Fourteenth Amendment's Due Process Clause protections to jury trials for delinquent juveniles.[148]

If an individual challenged involuntary civil commitment on the basis that the patient was not provided a jury trial, the reasoning of *McKiever* could be applied to decline the recognition of such a right. Indeed, the Supreme Court has observed that the question of whether a person is mentally ill and poses a threat of harm to themselves or others can be a complex question of fact and generally rests on the testimony of experts.[149]

---

guarantees the right to a jury trial for involuntary commitment proceedings, but federal circuit courts considering the question have not recognized such a right. *See, e.g.,* Poole v. Goodno, 335 F.3d 705, 710–11 (8th Cir. 2003), *accord* United States v. Carta, 592 F.3d 34 (1st Cir. 2010); Aruanno v. Hayman, 384 Fed. App'x 144 (3d Cir. 2010).

The Supreme Court has held that the Seventh Amendment preserves the right to a jury trial when the right existed under English common law at the time of the Amendment's adoption. Balt. & Carolina Line, Inc. v. Redman, 295 U.S. 654, 657 (1935). However, many courts have held that the Seventh Amendment does not apply in incompetency proceedings because there is no "value" in controversy at issue. Ward v. Booth, 197 F.2d 963 (9th Cir. 1952). For example, the Ninth Circuit reasoned in an incompetency proceeding: "The matter in controversy is the question of the competence [or] incompetence of the person named, and while the result of such a determination may affect extensive property holdings, it cannot be said that the issue to be tried is one where there is any value in controversy." *Id.* at 967 (internal quotations omitted). The Ninth Circuit's reasoning can also be applied to civil commitment cases, such that there is no "value in controversy" at issue, and therefore no right to a jury trial under the Seventh Amendment.

[146] *See, e.g.,* N.Y. Central R.R. Co. v. White, 243 U.S. 188, 207–08 (1916); McKeiver v. Pennsylvania, 403 U.S. 528, 547 (1971), *superseded by statute,* Revised Kansas Juvenile Justice Code, KAN. STAT. ANN. §§ 38-2301–38-23100 (2006), *as recognized in In re* L.M., 186 P.3d 164 (Kan. 2008). For a general discussion of the states' powers to regulate procedures in the Fourteenth Amendment context, see Cong. Rsch. Serv., *Power of States to Regulate Procedures,* CONSTITUTION ANNOTATED, https://constitution.congress.gov/browse/essay/amdt14-S1-5-4-7/ALDE_00013756/ (last accessed Apr. 10, 2023).

[147] 182 U.S. 427, 437 (1901). In a case where a widowed plaintiff challenged a state probate court's order declaring her incompetent on Due Process Clause grounds, the Supreme Court held: "[T]he Due Process Clause of the Fourteenth Amendment does not necessitate that the proceedings in a state court should be by a particular mode, but only that there shall be a regular course of proceedings in which notice is given of the claim asserted, and an opportunity afforded to defend against it." *Id.* (quoting Louisville & N. R. Co. v. Schmidt, 177 U.S. 230, 236 (1900)).

[148] *McKeiver,* 403 U.S. at 528. Although *McKeiver* did not concern an involuntary civil commitment, juvenile delinquency proceedings are a type of civil proceeding wherein the finding of delinquency may result in involuntary confinement in a juvenile detention center. *Id.* In *McKeiver,* a group of juveniles facing delinquency charges challenged the proceedings on Fourteenth Amendment Due Process Clause grounds, arguing they should be entitled to a trial by jury. *Id.* The Court first noted that juvenile court proceedings have both civil and criminal elements, which can make them difficult to distinguish. *Id.* at 541. In other cases concerning juvenile proceedings before the Court, the applicable due process standards concerned fundamental fairness, which emphasized factfinding. *Id.* at 543. For other cases in which the Court considers due process requirements for juvenile proceedings, see *In re* Gault, 387 U.S. 1 (1967); *In re* Winship, 397 U.S. 358 (1970). The Court observed, however: "[O]ne cannot say that in our legal system the jury is a necessary component of accurate factfinding," and thus that the Fourteenth Amendment did not give juveniles faced with delinquency adjudications the right to a jury trial. *McKeiver,* 403 U.S. at 543. The Court also recognized the potential for abuse that juvenile delinquency proceedings carry, but they declined to hold that any of the system's abuses had a "constitutional dimension." *Id.* at 547–48.

[149] *See, e.g.,* Addington v. Texas, 441 U.S. 418 (1979). The Court noted: "Whether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the *meaning* of the facts which must be interpreted by expert psychiatrists and psychologists." *Id.* at 429.

---

Even if the Fourteenth Amendment does not guarantee the right to a jury trial before an involuntary civil confinement, at least 17 states offer jury trials to individuals facing long-term civil confinement, although the right can be waived or otherwise limited to specific circumstances.[150] For example, New York state law allows for patients challenging an involuntary civil commitment to a jury trial when requested, but patients can waive this right if they do not raise it in a timely manner.[151]

## Substantive Due Process Protections for Individuals Subject to Involuntary Civil Confinement

This section discusses two types of constitutionally protected substantive due process rights that courts have recognized. The first is the liberty interest of all persons to be free from confinement; the second is related to the rights of confined persons to safe conditions. As discussed above, the Fourteenth Amendment protects individuals from the encroachment of state laws that restrict their "life, liberty, or property, without due process of law."[152] Traditionally, "liberty" means freedom from physical restraint or confinement, but the Supreme Court has also interpreted the Due Process Clause's liberty interests to include the rights of a person to enjoy life and live freely.[153] The Court has also recognized that the Due Process Clause protects certain fundamental constitutional rights (e.g., the rights to marry and use contraceptives) from state interference, even when the state provides sufficient procedures, although some Supreme Court Justices have expressed disagreement with this interpretation.[154] Nevertheless, the Court has recognized that the

---

[150] *E.g.*, Alaska Stat. Ann. § 47.30.735(e); Cal. Welf. & Inst. Code § 5302; Colo. Rev. Stat. § 27-65-113(1); D.C. Code § 21-544; 405 Ill. Comp. Stat. § 5/3-802; Kan. Stat. Ann. § 59-2960(a)(1); Ky. Rev. Stat. Ann. § 202a.076(2); Mich. Comp. Laws Ann. § 330.1453(2); Mo. Rev. Stat. § 632.350(1), (3); Mont. Code Ann. § 53-21-125; N.M. Stat. Ann. § 43-1-13(D); N.Y. Ment. Hyg. Law § 9.35; Okla. Stat. tit. 43a, § 5-411(3); Tex. Health & Safety Code §§ 574.032(a)–(b), (d); Va. Code Ann. § 37.2-821(F); Wash. Rev. Code § 71.05.300(2); Wis. Stat. Ann. §§ 51.20(2)(B), (11); Wyo. Stat. Ann. § 25-10-110(g). These examples were identified from a review of the current state statutes (as retrieved from Westlaw's state statute databases) cited in Margaret J. Lederer, *Not So Civil Commitment: A Proposal for Statutory Reform Grounded in Procedural Justice*, 72 Duke L.J. 903, 921 n.134 (2022) ("While many states leave the fact-finding to the presiding judge or officer, at least fourteen states allow respondents to elect a jury trial.") and Vicki Gordon Kaufman, *The Confinement of Mabel Jones: Is There a Right to Jury Trial in Civil Commitment Proceedings*, 6 Fla. St. Univ. L. Rev. 103 (1978).

[151] N.Y. Ment. Hyg. Law § 9.35 (2022).

[152] U.S. Const. amend XIV, § 1. Cong. Rsch. Serv., *Overview of Substantive Due Process*, Constitution Annotated, https://constitution.congress.gov/browse/essay/amdt14-S1-6-1/ALDE_00013814/ (last accessed Feb. 15, 2023).

[153] Cong. Rsch. Serv., *Liberty Deprivations and Due Process*, Constitution Annotated, https://constitution.congress.gov/browse/essay/amdt14-S1-5-2/ALDE_00013748/ (last accessed Mar. 3, 2023) (citing Allgeyer v. Louisiana, 165 U.S. 578, 589 (1897) ("The liberty mentioned in [the Fourteenth] amendment means, not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; [and] to pursue any livelihood or avocation . . . .")).

[154] Cong. Rsch. Serv., *Overview of Substantive Due Process*, Constitution Annotated, https://constitution.congress.gov/browse/essay/amdt14-S1-6-1/ALDE_00013814/ (last accessed Feb. 15, 2023). For more information on the Supreme Court's interpretation of the Fourteenth Amendment Due Process Clause in the context of substantive due process in general, see Cong. Rsch. Serv., *Overview of Noneconomic Substantive Due Process*, Constitution Annotated, https://constitution.congress.gov/browse/essay/amdt14-S1-6-3/ALDE_00013815/ (last accessed Apr. 10, 2023). *See also* Griswold v. Connecticut, 381 U.S. 479 (1965) (holding that the Fourteenth Amendment Due Process Clause included constitutional protections for the rights to marriage, family, and procreation); Obergefell v. Hodges, 576 U.S. 644, 721 (2015) (holding that the Due Process Clause required states to recognize marriages between same sex couples) (Thomas, J. and Scalia, J., dissenting, calling the majority's interpretation of the Fourteenth Amendment as protective of substantive due process rights a "dangerous fiction" that "distorts the constitutional text" (internal citations omitted))).

---

Due Process Clause protects the liberty interests of patients with SMI who are subject to involuntary confinement,[155] and it has made clear that even when a person is subject to involuntary confinement, this does not strip him or her of all constitutionally protected liberty interests.[156]

This section discusses a few of the constitutional, substantive due process protections, including the dangerousness standard and a patient's right to safety and freedom from restraint. The section concludes with a discussion of the rights of involuntarily hospitalized patients to both receive and refuse medical treatment.

## Showing of Requisite Conduct—"Dangerousness"

In 1964, Congress passed the Ervin Act, which governs the District's civil commitment process today.[157] The law provides threshold requirements for civil commitment, including proof of a mental illness and a showing of conduct that is likely to be injurious to self or others.[158] In other words, proof of a mental illness alone is insufficient to justify an involuntary civil commitment under the Act; one must also prove that the patient poses a threat to his or others' safety.[159] At the time of its enactment, the Ervin Act served as an example for other states that needed to update and modernize their civil commitment procedures, as it guaranteed certain civil rights for committed patients and established protective processes to prevent unnecessary or wrongful hospitalization.[160]

In *O'Connor v. Donaldson*, the Supreme Court directly acknowledged the liberty interest of individuals facing involuntary confinement and adopted a similar "dangerousness" requirement for an individual to be subject to civil commitment. The case involved a Florida citizen, involuntarily confined in a mental institution for nearly 15 years, who brought an action for damages under 42 U.S.C. § 1983 against the institution alleging a violation of his liberty under the Due Process Clause.[161] The patient argued that he was not mentally ill and his confinement resulted in an "intentional[] and malicious[]" deprivation of liberty.[162] At trial, the evidence showed that although the patient had been diagnosed with paranoid schizophrenia, he had never been a danger to others at any point in his life, he was not suicidal, and he had successfully held a job prior to his institutionalization.[163] The evidence further demonstrated that while confined, the patient received only "custodial care," rather than treatment for a mental illness.[164] The case presented the "relatively simple, but nonetheless important question," of whether the confinement violated the patient's liberty interest.[165]

---

[155] O'Connor v. Donaldson, 422 U.S. 563 (1975); Vitek v. Jones, 445 U.S. 480 (1980).

[156] Youngberg v. Romeo, 457 U.S. 307 (1982).

[157] Hospitalization of the Mentally Ill Act, Pub. L. No. 88-597, 78 Stat. 944, 947 (1964) (codified as amended in scattered sections of D.C. CODE §§ 21-, 32-). *See also* D.C. CODE. ANN. §§ 21-501–21-592 (2002).

[158] Hospitalization of the Mentally Ill Act, 78 Stat. at 947.

[159] *Id. See also* Testa & West, *supra* note 29.

[160] Bohman, *supra* note 44, at 856.

[161] O'Connor v. Donaldson, 422 U.S. 563 (1975).

[162] *Id.* at 564–65.

[163] *Id.* at 568.

[164] *Id.* at 569.

[165] *Id.* at 573. The Supreme Court granted certiorari in the case after the U.S. Court of Appeals for the Fifth Circuit issued a decision focused largely on whether the Fourteenth Amendment guarantees a right to medical treatment for persons who are involuntarily confined. The Court declined to decide whether persons subject to involuntary confinement have a right to treatment. *Id.*

---

The Supreme Court observed that even if mentally ill persons could be reasonably and accurately identified, which was a challenge under the currently evolving science, this alone was not a justification for institutionalization.[166] Neither is it acceptable for states to "fence in the harmless mentally ill . . . to avoid public unease," because the Court found that "[m]ere public intolerance or animosity cannot constitutionally justify the deprivation of a person's physical liberty."[167] The Court stated: "A finding of 'mental illness' alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement. . . . [T]here is [ ] no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom."[168] As discussed below, however, the Court did not address the degree of dangerousness that must be proven to justify an involuntary commitment; as a result, the issue has been largely left up to states.[169]

In 1992, the Supreme Court decided *Foucha v. Louisiana*, addressing the question of whether dangerousness alone, without evidence of mental illness, was sufficient to hold a person in civil confinement, and finding that it was not.[170] After being found not guilty for burglary by reason of insanity, the petitioner in *Foucha* was committed to a mental hospital.[171] Several years later, a court-appointed doctor found he had recovered from his mental illness, and the hospital superintendent recommended his release.[172] At a lower court hearing regarding his release, the same doctor testified that petitioner was not mentally ill, but had an "antisocial personality," which was untreatable, and the doctor would not "feel comfortable in certifying that [petitioner] would not be a danger to himself or to other people."[173] The trial court thus found that petitioner was dangerous and denied his release.[174]

Citing its earlier decision in *Addington v. Texas*, the Supreme Court stated that involuntary civil commitment required the state to prove, by clear and convincing evidence, "that the person sought to be committed is mentally ill *and* that he requires hospitalization for his own welfare and protection of others."[175] The Court also pointed to an earlier ruling in *Jones v. United States* for the assertion that to comply with due process, the "nature of commitment [must] bear some reasonable relation to the purpose for which the individual is committed."[176] The *Foucha* Court was unconvinced by the state's argument that the patient should remain committed on the basis of his antisocial personality, finding if the patient was no longer an "insanity acquittee," then he was entitled to constitutionally adequate procedures, including a hearing, as to his current mental

---

[166] *Id.* at 575.

[167] *Id.*

[168] *Id.* Chief Justice Warren Burger wrote a separate, concurring opinion to clarify that there is "no basis for equating an involuntarily committed mental patient's unquestioned unconstitutional right not to be confined without due process of law with a constitutional right to treatment." *Id.* at 587–88 (Burger, J., concurring).

[169] *See, e.g.,* Evelyn Burton, *Treatment Before Tragedy; Reform Maryland Involuntary Commitment Law*, THE BALT. SUN, Dec. 13, 2021, https://www.baltimoresun.com/opinion/op-ed/bs-ed-op-1214-involuntary-treatment-criteria-20211213-zxuknjmrszhxnckkgt5esghwwa-story.html.

[170] Foucha v. Louisiana, 504 U.S. 71 (1992).

[171] *Id.* at 73–74.

[172] *Id.* at 74–75.

[173] *Id.* at 75.

[174] *Id.*

[175] *Id.* (emphasis added) (quoting Addington v. Texas, 441 U.S. 418 (1979)).

[176] *Id.* at 79 (referencing Jones v. United States, 463 U.S. 354 (1990) (holding that the Constitution permits the federal government to confine a person found not guilty by reason of insanity to a mental institution "until such time as he has regained his sanity or is no longer a danger to himself or society," and that indefinite commitment of an inmate acquitted based only on proof of insanity by a preponderance of the evidence does not violate due process)).

state.[177] The Court further noted: "[T]he Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them."[178] Citing its decision in *O'Connor*, the Court held that the state could not constitutionally continue petitioner's hospitalization because he was no longer mentally ill.[179]

Given the Supreme Court's guidance that patients must be both mentally ill and a danger to themselves or others to justify involuntary hospitalization, states have leeway to craft their own civil commitment laws and procedures. According to a 2020 Treatment and Advocacy Center report, while most state laws recognize that a patient with SMI's inability to meet basic needs for food, shelter, and clothing make him a danger to himself for purposes of involuntary hospitalization, a wide variety of state standards on dangerousness exist.[180] For example, like almost all states, North Carolina's involuntary commitment law requires patients to be mentally ill and dangerous to self or others.[181] But, unlike some other states, the law specifically delineates ways in which an individual can be "dangerous to self," including being unable to "conduct . . . daily responsibilities and social relations, or to satisfy [the] need for nourishment, personal or medical care, shelter, or self-protection and safety."[182] North Carolina law also requires "a reasonable probability" that the person would suffer "serious physical debilitation within the near future unless adequate treatment is given."[183] By contrast, Maryland's civil commitment laws provide no specific criteria for dangerousness, stating only that a patient must present "a danger to the life or safety of the individual or of others" as a criteria for confinement.[184] The dangerousness standard for admission is not discussed or defined elsewhere in the statute or state regulations.

Both state and lower federal courts have also grappled with the requisite threshold of dangerousness for purposes of involuntary commitment. For example, in 2020, the Florida Court of Appeals reversed the civil commitment of a patient who failed to take his medication and who had "issues managing his hygiene," finding this was insufficient to present a threat of substantial harm to the patient for purposes of the dangerousness standard.[185] As discussed above, New York City has also wrestled with the appropriate interpretation of "dangerousness" for purposes of involuntarily hospitalizing unhoused individuals with SMI. In 1987, New York City Mayor Ed Koch instituted a controversial policy to civilly commit unhoused people who appeared incapable of self-care, which gained a great deal of media attention after the involuntary hospitalization of an unhoused woman named Joyce Brown, also known as Billie Boggs.[186] A similar policy to involuntarily hospitalize unhoused people with SMI was carried out by New York City Mayor

---

[177] *Id.*

[178] *Id.* at 80 (internal citations omitted).

[179] *Id.* at 78.

[180] *See* discussion of the concept of dangerousness in LISA DAILEY ET AL., TREATMENT ADVOC. CTR., GRADING THE STATES: AN ANALYSIS OF U.S. PSYCHIATRIC TREATMENT LAWS 13 (2020), https://www.treatmentadvocacycenter.org/storage/documents/grading-the-states.pdf.

[181] N.C. GEN. STAT. § 122C-268(j) (2021).

[182] N.C. GEN. STAT. § 122C-3.11(a)(1)(I) (2021).

[183] N.C. GEN. STAT. § 122C-3.11(a)(1)(II) (2021).

[184] MD. HEALTH GEN. § 10-617(a)(3) (2016). The Code of Maryland Regulations does not further delineate the dangerousness standard or provide a definition of what qualifies as dangerousness to self or others. *See* MD. CODE REGS. 10.21.01 (2022).

[185] J.B. v. Florida, 307 So. 3d 986, 988 (Fla. Dist. Ct. App. 2020)

[186] *See* Luis R. Marcos, *Taking the Mentally Ill Off the Streets: The Case of Joyce Brown*, 20 INT'L J. OF MENTAL HEALTH 7 (1991). *See also* Boggs v. N.Y.C. Health & Hosps. Corp., 132 A.D.2d 340, 361–62 (App. Div. 1987).

Bill de Blasio during his administration.[187] In a case challenging the de Blasio policy, the New York State Supreme Court ordered the release of an involuntarily hospitalized patient, finding his due process rights were violated because the hospital failed to establish he had a mental health disorder or was in need of further treatment.[188] New York City Mayor Eric Adams's recent policy pushing for the forced hospitalization of unhoused persons with mental illness has faced similar challenges.[189]

## The Rights to Safety and Freedom from Confinement

The Supreme Court addressed other constitutionally protected liberty interests to which civilly committed patients are entitled under the Fourteenth Amendment's Due Process Clause in *Youngberg v. Romeo*.[190] The *Youngberg* case is different from many of the others discussed in this report, because rather than a challenge to the confinement itself, the case discusses the substantive due process rights of individuals once they are confined. The Court held that involuntarily committed patients have the rights to reasonably safe conditions, freedom from restraint, and minimally adequate training, and that when determining whether the state has adequately protected these liberty interests, the proper standard is whether professional judgment was exercised by a qualified professional.[191]

The petitioner in *Youngberg*, the resident of a mental health facility, suffered numerous injuries while involuntarily committed.[192] While receiving medical treatment at a hospital, he was physically restrained for parts of the day.[193] The patient's mother sued the health providers, arguing they failed to keep him safe from violence, both his own and that of other patients against him; that they unlawfully physically restrained him; and that they failed to provide him with "appropriate treatment or programs" for his condition.[194] The jury returned a verdict for the patient, finding the providers violated his Eighth Amendment rights.[195] An *en banc* Third Circuit reversed, holding that the Fourteenth Amendment, rather than the Eighth, provided the proper constitutional basis for relief.[196]

---

[187] Mark S. Kaufman, *Crazy Until Proven Innocent? Civil Commitment of the Mentally Ill Homeless*, 19 COLUM. HUM. RTS. L. REV. 333 (1988); Press Release, Office of the Mayor, Mayor de Blasio Announces "NYC Safe," An Evidence-Driven Public Safety And Public Health Program That Will Help Prevent Violence (Aug. 6, 2015), https://www.nyc.gov/office-of-the-mayor/news/540-15/mayor-de-blasio-nyc-safe-evidence-driven-public-safety-public-health-program.

[188] MP v. Ramesar, 25 N.Y.S.3d 577 (Sup. Ct. 2016).

[189] *See, e.g.,* Baerga v. City of New York, No. 21-CV-05762 (PAC), 2023 WL 1107633 (S.D.N.Y. Jan. 30, 2023). As discussed in the court's opinion, the case began prior to the creation of Mayor Adams's policy to involuntarily hospitalize unhoused people in New York City. The plaintiffs filed an emergency temporary restraining order challenging the policy shortly after it was announced, but the court found the plaintiffs lacked standing to challenge it. As of the date of this writing, the policy stands. *Id.* at *2. It is likely that other cases challenging the policy will be filed in the future.

[190] 457 U.S. 307 (1982).

[191] *Id.*

[192] *Id.* at 310.

[193] *Id.*

[194] *Id.* at 311.

[195] The Eighth Amendment prohibits cruel and unusual punishment as well as excessive bail and fines. U.S. CONST. amend. VIII. The Third Circuit found that the Eighth Amendment was the improper constitutional basis for a civilly committed individual's rights, as the Eighth Amendment applies only to individuals who have committed a crime. *Youngberg*, 457 U.S. at 312.

[196] *Id.* at 312.

---

On review, the Supreme Court first observed that "[t]he mere fact that [petitioner] has been committed under proper procedures does not deprive him of all substantive liberty interests under the Fourteenth Amendment."[197] With respect to the right to confinement under safe conditions, the Court emphasized that individuals who are lawfully confined still have a right to personal safety, reasoning that "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed—who may not be punished at all—in unsafe conditions."[198] The Court used similar reasoning to recognize the patient's right to freedom from bodily restraint, noting that even the criminally incarcerated have such a right.[199] With respect to the patient's third claim of the right to habilitation, the Court found he was entitled to "minimally adequate or reasonable training," so as to prevent violence and the need to use physical restraints in the future.[200] The Court also highlighted the need to balance the liberty interests of patients against states' interests in "organized society," and instructed courts to do so by evaluating whether providers used professional judgment when making care decisions.[201] Finally, the Court acknowledged that care decisions made by an "appropriate professional" are presumptively correct.[202]

## The Rights to Receive or Refuse Treatment

As discussed, many states justify the involuntary hospitalization of their citizens through the well-established concept of *parens patriae*, or the idea that the state serves as a protector of citizens who are unable to care for themselves.[203] States also rely upon the police power rationale to protect citizens from dangerous persons.[204] Using these rationales of providing care and treatment to justify civil commitment, however, creates questions about the rights of confined individuals to receive treatment,[205] what kinds of treatment the state is obligated to provide, and whether a person can refuse treatment. For example, some advocates have used the *parens patriae* theory to argue that a right to treatment is recognized in the U.S. Constitution, arguing that to civilly commit a person who is dangerous and unable to care for his or her mental health needs necessarily requires the state to provide treatment.[206] Similarly, advocates have argued that when the state deprives a person of his or her liberty through involuntary confinement, due process

---

[197] *Id.* at 315.

[198] *Id.* at 315–16.

[199] *Id.* at 316.

[200] *Id.* at 319. Justices Blackmun, Brennan, and O'Connor concurred with the majority opinion but wrote separately to express that "minimally adequate training" should include "such training as is reasonable necessary to prevent a person's pre-existing self-care skills from *deteriorating* because of his commitment." *Id.* at 327. (Blackmun, J., concurring) (emphasis in original). The concurrence noted: "For many mentally retarded people, the difference between the capacity to do things for themselves within an institution and total dependence on the institution for all of their needs is as much liberty as they will ever know." *Id.* On the other hand, Justice Burger, concurring only in the judgment, wrote separately to emphasize his view that "respondent has no constitutional right to training, or 'habilitation,' *per se*." *Id.* at 329 (Burger, J., concurring in the judgment). While Justice Burger agreed that some amount of self-care instruction could be necessary, "the Constitution does not otherwise place an affirmative duty on the State to provide any particularly kind of training or habilitation—even such as might be encompassed under the essentially standardless rubric . . . to which the Court refers." *Id.* at 330. *See also* discussion of habilitation at note 219.

[201] *Id.* at 320–21 (internal citations omitted).

[202] *Id.* at 324.

[203] *See supra* "History of U.S. Laws Regarding Involuntary Civil Commitment."

[204] *Id.*

[205] For purposes of this report, the term "treatment" is used to connote both medical treatment and training or other rehabilitative treatment.

[206] *See, e.g., Hearings before the Subcomm. on Const. Rts. of the S. Comm. on the Judiciary on a Bill to Protect the Constitutional Rights of the Mentally Ill*, 88th Cong. 12 (1963) (statement of Sen. Sam Ervin).

---

requires that the person be entitled to treatment.[207] This section summarizes the various actions of Congress, the Supreme Court, and other federal courts on the rights of civilly committed patients to receive and refuse treatment.

It should be noted that inpatient treatment in a mental health facility is but one type of mental health treatment that can encompass not only the administration of antipsychotic medications, but can also include other types of behavioral therapies, which may help patients cope with their illnesses, live more independently, and help them deal with the stresses of daily life.[208] For purposes of this report, "mental health treatment" is used generally to refer to all types of care and treatment that patients receive while hospitalized.

### The Right to Treatment

Congress, via the Ervin Act, intended for involuntarily committed patients in D.C. to have access to medical and psychiatric care. Section 9(b) of the original Act stated: "Any person hospitalized in a public hospital for a mental illness shall, during his hospitalization, be entitled to medical and psychiatric care and treatment."[209] The Act also stated its purpose was "to protect the constitutional rights of certain individuals who are mentally ill, [and] to provide for their care, treatment and hospitalization."[210] At a Senate hearing in 1963, Senator Ervin emphasized that the right to treatment for the civilly committed was "most critical," stating that "[s]everal experts advanced the opinion that to deprive a person of liberty on the basis that he is in need of treatment, without supplying the needed treatment, is tantamount to a denial of due process."[211]

In *O'Connor v. Donaldson*, the Supreme Court chose not to address whether the Constitution affords involuntarily hospitalized patients the right to mental health treatment.[212] In that case, the petitioner suffered from paranoid schizophrenia and was involuntarily hospitalized for a number of years before bringing a lawsuit to challenge his confinement.[213] During his confinement, petitioner did not receive any medical treatment for his condition, and his requests for occupational training were denied.[214] The appellate court observed "that when . . . the rationale for confinement is that the patient is in need of treatment, the Constitution requires that minimally adequate treatment in fact be provided," holding that the Fourteenth Amendment guarantees a patient's right to treatment.[215] The Supreme Court declined to address the issue of the patient's right to treatment, stating that "there is no reason now to decide whether mentally ill persons dangerous to themselves or others have a right to treatment upon compulsory confinement."[216]

---

[207] *See, e.g.*, Wyatt v. Aderholt, 503 F.2d 1305 (5th Cir. 1974) (holding the Constitution guarantees a right to treatment for the involuntarily hospitalized).

[208] *What is Mental Illness*, AM. PSYCHIATRIC ASS'N, Nov. 2022, https://www.psychiatry.org/patients-families/what-is-mental-illness. For more information on mental health treatments, see *Mental Health Treatments*, MENTAL HEALTH AM., https://mhanational.org/mental-health-treatments (last accessed Mar. 7, 2023).

[209] Hospitalization of the Mentally Ill Act, Pub. L. No. 88-597, 78 Stat. 944, 951 (1964) (codified as amended in scattered sections of D.C. CODE §§ 21-, 32-).

[210] *Id.* at 944.

[211] *Hearings before the Subcomm. on Const. Rts. of the S. Comm. on the Judiciary on a Bill to Protect the Const. Rts. of the Mentally Ill*, 88th Cong. 12 (1963) (statement of Sen. Sam Ervin).

[212] 422 U.S. 563 (1975).

[213] *Id.* at 565.

[214] *Id.* at 569.

[215] *Id.* at 572.

[216] *Id.* at 573.

---

Instead, the Court found that because petitioner was not a danger to himself or others, the state could not confine him solely on the basis that he suffered from a mental illness.[217]

Before *O'Connor v. Donaldson* was heard by the Supreme Court, the Fifth Circuit found, after consideration as a matter of first impression, that the Fourteenth Amendment guaranteed the civilly committed a right to treatment when the justification for the commitment was treatment.[218] The Fifth Circuit again reaffirmed this finding in *Wyatt v. Aderholdt*, where it rejected a *parens patriae* justification for commitment when the state argued that the "primary function of civil commitment is to relieve the burden imposed upon the families and friends of the mentally disabled."[219] However, after *O'Connor and Wyatt* were decided, other Fifth Circuit judges expressed doubt as to whether the U.S. Constitution guarantees a right to treatment for involuntarily hospitalized patients. For example, in *Morales v. Turman*, the Fifth Circuit argued: "The civil commitment of the mentally ill without treatment is not necessarily an impermissible exercise of governmental power," and that arguments in favor of recognition of the Constitution's right to treatment "raise serious problems."[220]

Other federal courts have considered and recognized the rights of involuntarily committed patients to medical treatment under state and federal statutes, rather than in the U.S. Constitution. For example, in *Rouse v. Cameron*, the D.C. Circuit interpreted the Ervin Act to address whether a criminal defendant subject to involuntary civil commitment by reason of insanity has a right to medical treatment.[221] In recognizing the patient's right to treatment, the court reasoned that "[t]he purpose of involuntary hospitalization is treatment, not punishment," and thus when the rationale for confinement rests upon the necessity of treatment, the petitioner is essentially being jailed without it.[222] In making this holding, however, the court did not interpret the Constitution as providing such a right, but rather noted that Congress sidestepped the constitutional question by prescribing the right via the Act.[223]

## The Right to Training or Other Rehabilitative Services

In addition to medical treatment, involuntarily hospitalized patients have also argued they have a right to basic rehabilitation services to enable them to better undertake self-care, develop needed skills, and reduce unwanted behaviors, like violence or aggression.[224] The Supreme Court

---

[217] *Id.* at 575.

[218] Donaldson v. O'Connor, 493 F.2d 507, 510 (5th Cir. 1974), *vacated by* Gumanis v. Donaldson, 422 U.S. 1052 (1975).

[219] Wyatt v. Aderholt, 503 F.2d 1305, 1312–13 (5th Cir. 1974) ("[W]e find it impossible to accept the Governor's underlying premise that the 'need to care' for the mentally ill—and to relieve their families, friends, or guardians of the burdens of doing so—can supply a constitutional justification for civil commitment . . . . Against the sweeping personal interests involved, Governor Wallace would have us weigh the state's interest, and the interests of the friends and families of the mentally handicapped in having private parties relieved of the 'burden' of caring for the mentally ill. The state interest thus asserted may be, strictly speaking, a 'rational' state interest. But we find it so trivial beside the major personal interests against which it is to be weighed that we cannot possibly accept it as a justification for the deprivations of liberty involved.")

[220] 562 F.2d 993, 998 (5th Cir. 1977). *See also* Morales v. Thurman, 383 F. Supp. 53 (E.D. Tex. 1974) (recognizing the right to treatment under the U.S. Constitution for patients subject to involuntary hospitalization), *rev'd*, 535 F.2d 864 (5th Cir. 1976).

[221] Rouse v. Cameron, 373 F.2d 451 (D.C. Cir. 1966).

[222] *Id.* at 452–53.

[223] *Id.*

[224] *See, e.g.*, Youngberg v. Romeo, 457 U.S. 307 (1982); Brief of the Am. Psychiatric Ass'n as Amicus Curiae, *Youngberg*, 457 U.S. at 307, No. 80-1429, 1981 WL 389867. As explained in the brief, the terms "treatment" and (continued...)

---

discussed mentally ill patients' rights to such services in *Youngberg v. Romeo,* but the Justices reached different conclusions as to whether the Constitution protects such rights.[225] As discussed, the *Youngberg* Court found that an involuntarily committed patient had a constitutionally protected liberty interest under the Fourteenth Amendment that guaranteed him the right to "minimally adequate or reasonable training to ensure safety and freedom from undue restraint."[226] In other words, the Court recognized the patient's right to "minimally adequate" training only insofar as such training is reasonably necessary to protect the patient's other rights to safety in confinement and freedom from restraint.[227] As part of its analysis, the Court recognized that while the state has a certain duty of care to institutionalized persons, it has "considerable discretion in determining the nature and scope of its responsibilities."[228] The Court's decision attempts to balance the state's interests against those of the involuntarily committed, stating that in determining what training is "reasonable," courts should defer to the judgment of qualified professionals.[229]

Justices Harry Blackmun, William Brennan, and Sandra Day O'Connor wrote a concurring opinion in *Youngberg*, arguing that the Court did not resolve the issue of whether a state could involuntarily confine a person for "care and treatment" under state law, but then "constitutionally refuse to provide him any treatment."[230] The concurrence cited the Court's earlier, unanimous holding in *Jackson v. Indiana*, finding that "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."[231] The Justices then reasoned, similar to Senator Ervin's argument discussed above, that if the state involuntarily committed a person for care and treatment, the commitment would not be reasonably related to the purpose of confinement if the state did not provide treatment.[232] The three concurring Justices also argued that the majority's requirement of "minimally adequate training" should include training that is necessary to prevent a deterioration of skills as the result of a confinement.[233] For example, if a committed patient is able to feed or dress himself prior to confinement, he should be provided training, if needed, during his confinement to ensure he retains those skills.[234] The concurrence observed that for patients with mental illness, "the difference between the capacity to do things for themselves within an institution and total dependence on the institution for all of their needs is as much liberty as they will ever know."[235]

In a concurrence with the judgment, Chief Justice Warren Burger disagreed with Justices Blackmun, Brennan, and O'Connor, arguing he "would hold flatly that respondent has no constitutional right to training . . . *per se.*"[236] The Chief Justice noted that the patient's family

---

"habilitation" can both be used to refer to programs to assist patients with mental illness, but "habilitation" is often focused on training and skill development.

[225] 457 U.S. at 307.

[226] *Id.* at 319.

[227] *Id.* at 318, 322.

[228] *Id.* at 317 (internal citations omitted). In the *Youngberg* case, the state conceded it had duties to provide adequate shelter, food, clothing, and medical care to residents of the mental institution; the Court observed these were "the essentials of the care that the state must provide." *Id.* at 324.

[229] *Id.* at 322.

[230] *Id.* at 325 (Blackmun, Brennan & O'Connor, JJ., concurring).

[231] *Id.* (citing Jackson v. Indiana, 406 U.S. 715 (1972)).

[232] *Id.* at 326.

[233] *Id.* at 327.

[234] *Id.*

[235] *Id.*

[236] *Id.* at 329 (Burger, J., concurring in the judgment).

---

requested his institutionalization "to meet a serious need," and felt the state was satisfying its responsibilities to the patient by providing food, shelter, safe conditions, and medical care, thus justifying the patient's hospitalization.[237] In his view, "the Constitution does not otherwise place an affirmative duty on the State to provide any particular kind of training or habilitation."[238]

## The Right to Refuse Medical Treatment

In addition to outlining the constitutional parameters protecting the right of the civilly committed to receive medical treatment or rehabilitative services, courts have also considered the protected rights of these patients to refuse medical treatment. In 1982, the Supreme Court decided *Mills v. Rogers*, in which it considered whether a class of involuntarily committed patients had a constitutionally protected right to refuse antipsychotic medication.[239] The district court held in the patients' favor on the basis that the Constitution protected their privacy and liberty interests.[240] The district court noted that although subject to involuntary confinement, the patients had not been found incompetent under state law, thus they could refuse psychiatric medication.[241] The First Circuit agreed that involuntarily hospitalized patients had a right to refuse drug treatment, but it disagreed with the district court with regard to the circumstances under which the state's interest in forced drug treatment would outweigh the patients' interests.[242]

In deciding *Mills*, the Supreme Court discussed both substantive and procedural aspects of the rights of patients who are forced to take psychiatric medication, noting that both were "intertwined with questions of state law."[243] The Court explained that the U.S. Constitution defines the minimum protections for substantive rights, which can be supplemented by states, and that liberty interests created by state law receive protection from the Fourteenth Amendment's Due Process Clause.[244] In this way, questions of a patient's right to refuse medical treatment could be tied to both state and federal law.[245] To illustrate this point, the Court cited a recent

---

[237] *Id.*

[238] *Id.*

[239] Mills v. Rogers, 457 U.S. 291 (1982).

[240] *See* Cong. Rsch. Serv., *supra* note 49.

[241] *Mills*, 457 U.S. at 294–95. The district court did not identify a particular provision of the U.S. Constitution as protective of the patients' rights to privacy and liberty. The district court's ruling distinguished involuntary confinement from an order of incompetency, finding that when a patient was involuntarily confined for mental health treatment, this did not infer incompetency under Massachusetts law. The court concluded that "until a judicial finding of incompetency has bene made . . . the wishes of the patients generally must be respected." Rogers v. Okin, 478 F. Supp. 1352, 1361–62, 1365–68 (D. Mass 1979), *aff'd in part, rev'd in part*, 634 F.2d 650 (1st Cir. 1980), *vacated*, *Mills*, 457 U.S. at 291.

[242] *Mills*, 457 U.S. at 295–96 (citing *Rogers*, 634 F.2d at 650). The First Circuit found that the state police power to maintain order and provide safety and the *parens patriae* power to provide effective treatment were strong state interests which outweighed the possibility of harm to the patients if forcibly medicated. *Id.* at 296.

[243] *Id.* at 298–99. For purposes of its decision, the Court assumed the Constitution protects the right of mentally ill patients to refuse antipsychotic drug treatment. *Id.* at 299. The procedural question at issue concerned what procedures were constitutionally required before the state could forcibly medicate a patient. *Id.* The substantive questions were what aspect(s) of the Constitution protected the patients' liberty interest, and when the state's interests would outweigh the patients'. *Id.* Only the Court's findings with respect to the substantive legal issues are discussed here.

[244] *Id.* at 300. *See, e.g.*, Vitek v. Jones, 445 U.S. 480, 488 (1980).

[245] *Mills*, 457 U.S. at 300 ("Because state-created liberty interests are entitled to the protection of the federal Due Process Clause, the full scope of a patient's due process rights may depend in part on the substantive liberty interests created by state as well as federal law. Moreover, a State may confer *procedural* protections of liberty interests that extend beyond those minimally required by the Constitution of the United States. If a State does so, the minimal requirements of the Federal Constitution would not be controlling, and would not need to be identified in order to determine the legal rights and duties of persons within that State.").

---

Massachusetts state court decision, *In re Guardianship of Roe*, which recognized the rights of incompetent patients to refuse antipsychotic drugs, which the state court said could be overridden "only by an overwhelming state interest."[246] Applying the logic of *Roe*, the Supreme Court observed: "[I]t is distinctly possible that Massachusetts recognizes liberty interests of persons adjudged incompetent that are broader than those protected directly by the Constitution of the United States."[247] In remanding to the First Circuit, the Court stated: "[u]ntil certain questions have been answered, we think it would be inappropriate for us to attempt to weigh or even identify relevant liberty interests that might be derived directly from the Constitution, independently of state law."[248] The Court reasoned that in light of *Roe*, it was unclear whether the delineation of the patients' Fourteenth Amendment interests would resolve the case.[249]

The First Circuit's decision on remand was limited to the rights afforded to mentally ill patients under the Fourteenth Amendment's Due Process Clause.[250] The court acknowledged that "Massachusetts recognizes substantive and procedural rights that extend above the floor set by the due process clause of the Fourteenth Amendment,"[251] and that under state law, a patient could be forcibly medicated only "if [he] poses an imminent threat of harm to himself or others, and only if there is no less intrusive alternative to antipsychotic drugs."[252] The First Circuit then decided that although it could delineate the minimum constitutional standards afforded to mentally ill patients, it need not do so because Massachusetts law offered more protection than the Fourteenth Amendment.[253]

Since *Mills v. Rogers* was decided, the Supreme Court has not directly addressed the issue of whether and under what conditions a state could force a noncriminal, involuntarily hospitalized patient to take antipsychotic drugs. It appears from the Court's decision in *Mills* that a patient's constitutionally protected liberty interest is implicated by forced medication.[254] It remains unclear, however, how that interest is defined and the extent to which it could be outweighed by a competing state interest.

The Supreme Court has also discussed the rights of individuals to refuse medical treatment in other contexts. For example, the Court recognized in *Cruzan v. Director* that "a competent person

---

[246] *Id.* at 300–01 (citing 421 N.E.2d 40, 51 (Mass. 1981)). In *Roe*, the Massachusetts court rested its recognition of the right to refuse treatment in both the U.S. Constitution as well as the state common law. *Id.* at 42.

[247] *Mills*, 457 U.S. at 303.

[248] *Id.* at 305.

[249] *Id.* at 306. The Court instructed the court of appeals to "determine . . . whether *Roe* requires revision of its holdings or whether it may call for the certification of potentially dispositive state-law questions to the Supreme Judicial Court of Massachusetts. The Court of Appeals also may consider whether this is a case in which abstention is now appropriate." *Id.* (internal citations omitted).

[250] Rogers v. Okin, 738 F.2d 1, 3 (1st Cir. 1984). The First Circuit's holding was limited to this question due to the Supreme Court's ruling in *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984), in which the Court held the Eleventh Amendment barred federal courts from awarding injunctive relief ordering state officials to comply with state law.

[251] *Rogers*, 738 F.2d at 3.

[252] *Id.* at 3, 6 (internal citations omitted). The First Circuit noted that with respect to the substantive and procedural rights afforded to the patients by Massachusetts state law, under the Supreme Court's decision in *Pennhurst*, those rights "are no longer directly enforceable by federal courts in injunctive actions against state officials." *Id.* at 3–4.

[253] *Id.* at 9.

[254] The *Mills* Court observed: "The parties agree that the Constitution recognizes a liberty interest in avoiding the unwanted administration of antipsychotic drugs. Assuming that they are correct in this respect, the substantive issue involves a definition of that protected constitutional interest, as well as the identification of the conditions under which competing state interests might outweigh it." 457 U.S. at 299.

has a liberty interest under the Due Process Clause in refusing unwanted medical treatment."[255] And the Court held in *Washington v. Harper* that a federal prisoner with SMI had a "significant liberty interest" under the Fourteenth Amendment's Due Process Clause when the state attempted to forcibly medicate him.[256] Although neither of these cases addresses the specific issue of the right of an involuntarily hospitalized patient to refuse medical treatment, each offers insight into the limitations that the Due Process Clause places on a state's ability to force a person with SMI to take antipsychotic medication and when the state's interests override those of the patient.

Other federal circuit courts have considered the circumstances under which a state may forcibly medicate an involuntarily hospitalized patient. For example, in *Rennie v. Klein*, the Supreme Court directed the Third Circuit to consider the issue in light of its holding in *Youngberg v. Romeo*.[257] The Third Circuit recognized that the mentally ill patient at issue had a constitutionally protected liberty interest in refusing mental health treatment.[258] Under New Jersey law, the state could compel an institutionalized patient to take medication only if the person, "in the exercise of professional judgment," "constitute[d] a danger to himself or to others."[259] The court then found that the state placed sufficient procedural safeguards to protect patients' rights.[260] In a concurrence, one judge expressed his disagreement with the majority's holding, arguing that the issue before the court was whether the appropriate "professional judgment" from *Youngberg* was followed. The concurring judge argued that states justify involuntary commitment on the basis that the patient is a danger to self or others, so the state using the same precondition for involuntary hospitalization and forced medication "would not appear to conform to the constitutional professional judgment standard."[261]

# Considerations for Congress

There is ongoing scholarly debate over the use of forced institutionalization for patients with SMI, with some advocates claiming that such hospitalizations are helpful for vulnerable populations, such as unhoused people, and others arguing they actually cause more harm than

---

[255] 497 U.S. 261, 262 (1990). In *Cruzan*, the Court considered the rights of an incompetent patient and her surrogate to terminate her nutrition and hydration supplements after a car accident left her in a "persistent vegetative state." *Id.* at 266. The case concerned a state law that required clear and convincing evidence of a patient's wishes to decline lifesaving treatment. *Id.* at 261. The Court recognized the Fourteenth Amendment's Due Process Clause protects the interests of competent individuals not to be forced to undergo unwanted medical treatment, but held that the Due Process Clause did not prevent the state from establishing a procedural requirement of clear and convincing evidence of a patient's wishes prior to declining treatment. *Id.* at 278–80. After recognizing the individual's liberty interest in refusing unwanted treatment, the Court stated that the individual interest must be balanced against the state's interest in protecting life, finding the state interest more compelling. *Id.* at 281.

[256] 494 U.S. 210, 221–22 (1990). The Court decided the case in the same term as *Cruzan*. In *Harper*, a federal inmate challenged a state correctional facility's attempt to forcibly treat his mental illness with antipsychotic medication, arguing that it violated his rights under the Due Process Clause. *Id.* at 221. Under a state policy, a prisoner could be forcibly medicated if he had a mental disorder and was gravely disabled or posed a serious threat of harm to himself, others, or property. *Id.* at 215. The Court recognized that the prisoner had a significant liberty interest in refusing medication, but it applied an earlier, deferential standard for considering a state's interest in prison safety, finding that "the proper standard for determining the validity of a prison regulation that infringes on an inmate's liberty is to ask if the regulation is 'reasonably related to legitimate penological interest.'" *Id.* at 223. Under this standard, the Court reasoned that the prison had the duty to ensure the safety of its staff and other prisoners, and that forcibly medicating dangerous inmates was a rational means of furthering the state's interest in maintaining safety. *Id.* at 225.

[257] Rennie v. Klein, 720 F.2d 266 (3d Cir. 1983).

[258] *Id.* at 268 (citing Rennie v. Klein, 653 F.2d 836 (3d Cir. 1981) (en banc), *vacated*, 458 U.S. 1119 (1982)).

[259] *Rennie*, 720 F.2d at 269.

[260] *Id.* at 270.

[261] *Id.* at 272 (Adams & Becker, JJ., concurring in the judgment).

---

good and deter individuals with SMI from seeking care.[262] Stakeholders continue to advocate for the rights of those involuntarily committed, arguing that states require additional resources to treat patients with SMI and provide them with better care.[263] Others have suggested that the United States should instead curb Medicaid and other federal health care spending, arguing that it is increasing federal government debt.[264]

More recently, patient advocates, several Members of Congress, and the White House have stressed the need for increased outpatient mental health services to be available for both children and adults, many of whom are unable to access those services posthospitalization.[265] Others have called attention to the national shortage of mental and behavioral health professionals.[266]

While Congress does not directly control the processes and procedures governing involuntary civil commitment, as this is traditionally an area left to state law, Congress could influence state standards indirectly in a variety of ways. Congress could expand existing federal statutes that provide rights to institutionalized patients who are housed in facilities that receive federal funding. For example, Congress could create additional rights for children and youth facility residents, as outlined in the CHA, which currently recognizes "the right to be free from physical or mental abuse, corporal punishment, and any restraints or involuntary seclusions imposed for purposes of discipline or convenience."[267] Congress could also expand SAMHSA's authority in the Act to promulgate regulations ensuring that facilities have adequate, professional staff who are properly trained and/or could give SAMHSA more enforcement authority to police mental health facilities.

Congress could also indirectly influence the civil commitment process by increasing federal protections for individuals with SMI through legislation providing greater, more accessible care for institutionalized patients. For example, patients' rights advocates have urged Congress to do

---

[262] *Compare* Maya Kaufman, *Democratic Mayors Lead Course Correction on Psychiatric Commitments*, POLITICO, Mar. 1, 2023, https://www.politico.com/news/2023/03/01/democratic-mayors-lead-course-correction-on-psychiatric-commitments-00084387, *with* Andy Newman, *Advocates for Mentally Ill New Yorkers Ask Court to Halt Removal Plan*, N.Y. TIMES, Dec. 9, 2022, https://www.nytimes.com/2022/12/08/nyregion/nyc-mental-health-restraining-order.html. *See also* Betsy Reed, I was Hospitalized Against My Will. I Know Firsthand the Harm it can Cause, THE GUARDIAN, Dec. 23, 2022, https://www.theguardian.com/society/2022/dec/23/involuntary-hospitalization-policy-new-york-city-eric-adams; Morgan C. Shields, et al., Expanding Civil Commitment Laws is Bad Mental Health Policy, HEALTH AFFAIRS, Apr. 6, 2018, https://www.healthaffairs.org/content/forefront/expanding-civil-commitment-laws-bad-mental-health-policy.

[263] *E.g.*, *Advocacy*, TREATMENT ADVOC. CTR., https://www.treatmentadvocacycenter.org/fixing-the-system (last accessed Mar. 24, 2023).

[264] Maya MacGuineas, How Medicare, Medicaid, and Social Security are Driving the National Debt – and How We Can Fix It, GEORGE W. BUSH INSTITUTE (2020), https://www.bushcenter.org/catalyst/federal-debt/macguineas-medicaid-medicare-social-security-national-debt.

[265] Dan Frosch, More Money for Mental Health Programs Gets Bipartisan Support in Many States, WALL STREET JOURNAL, (Feb. 5, 2023), https://www.wsj.com/articles/more-money-for-mental-health-programs-gets-bipartisan-support-in-many-states-11675614344; Press Release, Office of Sen. Tina Smith, U.S. Senators Smith, Murkowski, Hassan Reintroduce Bipartisan Bill to Expand Mental Health Care Workforce (Feb. 23, 2023), https://www.smith.senate.gov/u-s-senators-smith-murkowski-hassan-reintroduce-bipartisan-bill-to-expand-mental-health-care-workforce/. The bill was introduced in the 117th Congress as the Mental Health Professionals Workforce Shortage Loan Repayment Act of 2021, S. 1578, 117th Cong. (2021) and H.R. 3150, 117th Cong. (2021), and then reintroduced as S.462, 118th Cong. (2023). GOVERNMENT ACCOUNTABILITY OFFICE, Behavioral Health: Available Workforce Information and Federal Actions to Help Recruit and Retain Providers (Oct. 27, 2022), https://www.gao.gov/products/gao-23-105250; The White House, Reducing the Economic Burden of Unmet Mental Health Needs, Issue Brief (May 31, 2022), https://www.whitehouse.gov/cea/written-materials/2022/05/31/reducing-the-economic-burden-of-unmet-mental-health-needs/.

[266] *See, e.g.*, St. George, *supra* note 8.

[267] 42 U.S.C. §§ 290ii(a), 290jj(a)(1).

away with the current "institutions for mental disease" or "IMD" exclusion so that Medicaid funds may be more easily used to provide institutionalized care for nongeriatric adults.[268] Other advocacy groups have resisted a repeal of the IMD exclusion, saying that it "would do more harm than good" and would divert state resources to institutionalization and away from services that keep patients with SMI in their communities.[269]

## Author Information

Hannah-Alise Rogers
Legislative Attorney

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

---

[268] *See, e.g.*, Treatment Advoc. Ctr., The Medicaid IMD Exclusion and Mental Illness Discrimination (2016), https://www.treatmentadvocacycenter.org/evidence-and-research/learn-more-about/3952.

[269] *See, e.g.*, Hannah Katch, House Bill Partially Repealing "IMD Exclusion" Would Do More Harm Than Good, Center on Budget and Policy Priorities, (Jun. 20, 2018), https://www.cbpp.org/blog/house-bill-partially-repealing-imd-exclusion-would-do-more-harm-than-good.; Center for Public Representation, Institutions for Mental Diseases Exclusion, available at https://medicaid.publicrep.org/feature/institutions-for-mental-diseases-exclusion/ (last accessed May 22, 2023).

William S. Justice
51 Storrs Street, #310
Concord, NH 03301

U.S. District Courthouse (NH)
55 Pleasant Street, Rm. 110
JENNIFER BARTLETT, Case Manager
Concord, NH 03301