**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| WILLIAM SOLER JUSTICE,<br><br>    Plaintiff,<br> v.<br><br>AARON BELANGER,<br><br> – and –<br><br>ERIC BARBARO,<br><br>    Defendants. | Case No.: 23-cv-00308-SE-AJ |

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**I. INTRODUCTION**

The Plaintiff, William Soler Justice, is a former patient of New Hampshire's Secure Psychiatric Unit (the "SPU"). In his Complaint, Mr. Justice alleges that the Defendants, Aaron Belanger and Eric Barbaro, unlawfully transferred him from the least restrictive ward of the SPU to the more restrictive "E Ward," the conditions of which Mr. Justice describes as "involuntarily seclusive." Compl. 4, ECF No. 1. Mr. Justice claims that, in doing so, the Defendants violated his substantive and procedural due process guaranteed by the Fourteenth Amendment. Mr. Justice now asserts two claims against both Defendants under 42 U.S.C. § 1983 to vindicate his substantive and procedural due process rights.

However, the undisputed facts of this case support a very different story. Mr. Justice's transfer followed an escalating psychiatric episode in which he refused to wear clothing, threatened a hunger strike despite his diabetes, became increasingly agitated during a treatment meeting, and responded to staff with profanity, leading his treating psychiatrist to conclude that he required

1

closer supervision for his own safety and treatment.  As further explained herein, summary judgment should be granted because (a) the summary judgment record conclusively demonstrates that neither Sergeant Belanger or Captain Barbaro made or caused the treatment decision that forms the basis of Mr. Justice's Section 1983 claims, and (b) even if they did, the temporary transfer did not violate Mr. Justice's substantive or procedural due process rights.  Alternatively, summary judgment should be granted because the Defendants are entitled to qualified immunity.

## II. STATEMENT OF MATERIAL FACTS

### A.    Mr. Justice's Commitment to the SPU.

1.    As the result of an incident that occurred on August 24, 2017, Mr. Justice was charged with attempted murder, first degree assault, and reckless conduct with a dangerous weapon—that being a car.  Ex. D at 1; *see also Justice v. Sununu*, No. 20-CV-517-PB, 2022 WL 18275895, at *1 (D.N.H. Dec. 2, 2022), *report and recommendation approved by Justice v. Governor*, No. 20-CV-517-PB, 2023 WL 171364 (D.N.H. Jan. 12, 2023).

2.    Mr. Justice was subsequently found not competent to stand trial.  As a result, the prosecutor's office that handled Mr. Justice's criminal charges filed a petition for his involuntary commitment with the 6th Circuit Court – Probate Division – Concord.  Ex. D at 1.

3.    Mr. Justice has a paranoid schizophrenia diagnosis.  *Id.*

4.    Following a hearing held on February 8, 2018, the probate court found, by clear and convincing evidence, that Mr. Justice was "in such mental condition as a result of mental illness as to create a potentially serious likelihood of danger to himself and/or others" and ordered that Mr. Justice be committed to the SPU for a period of five years pursuant to RSA chapter 135-C with a conditional discharge when and if clinically appropriate.  *Id.*

5.      On February 9, 2018, Mr. Justice was admitted to the SPU where he remained until his discharge to New Hampshire Hospital on August 4, 2020. *Id.*; *see also* Ex. A at 7.

6.      The SPU is part of the New Hampshire Department of Corrections (the "DOC") and located on the grounds of the New Hampshire State Prison for Men. Affidavit of Aaron Belanger ("Belanger Aff.") ¶ 5. However, the SPU is considered to be a separate and district unit that is overseen by the DOC's Director of Medical and Forensic Services as opposed to the Warden. *Id*.

7.      The SPU is New Hampshire's most secure psychiatric facility specifically tailored to help individuals with severe mental illness who have been found to be dangerous. Affidavit of Eric Barbaro ("Barbaro Aff.") ¶ 4; Belanger Aff. ¶ 4.

8.      The SPU provides patients, who often arrive in the midst of an acute psychiatric episode, with the necessary therapeutic and pharmaceutical resources so that they can safely transition to a less restrictive environment. Barbaro Aff. ¶¶ 4-5; Belanger Aff. ¶¶ 4-6.

9.      During his time in the SPU, Mr. Justice's care team consistently noted in his psychiatric progress notes that he suffered from paranoid delusions, and at times they also noted that he suffered from grandiose or persecution delusions. *See, e.g.,* Ex. A at 48, 49, 52.

10.      Mr. Justice has consistently denied that he has a mental illness and does not believe that he requires medication for schizophrenia. *See, e.g.*, *id.* at 9, 11, 21-22, 28, 38, 42, 46; *see also* Ex. D at 2.

**B.      Levels of Care at the SPU.**

11.      The SPU offers three "Levels of Care" for patients, and each Levels of Care is "indicative of the amount of supervision a resident requires" and of the patient's privileges and restrictions. Barbaro Aff. at ¶¶ 7-18; Ex. E at. 2. From most to least restrictive, these levels are

Acute Care, Supervised Care, and Assisted Care.  Barbaro Aff. ¶¶ 7-10; Ex. E at 3-5; *see also* Belanger Aff. ¶ 8.

12.    Patients may be moved to a more or less restrictive Level of Care based on the patient's progression or regression towards their treatment goals. Barbaro Aff. ¶ 7, Ex. E at 4; *see also* Barbaro Aff. ¶¶ 16-21, 23-24.  In making this decision, the treatment team considers the patient's medication compliance, documented progress in treatment towards their goals, and any incident reports or privilege reductions.  Barbaro Aff. ¶ 7, Ex. E at 3; *see also* Barbaro Aff. ¶¶ 16-18, 21, 23-24.

13.    Except in emergency cases where a resident represents an acute danger to themselves, staff, or another resident, when the Officer in Charge ("OIC") can move the resident immediately, the decision to move a patient to a different level of care is made by the attending psychiatric provider.  Barbaro Aff. ¶¶ 3, 20; Belanger Aff. ¶ 16.  Corrections Officers do not have the authority to move patients to a different level of care. Barbaro Aff. ¶¶ 3, 31; Belanger Aff. ¶ 16.

14.    Absent exceptional circumstances, either the attending psychiatric provider or a mental health counselor will meet with a patient before moving the patient to a different ward to discuss their behavior, SPU expectations, and the reasons for moving them.  Barbaro Aff. ¶¶ 20-21.

15.    Patients on Acute Care Status are those whose mental conditions necessitate constant supervision, often because they pose a safety risk to themselves or others.  Barbaro Aff. ¶¶ 8-9, 13, 18; Belanger Aff. ¶¶ 10, 13.

16.    Patients on Acute Care Status may spend two to four hours outside of their rooms daily, in addition to time to shower and medical and therapeutic appointments. Barbaro Aff. ¶ 7,

4

13, Ex. E at 3; Belanger Aff. ¶ 11.  Patients may individually spend time unrestrained in the yard and the dayroom. Ex. E at 3; Ex. F at ¶ 13; Ex. G at ¶ 11. They are always accompanied by a security officer outside their cell and may be moved within the unit in restraints. Barbaro Aff. ¶ 7, 13, Ex. E at 3.  They are limited to non-contact visits. Barbaro Aff. ¶ 7, Ex. E at 3.

17.    These patients are also expected to participate in activities offered in their assigned dayroom, as well as some off ward groups, which are offered for an hour each day for five days per week, and off ward "activities (restrained and unrestrained) as indicated by their treatment plan." Barbaro Aff. ¶ 7, Ex. E at 3-4; Belanger Aff. ¶ 13.

18.    All SPU residents are limited to the property that the SPU Handbook indicates is allowed to residents on their respective level of care.  Barbaro Aff. ¶ 7, Ex. E at 3.  Of the three levels of care, residents on the Acute Care Status are allowed the least amount of personal property. Ex. H at 30-35.

19.    Patients on the Acute Care Status are required to have their status reviewed at least weekly, Barbaro Aff. ¶ 7, Ex. E at 3, though the treatment team discusses all the SPU patients, regardless of where they are housed, at a daily morning meeting, and discusses any patients that may need to move to a different ward, Barbaro Aff. ¶ 23.

20.    Absent exceptional circumstances, patients on Acute Care Status reside in the E Barbaro Aff. ¶ 10, 13; Belanger Aff. ¶ 8.

21.    "Residents on Supervised Care Status require active & regular supervision due to their inability to function properly due to their general mental condition." Barbaro Aff. ¶ 7, Ex. E at 3-4.

22.    Additionally, Supervised Care Status may be used to "monitor patients who have exhibited behavior(s) that are problematic but do not result in harm to self or others."  Barbaro Aff. ¶ 7, Ex. E at 4.

23.    Residents on Supervised Care Status may spend time in the ward dayroom, as determined by the ward schedule and modified by their treatment plan, under staff supervision. Barbaro Aff. ¶ 7, Ex. E at 4.  Supervised Care residents on the F Ward spend approximately eight to ten hours outside their rooms daily. Belanger Aff. ¶ 12; Barbaro Aff. ¶ 16.  They may also participate in any group included in their treatment plan, though they are supervised by staff at all times, on and off their unit. Barbaro Aff. ¶¶ 7, 16, Ex. E at 4.

24.    These residents are limited to the personal property outlined in the SPU Handbook, though they are allowed more personal property than residents on Acute Care Status.  Barbaro Aff. ¶ 7, Ex. E at 4; *see also* Ex. H at 30-34.  For example, residents on Supervised Care Status may have boots or sneakers with laces, multiple sets of clothes, a spork, and pencils, while residents on Acute Care Status are limited to slip-on shoes, a single set of clothes, and safety pens and they may not have cutlery.  Ex. H at 30-34.

25.    Residents on Supervised Care Status have their status reviewed at least once a month.  Barbaro Aff. ¶ 7, Ex. E at 4.

26.    Absent exceptional circumstances, patients on Supervised Care Status reside in the F Ward.  Belanger Aff. ¶ 8; Barbaro Aff. ¶¶ 10, 16.

27.    In addition to the privileges afforded to residents on Supervised Care Status, residents on Assisted Care Status may attend unit activities without an escort, spend time in the unit dayroom without direct supervision, "earn higher paying off ward jobs," and independently

access the video library and game system. Barbaro Aff. ¶ 7, Ex. E at 4-5. They are free to spend most of the day outside of their rooms with limited supervision. Barbaro Aff. ¶ 17.

28. Residents on Assisted Care Status are allowed more property than residents on the two more restrictive statuses. Ex. H at 30-35. For example, they are allowed, among other things, a watch, watercolor paints, and a warming pot. *Id.*

29. Residents on Assisted Care Status are expected to attend groups and to fully engage with their treatment. Barbaro Aff. ¶ 7, Ex. E at 4; Ex. A at 14.

30. Residents on Assisted Care Status have their status reviewed at least once a month. Barbaro Aff. ¶ 7, Ex. E at 5.

31. Absent exceptional circumstances requiring the SPU to temporarily reassign the cells, patients on Assisted Care Status reside in the G or H Wards.  Belanger Aff. ¶ at 8; Barbaro Aff. ¶ 17.

**C.    Mr. Justice's Care Status From April 9, 2020 to April 23, 2020.**

32. On December 23, 2019, Mr. Justice was notified that he was accepted to New Hampshire Hospital and that he was placed on the waitlist to be discharged once a bed was available. Ex. A at 14.

33. At this time, Mr. Justice resided in the H Ward of the SPU, where he was on Assisted Care Status.  *Id*

34. During the week leading up to April 9, 2020, Mr. Justice learned that two residents would be discharged from the SPU.  Ex. B at 6.

35. Mr. Justice became upset and expressed his belief that he should have been discharged before them.  *See id.*

36.     One of Mr. Justice's treatment goals at the SPU was to "maintain boundaries between staff and peers" and to "[d]emonstrate safe behavior."  Ex. A at 15.

37.     On the morning of April 9, 2020, an SPU staff member, Christopher Berntsen, was serving breakfast in the H Ward when he found Mr. Justice naked in his room.  Barbaro Aff. ¶ 25, Ex. G at 1.  Mr. Justice refused breakfast and said that he had lost his underwear. *Id.*  Mr. Berntsen determined that Mr. Justice would be offered clothes and locked in his room until he could be seen by his treatment team. *Id.*; Ex. A at 48.

38.     Mr. Justice was reluctant to meet with a doctor, but met with Dr. Wendy Martin, along with his primary care clinician, Christina O'Connor, and Sergeant Eric Barbaro. Ex. A at 48; Barbaro Aff. ¶ 26.

39.     Upon arriving at the meeting, Mr. Justice was distressed to see Dr. Wendy Martin because he believed that Dr. Martin had conspired with his cousin to allow his cousin to impersonate Dr. Martin to enter the facility.  Barbaro Aff. ¶ 26; Ex. A at 48; *see also* Ex. A at 13, 53-55 (expressing this belief on 3/19/20, 2/6/20, 1/17/20, and 1/3/20).

40.     Mr. Justice has type two diabetes mellitus.  Ex. A at 8.

41.     Mr. Justice told Dr. Martin he was upset because the water in the showers was not warm enough.  *Id.* at 48.  Mr. Justice said that he planned to go on hunger strike because of the issue with the showers.  *Id.*

42.     Mr. Justice explained that after two days on hunger strike, he would go into a diabetic coma, which would force SPU staff to send him to a hospital where he could "speak about how his basic human rights are not being upheld." Ex. B at 10.

43.    Ms. O'Connor advised Mr. Justice that his behavior was "not H level of behavior" because he needed to follow orders from security officers, including putting on clothes when asked to do so.  *Id.*

44.    Ms. O'Connor noted that Mr. Justice "cannot remain on H tier if chooses to be on hunger strike."  *Id.*

45.    Mr. Justice explained that he only disobeyed the order to put on clothes because he did not have underwear that fit.  *Id.*

46.    Mr. Justice was dissatisfied when he was told that maintenance personnel were aware of the issue with the showers and "became increasingly agitated such that the meeting was terminated."  Ex. A at 48.

47.    Later in the morning of April 9, 2020, Officer Belanger was standing outside the security office doorway when he saw Mr. Justice being escorted out of the treatment room across the hall and asked Mr. Justice how he was doing.  Belanger Aff. ¶ 17; *see also* Compl. at 2, ECF No. 1.  In response, Mr. Justice raised his voice and asked Officer Belanger about his sister. Belanger Aff. ¶¶ 17-21, Ex. C at 2.

48.    When Officer Belanger asked Mr. Justice not to ask about his sister, Mr. Justice continued to berate him; repeating himself several times while becoming increasingly agitated and continuing to raise his voice. Ex. C at 2; *see also* Compl. at 2, ECF No. 1 ("I repeated the question numerous times.").  Finally, Mr. Justice said "Fuck off Belanger!"  Belanger Aff. ¶ 21, Ex. C at 2.

49.    Officer Belanger instructed Mr. Justice to lockdown in his room, which is akin to "timeout" and notified Sergeant Barbaro about the incident.  Belanger Aff. ¶¶ 20-21; Barbaro Aff. ¶ 29; *see also* Belanger Aff. ¶ 17, Ex. C at 2; Compl. at 2, ECF No. 1.  While the treatment team may consider the underlying incident when evaluating the appropriate level of care for the resident,

the order to lock in does not directly affect the resident's Level of Care status.    Belanger Aff. ¶¶ 20-21; Barbaro Aff. 19-20, 23-24.

50.    Mr. Justice returned to his cell and locked down as instructed.  Belanger Aff. ¶ 20.

51.    Dr. Martin determined that, given Mr. Justice's refusal to wear clothes, his declaration that he would go on a hunger strike, and his "negative, unprovoked, and irritable" response to Captain Belanger, "he would be safest on E-ward on [Acute Care Status]." Ex. A at 48.

52.    On April 9, 2020, Dr. Martin ordered Mr. Justice to be placed on Acute Care Status and relocated to the E Ward.  *Id.*

53.    Between April 9, 2020 and April 13, 2020, Mr. Justice declined all meals, generally refused to speak to SPU staff, and declined several medical assessments.  Ex. B at 5-10.

54.    From April 10, 2020 to April 13, 2020, Mr. Justice was scheduled to, but did not receive medications to help manage his diabetes for several days because the hunger strike required him to have a medical assessment before he could receive the medications and he refused the assessment.  Ex. B at 5, 10-11; Ex. A at 1-6.

55.    On April 13, 2020, David Choi attempted to meet with Mr. Justice as a covering provider, but "[h]e would not respond verbally and he was seen lying on his bed and looking at the ceiling." Ex. A at 47.

56.    On April 13, 2020, David Choi determined that he required constant observation and ordered him to be moved to the infirmary on Acute Care Status, which has cameras in the room. Ex. A at 7; Ex. B at 6.

57.    On the evening of April 13, 2020, Mr. Justice ended his hunger strike. Ex. B at 5-6.

58.     On April 15, 2020, Mr. Justice was moved back to the E ward, where he remained on Acute Care Status. Ex. A at 7; Ex. B at 4. David Choi ordered this treatment. Ex. A at 7.

59.     On April 15, 2020, Mr. Justice was brought to the nurse's station for "FSBS" (Fingerstick Blood Sugar) monitoring, but SPU Nurse, Ester Matillano, noted it was difficult to have appropriate conversations with him because he was "[v]ery fixated about seclusion" and was "[n]ot able to discuss therapeutically for he raised his voice[] and ha[d] an angry affect." Ex. B at 4, 7. Nurse Matillano was forced to end the conversation and have Mr. Justice return to his room "to avoid escalation." *Id.* at 4.

60.     Mr. Justice attended a therapeutic group session designed to help patients develop grounding skills to cope with strong emotional pain on April 16, 2020. *Id.* at 3. The practitioner who ran the group noted that Mr. Justice was "talkative, although redirectable and appeared to listen to others" and that "[h]e seemed engaged." *Id.*

61.     Mr. Justice made phone calls while he was in the E Ward. *Id.*

**D.      Mr. Justice's Return to the H Ward and Discharge from the SPU.**

62.     On April 17, 2020, Dr. Martin ordered Mr. Justice moved to Supervised Care Status on the F Ward of the SPU. Ex. A at 7.

63.     On April 21, 2020, Mr. Justice was invited to attend a group session and declined to attend. Ex. B at 2.

64.     Mr. Justice attended a therapeutic group session on April 22, 2020 designed to help patients develop pro social and leisure skills," through a game where residents were expected to answer questions about themselves. *Id.* Mr. Justice appeared "cooperative and engaged" in the activity. *Id.* at 3.

65.     On April 23, 2020, Dr. Garrett Graves ordered Mr. Justice moved to Assisted Care Status on the H Ward of the SPU.  Ex. A at 7.

66.     Mr. Justice remained in the H Ward on Assisted Care Status until he was discharged from the SPU to New Hampshire Hospital on August 4, 2020. *Id.*

### III. ARGUMENT

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). To avoid summary judgment, the non-moving party must come forward with "concrete evidence from which a reasonable" fact-finder "could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  The court is not obliged to credit "conclusory allegations, improbable inferences, acrimonious invective, or rank speculation.'" *Gray v. Cummings*, 917 F.3d 1, 5 (1st Cir. 2019) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)).  "The non-movant cannot merely rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020) (quotations and citations omitted).  "At the summary judgment stage, the absence of evidence on an issue redounds to the detriment of the party who bears the burden of proof on that issue." *Perez v. Lorraine Enters., Inc.*, 769 F.3d 23, 30 (1st Cir. 2014).

Under this standard, Mr. Justice's Section 1983 claims fail for three independent reasons. First, Mr. Justice cannot impose Section 1983 liability upon the Defendants because the summary judgment record conclusively demonstrates that neither Defendant made, directed, or otherwise caused the treatment decision to transfer Mr. Justice to a more restrictive level of care.  Second, even if the Defendants were personally involved in this decision, Mr. Justice's temporary transfer

12

to a more restrictive level of care did not violate his due process rights because it reflected a reasonable medical judgment in response to Mr. Justice's deteriorating psychiatric condition, rather than punishment, and Mr. Justice received all the process the Constitution required under the circumstances.  Third, because no clearly established law would have placed a reasonable corrections officer on notice that the conduct at issue was unconstitutional, the Defendants are entitled to qualified immunity.

Discovery has now closed and Mr. Justice cannot come forward with any trial worthy issue of fact to avoid summary judgment.[1]  Accordingly, for the reasons further explained herein, the Defendants are entitled to a judgment as a matter of law, which is why their Motion for Summary Judgment should be granted.

**A.    The Defendants Did Not Cause The Alleged Deprivation of Mr. Justice's Due Process Rights.**

Mr. Justice's Section 1983 claims fail as a matter of law because he cannot come forward with *any* evidence that either Officer Belanger or Officer Barbaro changed, or caused to be changed, his level of care status, the only act at issue that allegedly violated Mr. Justice's constitutional rights.  *See* Compl. at 2.  By its own terms, Section 1983 allows the imposition of liability only on a defendant who, acting under the color of law, "subjects, or causes to be subjected any citizen . . . or other person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution."  42 U.S.C. § 1983.  "It is axiomatic that the liability of persons sued

---

[1] As demonstrated by his answers to the Defendants' Interrogatories, Mr. Justice offered nothing more than conclusory assertions to support his theory that his substantive and procedural due process rights were violated.  A true an accurate copy of Mr. Justice's initial interrogatory answers are attached hereto as Exhibit J, which fail identify the factual content requested by the Defendants and instead consist primarily of legal arguments and citations to legal authorities.  Mr. Justice's supplemental interrogatory answers, a true and accurate copy of which is attached hereto as Exhibit K, fare no better.

in their individual capacities under section 1983 must be gauged in terms of their own actions." *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999).

Here, none of the evidence in the summary judgment record suggests that Officer Belanger was responsible for moving Mr. Justice to the E ward, nor is there any suggestion that other SPU staff moved him on Officer Belanger's orders. To the contrary, as a Corrections Officer, Officer Belanger did not have the authority to move Mr. Justice to a different ward. Belanger Aff. ¶ 16. Aside from being present for an incident which led Mr. Justice's treatment team to reconsider the suitability of Assisted Care Status for his condition, it cannot be disputed that Officer Belanger was not involved in the decision to move Mr. Justice to E Ward at all. *Id.* at ¶ 22. In fact, Mr. Justice's treatment team—of which Officer Belanger was not a part—was concerned that his behavior might necessitate moving him to a more restrictive level of care even before his negative interaction with Sergeant Belanger, and his behavior leading up to the incident on April 9, 2020 indicated that his psychiatric condition was decompensating. *Id.* at ¶ 24-25; Barbaro Aff. ¶ 27; Ex. A. at 48; Ex. B at 10.

Neither can Mr. Justice come forward with any evidence to support his assertion that Captain Barbaro was personally responsible for the decision to move him to E Ward. This was a treatment decision made for Mr. Justice's well-being and his own medical records attribute this decision to Dr. Martin, not to either of the Defendants. Barbaro Aff. ¶ 27; Ex. A. at 48; Ex. B at 10. As OIC, Captain Barbaro could move a resident only if the resident created an acute security risk in a less restrictive ward and Mr. Justice's behavior, while concerning and indicative of his decompensating psychiatric status, did not pose an immediate threat to the safety of those around him. Barbaro Aff. at ¶¶ 3, 31; Belanger Aff. ¶¶ 16, 20. Without more, Mr. Justice's unfounded claim that Captain Barbaro ordered him to be sent to E Ward amounts to nothing more than a

14

"conclusory allegation" that is insufficient to meet his burden of proof on summary judgment. *Gray*, 917 F.3d at 5.

In all, the summary judgment record is devoid of any evidence that either Officer Belanger or Officer Barbaro caused or ordered Mr. Justice's transfer to Acute Care Status or that the move was occasioned by their "own actions." *Rogan*, 175 F.3d at 77. Simply put, Defendants cannot be held responsible for a decision that they did not make, which is why summary judgment as to Mr. Justice's Section 1983 claims is warranted.

**B.      Mr. Justice's Due Process Rights Were Not Violated.**

Even assuming that Officer Belanger or Officer Barbaro were behind the decision to transfer Mr. Justice to a more restrictive level of care—to be clear, they did not—his Section 1983 claims still fail because his move to the E Ward and F Ward did not run afoul of his substantive or procedural due process rights.

**1.      Mr. Justice's transfer was a clinical treatment decision, not punishment, and therefore does not violate his substantive due process rights.**

As a civilly committed person, Mr. Justice had a substantive due process right to be free from punishment. *See Bell v. Wolfish*, 441 U.S. 520, 535 (U.S. 1979) (discussing the right of detained, but not convicted, persons to be free from punishment). Nevertheless, this substantive due process right is limited and even seemingly "[d]isagreeable conditions can . . . be consistent with the demands of due process, so long as they do not amount to punishment." *Healey v. Spencer*, 765 F.3d 65, 78 (1st Cir. 2014).

For instance, therapeutic treatment centers may implement conditions designed to promote security because "an unsafe environment would be one in which the ability to deliver effective therapeutic services would be drastically reduced." *Langton v. Johnston*, 928 F. 2d 1206, 1220 n.17 (1st Cir. 1991); *see also Healey*, 765 F.3d at 78. Such conditions are constitutionally

15

permissible so long as they "bear some reasonable relation to the purpose[s] for which persons are committed." *Healey*, 765 F. 3d at 78 (alterations in original) (quoting *Cote v. Murphy*, 152 Fed.Appx. 6, 7 (1st Cir. 2005). This requires that the conditions reflect the defendant's "reasonable professional judgment." *Id*. (quoting *Battista v. Clarke*, 645 F. 3d 449, 453 (1st Cir. 2011)). "[T]reatment and training decisions, if made by a professional are presumptively valid." *Doe v. Gaughan*, 808 F.2d 871, 884 (1st Cir. 1986) (footnote omitted). On the other hand, punishments are those conditions "imposed for the *purpose of punishment* [rather than] an incident of some other legitimate governmental purpose." *Bell*, 441 U.S. at 538 (emphasis added) (holding that the requirement that a facility demonstrate a "compelling necessity" for any restrictive condition is far too onerous).

Here, there can be no dispute that the treatment team's decision to move Mr. Justice to the E Ward was not punitive; it was made to ensure his safety and to effectuate his treatment. *Bell*, 441 U.S. at 535; Ex. A at 48. Indeed, on April 9, 2020, SPU officers and members of Mr. Justice's treatment team noted that he refused to put on clothes, declared to that he was going to go on hunger strike, became so upset that the treatment team was forced to end the meeting, and finally had a "negative, unprovoked, and irritable" reaction to a friendly greeting from a security officer. Ex. A at 48; *see also* Ex. B at 8-10; Ex. C at 1-2; Barbaro Aff. ¶¶ 26-27. Mr. Justice was committed to the SPU to keep him safe from himself and others safe from him. *See* Ex. D. Faced with evidence that Mr. Justice's precarious psychiatric stability had started to slip, and would only become exacerbated following his hunger strike, Dr. Martin made the "reasonable professional judgment" that he would be safest in the E Ward, where the SPU's clinical staff could monitor his food and water consumption and limit his unsupervised interactions with others. Ex. A at 48; *see also* Ex. F at ¶ 28; Ex. B at 4 ("[S]eclusion is needed ONLY for a patient's safety") (emphasis in

16

original).   Given the potentially dangerous condition of SPU residents, *see* RSA 622:45, it is imperative for the security of the facility that SPU staff have the authority to determine which residents pose a potential danger to themselves or others at any given time and to restrict those residents so that they cannot cause harm. *Langton*, 928 F. 2d at 1220 n.17; *see also Healey*, 765 F.3d at 78;

As a reasonable professional judgment, the decision to move Mr. Justice is "presumptively valid." *Doe*, 808 F.2d at 884.   Aside from his own conjecture that Officer Barbaro had him transferred to the E Ward because he made a comment to Officer Belanger about his sister, Mr. Justice offers no evidence to suggest that this was "for the purpose of punishment" for those comments rather than the result of a reasonable determination that his behavior indicated that he posed a risk to himself or others.  *See Bell*, 441 U.S. at 538; *see generally* Exs. J & K.  Such naked speculation as to the motive of the SPU's staff for moving Mr. Justice to the E Ward is not enough for him to survive summary judgment. *Springer,* 518 F. 3d at 484.

> **2.      Mr. Justice's procedural due process rights were not violated during his temporary transfer within the SPU.**

Mr. Justice's procedural due process claim fares no better.   To prevail on this theory, Mr. Justice "must identify a protected liberty or property interest" and establish that either Officer Belanger or Officer Barbaro "deprived him of that interest without constitutionally adequate process. *Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 56 (1st Cir. 2006) (cleaned up).  For the reasons further explained below, Mr. Justice's procedural due process claim falls short on both elements.

#### i. *Mr. Justice's move to the E and F Wards did not implicate his liberty interests.*

The Due Process Clause protects civilly committed individuals from restrictions that amount to punishment. *See Bell*, 441 U.S. at 535. Accordingly, where a civilly committed person challenges an internal placement decision, the relevant inquiry is whether the restriction constitutes punishment or instead reflects the exercise of reasonable professional judgment in furtherance of legitimate treatment or institutional security objectives. *Id.* at 358; *see also Healey*, 765 F.3d at 78.

As this Court has recognized, Mr. Justice's claimed liberty interests derives from his substantive due process right to be free from punishment. *Order on Report & Recommendation*, Doc. No. 8, at 5. Nevertheless, for the reasons explained in Part III.B.1 above, Mr. Justice's temporary reassignment to the E and F Wards was not punishment in the constitutional sense. Instead, it was a clinical treatment decision made in the professional judgment of his treatment providers. Because the transfer did not amount to punishment, it did not implicate the liberty interest upon which Mr. Justice's procedural due process claim depends. *See Bell*, 441 U.S. at 538; *Healey*, 765 F.3d at 78.

Indeed, there can be no genuine dispute that Mr. Justice was transferred to a more restrictive level of care because he refused to wear clothing appropriately or even at all, engaged in a hunger strike notwithstanding his diabetic condition, allowed his room to become unsanitary, and responded aggressively and without provocation to Officer Belanger. Belanger Aff. ¶¶ 18-20

These circumstances reasonably led Mr. Justice's treatment team to conclude that he was decompensating and presented heightened treatment and security concerns. Ex. A at 48; Ex. B at 9-11; Belanger Aff. ¶ 24. Mr. Justice offers no competent evidence that his transfer was imposed for punitive purposes. Ex. J; Ex. K. Rather, he relies solely on speculation and conclusory

18

assertions, which are insufficient to create a genuine issue of fact to avoid summary judgment. *Springer*, 518 F. 3d 484. Because Mr. Justice fails to establish that his temporary transfer to a more restrictive level of care implicated a constitutionally protected liberty interest, his procedural due process claim necessarily fails as a matter of law.

### ii. *Mr. Justice was afforded constitutionally adequate process.*

Even assuming that Mr. Justice could identify a protected liberty interest, his claim would still fail because he received all of the process constitutionally required to justify his involuntary commitment to the SPU. Ex. D. There can be no dispute that Mr. Justice was committed to the SPU only after a full hearing where he had, but consistently refused, the assistance of court appointed counsel. *Id.* Once lawfully committed in accordance with New Hampshire's civil commitment statute, RSA chapter 135-C, decisions regarding Mr. Justice's placement and treatment within the SPU are matters entrusted to the professional judgment of its qualified clinicians. *See, Youngberg v. Romero*, 457 U.S. 307, 321-23 (1982) (holding that "the Constitution only requires that the courts make certain that professional judgment in fact was exercised") (quoting *Romero v. Youngberg*, 644 F.2d 147, 178 (3d Cir. 1980) (Seitz, J., concurring)); *see also Kansas v. Hendricks*, 521 U.S. 346, 368 n.4 (1997) ("States enjoy wide latitude in developing treatment regimens.").

Mr. Justice does not point to any authority, and the Defendants are aware of none, holding that the Constitution requires a separate hearing before clinicians may temporarily transfer a civilly committed patient between treatment wards in response to changing clinical or security concerns. Because Mr. Justice's temporary reassignment reflected the exercise of professional judgment, rather than the imposition of punishment, the Due Process Clause does not require additional procedural safeguards before the transfer occurred. Rather, "due process is flexible and calls for

such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). In determining what process is due, courts balance the private interest at stake, the risk of an erroneous deprivation under existing procedures, the probable value of additional safeguards, and the government's interests. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

The procedures employed by the SPU readily satisfy that standard. Before Mr. Justice was transferred, he met with Dr. Martin, Christina O'Connor, and Captain Barbaro, who explained that his refusal to wear clothing and participation in a hunger strike could result in his transfer to a more restrictive ward. Ex. A at 48; Ex. B at 9-11; Barbaro Aff. ¶¶ 26-27. Mr. Justice was afforded an opportunity to respond and explained that he refused to wear pants because none fit him. Barbaro Aff. ¶ 27; Ex. B at 10. Thus, Mr. Justice received notice of the reasons for the proposed transfer and an opportunity to present his position to his treatment team.

Although Mr. Justice did not discuss his later confrontation with Sergeant Belanger during that meeting because it had not yet occurred, the summary judgment record demonstrates that an immediate second meeting would have served little purpose. For example, after the April 9, 2020 incident, Mr. Justice refused to communicate with SPU staff for several days, declined necessary examinations, and, when a provider later attempted to discuss his placement, refused to engage. Ex. A at 47-48; Ex. B at 6-11. Once his condition improved, Mr. Justice's treatment team eventually reduced his restrictions by transferring him from E Ward to the less restrictive F Ward. Ex. A at 7; Ex. B at 3-4.

Under these circumstances, the risk of an erroneous deprivation was minimal, while the State's interests in maintaining institutional safety and providing effective psychiatric treatment were substantial. Requiring an additional hearing before clinicians could temporarily adjust a patient's placement in response to acute behavioral deterioration would undermine the professional

20

judgment that *Youngberg* instructs courts to respect. *See Youngberg*, 457 U.S. at 321-23. Because Mr. Justice's temporary reassignment reflected the exercise of professional judgment, rather than the imposition of punishment, the Due Process Clause did not require additional procedural safeguards before the transfer occurred.

Thus, there can be no dispute that Mr. Justice was afforded ample due process. As such, Mr. Justice's procedural due process claim fails as a matter of law, which is why the Defendants' Motion for Summary Judgment should be granted.

**C.      The Defendants Are Entitled To Qualified Immunity.**

Even assuming that the summary judgment record presents a genuine dispute of material fact as to whether the Defendants violated Mr. Justice's constitutional rights, his Section 1983 claims still fail as a matter of law because the Defendants are entitled to qualified immunity. As government officials sued in their individual capacity, Officers Belanger and Barbaro are entitled to qualified immunity unless Mr. Justice can establish that "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Because qualified immunity is not just immunity from liability, but also immunity from suit, courts should resolve the issue at the earliest possible stage of the litigation. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

As explained above, Mr. Justice cannot establish that the Defendants violated his substantive or procedural process rights. Even assuming otherwise, however, Mr. Justice cannot satisfy the second step of the qualified immunity analysis. To overcome the Defendants' qualified immunity, Mr. Justice must identify either 'controlling authority' or a 'consensus of cases of persuasive authority' sufficient to send a clear signal to a reasonable official" that their specific

21

conduct violated constitutional or statutory norms. *Alfano v. Lynch*, 847 F.3d 71, 76 (1st Cir. 2017) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). In this regard, the constitutional norms that the Defendants allegedly violated must be "beyond debate." *Wesby*, 583 U.S. at 63.

With respect to Mr. Justice's substantive due process claim, no clearly established law would have informed a reasonable officer that transferring a civilly committed resident to a more restrictive ward for observation and treatment violated the Constitution. To the contrary, the governing cases emphasize that courts must defer to treatment decisions grounded in reasonable professional judgment. *Youngberg*, 457 U.S. at 321-23; *Healey*, 765 F.3d at 78. Mr. Justice identifies no controlling authority, and Defendants are aware of none, holding that temporarily assigning a civilly committed patient to a more restrictive ward under circumstances such as those presented here amounts to unconstitutional punishment. Any reasonable officer could thus conclude that transferring Mr. Justice after he exhibited volatile behavior and refused to eat was a lawful response to an acute psychiatric episode rather than an unconstitutional punishment.

The same is true of Mr. Justice's procedural due process claim. Again, there is no clearly established law holding that a temporary transfer between treatment wards within a secure psychiatric hospital implicates a protected liberty interest, much less prescribing the process constitutionally required before such a transfer occurs. As discussed above, the First Circuit has not established a standard governing when changes in housing or treatment conditions within a civil commitment facility like the SPU trigger procedural due process protections. Nor has it clearly established that the process Mr. Justice received, which included an evaluation by his treating provider who ordered the transfer, was constitutionally inadequate. In the absence of controlling authority or a robust consensus of persuasive authority addressing these circumstances, reasonable officials could not have understood that their conduct violated clearly established law.

22

Thus, because no clearly established law would have placed reasonable SPU officers on notice that their conduct violated the Constitution, Defendants Belanger and Barbaro are entitled to qualified immunity on both his substantive and procedural due process claims.

## IV. CONCLUSION

For the reasons explained herein, there is no genuine issue of material fact that the Defendants' are entitled to summary judgment as a matter of law on Mr. Justice's Section 1983 claims.  Accordingly, this Court should grant the Defendants' Motion for Summary Judgment.

Respectfully submitted,

AARON BELANGER and ERIC BARBARO

By their attorney,

JOHN M. FORMELLA
ATTORNEY GENERAL

Dated: July 22, 2026

/s/ Duncan A. Edgar
Duncan A. Edgar, Esq., Bar No. 266272
Assistant Attorney General
New Hampshire Department of Justice
Civil Litigation Unit
1 Granite Place South
Concord, NH 03301
(603) 271-3658
duncan.a.edgar@doj.nh.gov

## CERTIFICATE OF SERVICE

I, Duncan A. Edgar, hereby certify that on this date, I caused a true copy of the foregoing to be served to all parties that have entered appearances in this case via CM/ECF.

Dated: July 22, 2026

/s/ Duncan A. Edgar
Duncan A. Edgar, Esq.