**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| WILLIAM SOLER JUSTICE,<br><br>               Plaintiff,<br>    v.<br><br>AARON BELANGER,<br><br>  – and –<br><br>ERIC BARBARO,<br><br>               Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Case No.: 23-cv-00308-SE-AJ<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**AFFIDAVIT OF ERIC BARBARO**
**IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I, Eric Barbaro, being under oath and subject to the penalties of perjury, hereby state on my own knowledge and belief as follows:

1.     My legal name is Eric Barbaro.  I am over eighteen years of age and am competent to make this Affidavit.

2.     I was employed by the State of New Hampshire Department of Corrections (the "DOC") for about thirty-one years and I worked at the Secure Psychiatric Unit (the "SPU") for about sixteen years.  In April of 2020, I was a Corrections Sergeant at the Secure Psychiatric Unit (the "SPU").  I make this Affidavit voluntarily.  The information in this Affidavit is based upon my personal knowledge.  I would be competent to testify to the matters set forth in the Affidavit if called to do so at trial.

3.     As the Corrections Sergeant, I was responsible for supervising the dayshift and ensuring security at the SPU.  To best ensure security, I met with the facility's clinical staff daily to discuss concerns about patients.  As the Officer in Charge (OIC) of the dayshift, I had the authority to move patients to a more restrictive ward when they posed an imminent or life-

1

threatening risk to the safety of another patient, an officer, or other SPU employee, after they were assessed for safety by a mental health nurse and the nurse approved the move.  Absent these limited and extreme circumstances, I would contribute my perspective on the potential security risks associated with moving a patient to a more or less restrictive setting because security officers observe residents in their daily interactions, but the SPU doctors made the ultimate decision and would provide a written order to move a patient to a different ward.  A complete list of my job functions as a Corrections Sergeant is set forth in the Supplemental Job Description for this position, a true and accurate copy of which bearing my signature is attached to my Motion for Summary Judgment ("MSJ") as Exhibit F.

4.     The SPU is the most intensive and secure psychiatric inpatient facility in the State of New Hampshire.  The types of patients that are sent to the SPU for treatment include, without limitation, individuals who have been (a) transferred from prison or jail for acute psychiatric care, (b) ordered by a court to undergo psychiatric treatment or pre-trial competency evaluation, (c) found to be not guilty by reason of insanity, and (d) involuntarily committed by the probate court pursuant to RSA chapter 135-C.  As such, nearly all new residents arrive at the SPU in the midst of an acute psychological crisis.

5.     The goal of the SPU is to provide residents with intensive psychiatric care so that they may achieve a stable psychiatric condition and obtain resources to safely progress to less restrictive tiers within the SPU, with the end goal of a move to a less restrictive inpatient setting—like the New Hampshire Hospital—or return to their community.  Psychiatric care at the SPU varies according to a resident's treatment plan, but generally includes clinical evaluations, one on one and group therapeutic sessions, and medication management.

6. Group therapy sessions are offered to residents in all wards of the SPU daily. The treatment team makes individualized recommendations for which sessions to attend to each resident, but it is up to the patient to decide to attend specific sessions.

7. The SPU is a structured environment, and this structure is in place to ensure the safety of both SPU residents and staff. The structure of the SPU governed by DOC Policy and Procedure Directive ("PPD") 550. A true and accurate copy of this policy is attached my to MSJ as Exhibit E.

8. Male residents at the SPU are housed in four different wards, in addition to the infirmary. Residents who demonstrate safe behavior, follow directions, and cooperate with treatment by taking appropriate medication and attending therapy sessions, will be moved to a less restrictive ward when the treatment team determines that they will be able to safely interact with other residents and staff. If a resident's behavior indicates that they are no longer safe to be around, they pose a danger to themselves, or if the resident demonstrates that they need more treatment or observation, they will be moved back to a more restrictive ward.

9. Because SPU residents have already been found to be potentially dangerous upon admission, when they are in a poor psychiatric condition (as is often evident when they exhibit unpredictable, bizarre, or dangerous behavior) they are moved to a more restrictive ward where they will have less opportunity to harm themselves or others, there are more security personnel to intervene in case of an incident, and their behavior can be more closely monitored.

10. Residents' privileges and restrictions are determined by their Level of Care Status. There are three Level of Care Statuses: Acute Care Status ("ATC"), the most restrictive, Supervised Care Status ("SC"), and Assisted Care Status ("AC"), the least restrictive. With some

exceptions for logistical reasons, patients reside in the ward that corresponds to their Level of Care Status with other residents on the same Level of Care.

11.    Most new residents to the SPU are housed in the infirmary, where they are under nearly constant supervision while the SPU providers evaluate the patient's psychiatric condition, including the possibility that they will pose a risk to themselves, other patients or SPU employees, and determine an appropriate treatment plan.  If there is no room in the infirmary, the treatment team will triage residents based on the danger that they may pose a risk to themselves, a new resident who has not demonstrated self-harming behavior will be housed in the E Ward.

12.    The Infirmary has room for six patients.  Depending on the status of a patient in the infirmary, the treatment team may place them on one-to-one constant observation by a trained staff member, checked on every fifteen minutes, or checked on every thirty minutes.

13.    Residents with a psychiatric condition that requires close monitoring are placed on "Acute Care Status" ("ATC") and usually moved from the infirmary to the E Ward.  The E Ward is the most restrictive ward at the SPU.  Residents housed in this Ward spend two to three hours outside of their room daily in the dayroom or the yard and, in addition, they attend therapy and medical appointments.  While they are handcuffed and escorted by security staff when they are transported, they are not required to wear handcuffs in the dayroom or the yard.  They may attend group therapy sessions with up to four other residents in individual therapy booths.  Residents' rooms are next to each other, and they can talk to each other through the walls.  Occasionally, because the E Ward only has ten beds, nonviolent residents on ATC Status may be housed in the F Ward, or residents may reside in the infirmary on ATC Status.

4

14.     Because E Ward residents spend most of their time in their rooms and they are accompanied by a security officer anytime they leave the room, SPU staff can monitor their interactions with other residents to see if they exchange food, medications, or other items.

15.     The amount of time that residents spend in the E Ward varies greatly by resident, it may be as little as one day, or it may be several months, it all depends on the patient's condition and available bedspace for new patients.

16.     Residents who progress in their treatment are placed on Supervised Care ("SC") Status and moved to the F Ward.  F Ward residents spend approximately eight hours daily outside of their rooms, including time for mental health appointments and group therapy, and there can be as many as ten residents in common areas on the Ward at a time. These residents are free to interact with each other, although there is always a security officer present to supervise their interactions.

17.     Residents who continue to progress in their treatment are placed on Assisted Care ("AC") Status and moved to the G Ward and then to H Ward.  Residents in H and G Wards are completely independent.  During the day, aside from times that they are asked to stand for count twice a day, they are free to walk around the Ward and outside the Ward with permission, come and go from their rooms, and interact with each other. H and G Ward residents assist staff with various responsibilities in the SPU, and they are free to work without handcuffs. Security officers conduct "rounds" every half hour to check on residents, but they do not constantly supervise the residents in this Ward.

18.     To be assigned to G or H Ward, a resident's behavior should not pose a safety risk to themselves or others. If a resident on G or H Ward does pose a safety risk to themselves or others, that resident will be assessed by members of the SPU mental health team.

19.    If a resident was involved in a serious safety or mental health incident, like declaring that they were planning to go on a hunger strike or refusing to put on clothes, a provider or mental health counselor will meet with them as soon as possible on the same day.  When I was available, I often attended to provide the security team's perspective on the incident.  For less serious incidents, for example, if a patient stole something from another patient, a mental health professional would meet with the resident at some point during the week.

20.    Unless the resident poses an imminent security risk such that the OIC decides to move them to a more restrictive ward immediately, the residents meet with either a doctor or mental health counselor to discuss the expectations of the SPU, their behavior, and the reasons for moving them before they are moved to a more restrictive ward.  At this meeting, residents have the opportunity to offer their perspective on the decision to move them, including by offering insight into any relevant incident that led to the decision.

21.    The doctor or clinician assesses the patient's comments, behavior, and safety status at this meeting and takes it into account when making the final decision to move them to another ward.

22.    In April of 2020, the Captain of the SPU was Captain Scott Marshall, and he reviewed all security related reports.

23.    The SPU has a daily morning meeting with the treatment team, which the providers, nurses, mental health counselors, and the administrator, who oversees the mental health professionals.  The first shift OIC and sometimes the Corrections Captain also attend.  As Sergeant, I was the first shift OIC and I often attended these meetings, and when I was not available to attend, either the Corrections Captain or a Corrections Corporal would attend.  At this meeting, we would discuss all the patients at the SPU, including their behavior, overall well-being and success in

specific treatment, their treatment plan, and any relevant security and mental health incidents.  If it seemed that a patient was succeeding in their ward, needed more treatment, or needed more observation and would likely need to move to a more restrictive different ward or was ready to move to a less restrictive ward, the treatment team and security would discuss it at this meeting before a doctor or clinician met with the resident and the doctor ordered that they be moved.  The security personnel in attendance would go through the incident reports from the day before and any notable patient behavior they observed.

24.    Residents, providers, clinicians, and security staff do a lot of work with patients to stabilize their psychiatric condition and progress them to less restrictive wards.  If a patient is moved back to a more restrictive ward, the patient needs more treatment to reach their treatment plan goals and safely move to a less restrictive ward.

25.    When I arrived for the day on April 9, 2020, I received the incident report for an incident indicating that, early that morning, William Soler Justice, a resident residing in the H Ward, refused to eat breakfast when it was offered to him and refused put on underwear or pants as instructed by SPU staff member, Christopher Berntsen.  Mr. Berntsen determined that Mr. Justice should be locked in his room until he could meet with a clinician or provider. A true and accurate copy of this incident report is attached to my MSJ as Exhibit G.

26.    Mr. Justice was escorted to a meeting with Dr. Wendy Martin and Christine O'Connor, a primary care clinician, which I attended.  Mr. Justice was very reluctant to meet with Dr. Martin because he believed that Dr. Martin had conspired with Plaintiff's cousin to allow his cousin to impersonate Dr. Martin to enter the facility.

27.    At the meeting, Ms. O'Connor and Dr. Martin tried to deescalate the situation to keep him on the H Ward.  Mr. Justice declared that he intended to go on hunger strike because the

showers in the H Ward were not warm enough.  It was made clear to Mr. Justice that he needed to obey orders, like the order to put on clothes, if he wanted to stay on H Ward.  Mr. Justice responded that he did not put on pants because he did not have any pants that fit him.  While I do not recall whether Mr. Justice was specifically told that he would have to be moved if he went on a hunger strike, the treatment team typically tells residents on H and G Ward that if they go on a hunger strike, they will be moved to a more restrictive ward.  I have reviewed Ms. O'Connor's notes on this meeting, attached to my MSJ as Exhibit B at page 10, and Dr. Martin's notes on this meeting, attached to my MSJ as Exhibit A at page 48, and believe them to be a true and accurate representation of what occurred at the meeting.

28.    If a resident is on hunger strike, it is safer for them to be on the E Ward or in the Infirmary where SPU staff can monitor everything that goes into and comes out of their room to see whether they have started eating and monitor their water consumption.  This type of monitoring is impossible in the G or H Wards, where residents are free to come and go from their rooms and exchange items with other residents, as with the F Ward, where they are allowed to meet with other residents and (although they are not allowed to pass food or medication), they have more opportunity to pass food or medication.

29.    Later in the morning of April 9, 2020, Officer Aaron Belanger informed me that Mr. Justice had an aggressive reaction when Officer Belanger greeted him and Officer Belanger had ordered him to lock in his room.  I instructed Officer Belanger to write an incident report, which I later reviewed and approved, and after I reviewed the report, I sent it to Captain Marshall for his final approval.  Although I am listed as the reporting staff on this report, Officer Belanger was the reporting staff, my name was listed in error due to confusion with a new system for online reporting. A true and accurate copy of this incident report to my MSJ as Exhibit C.

8

30.     After an incident, I always inform mental health staff, which would include Dr. Martin, the nursing team, and, if they are available, the administrator, who oversees the mental health staff about the incident. Dr. Martin ordered Mr. Soler Justice moved from H Ward to E Ward and placed on Acute Care Status.

31.     Mr. Soler Justice's behavior, while concerning, did not pose an acute safety risk to SPU patients or staff such that I, as the OIC, felt that it was necessary to immediately move him to the E Ward. With that said, the decision to move Mr. Soler Justice to the E Ward was not mine to make. Dr. Martin ordered that Mr. Soler Justice be placed in the E Ward for the time being and, as the OIC, I was obligated to defer to her clinical judgment.

I, Eric Barbaro, hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on July 21, 2026.
Eric Barbaro

DEBORA A DESROCHERS
NOTARY PUBLIC
State of New Hampshire
My Commission Expires
September 25, 2029

Debora Desrochers
Notary – Exp. 9/25/29
7/22/26

9