**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| WILLIAM SOLER JUSTICE,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>AARON BELANGER,<br><br>　– and –<br><br>ERIC BARBARO,<br><br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　　Case No.: 23-cv-00308-SE-AJ<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**AFFIDAVIT OF AARON BELANGER**
**IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I, Aaron Belanger, being under oath and subject to the penalties of perjury, hereby state on my own knowledge and belief as follows:

1.　　My legal name is Aaron Belanger.  I am over eighteen years of age and am competent to make this Affidavit.

2.　　I was employed by the State of New Hampshire Department of Corrections (the "DOC") at the Secure Psychiatric Unit (the "SPU") for more than twenty years and retired in 2026. From when I started until April of 2022 when I was promoted to Corrections Sergeant, I was a Corrections Officer, including in April of 2020.  I make this Affidavit voluntarily.  The information in this Affidavit is based upon my personal knowledge.  I would be competent to testify to the matters set forth in the Affidavit if called to do so at trial.

3.　　As a Corrections Officer, I was responsible for ensuring the safety of residents and staff at the SPU.  This included monitoring and observing residents in shared spaces, conducting "rounds" (periodic security checks on residents in their rooms), and escorting patients to medical and therapeutic groups and appointments, as well as other locations both within and outside of the

1

SPU.  As a Corrections Officer, many of my job functions were shared with Corrections Officers in other prison settings in New Hampshire prisons, the general description of job functions for Corrections Officers is set forth in the Supplemental Job Description for this position, a true and accurate copy of which bearing my signature is attached to my Motion for Summary Judgment as Exhibit I.  In addition to these responsibilities, as a SPU Corrections Officer, I completed a two-week specialized mental health training at the New Hampshire Hospital and was expected to take a therapeutic approach to my interactions with the residents and act with sensitivity to the various types of mental illness that impact residents.

4.      The SPU is the most intensive and secure psychiatric inpatient treatment facility in the State of New Hampshire and is specifically designed to serve those having acute psychiatric needs that must be provided in an inpatient setting.  The types of patients that are sent to the SPU for treatment include, without limitation, individuals who have been (a) transferred from prison or jail for acute psychiatric care, (b) ordered by a court to undergo psychiatric treatment or pre-trial competency evaluation, (c) found to be not guilty by reason of insanity, (d) transferred from other state-run psychiatric facilities for emergency care, and (e) involuntarily committed by the probate court pursuant to RSA chapter 135-C.  As such, nearly all new residents arrive at the SPU in the midst of an acute psychological crisis and pose a serious risk to themselves or others.

5.      While the SPU is located on the grounds of the New Hampshire State Prison for Men, it is considered to be a separate and distinct unit that is overseen by the DOC's Director of Medical and Forensic Services as opposed to the Warden.

6.      The goal of the SPU is to provide residents with intensive psychiatric care so that they may achieve a stable psychiatric condition and obtain resources to safely progress to less restrictive tiers within the SPU and eventually move to a less restrictive inpatient setting, like the

New Hampshire Hospital, or return to their community. Psychiatric care at the SPU varies according to a resident's treatment plan, but generally includes clinical evaluations, one-on-one and group therapeutic sessions, and medication management.

7.      The SPU is a structured environment, and this structure is in place to ensure the safety of both SPU residents and staff.  The structure of the SPU governed by DOC Policy and Procedure Directive ("PPD") 550.  Affidavit of Eric Barbaro ("Barbaro Aff.") ¶ 7, Ex. E.

8.      With some exceptions for logistical reasons, residents reside in a ward that corresponds to their Level of Care Status. Residents on Acute Care Status ("ATC"), the most restrictive, usually reside in E Ward, residents on Supervised Care Status ("SC") usually reside in F Ward, and residents on Assisted Care Status, the least restrictive, usually reside in G or H Wards. The Levels of Care are described fully in PPD 550.  Barbaro Aff. ¶ 7, Ex. E at 3-5.

9.      New residents at the SPU are first admitted to the infirmary, where they are under close supervision; doctors may place residents in the infirmary under one-on-one supervision, which they typically do because the resident is a danger to themselves, or order that they are checked on every fifteen or thirty minutes.  Residents in the infirmary are the most dangerous to themselves and others.

10.     Male residents at the SPU are housed in four different wards, in addition to the infirmary. Residents who follow their treatment plan, comply with staff directions, and prove that they can be trusted are moved to less restrictive wards.  If a resident's behavior indicates that they are no longer safe to be around or pose a threat to themselves, they will be moved back to a more restrictive ward.

11.     Once processed and in a moderately stable psychiatric condition such that they no longer pose an imminent risk of harm to themselves or others, residents are moved from the

infirmary to the E Ward, also referred to as the "E Tier" where they progress in their treatment.  E Ward residents are locked in their rooms for approximately twenty to twenty-two hours per day, during which time they are monitored by corrections officers and nursing staff.  These residents leave their rooms to visit the yard and the dayroom twice daily, as well as to shower.  E Ward residents also leave their rooms to meet with clinicians and providers, as dictated by their treatment plan and their treatment team's schedule.

12.    Residents who progress further in their treatment are moved from E Ward to F Ward. Residents on F Ward are allowed to spend approximatively eight to ten hours per day outside of their rooms.

13.    Residents who progress in their treatment and have shown that they can be trusted to independently conduct themselves safely are moved from F Ward to G Ward and then, typically from G Ward to H Ward, though the expectations and restrictions are the same on G and H Wards. Residents on the G and H wards spend most of the day outside of their rooms.  Residents on the H Ward have progressed in their treatment such that they are preparing to be discharged from the SPU to a less restrictive setting.  The G and H Wards are the least restrictive wards at the SPU.

14.    Residents on the G and H Wards generally do not need to be escorted by a corrections officer within the SPU, they can independently walk around the unit, including to medical appointments.  Residents on these Wards may have on or off Ward jobs and they are free to go to their jobs and do their jobs unrestrained.  If a resident from the G or H Ward is escorted by a security officer, with or without restraints, it generally indicates that the resident has recently exhibited behavior that may make them a risk to themselves or others.

15.    Corrections Officers conducted "rounds" every hour or every half hour; while I do not recall the exact date, the SPU transitioned from conducting rounds every hour to every half

hour around 2020. The doors to residents' rooms are made from steel, with a window that is approximately five inches wide. When an officer conducts rounds, they look through the window to check whether the resident needs medical attention, is attempting to harm themselves, or otherwise needs assistance, which includes requests for hygiene products.

16.     As a Corrections Officer, I did not have the authority to move residents to a different ward.  The decision to move a resident is made by an SPU doctor, or, in situations where the resident poses a serious, immediate security risk—for example if they assault another resident, assault an officer, or self-harm—by the Head of Security or the Officer in Charge (OIC) and the clinical team will review the move as soon as they are present and able to do so.

17.     On the morning of April 9, 2020, I was standing in the entrance to the security office, which is across the hall from the treatment room, when Mr. Justice was escorted out of the treatment room by Officer Wren. The hallway is approximately eight to ten feet wide.

18.     Mr. Justice appeared disheveled; he only had one arm in the appropriate armhole of his shirt.

19.     I greeted Mr. Justice and asked how he was doing. In response, Mr. Justice began repeating "HOW'S YOUR SISTER, HOW'S YOUR SISTER, HOW'S YOUR SISTER" while approaching me and raising his voice. His manner was very aggressive. He is very large—approximately six feet and six inches tall—and he appeared at this time to be trying to use his size to intimidate me.

20.     I was worried that, if allowed, Mr. Justice would try to hurt me or another resident or staff member. I ordered Mr. Justice to "lock in" his room because he was aggressive, disrespectful, and unduly familiar towards me.  Ordering a resident to lock in his room is akin to putting him in timeout. I did not handcuff him because he did not touch me, he followed my

5

direction to lock in, and there was another officer present in case I needed backup, but I felt that his behavior was aggressive and out of line such that it nearly reached the point where handcuffs would be required.  This behavior was especially out of line for an H Ward resident, which has higher expectations for residents.

21.     I told Sergeant Eric Barbaro about the incident. Sergeant Barbaro ordered me to write an incident report, which I did.  I wrote the report attached my MSJ as Exhibit C, which was later reviewed and approved by Sergeant Barbaro.  Sergeant Barbaro is listed as the reporting staff on the report due to a discrepancy from when incident report forms were digitized.  This report reflects the summary that I wrote at the time.

22.     Sergeant Barbaro consulted Dr. Martin, and Dr. Martin ordered Mr. Justice to be moved to the E Ward. I was not consulted on, and did not participate in, this decision.

23.     As the property officer, part of my job was to enter residents' rooms when they were moved to a different ward to retrieve their personal belongings.  When I entered Mr. Justice's room to retrieve his belongings, it was trashed and littered with old food, and papers saturated with unidentified liquids.

24.     In my opinion, based on my experience at the SPU, Mr. Justice's disheveled clothing, unkempt room, and unprovoked aggressive reaction indicated he was in a psychiatric decompensation episode.

25.     During his time at the SPU, Mr. Justice often had periods of decompensation where he exhibited aggressive behavior, and he was often moved from less restrictive wards back to more restrictive wards.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK
SIGNATURE PAGE FOLLOWS

6

I, Aaron Belanger, hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on July 20, 2026.

Aaron Belanger

7