# EXHIBIT J

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

WILLIAM SOLER JUSTICE,

          Plaintiff,

v.

AARON BELANGER,

– and –

ERIC BARBARO,

          Defendants.

Case No.: 23-cv-00308-SE-AJ

## DEFENDANT AARON BELANGER'S FIRST SET OF INTERROGATORIES PROPOUNDED UPON PLAINTIFF WILLIAM SOLER JUSTICE

The Defendant, Aaron Belanger, by and through its undersigned counsel, hereby request that the Plaintiff, William Soler Justice, answer, in writing and under oath, the following Interrogatories pursuant to Fed. R. Civ. P. 33:

### DEFINITIONS

Unless otherwise specified, the following definitions shall apply to these Interrogatories:

A.     "Communication" shall mean the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) by any means, including, without limitation, telephone conversations, letters, memoranda, e-mail, text message, or other written or electronic communication, meetings, or any occasion of joint or mutual presence, as well as transfer of any document from one person to another.

B.     "Complaint" shall mean the Complaint in this action dated November 14, 2022.

C.     "Concerning" shall mean relating to, referring to, describing, evidencing, offering evidence of, and constituting.

D.     "Defendant Barbaro" shall mean the Defendant in this action, Eric Barbaro, as well as any other persons or entities acting on his behalf.

E.     "Defendant Belanger" shall mean the Defendant in this action, Aaron Belanger, as well as any other persons or entities acting on his behalf.

1

F.      "Document" and "documents" are used in the broadest permissible sense under the Federal Rules of Civil Procedure and shall include, without limitation, tangible things and all writings, drawings, graphs, charts, photographs, sound recordings, images, and other data compilations stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form, including any copies, drafts, and reproductions thereof, to which you have or had have had access and every copy of such document which contains any commentary or notation not appearing in the original.

G.      "Entity" shall mean any company, corporation, partnership, union, joint venture, sole proprietorship, association, government agency, organization, or any other similar type of group through which business is conducted, or any director, officer, employee, or agent thereof.

H.      "Knowledge" includes first-hand information and information derived from any other source, including hearsay knowledge.

I.      "Person" shall mean any natural person or any business, legal or governmental entity or association.

J.      "Plaintiff" shall mean the Plaintiffs in this action, Willaim Soler Justice, as well as any other persons or entities acting on his behalf.

K.      "Relate to" and "relating to" shall mean and include any information concerning, comprising, identifying, summarizing, evidencing, containing, discussing, mentioning, describing, reflecting, comparing, analyzing, memorializing, or pertaining in any way to the subject matter of the discovery request in which such term is used.

L.      "You," including the possessive "your," shall refer to Jane Waterhouse, her counsel, and any consultants, experts, investigators, agents, or other persons acting on her behalf or in concert with her.

M.      Singular forms of any noun or pronoun shall embrace and be read to include the plural as the context may make appropriate.

N.      Masculine forms of any noun or pronoun shall embrace and be read to include the feminine or neuter as the context may make appropriate.

O.      "Any" shall be construed to include "all," and vice versa, to make the Interrogatory inclusive rather than exclusive.

P.      "Each shall be construed to include "every," and vice versa, to make the Interrogatory inclusive rather than exclusive.

Q.      "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

2

## INSTRUCTIONS

A.      You must respond to each Interrogatory in accordance with Fed. R. Civ. P. 33. Each Interrogatory is to be answered separately, fully, and specifically.  Each interrogatory should be answered upon your entire knowledge from all sources and all information in your possession or otherwise available to you, including information from your officers, employees, agents, representatives, or consultants, and all information which is known by each of them.   An incomplete or evasive answer is a failure to answer.

B.      Defendant Belanger hereby requests that, pursuant to Fed. R. Civ. P. 26(e), after responding to these Interrogatories, you shall supplement and correct any responses later learned to be incomplete or incorrect immediately upon learning that a prior response was incomplete or incorrect.

C.      All information requested herein is to be set forth if it is in your possession or control, or is available or accessible to you or any of you agents, consultants, counsel, investigators, representatives, or any other person or persons acting for you or on your behalf.

D.      If you cannot respond to any of the following interrogatories in full after exercising due diligence to secure the information to do so, then you shall respond to the extent possible and explain your inability to provide a complete answer.  State whatever information or knowledge you have about the unanswered portion of any interrogatory.

E.      In accordance with Fed. R. Civ. P. 26(b)(5), if any information called for by an Interrogatory is withheld on the basis of a claim of privilege, set forth the nature of the claimed privilege and the nature of the information with respect to which it is claimed in such a way so as to enable Defendant Belanger to assess the applicability of the claimed privilege or protection.

F.      Whenever an Interrogatory requests the identification of a document, the answer shall state, at a minimum, the following information: (i) the type of document; (ii) the general description of the subject matter of the document; (iii) the date of the document; (iv) the author or authors of the document; (v) the person to whom the document (or a copy of the document) has been sent; and (vi) if the document was destroyed,  the date and reason for or circumstances under which it was destroyed.  Once a document has been identified in accordance with this instruction, only the name of that document need be listed in response to subsequent interrogatories requesting the identification of that document.

G.      If any Interrogatory may be answered fully by a document, the document may be attached in lieu of an answer if the document is marked to refer to the Interrogatory to which it responds.

H.      Whenever an Interrogatory requests the identity of a natural person, the answer shall state, at a minimum, the following information: (i) the person's full name; (ii) the person's present or last known address; (iii) the person's position of employment at the time in question; and (iv) the person's present or last known place of employment and the address thereof.  Once a

3

person has been identified in accordance with this instruction, only the name of that person need be listed in response to subsequent interrogatories requesting the identification of that person.

     I.     Whenever an Interrogatory requests the identity of an entity, the answer shall state, at a minimum, the following information: (i) the entity's full name, including, when not apparent from the name, the nature of the entity (*e.g.*, corporation, limited liability company, partnership, professional corporation, *ect.*); (ii) the present or last known address of the entity's headquarters or principal place of business; (iii) the state in which the entity was incorporated or was otherwise created. Once an entity has been identified in accordance with this instruction, only the name of that entity need be listed in response to subsequent interrogatories requesting the identification of that entity.

     J.     Whenever an Interrogatory seeks a description of an act, transaction, occurrence, dealing, or instance, the answer shall state, at a minimum, the following information: (i) date when the act, transaction, occurrence, dealing, or instance occurred; (ii) the place where the act, transaction, occurrence, dealing, or instance occurred; (iii) the identity of each person participating therein; (iv) the person on whose behalf each such person participated or purported to participate; (v) the nature and substance of all communications occurring during, or in connection with the act, transaction, occurrence, dealing, or instance, and the identity all documents referring thereto or reflecting the act, transaction, occurrence, dealing, or instance.

     K.     Whenever an Interrogatory asks for a date, state the exact day, month, and year, if ascertainable or, if not, the best approximation thereof.

     L.     Whenever an Interrogatory calls upon the responding party to "state the basis " of or to "state all facts" concerning a particular claim, allegation, or defense (or uses comparable language, the responding party shall provide a substantial summary of the factual basis supporting the claim, allegation, or defense at the time the interrogatory is answered. The summary shall, at a minimum, state the following: (i) a description of the essential acts or failures to act forming the substance of the claim, allegation, or defense; (ii) the identity of the persons and entities that, through firsthand information or possession of documents, are the sources of the party's information regarding the claim, allegation, or defense; and (iii) when one or more documents is the basis of the claim, allegation, or defense, the identity of each such document. In stating the basis, a party may not withhold information from the interrogatory answer because it derives from attorney work product or was obtained in anticipation of litigation if the party intends to offer this information at trial.

## INTERROGATORIES

1.      Identify all individuals who participated or assisted in answering these Interrogatories. For each individual identified in answering this Interrogatory, identify such individual's full name, address, date of birth, current occupation, and business address, and the specific Interrogatory by number that the individual participated or assisted in answering.

ANSWER: Wanda Duryea, 1137 Meaderboro Rd.; Farmington, NH 03835 (603) 923-2793 My Guardian assisted with questions 1 – 10. Google AI.

2.      State all facts upon which you base your contention that Defendant Belanger violated your substantive due process rights under the Fourteenth Amendment of the United States Constitution.

ANSWER: **Substantive Due Process Rights**
Substantive due process protects the patient from **arbitrary or unnecessarily restrictive actions by the state**, regardless of how fair the facility's internal hearing procedures might be.

- **The Core Liberty Interest:** Civilly committed individuals retain a constitutionally protected liberty interest in **freedom of movement, personal safety, and freedom from undue bodily restraint**.

- **The Legal Standard (*Youngberg v. Romeo*):** In *Youngberg v. Romeo* (1982), the U.S. Supreme Court ruled that restrictions placed on civilly committed individuals are only valid if they are based on the **"exercise of professional judgment."**

- **Application to Rule Violations:** If a patient violates a rule, the facility **cannot impose punitive segregation or isolation purely as punishment**. Any restrictive measure— such as chemical sedation, physical restraint, or placement in a locked seclusion room— must serve a legitimate **therapeutic or safety purpose** (e.g., preventing immediate harm to self or others) rather than a disciplinary one.

- **The Least Restrictive Alternative:** Substantive due process requires that any restriction used to address a behavioral violation must be the **least restrictive means available** to safely manage the situation and maintain a safe environment.

3.      State all facts upon which you base your contention that Defendant Barbaro violated your substantive due process rights under the Fourteenth Amendment of the United States Constitution.

ANSWER: same as answer to # 2.

5

4.    State all facts upon which you base your contention that Defendant Belanger violated your procedural due process rights under the Fourteenth Amendment of the United States Constitution.

ANSWER: Procedural due process governs **the mechanisms, hearings, and formal steps** the facility must follow before or immediately after stripping a patient of privileges or increasing their restrictions due to a rule violation.
**The Balancing Test (*Mathews v. Eldridge*):** Courts use the three-part *Mathews v. Eldridge* (1976) framework to determine what procedures are due. This weighs the patient's severe liberty interest against the hospital's operational interest in immediate institutional safety. **Pre-Deprivation vs. Post-Deprivation:** Because behavioral rule violations in a psychiatric unit often create sudden safety hazards, facilities are legally permitted to take **immediate emergency actions** (like physical restraint or emergency medication) without a prior hearing. However, procedural due process dictates that an **expedited administrative review or formal hearing must occur shortly thereafter** to validate the ongoing restriction.

5.    State all facts upon which you base your contention that Defendant Barbaro violated your procedural due process rights under the Fourteenth Amendment of the United States Constitution.

ANSWER:  same answer as #4 & 6.

6.    Describe in exact detail the injuries and or damages, including monetary damages, sustained by you as a result of the incidents alleged in the Complaint.  Include in your answer the methods used to calculate each category of damages, and identify which damages are attributable to each alleged incident.

ANSWER: Payouts for unconstitutional solitary confinement or denial of due process typically scale by the specific conditions and duration. Recent legal precedents establish these benchmarks:

New York City (Rikers Island Lawsuit): A massive $53 million settlement was approved for detainees who were wrongfully placed in restrictive housing or denied hearings. Affected individuals were awarded $400 per day, and $450 per day if the detainee was under 22 or had a serious mental health condition. For 14 days, this would calculate to roughly $4,200 to $4,725 in gross damages.

6

Suffolk County (Massachusetts): A federal civil rights settlement established a per diem rate of payment for individuals incarcerated in restrictive conditions, with lead plaintiffs eligible for up to $20,000, plus supplementary payouts for individuals who suffered documented temporary medical or psychological injuries. Individual Eighth Amendment Lawsuits: Settlements for individuals who sustain severe psychological damage or are isolated for prolonged durations under particularly egregious conditions can yield significantly higher individual awards.

A legal argument framework is outlined below for a civilly committed individual unlawfully subjected to a 23/7 punitive lockdown at the **New Hampshire Secure Psychiatric Unit (SPU)**. Because the SPU operates within the physical confines of the New Hampshire State Prison for Men, civilly committed patients (who are not convicted of any crime) are routinely subjected to prison-like punitive conditions rather than therapeutic care.

---

**Part I: Legal Claims and Liability Framework**

**1. Fourteenth Amendment Due Process Violation (The *Youngberg* Standard)**
- **The Argument:** Because the Plaintiff is civilly committed and has not been convicted of a crime, their conditions of confinement are governed by the **Fourteenth Amendment's Due Process Clause**, not the Eighth Amendment. Under the landmark U.S. Supreme Court precedent *Youngberg v. Romeo*, 457 U.S. 307 (1982), civilly committed individuals are entitled to "more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."
- **Application to Facts:** Placing a civilly committed patient in a 23/7 isolation lock down for merely asking a corrections officer his sister's name serves no legitimate, non-punitive, or therapeutic purpose. Asking a question does not pose an imminent safety threat. Under *Youngberg*, restrictions on a civil patient's liberty must be based on the professional judgment of a clinical medical provider—not the arbitrary, retaliatory whim of a corrections guard.

**2. Procedural Due Process (Lack of Notice and Hearing)**
- **The Argument:** Under *Mathews v. Eldridge*, 424 U.S. 319 (1976), the state must provide procedural safeguards before depriving a person of a protected liberty interest. SPU residents retain all individual rights under New Hampshire statutory law (**NH RSA 622:44**), "except where safety or security mandates restriction."
- **Application to Facts:** The facility stripped the Plaintiff of their remaining liberty (moving them from the general ward to a solitary cell) with zero advanced notice, zero written disciplinary reports, and no opportunity for a hearing to contest the lockdown. This total absence of process violates the Fourteenth Amendment.

**3. First Amendment Retaliation**
- **The Argument:** Inquiring about a guard's family member, while potentially annoying or unorthodox, constitutes a form of verbal expression that does not cross into a true threat. Plunging a patient into a 23/7 lockdown serves as direct, disproportionate retaliation meant to chill speech and expression inside the facility.

---

**Part II: The Psychiatric Injury Evidence**
- **Establishing Historical Causation:** As far back as *In re Medley*, 134 U.S. 160 (1890), the U.S. Supreme Court recognized that forcing individuals into solitary confinement causes a rapid, visible degradation of mental faculties, often leading to psychosis or suicide.

7

- **The Aggravation of Vulnerability:** Civilly committed individuals are already managing acute psychological conditions. According to findings by the <u>New Hampshire Advisory Committee to the U.S. Commission on Civil Rights</u>, the SPU operates a "highly controlled, solitary-confinement environment, where security concerns must take precedent to clinical decisions." Taking an actively ill patient and placing them in 23/7 sensory deprivation acts as an unconstitutional catalyst that severely exacerbates their underlying diagnoses.

---

### Part III: Detailed Itemization of Damages
### 1. Monetary (Economic) Damages
Because a civilly committed individual may eventually be released or require external care, the economic impacts are long-lasting:
- **Extended Institutionalization Costs:** 14 days in 23/7 solitary confinement sets back a patient's therapeutic progress by months or years. The state should be financially liable for the extended duration of commitment caused by the psychiatric regression.

### 2. Non-Monetary (General) Damages
- **Severe Emotional Distress and Psychical Pain:** Damages for the acute panic, terrifying hallucinations, auditory distortions, and overwhelming sense of impending madness suffered during the 336 hours spent inside the cell.
- **Loss of Enjoyment of Life:** Compensation for the permanent psychological scars (e.g., development of chronic paranoia, severe insomnia, or an inability to form trusting human relationships) that persist long after the 14-day lockdown ends.

### 3. Punitive Damages
- **The Argument:** Under federal civil rights law (42 U.S.C. § 1983), punitive damages are available against individual defendants (the guards and supervisors) if their conduct is shown to be motivated by evil motive or intent, or involves reckless or callous indifference to the federally protected rights of others.
- **Application to Facts:** Locking a defenseless, civilly committed psychiatric patient in a cell for 23 hours a day over an innocent, non-threatening verbal question constitutes a malicious, bad-faith abuse of official power designed purely to punish.

7.      Identify all persons having knowledge of the allegations set forth in your Complaint and provide a detailed description of each persons' knowledge.

Wanda Duryea, My Guardian: I spoke with her regarding the events while they were happening on a recorded phone line in SPU. She advocated for me to the prison employees to be removed from solitary like conditions prior to due process. OPG Guardian Eric Hansmeier

The individuals that I spoke to about the Belanger/Barbaro case are: Wanda Duryea, Keith Dobens (my peer in Concord-603-271-0484/603-271-0468), Peter Giandalone (my peer in Concord-603-931-6752), Jordan Gamache (my peer in Manchester), Jeremy Sterling (my

peer in Freedom), Christian Beer (my case manager), c.o. Dan Shapiro, Judge Paul Barbadoro and perhaps my psychiatrist, Dr. Paul Brown.

I do not have a reliable memory of communicating the specific facts of this case with the following individuals, but, in the interest of transparency I may have communicated to: President Donald Trump, former President Joe Biden, former U.S. Atty. General, Merrick Garland, former governor, Chris Sununu, current governor, Kelly Ayotte, U.S. Atty. (NH) Erin Creegan, U.S. Congresswoman, Maggie Goodlander, NH Atty. General, John Formella, my sister-in-law, Janice Feliciano, my nephew, Jon Feliciano, my niece, Tiaraliz Sepulveda, my cousin, Madeline Laroche, her husband, Scott Laroche, Dr. Wendy Martin, my uncle, Capt. Frank Soler (7630 Great Bear Lake Drive, Sebastian, FL 32976/813-520-6761), my former lawyer, John Laboe, NY Atty. General, Letitia James, Manhattan District Atty., Alvin Braggs, Dr. Lampigñano, NH Hospital mental health worker, "Annie", NH Hospital nurse, "Liz", c.o. Wrenn, SPU nurses, "Esther", "Nancy", and Sherri Phillips, SPU Capt. Marshall, former SPU commissioner, Helen Hanks. Christine O'Connor, Paula Mattis, Eric Hansmeier, FBI.

8.      Identify all persons, having knowledge of any and all damages you sustained as a result of any of the incidents alleged in your Complaint.

ANSWER: Wanda Duryea, My Guardian: I spoke with her regarding the events while they were happening on a recorded phone line in SPU. She advocated for me to the prison employees to be removed from solitary like conditions prior to due process. OPG Guardian Eric Hansmeier
The individuals that I spoke to about the Belanger/Barbaro case are: Wanda Duryea, Keith Dobens (my peer in Concord-603-271-0484/603-271-0468), Peter Giandalone (my peer in Concord-603-931-6752), Jordan Gamache (my peer in Manchester), Jeremy Sterling (my peer in Freedom), Christian Beer (my case manager), c.o. Dan Shapiro, Judge Paul Barbadoro and perhaps my psychiatrist, Dr. Paul Brown.

I do not have a reliable memory of communicating the specific facts of this case with the following individuals, but, in the interest of transparency I may have communicated to: President Donald Trump, former President Joe Biden, former U.S. Atty. General, Merrick Garland, former governor, Chris Sununu, current governor, Kelly Ayotte, U.S. Atty. (NH) Erin Creegan, U.S. Congresswoman, Maggie Goodlander, NH Atty. General, John Formella, my sister-in-law, Janice Feliciano, my nephew, Jon Feliciano, my niece, Tiaraliz Sepulveda, my cousin, Madeline Laroche, her husband, Scott Laroche, Dr. Wendy Martin, my uncle, Capt. Frank Soler (7630 Great Bear Lake Drive, Sebastian, FL 32976/813-520-6761), my former lawyer, John Laboe, NY Atty. General, Letitia James, Manhattan District Atty., Alvin Braggs, Dr. Lampigñano, NH Hospital mental health worker, "Annie", NH Hospital nurse, "Liz", c.o. Wrenn, SPU nurses, "Esther",

9

"Nancy", and Sherri Phillips, SPU Capt. Marshall, former SPU commissioner, Helen Hanks. Christine O'Connor, Paula Mattis, Eric Hansmeier, FBI.

9.    Identify each and every person you expect to call as a witness on your behalf at trial and, for each person identified, describe the substance of that person's expected testimony.

ANSWER: Aubrey Land (386) 249-4325

## 1. The custodial setting is uniquely complex

Although the Plaintiff was civilly committed for mental health treatment, he was housed inside a **state correctional facility** operated and staffed by correctional officers trained primarily in **custody, control, and security of convicted prisoners**, not in the treatment of civilly committed patients. Understanding how correctional policies, training, command structure, and use-of-force protocols operate in this environment is essential to determining whether staff actions were lawful or constitutionally permissible.

A correctional expert is uniquely qualified to explain:

- The **authority and limits** of correctional officers when dealing with civilly committed individuals
- The distinction between **security-based interventions** and **punitive discipline**
- How correctional policies differ when applied to inmates versus civilly committed residents

Without expert testimony, the Court is left to speculate about operational norms that are highly specialized.

## 2. Use of force and confinement decisions require professional context

The conduct at issue includes:

- Placement in confinement for alleged "disrespect"
- Use of restraints and force
- Removal from a mental health housing area
- Absence of disciplinary hearings or clinical authorization

Whether these actions constitute **punishment, treatment**, or **legitimate safety measures** cannot be determined without an understanding of:

- Accepted correctional standards
- Industry training regarding mentally ill residents
- Proper escalation and de-escalation protocols
- The role of clinical versus custody staff in placement decisions

A correctional expert does not offer legal conclusions but instead provides the **professional framework** necessary for the Court to assess whether staff actions departed from accepted standards and practices.

## 3. Civil commitment changes the constitutional analysis

Civilly committed individuals are not subject to punishment. Their confinement is justified only by treatment and safety needs. This distinction is critical and often misunderstood in correctional settings.

10

A correctional expert assists the Court by explaining:

- How civil commitment alters permissible responses to behavior
- Why disciplinary confinement for verbal conduct is inconsistent with correctional and mental-health standards
- How professional judgment must guide responses, rather than reflexive security measures

This testimony helps the Court evaluate **substantive and procedural due process issues** through the lens of real-world correctional operations.

**4. Policy compliance and deviations are not self-evident**

The record references multiple policies, statutes, and standards governing:

- Use of force
- Restraints and seclusion
- Mental health housing
- Patient rights

A correctional expert explains:

- What staff are trained to do
- What policies require in practice
- How deviations occur
- Why certain actions would be viewed within the profession as excessive, punitive, or unjustified

These are factual, experience-based explanations that assist the trier of fact without invading the role of the Court.

**5. Expert testimony aids, rather than supplants, judicial decision-making**

Courts routinely rely on correctional experts in cases involving:

- Jail and prison conditions
- Use of force
- Failure to protect
- Mental health care in custodial settings

Here, the expert's role is to **educate the Court** on specialized correctional practices so the Court may apply the law accurately to the facts. Excluding such testimony would deprive the Court of critical context necessary to fairly assess conduct occurring in a highly regulated and technical environment.

**Conclusion**

Because this case arises from actions taken inside a correctional institution, by correctional staff, against a civilly committed individual, **expert testimony from a qualified correctional professional is essential**. The expert provides specialized knowledge regarding standards, training, authority, and accepted practices that are beyond ordinary experience and directly relevant to the Court's analysis of the alleged constitutional and statutory violations.

Beatrice Coulter, RN Effects of 23/7 lock down of a civilly committed person who has been diagnosed as Schizophrenic. (603) 717-5330

Wanda Duryea (603) 923-2793 Distress and complaints about 23/7 lock down

Guardian Eric Hansmeier Office of Public Guardian - 2 Pillsbury Street, Suite 400 • Concord, NH 03301

11

Helen Hanks Former DOC Commissioner
Paula Mattis Former SPU Director

10.    Identify and describe all communications you had with any person about any of the incidents alleged in the Complaint, including the identity of the person you communicated with and the substance of the communications.

ANSWER: same as #8

Respectfully submitted,

AARON BELANGER

By his attorneys,

JOHN M. FORMELLA
ATTORNEY GENERAL

Dated: June 1, 2026

/s/ Duncan A. Edgar
Duncan A. Edgar, Esq., Bar No. 266272
Assistant Attorney General
New Hampshire Department of Justice
Civil Litigation Unit
1 Granite Place South
Concord, NH 03301
(603) 271-3655
duncan.a.edgar@doj.nh.gov

## CERTIFICATE OF SERVICE

I, Duncan A. Edgar, hereby certify that on this date, I caused a true copy of the foregoing First Set of Interrogatories (in both Microsoft Word and PDF format) to be sent to the Plaintiff, William Soler Justice, by email.

Dated: June 1, 2026

/s/ Duncan A. Edgar
Duncan A. Edgar, Esq.

12

I, William Soler Justice on this **24th** day of **June**, 2026, hereby swear that the foregoing answers to these Interrogatories are true, accurate, and complete to the best of my knowledge, information, and belief.

William Soler Justice

STATE OF NEW HAMPSHIRE

COUNTY OF **Merrimack**

Signed and sworn to before me on this **24th** day of **June**, 2026, by William Soler Justice, known to me or satisfactorily proven to be the person whose name appears in the within document and acknowledges that he executed the same for the purposes contained therein.

Date: **6/24/26**

Notary Public/Justice of the Peace

Name:

My commission expires: **9/25/2029**

13

NH DEPT OF JUSTICE
JUN 26 '26 PM 1:50

William S. Justice
51 Storrs Street, #310
Concord, NH 03301



CERTIFIED MAIL

9589 0710 5270 4025 9134 34

DUNCAN A. EDGAR, ESQ., AAG
NH Dept. of Justice
Civil Litigation Unit
1 Granite Place South
Concord, NH 03301





RDC 99

Retail

03301

U.S. POSTA
FCM LETTE
CONCORD,
JUN 24, 202

$6.37

S2324P501