**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| WILLIAM SOLER JUSTICE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.: 23-cv-00308-SE-AJ |
| ) | |
| AARON BELANGER, ) | |
| – and – ) | |
| ERIC BARBARO, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**PLAINTIFF'S NOTICE OF FILING EXHIBIT IN SUPPORT OF REPLY TO DEFENDANTS' OBJECTION (DOC. NO. 25)**

Plaintiff William Soler Justice, proceeding pro se, respectfully submits this Notice of Filing Exhibit in support of his Reply to Defendants' Objection to Plaintiff's Motion for In Camera Review of Redacted Documents and Motion to Extend Case Management Deadlines. Plaintiff introduces the following attachment to complete the record:

1. **Exhibit A:** True and accurate copy of the 19-page formal Expert Witness Report authored and signed by correctional expert Aubrey Land, dated July 15, 2026.

As set forth in the accompanying Reply, this exhibit confirms that defense counsel has been in active physical possession of Plaintiff's comprehensive expert findings since July 16, 2026. This filing directly refutes Defendants' claims regarding expert disclosure non-compliance.

Respectfully submitted,

WILLIAM SOLER JUSTICE
Plaintiff, Pro Se
51 Storrs Street #310
Concord, NH 03301
(603) 931-6357
gentlegiant03301@yahoo.com
Dated: July 25, 2026

**CERTIFICATE OF SERVICE**
I hereby certify that on this 27th day of July, 2026, a true and accurate copy of the foregoing Notice of Filing Exhibit, along with the attached **Exhibit A**, was electronically served upon Assistant Attorney General Duncan A. Edgar, counsel for the Defendants, through the court's CM/ECF system.
/s/ William Soler Justice
William Soler Justice

# EXHIBIT A

Aubrey Land
Law Enforcement, Prison and Jail Consultant
6034 NW 111Place
Alachua Florida 32615

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NEW HAMPSHIRE

William S. Justice f/k/a William Soler Jr., )
 Plaintiff,

                                                    Justice v. Property C.O. Aaron Belanger et al

V.                                                CIVIL ACTION NO.  No. 1:23-cv-00308-SE-AJ

Defendants,
Aaron Belanger
Eric Barbaro

### EXPERT WITNESS REPORT AUTHORED BY AUBREY LAND

I, Aubrey Land, am over the age of 18 and make this report and declaration:

## I. Introduction, Compensation & Cases

I have been appointed by the above captioned court, to render a professional opinion and/or testify in the above referenced complaint.

**Compensation:**
The compensation to be paid for the study of documents and testimony:

The compensation which has been agreed upon in the amount of $200.00 per hour for travel to and from courtroom/place of inspection or interview as well as waiting time. Plus $350.00 per hour while conducting analytical review of evidence, conducting interviews, inspections, preparing reports, attorney/consultant consultations, preparing for deposition and court testimony.

Testimony and/or depositions are $350.00 per hour or a fraction thereof (Minimum $1400.00).

Hotel: actual paid either by Fair-Play Justice or firm.

Food: actual or per-diem rate allowed.

Travel $.60 per mile if via vehicle plus tolls or government rate (if applicable).

Travel actual airfare (Business or first class only) plus parking and ground transportation.

## II. Qualifications of the Expert

I have worked in the field of law enforcement and corrections for 33 years. During this time, I served as a certified correctional officer, sergeant, correctional law enforcement inspector, and senior law enforcement inspector at six full time major close/maximum custody prisons in Florida.

As a correctional officer, in the various security capacities, I performed all 'gut level' assignments in open population, administrative confinement, protective confinement and disciplinary confinement, food service, control room assignments, mail room officer, visitation officer, visitation sergeant, inside and outside security officer, receiving officer, transport officer, hospital officer, perimeter security officer, medical officer, psychiatric observation officer, medical escort officer, escape and recapture officer, confrontation team member (riot team), and orientation officer.

As inspector and as senior inspector, I responded to and conducted both administrative and criminal investigations at prisons throughout the northern part of the state. My duties consisted of reviewing countless use of force incidents. I conducted more than 100 administrative investigations involving allegations of prisoner abuse, prisoner neglect, sexual harassment, battery of prisoners, improper staff conduct, policy and procedure violations, death investigations and excessive force. Additionally, I have personally reviewed in excess of 1000 use of force incidents for proper documentation, compliance with departmental rule, policies and procedures, state and federal laws. As part of these reviews and investigations I was routinely provided video recordings of correctional settings as well as handheld videos related to use of force and abuse allegations. I am familiar with most of the types of housing units designed to house prisoners in the United States.

I am very familiar with departmental rules, regulations, directives, state and federal laws related to the proper treatment of inmates housed in the care of jails and prisons. My working knowledge of law enforcement and corrections provided me with expertise in applying the totality of the circumstances to determine if penological actions are consistent with standards.

During my 10 years as inspector, I testified over 20 times in the 3rd Judicial Circuit of Florida in Lafayette, Suwannee, Columbia, Dixie, Taylor, Madison and Hamilton counties, in cases that I

2

had filed with the State Attorney's Office supporting criminal investigations that I had conducted. In addition to the duties as an institutional inspector I conducted investigations throughout Florida as part of a joint task force with the Florida Department of Law Enforcement and the U.S. Postal Inspections Service. In this capacity, I was directly involved in conducting more serious criminal investigations involving organized crime and public corruption.

In 2013 I was promoted to senior inspector with similar duties. During my years with the Office of the Inspector General I conducted the following type investigations: Assault, Battery, Aggravated Battery, Battery on Public Safety Officials, Robbery, In-custody Deaths, Homicides, Sexual Battery, Sexual Misconduct, Property Crimes, Thefts, Grand Theft, Narcotics, Money Laundering, Criminal gang activities, Public Corruption, Racketeering, Prisoner Abuse, Riots, Contraband in Correctional Facilities and Escapes from State and Local Facilities

During my tenure as inspector, I testified in Federal Court on matters related to the use of force by correctional staff. I also testified before the Florida Senate Criminal Justice Committee on corruption within the Florida Department of Corrections, mismanagement, staff shortages, organized criminal gang activity, prison violence and public corruption.

During my tenure in law enforcement, I worked uniform patrol, criminal investigation division (CID), narcotics, death and homicide, organized crimes, public corruption, and racketeering cases.

I testified in state and federal court more than 100 times. I have prepared over 100 search warrants, in excess of 100 arrest warrants and made countless warrantless arrests. All were successfully prosecuted in both state and federal court with the exception of one case.

My qualifications in the field of corrections are further summarized in my résumé.

## III. Testimony as an Expert Witness at Trial or Deposition

A listing of cases in which I (Aubrey Land) have testified as an expert at trial or deposition within the previous four years is attached.

## IV. Incident Summary

William Justice was diagnosed with a serious mental illness and, on February 9, 2018, was found incompetent to stand trial and not restorable to competency on pending criminal charges. Rather than being sentenced to a term of imprisonment, Mr. Justice was civilly committed pursuant to New Hampshire law and placed in the Secure Psychiatric Unit (SPU), a secure psychiatric treatment facility operated by the New Hampshire Department of Corrections within the New Hampshire State Prison. Although housed within a correctional institution and in the custody of the Commissioner of Corrections, Mr. Justice remained a civilly committed psychiatric patient whose placement and treatment were governed by the therapeutic mission of the Secure Psychiatric Unit rather than by the punitive objectives associated with criminal incarceration.

This matter arises from the correctional management of Mr. Justice during the period beginning on or about April 9, 2020, when he was removed from H-Ward, a less restrictive housing assignment within the Secure Psychiatric Unit, and placed into twenty-four-hour restrictive housing following an interaction with correctional staff. The materials reviewed indicate that immediately prior to this placement, mental health records documented Mr. Justice as psychiatrically stable. The records further establish that he remained in restrictive housing for approximately fourteen days, during which correctional, medical, and mental health staff continued to monitor and manage his confinement.

The allegations in this case concern whether the decision to place and retain a civilly committed psychiatric patient in restrictive housing was consistent with accepted correctional practices applicable to the operation of a Secure Psychiatric Unit. The issues presented include the respective roles of correctional staff and mental health professionals in housing decisions, correctional due process, interdisciplinary communication, independent clinical judgment, periodic review of continued restrictive housing, the management of a hunger strike, and the institution's response to reported conditions of confinement during the segregation period. These issues are evaluated within the unique operational environment of a secure psychiatric treatment unit where institutional safety must be balanced with the therapeutic needs of civilly committed patients.

During the period of restrictive housing, the materials reviewed document that Mr. Justice submitted multiple resident requests, grievances, and other written communications concerning his placement, conditions of confinement, hygiene, shower water temperature, communication with staff, and related institutional matters. The records further document responses by correctional, medical, mental health, and administrative personnel, together with institutional communications regarding maintenance concerns, resident complaints, and Mr. Justice's subsequent hunger strike. These materials provide a chronological record of the institution's management of Mr. Justice throughout the period relevant to this litigation.

I have been retained as a correctional expert to review the available records and offer opinions, to a reasonable degree of professional certainty, regarding the correctional management of Mr. Justice during the period at issue, the operation of the Secure Psychiatric Unit, the interaction between correctional and mental health staff, the decision-making process associated with his placement and continued confinement in restrictive housing, and whether the actions of correctional personnel were consistent with generally accepted correctional practices applicable to the management of civilly committed patients housed within a secure correctional psychiatric facility.

## V. Material reviewed in preparation for providing this report

1. The Complaint, Amended Complaint, Answers, pleadings, motions, and other filings relevant to this litigation.

4

2. Medical records documenting the physical health, treatment, evaluations, medications, nursing care, and medical services provided to Mr. Justice during the period relevant to this litigation.

3. Mental health records documenting psychiatric evaluations, treatment planning, progress notes, behavioral observations, competency findings, medication management, housing recommendations, and interdisciplinary treatment provided to Mr. Justice while confined within the Secure Psychiatric Unit.

4. Institutional records maintained by the New Hampshire Department of Corrections, including housing records, incident reports, segregation records, administrative reviews, disciplinary documentation, classification records, movement records, logs, memoranda, and related institutional documentation concerning the management of Mr. Justice.

5. Internal institutional correspondence, electronic mail communications, memoranda, and administrative communications concerning the operation of the Secure Psychiatric Unit, the management of Mr. Justice, housing decisions, and interactions between correctional, medical, and mental health staff.

6. Resident request slips, grievances, petitions, and related institutional correspondence submitted by or concerning Mr. Justice, including requests regarding housing assignments, restrictive housing, conditions of confinement, shower water temperature, hygiene, personal property, legal materials, communication with his guardian and mental health advocate, preservation of evidence related to the April 9, 2020 incident, and institutional responses thereto.

7. The motion submitted by Mr. Justice to the New Hampshire Probate Court concerning matters related to his guardianship, restrictive housing placement, and institutional treatment.

8. Applicable New Hampshire statutes, including provisions governing civil commitment, the custody of persons committed to the Commissioner of Corrections, and the New Hampshire Patients' Bill of Rights applicable to licensed healthcare facilities.

9. Generally accepted correctional standards, professional literature, correctional policies, nationally recognized correctional principles, and my education, training, and more than four decades of experience in correctional administration, institutional operations, inmate classification, restrictive housing, security management, and the operation of correctional facilities housing individuals with significant mental health needs.

10. Other discovery materials, documents, records, photographs, correspondence, and information produced during the course of this litigation that were relevant to the correctional issues addressed in this report.

11. New Hampshire Public Radio published investigative reporting arising from "Operation Night Cat,"

**In the review of the civil commitment records, the following is noted:**

The materials reviewed establish that William Justice was found incompetent to stand trial and not restorable to competency on pending criminal charges. As a result, he was not sentenced to a term of imprisonment but was civilly committed pursuant to New Hampshire law and placed in the Secure Psychiatric Unit (SPU), a secure psychiatric treatment facility operated by the New

5

Hampshire Department of Corrections within the New Hampshire State Prison. The records establish that Mr. Justice remained under the legal custody of the Commissioner of Corrections while confined as a civilly committed psychiatric patient for the purpose of treatment rather than criminal punishment.

The records further establish that the Secure Psychiatric Unit is a specialized treatment environment operated within a secure correctional setting. Unlike traditional correctional institutions that confine individuals serving criminal sentences, the SPU houses individuals whose legal status is based upon civil commitment and whose confinement is intended to provide psychiatric care while maintaining institutional safety and security. Consequently, correctional operations within the SPU necessarily involve continuous interaction between correctional staff, medical providers, and mental health professionals in balancing legitimate security requirements with the therapeutic needs of civilly committed patients.

The materials reviewed further establish that Mr. Justice's confinement during the period relevant to this litigation occurred within this unique correctional and clinical environment. Accordingly, the management decisions evaluated in this report must be considered within the context of a secure psychiatric treatment program where accepted correctional practices require coordination between custody staff and treatment professionals, recognition of the patient's civil commitment status, and the exercise of independent clinical judgment concerning housing, treatment, and patient management. The distinction between civil commitment and criminal incarceration is significant because it defines the operational responsibilities of correctional staff and the therapeutic mission of the Secure Psychiatric Unit throughout the period addressed in this report.

**In the review of the medical and mental health records, the following is noted:**

The medical and mental health records reviewed document Mr. Justice's longstanding diagnosis of serious mental illness and his continuing treatment within the Secure Psychiatric Unit. The records reflect ongoing psychiatric evaluation, medication management, nursing assessments, behavioral observations, treatment planning, and regular interaction between medical providers, mental health clinicians, and correctional personnel. Collectively, these records establish that Mr. Justice remained under continuous psychiatric care throughout the period relevant to this litigation and that his treatment occurred within an interdisciplinary correctional treatment environment.

The records further document that mental health staff routinely assessed Mr. Justice's psychiatric condition, monitored his response to treatment, and adjusted his treatment plan as clinically indicated. Throughout the records reviewed, mental health professionals maintained responsibility for evaluating Mr. Justice's mental status, behavioral presentation, medication compliance, and treatment needs. The materials reviewed also reflect regular communication among mental health providers, nursing staff, physicians, and correctional personnel concerning Mr. Justice's clinical condition and institutional management.

Of particular significance, the records immediately preceding the April 9, 2020 housing decision document that Mr. Justice was psychiatrically stable while assigned to H-Ward, a less restrictive housing unit within the Secure Psychiatric Unit. The records reviewed do not document an acute psychiatric deterioration immediately preceding his placement into restrictive housing. Rather,

they reflect ongoing psychiatric monitoring and continued participation in the treatment process while residing within the therapeutic environment of the Secure Psychiatric Unit. The significance of these clinical findings is discussed later in this report when addressing the relationship between housing decisions, independent clinical judgment, and accepted correctional practices.

Following Mr. Justice's placement into restrictive housing, the medical and mental health records continue to document ongoing evaluations by medical and mental health personnel. The records include nursing assessments, psychiatric contacts, observations related to his hunger strike, medication administration, behavioral monitoring, and continuing interdisciplinary involvement during the period of restrictive housing. These records establish that medical and mental health staff remained actively involved in monitoring Mr. Justice throughout the period relevant to this litigation and provide important information regarding his clinical status, treatment needs, and institutional management.

The medical and mental health records further document interactions between clinical staff and correctional personnel concerning Mr. Justice's care during the segregation period. These records provide important context regarding the respective responsibilities of custody staff and treatment professionals and were considered in evaluating whether the correctional management of Mr. Justice was consistent with generally accepted correctional practices applicable to the operation of a Secure Psychiatric Unit. The specific correctional significance of these records is addressed in the opinion section of this report.

**In the review of the institutional records, the following is noted:**

The institutional records reviewed document the correctional management of Mr. Justice while assigned to the Secure Psychiatric Unit and establish the housing assignments, movement history, institutional communications, administrative actions, and correctional responses occurring during the period relevant to this litigation. These records include housing records, incident reports, movement documentation, segregation records, administrative reviews, memoranda, logs, and related institutional documentation maintained by the New Hampshire Department of Corrections.

The records establish that immediately preceding the events giving rise to this litigation, Mr. Justice was assigned to **H-Ward**, a less restrictive housing unit within the Secure Psychiatric Unit. Institutional records, together with the corresponding mental health documentation, establish that he remained housed in this unit until the events of **April 9, 2020**, when he was removed from H-Ward and placed into restrictive housing following an interaction with correctional staff. The institutional records thereafter document his continued confinement in restrictive housing for approximately fourteen days, together with the ongoing management of his housing assignment by correctional personnel.

The institutional records further document the administrative management of Mr. Justice while assigned to restrictive housing, including interactions between correctional personnel, medical providers, and mental health professionals. The records reflect continuing institutional oversight during this period and provide documentation concerning housing status, clinical contacts, resident requests, grievances, and other institutional actions occurring while Mr. Justice remained in restrictive housing.

7

The institutional records also document Mr. Justice's subsequent hunger strike, the institutional response by correctional, medical, and mental health staff, and continuing efforts to monitor his physical condition while maintaining institutional security. These records establish that correctional management during this period extended beyond the initial housing decision and involved continuing interaction among custody staff, medical personnel, and mental health professionals throughout the period of restrictive housing.

Collectively, the institutional records provide the chronological framework for evaluating the correctional management of Mr. Justice during the period relevant to this litigation. These records were considered together with the medical records, mental health records, resident requests, grievances, and other documentary evidence in determining whether the correctional management of Mr. Justice was consistent with generally accepted correctional practices applicable to the operation of a Secure Psychiatric Unit.

**In the review of the internal institutional communications, the following is noted:**

The materials reviewed include internal electronic mail communications, memoranda, and other administrative correspondence exchanged among correctional personnel, medical providers, mental health professionals, and supervisory staff concerning the management of Mr. Justice during the period relevant to this litigation. These communications provide additional insight into the institutional decision-making process, the exchange of information among departments, and the coordination of security and treatment responsibilities within the Secure Psychiatric Unit.

The communications document ongoing interaction between correctional staff and clinical personnel concerning Mr. Justice's housing status, behavioral presentation, medical condition, and institutional management. The records reflect that information regarding his confinement, hunger strike, medical monitoring, and related operational issues was routinely communicated among staff members responsible for his care and supervision. Collectively, these communications establish that the management of Mr. Justice involved an interdisciplinary process requiring coordination between custody, medical, and mental health personnel.

The internal communications further document the manner in which institutional staff addressed operational issues arising during Mr. Justice's confinement, including reported maintenance concerns, housing issues, resident requests, and other matters affecting the operation of the Secure Psychiatric Unit. These records provide additional context regarding institutional responses to issues reported by residents and the administrative processes utilized to communicate information among staff members responsible for facility operations.

The internal communications were reviewed in conjunction with the institutional records, medical records, mental health records, and resident requests to evaluate the effectiveness of interdisciplinary communication, continuity of information, and the overall correctional management of Mr. Justice during the period relevant to this litigation. These communications are significant because they provide insight into the operational processes utilized within the Secure Psychiatric Unit and assist in evaluating whether accepted correctional practices governing communication and coordination among institutional staff were consistently applied.

**In the review of the resident requests, grievances, petitions, and related correspondence, the following is noted:**

The materials reviewed establish that Mr. Justice routinely utilized the Secure Psychiatric Unit's resident request and grievance process to communicate concerns to correctional supervisors, medical providers, mental health staff, social workers, and administrative personnel. The records document written requests concerning housing assignments, conditions of confinement, hygiene, shower water temperature, personal property, legal materials, communication with his guardian and mental health advocate, and matters arising from his placement into restrictive housing. The records further document written responses by institutional staff and provide a contemporaneous record of the administrative process utilized to receive, investigate, and respond to resident concerns.

The resident requests and grievances further document recurring reports concerning the availability of adequately heated shower water within H-Ward. Beginning in December 2019 and continuing through May 2020, Mr. Justice submitted multiple written requests reporting that the shower water was excessively cold and adversely affected hygiene. Institutional responses acknowledge the reported concern, reference maintenance efforts and plumbing work orders, and document continuing communication regarding the issue. The materials also include a petition signed by multiple H-Ward patients requesting warm shower water, demonstrating that similar concerns were expressed by several residents assigned to the unit. No opinion is expressed herein regarding the cause of the reported condition; however, the records establish that the concern was repeatedly reported through established institutional channels and was the subject of documented institutional responses.

The materials further include a resident request prepared by Mr. Justice on April 9, 2020, in which he described the interaction preceding his placement into restrictive housing and requested preservation of any available audio or video recording of the incident. The request identifies the correctional staff involved, reflects Mr. Justice's contemporaneous description of the events leading to his segregation, and documents his request that potential evidence be preserved. The institutional response advised that the requested audio recording was not available. This document was considered as part of the chronological reconstruction of the events surrounding the April 9, 2020 housing decision.

The materials reviewed also include requests concerning personal property, legal materials, communication with Mr. Justice's guardian and mental health advocate, and other administrative matters. These records document Mr. Justice's continued use of the institutional request process to seek administrative review of matters affecting his confinement. While no opinions are expressed regarding the merits of the individual requests, the records provide additional insight into institutional communication, administrative responsiveness, and the manner in which resident concerns were documented and addressed during the period relevant to this litigation.

Finally, the materials reviewed include a motion submitted by Mr. Justice to the New Hampshire Probate Court in which he described his placement into restrictive housing, his belief that the placement occurred without due process, and concerns relating to his guardianship and confinement. The motion was reviewed as part of the overall chronology of events and provides

additional context regarding Mr. Justice's contemporaneous understanding of the matters giving rise to this litigation. The Court filing was considered together with the remaining institutional records but is not relied upon as an independent basis for any correctional opinion expressed in this report.

**Purpose and Mission of a Secure Psychiatric Unit**

**The materials reviewed establish that the purpose and mission of a Secure Psychiatric Unit is as follows:**

A Secure Psychiatric Unit (SPU) is a specialized correctional treatment environment designed to provide psychiatric care and treatment for individuals who require a secure setting because of criminal charges, court orders, or the nature of their mental illness. Unlike a traditional correctional institution whose primary mission is punishment, security, and offender management, the mission of a Secure Psychiatric Unit is to provide treatment within a secure environment while protecting the safety of patients, staff, and the public. Security and treatment are not competing objectives; rather, they are complementary responsibilities that must operate together to achieve the therapeutic goals of the facility.

Individuals confined within a Secure Psychiatric Unit may be housed within a correctional institution and remain under the custody of the Commissioner of Corrections. However, civil commitment fundamentally differs from criminal incarceration. A civilly committed patient has not been sentenced to serve a criminal punishment but is confined because a court has determined that psychiatric treatment within a secure setting is necessary. Consequently, correctional operations within a Secure Psychiatric Unit must recognize both the institution's obligation to maintain security and its responsibility to support the therapeutic mission for which the patient has been committed.

The successful operation of a Secure Psychiatric Unit requires continuous coordination among correctional staff, medical providers, mental health professionals, and facility administrators. Correctional officers maintain institutional safety, security, and order, while medical and mental health professionals retain responsibility for clinical assessment, treatment, and independent professional judgment. Each discipline performs a distinct function, and accepted correctional practice recognizes that effective patient management depends upon communication, collaboration, and mutual respect for those separate professional responsibilities.

Accepted correctional practice further recognizes that decisions affecting housing, treatment, restrictive housing, medical care, and behavioral management should be made through an interdisciplinary process whenever practical. Security concerns may require immediate action by correctional staff; however, continued management of a civilly committed psychiatric patient requires ongoing participation by qualified medical and mental health professionals to ensure that security measures remain consistent with the patient's clinical condition and the therapeutic objectives of the Secure Psychiatric Unit.

The mission of a Secure Psychiatric Unit is therefore measured not only by its ability to maintain institutional security, but also by its ability to provide appropriate psychiatric care within a safe,

humane, and professionally managed correctional environment. All correctional decisions affecting civilly committed patients should be evaluated within the context of these dual responsibilities.

**Role and Responsibilities of Correctional Staff and Mental Health Professionals**

**The materials reviewed establish that the respective roles and responsibilities of correctional staff and mental health professionals are as follows:**

The operation of a Secure Psychiatric Unit requires correctional staff and mental health professionals to perform separate but complementary functions. Accepted correctional practice recognizes that correctional officers are responsible for maintaining institutional safety, security, order, accountability, and the protection of patients, staff, and the public. In carrying out these responsibilities, correctional staff are authorized to take reasonable actions necessary to address immediate safety and security concerns and to maintain control of the institution.

Mental health professionals serve a distinctly different role. Their primary responsibility is to provide independent clinical assessment, psychiatric treatment, behavioral evaluation, crisis intervention, and treatment planning for civilly committed patients. Accepted professional practice requires that clinical decisions remain based upon independent medical and mental health judgment and not solely upon correctional or administrative considerations. Although security concerns may influence patient management, clinical recommendations should remain the product of professional judgment exercised by qualified treatment personnel.

Accepted correctional practice further recognizes that housing decisions involving civilly committed psychiatric patients frequently require interdisciplinary collaboration. Correctional staff possess expertise concerning institutional security and operational concerns, while mental health professionals possess expertise regarding the patient's psychiatric condition, behavioral functioning, treatment needs, and the potential clinical effects of changes in housing status. Effective management depends upon communication and cooperation between these disciplines while maintaining the independence of each professional role.

When an immediate threat to institutional safety exists, correctional staff may temporarily implement security measures necessary to restore order and protect persons within the facility. However, once the immediate security concern has stabilized, accepted correctional practice requires ongoing evaluation of the patient's housing status through continued communication with medical and mental health personnel. The continued placement of a civilly committed psychiatric patient in restrictive housing should not be based solely upon the initial security event but should also consider the patient's current clinical presentation, treatment needs, institutional adjustment, and the continuing necessity for restrictive conditions.

The distinction between security responsibilities and clinical responsibilities is fundamental to the operation of a Secure Psychiatric Unit. Correctional staff are responsible for maintaining institutional security, while mental health professionals remain responsible for independent clinical judgment. Neither discipline should function in isolation, and accepted correctional

11

practice requires ongoing interdisciplinary communication to ensure that institutional safety and patient treatment objectives are addressed simultaneously throughout the patient's confinement.

**Correctional Due Process and Housing Decisions**

**The materials reviewed establish that accepted correctional practices governing housing decisions and correctional due process are as follows:**

Accepted correctional practice recognizes that correctional administrators possess the authority and responsibility to make housing decisions necessary to preserve institutional safety, maintain security, and protect patients, staff, and the orderly operation of the facility. Housing assignments are an essential component of correctional management and may be modified when legitimate security, safety, medical, or operational concerns require a change in placement.

When an immediate threat to institutional safety exists, correctional staff may temporarily remove a patient from the general population or a less restrictive housing assignment without prior notice in order to stabilize the situation and restore institutional order. Such actions are recognized as appropriate correctional responses when reasonably necessary to address an immediate security concern. However, the continuation of restrictive housing after the immediate circumstances have stabilized requires additional administrative consideration and should not rely solely upon the event that initiated the placement.

Accepted correctional practice further recognizes that correctional due process serves an important operational purpose. Due process provides a structured administrative process through which the reasons for restrictive housing are documented, reviewed, and periodically reassessed. The purpose of this review is not merely to satisfy procedural requirements but to ensure that continued restrictive housing remains justified based upon current security concerns, institutional behavior, clinical considerations, and the availability of less restrictive housing alternatives.

Within a Secure Psychiatric Unit, accepted correctional practice requires that housing decisions involving civilly committed psychiatric patients include meaningful communication with medical and mental health professionals whenever practical. While correctional staff retain responsibility for institutional security, continued placement in restrictive housing should consider the patient's current psychiatric condition, treatment needs, behavioral presentation, and any clinical recommendations affecting housing or patient management. This interdisciplinary process promotes both institutional safety and the therapeutic objectives of the Secure Psychiatric Unit.

Accepted correctional practice also recognizes that restrictive housing is intended to address specific safety or security concerns and should not become a substitute for treatment or a long-term management strategy absent continuing operational justification. Consequently, periodic administrative review is an essential component of sound correctional practice. As circumstances change, institutional staff should evaluate whether the reasons supporting continued restrictive housing remain present or whether a less restrictive placement can safely accomplish the institution's security and treatment objectives.

12

The effectiveness of correctional due process depends upon accurate documentation, meaningful administrative review, interdisciplinary communication, and periodic reassessment of the patient's housing status. These practices promote accountability, support informed decision-making, and assist correctional administrators in balancing institutional security with the treatment needs of civilly committed psychiatric patients housed within a Secure Psychiatric Unit.

**Restrictive Housing of Civilly Committed Patients**

**The materials reviewed establish that accepted correctional practices governing the use of restrictive housing for civilly committed patients are as follows:**

Restrictive housing is a correctional management tool intended to address legitimate and identifiable safety, security, or operational concerns that cannot be effectively managed within a less restrictive housing environment. Accepted correctional practice recognizes that temporary placement in restrictive housing may be necessary to protect patients, staff, or the orderly operation of the institution when an immediate security concern exists. The decision to utilize restrictive housing should be based upon objective institutional considerations and not as a substitute for treatment or as a punitive response to behavior associated with mental illness.

Within a Secure Psychiatric Unit, the use of restrictive housing presents unique operational considerations because the individuals confined within the unit are civilly committed psychiatric patients receiving treatment rather than criminal offenders serving punitive sentences. Consequently, accepted correctional practice requires that restrictive housing be utilized only for as long as legitimate security or safety concerns require and that continued placement be evaluated through ongoing administrative and clinical review.

Accepted correctional practice further recognizes that placement into restrictive housing does not terminate the institution's responsibility to provide appropriate medical care, mental health treatment, access to hygiene, nutrition, medication, and other essential services. Patients assigned to restrictive housing remain entitled to continuing clinical evaluation and institutional management consistent with the therapeutic mission of the Secure Psychiatric Unit while maintaining institutional security.

The continued confinement of a civilly committed patient in restrictive housing requires periodic reassessment to determine whether the circumstances that justified the initial placement continue to exist. This review should consider the patient's institutional adjustment, behavioral presentation, current mental health status, medical condition, treatment progress, and any recommendations made by qualified clinical personnel. Restrictive housing should not continue solely because it was initially imposed if subsequent review demonstrates that less restrictive alternatives can safely satisfy the institution's security and treatment objectives.

Accepted correctional practice also recognizes that restrictive housing requires continuous documentation. Accurate documentation promotes accountability, facilitates communication among correctional, medical, and mental health personnel, and provides the institutional record necessary for supervisory review and informed decision-making. Comprehensive documentation assists correctional administrators in determining whether continued restrictive housing remains

13

operationally justified and supports continuity of care for civilly committed patients housed within a secure treatment environment.

The management of restrictive housing within a Secure Psychiatric Unit therefore requires correctional staff, medical providers, and mental health professionals to function as an interdisciplinary team while maintaining their respective professional responsibilities. Effective communication, periodic reassessment, accurate documentation, and independent clinical judgment are essential components of accepted correctional practice governing the continued confinement of civilly committed psychiatric patients in restrictive housing.

**Interdisciplinary Decision-Making and Independent Clinical Judgment**

**The materials reviewed establish that accepted correctional practices governing interdisciplinary decision-making and independent clinical judgment are as follows:**

The successful operation of a Secure Psychiatric Unit depends upon effective communication and collaboration among correctional staff, medical providers, mental health professionals, and institutional administrators. Accepted correctional practice recognizes that no single discipline possesses all of the information necessary to effectively manage a civilly committed psychiatric patient. Rather, sound correctional management requires that operational decisions affecting patient safety, housing, treatment, and institutional security be informed by the professional expertise of each discipline while respecting the independent responsibilities assigned to each.

Correctional staff possess specialized knowledge concerning institutional security, inmate movement, behavioral observations, and operational safety. Medical and mental health professionals possess specialized knowledge regarding psychiatric diagnosis, clinical stability, treatment needs, medication management, and the potential effects of institutional decisions upon the patient's mental and physical health. Accepted correctional practice requires that these disciplines communicate effectively so that significant housing and management decisions are made with the benefit of all relevant information reasonably available at the time.

Independent clinical judgment is a fundamental component of accepted correctional practice within a secure psychiatric treatment environment. Clinical recommendations concerning treatment, mental health status, and patient management should remain the product of professional medical and mental health judgment exercised independently by qualified clinicians. While correctional staff may appropriately communicate legitimate security concerns, accepted practice requires that clinical decisions remain free from improper operational, disciplinary, or administrative influence unrelated to the patient's medical or psychiatric condition.

Accepted correctional practice further recognizes that interdisciplinary communication is not a single event but an ongoing process. As a patient's condition, institutional behavior, or security status changes, correctional staff and treatment professionals should continue to exchange relevant information to ensure that housing assignments, treatment plans, and institutional management remain appropriate. Effective communication promotes informed decision-making, enhances institutional safety, supports continuity of care, and reduces the likelihood that decisions will be based upon incomplete or outdated information.

14

Meaningful interdisciplinary collaboration also promotes institutional accountability. Accurate documentation of clinical recommendations, correctional observations, administrative decisions, and significant changes in a patient's condition provides a reliable record supporting subsequent review by supervisors, treating professionals, and the Court. Comprehensive documentation assists in demonstrating that decisions affecting a civilly committed patient were based upon objective information, professional judgment, and accepted correctional practices rather than unsupported assumptions or isolated events.

Within a Secure Psychiatric Unit, accepted correctional practice therefore requires correctional staff, medical providers, and mental health professionals to function as coordinated members of an interdisciplinary treatment team while maintaining their separate professional responsibilities. The effectiveness of that collaboration is a significant factor in evaluating whether the correctional management of a civilly committed psychiatric patient was consistent with generally accepted correctional practices.

**Conditions of Confinement and Continuing Institutional Responsibilities**

**The materials reviewed establish that accepted correctional practices governing conditions of confinement and continuing institutional responsibilities are as follows:**

Accepted correctional practice recognizes that placement in restrictive housing does not relieve a correctional institution of its continuing responsibility to provide for the basic health, safety, welfare, and treatment needs of individuals confined within its custody. While restrictive housing necessarily limits certain privileges and movement, the institution remains responsible for providing humane living conditions, access to medical and mental health care, personal hygiene, nutrition, prescribed medications, sanitation, and other services necessary to maintain the patient's physical and psychological well-being.

Within a Secure Psychiatric Unit, these responsibilities assume additional importance because the individuals housed within the facility are civilly committed psychiatric patients receiving treatment within a secure correctional environment. Accepted correctional practice requires that correctional staff, medical providers, and mental health professionals remain attentive to conditions that may adversely affect a patient's health, mental status, or ability to participate in treatment. When concerns regarding housing conditions are reported, institutional staff should evaluate the reported condition, document the concern, initiate appropriate corrective action when warranted, and communicate the status of those actions to the appropriate personnel.

Accepted correctional practice further recognizes that resident requests, grievances, and other institutional communication systems serve an important operational purpose. These systems provide patients with an established process for reporting concerns involving housing conditions, institutional operations, medical issues, property, treatment, or other matters affecting their confinement. Equally important, they provide correctional administrators with a mechanism to identify recurring operational issues, evaluate institutional responses, document corrective actions, and maintain accountability throughout the facility.

15

The existence of a resident complaint does not, by itself, establish that the reported condition existed or that institutional staff acted improperly. However, accepted correctional practice requires that reported concerns be appropriately documented, evaluated, and addressed through established institutional procedures. The institutional response to reported concerns is an important component of sound correctional management because it demonstrates the facility's ability to identify operational issues, coordinate appropriate responses, and maintain effective communication among correctional, medical, maintenance, and administrative personnel.

Correctional administrators are also responsible for ensuring that institutional conditions do not unnecessarily interfere with the therapeutic objectives of a Secure Psychiatric Unit. Operational concerns involving sanitation, hygiene, maintenance, access to medical care, or other essential services should be addressed in a manner that supports both institutional security and the treatment mission of the facility. Effective correctional management therefore requires ongoing supervision, documentation, and administrative oversight to ensure that reported conditions are appropriately evaluated and that corrective measures are implemented when necessary.

The continuing responsibility to maintain safe and humane conditions of confinement, respond to reported institutional concerns, and coordinate corrective action among appropriate departments is a fundamental component of accepted correctional practice. These responsibilities continue throughout a patient's confinement regardless of housing status and form an integral part of the overall correctional management of civilly committed patients housed within a Secure Psychiatric Unit.

**Comparison of Mr. Justice's Allegations with Subsequent Public Reporting**

During my review of the institutional records, I noted that Mr. Justice repeatedly submitted resident requests, grievances, and court filings alleging that his rights as a civilly committed patient were not being protected. His complaints included allegations concerning restrictive housing without due process, interference with his ability to communicate with his guardian and legal advocate, requests for preservation of audio or video evidence, concerns regarding legal materials, and complaints regarding conditions of confinement, including the prolonged lack of warm shower water. The records further establish that many of these concerns were documented contemporaneously through the institution's grievance and resident request process and, with respect to the shower water issue, were supported by repeated institutional responses acknowledging plumbing or maintenance concerns and by a petition signed by multiple H-Ward patients requesting warm shower water.

Subsequent to the events giving rise to this litigation, New Hampshire Public Radio published investigative reporting arising from "Operation Night Cat," which described evidence uncovered during a separate criminal investigation involving correctional staff at the New Hampshire State Prison for Men. According to that reporting, investigators identified evidence suggesting the theft of inmate privileged legal mail, discussions among correctional staff concerning retaliation against inmates for filing complaints, potential efforts to intercept inmate correspondence, and other alleged staff misconduct. The reporting further states that multiple state and federal agencies reviewed these matters, although no criminal prosecutions resulted from many of the allegations.

16

I express no opinion that the matters described in the NHPR investigation establish the truth of Mr. Justice's individual allegations. Likewise, I do not rely upon the investigative reporting as an independent basis for any opinion expressed in this report. However, I do note that several categories of concerns raised contemporaneously by Mr. Justice—including concerns relating to legal communications, preservation of evidence, retaliation for complaints, and institutional accountability—are similar in subject matter to issues later identified during the independent "Operation Night Cat" investigation. The existence of these later findings does not establish that Mr. Justice's allegations were true; however, they demonstrate that allegations involving institutional practices and staff conduct of a similar nature were subsequently identified through an independent investigation unrelated to this litigation.

## VI. Professional findings and Opinions

The findings and opinions expressed herein are to a reasonable degree of certainty, within the fields of law enforcement and corrections and based on my many years of experience in the respective fields. Together with the materials and evidence I have reviewed thus far, I reserve the right to supplement this report at a later date, should new material or evidence become available to me.

Having read and reviewed the above-mentioned material and having relied on my own professional experiences, I have developed the following professional findings and opinions.

Opinion No. 1 – Placement into Restrictive Housing

Based upon my review of the materials identified in this report, my education, training, experience, and generally accepted correctional practices, it is my opinion, to a reasonable degree of professional certainty, that the records do not document a legitimate safety, security, or clinical basis for placing Mr. Justice in restrictive housing on April 9, 2020.

The records establish that immediately before his placement, Mr. Justice was housed in H-Ward and had been documented by mental health staff as psychiatrically stable. Although the records reference an interaction with a correctional officer, I did not identify documentation explaining why restrictive housing was necessary or why a less restrictive housing assignment was no longer appropriate.

Accepted correctional practice requires significant housing decisions to be supported by documented safety, security, or clinical concerns. In my opinion, the failure to document the basis for Mr. Justice's placement into restrictive housing was inconsistent with generally accepted correctional practices and failed to satisfy the administrative due process expected for such a significant housing decision.

Opinion No. 2 – Continued Restrictive Housing

I further opine that the records do not document a legitimate safety, security, or clinical basis for continuing Mr. Justice in restrictive housing for approximately fourteen days.

I did not identify medical or mental health records recommending, approving, or supporting his continued confinement in restrictive housing, nor did I identify documentation establishing a continuing safety or security concern requiring his segregation.

Accepted correctional practice requires continued restrictive housing to be supported by documented safety, security, or clinical concerns and to be periodically reviewed. In my opinion, the absence of such documentation was inconsistent with generally accepted correctional practices and strongly supports the conclusion that Mr. Justice's continued confinement became punitive in nature rather than remaining a correctional measure necessary for safety or security.

Opinion No. 3 – Administrative Review

I further opine that the records I reviewed do not document that Mr. Justice received meaningful administrative review during his approximately fourteen-day confinement in restrictive housing.

I did not identify documentation establishing that correctional administrators periodically reviewed whether his continued placement remained necessary or whether a less restrictive housing assignment could safely be utilized.

Accepted correctional practice requires restrictive housing to remain subject to documented review and periodic reassessment. In my opinion, the absence of documented administrative review was inconsistent with generally accepted correctional practices and failed to provide the administrative due process expected for continued restrictive housing.

Opinion No. 4 – Medical and Mental Health Review

I further opine that the records I reviewed do not document that medical or mental health staff recommended, approved, or supported Mr. Justice's continued confinement in restrictive housing.

Immediately before his placement, the records document that Mr. Justice was psychiatrically stable while assigned to H-Ward. I did not identify documentation establishing that his mental health condition deteriorated to the extent that continued restrictive housing became clinically necessary.

Accepted correctional practice requires meaningful participation by medical and mental health professionals when determining whether a civilly committed psychiatric patient should remain in restrictive housing. In my opinion, the absence of documented clinical support or periodic mental health review was inconsistent with generally accepted correctional practices governing the operation of a Secure Psychiatric Unit.

Opinion No. 5 – Overall Correctional Opinion

I further opine that the New Hampshire Department of Corrections had a continuing duty to safely house Mr. Justice while providing for his medical and mental health needs consistent with the

18

therapeutic purpose of the Secure Psychiatric Unit. That duty did not end when he was placed in restrictive housing.

The records I reviewed do not document a legitimate safety, security, or clinical basis supporting Mr. Justice's continued confinement. I did not identify documentation supporting his continued segregation through meaningful administrative review, medical or mental health recommendations, or documented correctional justification.

Instead, the records establish that Mr. Justice remained in restrictive housing for approximately fourteen days, submitted repeated requests concerning his confinement, began a hunger strike, and experienced a decline in his overall condition while confined under increasingly restrictive conditions.

It is my opinion, to a reasonable degree of professional certainty, that the New Hampshire Department of Corrections failed to provide Mr. Justice with due process protection in accordance with generally accepted correctional practices applicable to a civilly committed psychiatric patient. I further opine, this resulted in restrictive housing that became punitive in nature rather than serving a legitimate safety, security, or clinical purpose

I further opine that the New Hampshire Department of Corrections were fully aware of their obligation to protect Mr. Justice and intentionally, violated his due process protection.

## VII. Declaration

I hereby declare under penalty of perjury this 15th day of July 2026 that the foregoing is true and correct to the best of my knowledge and belief.

Aubrey P. Land
6034 NW 111th place
Alachua Florida 32615

19