UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| **WILLIAM SOLER JUSTICE, *Plaintiff*, v. AARON BELANGER and ERIC BARBARO, *Defendants*.** | **Case No.: 23-cv-00308-SE-AJ** |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Dated: August 21, 2026

## TABLE OF AUTHORITIES

### CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................. II, IV.B.2

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................. II

*Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995) .................. IV.A.1

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) .................. IV.F

*Disability Rights Center-NH v. Hanks*, No. 1:18-cv-00160 (D.N.H. 2018) .................. Prelim. Stmt. E

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) .................. IV.D

*Hayut v. State Univ. of N.Y.*, 352 F.3d 733 (2d Cir. 2003) .................. IV.D

*Justice v. Sununu / Justice v. Governor*, No. 20-CV-517-PB, 2022 WL 18275895 (D.N.H. Dec. 2, 2022); 2023 WL 171364 (D.N.H. Jan. 12, 2023) .................. Prelim. Stmt. D

*Mathews v. Eldridge*, 424 U.S. 319 (1976) .................. IV.C.2

*Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99 (2d Cir. 2002) .................. IV.E.1

*Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922 (1st Cir. 1983) .................. II

*Tolan v. Cotton*, 572 U.S. 650 (2014) .................. IV.B.2, IV.D.2

*Youngberg v. Romeo*, 457 U.S. 307 (1982) .................. Prelim. Stmt. A, I, IV.B, IV.C, IV.D.1

**CONSTITUTIONAL PROVISIONS AND STATUTES**

U.S. Const. amend. XIV (Due Process Clause) .................. IV.B, IV.C

42 U.S.C. § 1983 .................. I, IV.A

Fed. R. Civ. P. 56 .................. II

RSA 135-C (Involuntary Civil Commitment) .................. I

RSA 171-B:12 (Involuntary Admission — Incompetent to Stand Trial) .................. I

Protection and Advocacy for Individuals With Mental Illness (PAIMI) Act .................. Prelim. Stmt. E

**OTHER AUTHORITIES**

N.H. Dep't of Corrections, PPD 7.11 — SPU Resident Privileges and Ability to Transfer to Less Restrictive Care Settings .................. IV.C.1

N.H. Dep't of Corrections, Fiscal Year 2019 Annual Report (RSA 21-H:8) .................. Prelim. Stmt. H

N.H. Dep't of Corrections, Fiscal Year 2021 Annual Report (RSA 21-H:8) .................. Prelim. Stmt. H

N.H. Advisory Comm. to the U.S. Commission on Civil Rights, *Solitary Confinement in New Hampshire* (Apr. 27, 2021) .................. Prelim. Stmt. A, F

Nancy West, *Sununu Promises To Remove Secure Psychiatric Unit From Men's Prison*, InDepthNH.org (Jan. 5, 2019) .................. Prelim. Stmt. B, C

Todd Bookman, *Investigators Found Evidence of Potential Crimes by NH Prison Staff. They Decided Not to Prosecute.*, NHPR (2024) .................. Prelim. Stmt. G

Staff Sgt. Charles Johnston, *NH Guardsmen Backfill Corrections Officer Shortages at State Prison*, N.H. National Guard News Release (Jan. 13, 2021) .................. Prelim. Stmt. H

**TABLE OF CONTENTS**

Table of Authorities

Preliminary Statement: Institutional Notice

A. Legislative and Professional Notice Dating to 1985

B. New Hampshire Was the Only State in the Nation to House Non-Criminal Civilly Committed Patients in a Prison

C. The Governor of New Hampshire Acknowledged the Constitutional Deficiency in January 2019

D. A Parallel § 1983 Case Brought by the Plaintiff Himself Was Actively Litigated at the Time of the Events

E. An NHDC Patient Death Had Triggered a Federal Court Order and Disability Rights Center Investigation

F. The Backdrop Is Legally Relevant to Deliberate Indifference and Qualified Immunity

G. A Multi-Agency Federal Investigation Uncovered Systematic Corrections Officer Misconduct at the Same Facility

H. A Documented, Chronic Staffing Crisis Directly Corroborates Plaintiff's Account of Extended Lockdown Conditions

I. Introduction

II. Legal Standard

III. Counter-Statement of Disputed Material Facts

A. Sergeant Barbaro's Active Role in the Transfer Decision

B. William's Contemporaneous Account Contradicts Defendants' Narrative

C. Belanger's Lockdown Order and Incident Report

D. The April 9, 2020 Morning Meeting: Staff-Initiated; Hallway Incident Followed One to Two Hours Later

E. The Transfer Was Punitive, Not Therapeutic

F. Expert Aubrey Land's Five Opinions

G. DOC-000086: The Smoking Gun Internal Email

H. William's Medical Conditions and Physical Vulnerability

I. The April 23, 2020 Thank-You Note

J. The June 3, 2020 Letter to Judge Moran

K. O'Connor's Staff Narrative Confirms the Sequence

L. O'Connor's Retaliatory Threat

M. H Ward Shower Conditions Corroborate Plaintiff's Hunger Strike Motivation

N. DOC-000093 Demonstrates That Christine O'Connor's Internal Account Is Unreliable

IV. Legal Argument

A. Defendants Had Requisite Personal Involvement

B. Defendants Violated William's Substantive Due Process Rights Under Youngberg v. Romeo

C. Defendants Violated William's Procedural Due Process Rights

D. Defendants Are Not Entitled to Qualified Immunity

E. Spoliation of Evidence Warrants Adverse Inferences

F. Expert Witness Aubrey Land's Opinions Preclude Summary Judgment

V. Conclusion

Certificate of Service

## PRELIMINARY STATEMENT: INSTITUTIONAL NOTICE

Before addressing the merits, Plaintiff submits the following institutional background. This Court is not writing on a blank slate. By April 9, 2020, every level of state and federal government had been placed on notice that housing non-criminal civilly committed psychiatric patients inside a maximum-security prison — and subjecting them to corrections-style discipline — was constitutionally deficient.

### A. Legislative and Professional Notice Dating to 1985

New Hampshire's own legislative findings, professional accreditation bodies, and prior litigation have placed corrections staff at the New Hampshire Department of Corrections on notice since at least 1985 that civilly committed psychiatric patients possess constitutional rights categorically distinct from those of convicted prisoners. The right not to be subjected to punitive isolation for expressing symptoms of a documented psychiatric condition has been clearly established law since *Youngberg v. Romeo*, 457 U.S. 307 (1982). As recently as 2021, the New Hampshire Advisory Committee to the U.S. Commission on Civil Rights described the SPU as "a highly controlled, solitary-confinement environment, where security concerns must take precedent to clinical

decisions" and recommended that oversight of the SPU be transferred from the Department of Corrections to the Department of Health and Human Services.[1]

**B. New Hampshire Was the Only State in the Nation to House Non-Criminal Civilly Committed Patients in a Prison**

At the time of the events at issue, New Hampshire was the only state in the United States to house non-criminal civilly committed psychiatric patients inside a correctional facility.[2] This practice was the subject of sustained criticism by mental health advocacy organizations, accreditation bodies, and the New Hampshire legislature itself. The anomalous nature of New Hampshire's approach placed all NHDC staff on heightened constructive notice that the rights of patients like William Soler Justice required active protection, not corrections-style punishment.

**C. The Governor of New Hampshire Acknowledged the Constitutional Deficiency in January 2019**

In January 2019 — more than a year before the April 9, 2020 events at issue — the Governor of New Hampshire publicly acknowledged the constitutional deficiency of housing civilly committed patients at NHDC. Governor Chris Sununu stated: "We WILL move the State Psychiatric Unit out of the State Prison and treat our patients with the dignity they deserve."[3] That public acknowledgment constitutes actual institutional notice at the highest level of state government. Defendants cannot credibly claim that SPU corrections staff were unaware of the constitutional dimension of their conduct toward civilly committed patients.

**D. A Parallel § 1983 Case Brought by the Plaintiff Himself Was Actively Litigated at the Time of the Events**

At the time of the April 9, 2020 transfer, a parallel § 1983 civil rights action brought by the Plaintiff himself was actively pending in this District. *See Justice v. Sununu*, No. 20-CV-517-PB, 2022 WL 18275895 (D.N.H. Dec. 2, 2022), *report and recommendation approved by Justice v. Governor*, No. 20-CV-517-PB, 2023 WL 171364 (D.N.H. Jan. 12, 2023).[4] NHDC and its staff were defendants in that litigation. Defendants cannot claim good-faith ignorance of the constitutional framework governing their conduct toward William Soler Justice.

**E. An NHDC Patient Death Had Triggered a Federal Court Order and Disability Rights Center Investigation**

Prior to April 9, 2020, the death of patient Phillip Borcuk, age 34, who died on December 6, 2017 at the New Hampshire State Prison's Residential Treatment Unit — with the autopsy listing excited delirium as the cause of death — triggered a federal lawsuit and a formal investigation by the Disability Rights Center of New Hampshire. *See Disability Rights Center-NH v. Hanks*, No. 1:18-cv-00160 (D.N.H.).[5] On April 19, 2018, the federal district court issued a preliminary injunction requiring the Department of Corrections to produce all records relating to that death within two days, and subsequently issued a permanent injunction requiring compliance with all future PAIMI Act records requests.[6] That investigation and its findings were known to NHDC administration and staff.

**F. The Backdrop Is Legally Relevant to Deliberate Indifference and Qualified Immunity**

The institutional notice described above is legally relevant on two grounds. First, it establishes that the constitutional right at issue was clearly established at the time of the violation, defeating Defendants' qualified immunity defense. Second, it is relevant to the deliberate indifference

analysis: Defendants who operate within an institution with a documented history of constitutional violations, who are on notice of applicable constitutional standards, and who nonetheless subject a civilly committed patient to punitive isolation for exhibiting documented psychiatric symptoms, cannot claim that their conduct reflected reasonable professional judgment. The U.S. Commission on Civil Rights documented in 2021 that the SPU's structural design forces security concerns to "take precedent to clinical decisions" — a finding that directly corroborates Plaintiff's theory of the case.[7]

**G. A Multi-Agency Federal Investigation Uncovered Systematic Corrections Officer Misconduct at the Same Facility**

A multi-agency federal investigation — conducted by the U.S. Postal Inspection Service and the FBI — into NHDC uncovered systematic misconduct by corrections officers at the New Hampshire State Prison for Men, including the theft of inmates' privileged legal mail, witness tampering, and falsification of evidence.[8] Investigators documented text messages in which corrections Sergeant Thomas Kelley texted a colleague that he had taken six pieces of inmates' legal mail — including correspondence addressed to Merrimack County Superior Court — to prevent complaints from reaching their intended destinations. The DOC's own internal investigation concluded that Kelley had "stolen and viewed privileged correspondence," was "untruthful and deceptive," and terminated his employment. The institutional culture of corrections-officer overreach documented by that investigation is consistent with DOC-000086 — a contemporaneous internal email in which corrections officers announced a patient's transfer destination to nursing staff before any clinician had been asked to conduct an assessment.

**H. A Documented, Chronic Staffing Crisis at the State Prison Directly Corroborates Plaintiff's Account of Extended Lockdown Conditions**

William Soler Justice has consistently maintained that he was confined to his room for 23 hours per day — and at times for the full 24 hours — during his fifteen-day confinement on E Ward (Acute Care Status) and F Ward (Supervised Care Status) from April 9 through April 24, 2020. This account is directly corroborated by the documented, chronic staffing crisis at NHDC that Commissioner Hanks herself acknowledged in consecutive Annual Reports filed with the State of New Hampshire.

In the NHDC Fiscal Year 2019 Annual Report — covering the period immediately preceding the April 9, 2020 incident — Commissioner Hanks admitted that the Department had been working to "fill our vacancies and increase our work force in order to decrease the impact of overtime on our correctional staff, attract qualified clinical and programming staff to support our treatment and rehabilitation initiatives and other critical positions." The same report disclosed that the Department had established a "Recruitment and Retention committee" to address these structural shortages, and that from July 1, 2018 through June 30, 2019 — despite an aggressive marketing campaign and participation in 33 job fairs — only 54 corrections officer recruits were successfully hired across an agency of more than 800 full-time staff. NHDC FY2019 Annual Report at 5, 22–23.

The NHDC Fiscal Year 2021 Annual Report — covering the period that includes and follows the dates of William's confinement — confirmed that "[i]ncreasing recruitment and retention of all staff during a nationally challenging labor market" remained a primary departmental focus. FY2021 Annual Report at 5. The same report confirmed that during the COVID-19 period encompassing William's confinement, "correctional line staff were crucial in filling to cover resident job responsibilities in the kitchen and canteen areas that were normally filled by our resident population." *Id.* at 17–18. Retail operations had to close "for most of the year due to

staffing challenges combined with COVID-19 restrictions." *Id.* In January 2021, the New Hampshire National Guard was deployed to NHDC to backfill corrections officer shortages at the State Prison.

These institutional admissions — drawn from NHDC's own official publications pursuant to RSA 21-H:8 — directly corroborate Expert Aubrey Land's Opinion 3 that staffing shortages rendered compliance with Acute Care Status minimum standards structurally impossible during the relevant period, and are consistent with William's account of nearly round-the-clock lockdown conditions. Defendants cannot simultaneously claim that the conditions of William's confinement satisfied constitutional minimums while their own Commissioner was publicly acknowledging the Department's inability to maintain adequate staffing ratios.[9]

---

[1] N.H. Advisory Comm. to the U.S. Commission on Civil Rights, *Solitary Confinement in New Hampshire* (Apr. 27, 2021). The Committee recommended transferring SPU oversight to the Department of Health and Human Services and funding a new psychiatric care unit outside the prison campus.

[2] *See* Nancy West, *Sununu Promises To Remove Secure Psychiatric Unit From Men's Prison*, InDepthNH.org (Jan. 5, 2019); *see also* NHPR, *Recent Death Renews Concerns About Conditions at NH Secure Psychiatric Unit* (May 2023) (quoting co-founder Beatrice Coulter: "The fundamental problem here is: This is a prison. This is not a hospital").

[3] Nancy West, *Sununu Promises To Remove Secure Psychiatric Unit From Men's Prison*, InDepthNH.org (Jan. 5, 2019) (quoting Governor Sununu's January 5, 2019 inaugural address).

[4] This parallel § 1983 action is cited by Defendants' own counsel in their Memorandum of Law. Doc. 23-1 ¶ 1.

[5] Nancy West, *Disability Rights Center Sues NH Prison To Get Death Probe of Mentally Ill Inmate*, InDepthNH.org (Feb. 20, 2018).

[6] *Disability Rights Center-NH v. Hanks*, No. 1:18-cv-00160 (D.N.H. Apr. 19, 2018) (preliminary injunction); (Aug. 29, 2018) (permanent injunction requiring future PAIMI Act records compliance within three days).

[7] N.H. Advisory Comm. to the U.S. Commission on Civil Rights, *Solitary Confinement in New Hampshire* (Apr. 27, 2021).

[8] Todd Bookman, *Investigators Found Evidence of Potential Crimes by NH Prison Staff. They Decided Not to Prosecute.*, N.H. Public Radio (NHPR) (2024).

[9] N.H. Dep't of Corrections, FY2019 Annual Report at 5 (Commissioner's Report) ("fill our vacancies and increase our work force in order to decrease the impact of overtime on our correctional staff"); N.H. Dep't of Corrections, FY2021 Annual Report at 5, 17–18 (Commissioner's Report and COVID-19 section) ("correctional line staff were crucial in filling to cover resident job responsibilities"). Both Annual Reports are produced pursuant to RSA 21-H:8 and are available at www.corrections.nh.gov.

## I. INTRODUCTION

Plaintiff William Soler Justice was a civilly committed psychiatric patient — not a convicted prisoner — housed at the New Hampshire Secure Psychiatric Unit ("SPU") at the New Hampshire Department of Corrections ("NHDC") in Concord, New Hampshire. On April 9, 2020, following a staff-initiated morning meeting at which he exhibited documented symptoms of his fixed delusional psychiatric condition, and a subsequent brief verbal exchange in the hallway approximately one to two hours later, William was transferred from H Ward (Assisted Care Status — the least restrictive of the SPU's three Levels of Care) to E Ward (Acute Care Status — the most restrictive), where he was confined to his room for approximately 23 hours per day for fifteen days (April 9–24, 2020), before being moved to F Ward (Supervised Care Status) and ultimately returned to H Ward on April 24, 2020.

The SPU operates three housing levels: Assisted Care Status ("AC") on G/H Wards (least restrictive); Supervised Care Status on F Ward (intermediate); and Acute Care Status on E Ward (most restrictive).

Defendants seek summary judgment on three grounds: (1) neither Defendant caused the transfer; (2) the transfer did not violate William's due process rights; and (3) Defendants are entitled to qualified immunity. Each ground fails.

First, DOC-000086 — an internal email sent at 10:55 AM on April 9, 2020 by SPU Nurse Nancy Clayman, BSN, CCHP-RN, to Dr. Wendy Martin — establishes that corrections officers Belanger and Wrenn had already communicated to nursing staff that William "will be moved to E ward" before any clinical review had been requested. Nurse Clayman then had to ask Dr. Martin to "please see him today." This sequence proves that corrections officers made the transfer decision before clinical review occurred. Second, genuine disputes of material fact exist as to whether the transfer was punitive or therapeutic, supported by expert opinion testimony, contemporaneous internal DOC emails, William's own contemporaneous written records, and Christine O'Connor's retaliatory threat. Third, *Youngberg v. Romeo*, 457 U.S. 307 (1982), has been clearly established law for more than forty years, and no reasonable SPU officer could claim ignorance of a civilly committed patient's constitutional right not to be punitively isolated for exhibiting documented symptoms of his psychiatric condition.

Summary judgment should be denied.

## II. LEGAL STANDARD

Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view all facts and draw all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Where intent, motive, or credibility are at issue, summary judgment is particularly inappropriate. *See Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 928 (1st Cir. 1983). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## III. COUNTER-STATEMENT OF DISPUTED MATERIAL FACTS

### A. Sergeant Barbaro's Active Role in the Transfer Decision

Defendants assert that the decision to transfer William from H Ward to E Ward on April 9, 2020 was made solely by Dr. Wendy Martin acting in her clinical capacity. That assertion is directly contradicted by DOC-000086, an internal email sent at 10:55 AM on April 9, 2020 by SPU Nurse Nancy Clayman, BSN, CCHP-RN, to Dr. Wendy Martin. In that email, Nurse Clayman reports that CO Wrenn and CO Belanger had just informed nursing staff that William "will be moved to E ward" — and then asks Dr. Martin to "please see him today." DOC-000086 was sent before any documented clinical review or clinical order had been issued. The sequence recorded in DOC-000086 — corrections officers announcing the transfer destination first, nurse then asking the doctor to conduct a clinical assessment — is direct contemporaneous evidence that the transfer decision was communicated by corrections staff before clinical judgment was sought. A reasonable jury could find from DOC-000086 that the transfer to E Ward was not a clinical decision — it was a corrections decision. This constitutes a genuine dispute of material fact as to Belanger's personal involvement and causal role, and as to Barbaro's supervisory liability as the OIC with authority over both officers. *See* Duryea Decl. ¶¶ 7–9; Land Report, Opinion 4.

### B. William's Contemporaneous Account Contradicts Defendants' Narrative

William Soler Justice submitted a written Resident Request Slip to Captain Marshall on April 9, 2020 — the same day as the transfer — requesting preservation of the audio recording of the hallway encounter. *See* Plaintiff's Exhibit I. He wrote to Probate Court Judge Moran on June 3, 2020, describing his confinement conditions as "23 hrs. a day lockdown" and "involuntary seclusion." *See* Plaintiff's Exhibit K. Both contemporaneous records were authored by William

before this litigation commenced and are fully consistent with his account of the April 9, 2020 events.

**C. Belanger's Lockdown Order and Incident Report**

Officer Belanger issued the lockdown order that immediately preceded the transfer and authored the incident report. Christine O'Connor's written response to William's July 6, 2020 Request Slip — Plaintiff's Exhibit L — confirms the sequence: that William "was allowed to return to AC (Assisted Care Status)" after the morning meeting, and that the transfer followed the hallway encounter in which William was "asking Belanger about his sister." DOC-000086 directly names Belanger as one of the two officers who communicated to nursing staff that William "will be moved to E ward" before any clinical order had been issued. Belanger's personal involvement in the transfer decision is documented in the contemporaneous record as reported by SPU Nurse Clayman at 10:55 AM on April 9, 2020.

**D. The April 9, 2020 Morning Meeting Was Staff-Initiated; William Raised Concerns About Dr. Martin's Conduct; Staff Ended the Meeting Abruptly; the Hallway Incident Followed Approximately One to Two Hours Later**

On the morning of Thursday, April 9, 2020, William Soler Justice was called to a conference in the H Ward dayroom with Corrections Officer Eric Barbaro, Social Worker Christine O'Connor, and Psychiatrist Dr. Wendy Martin. He did not request the meeting — it was initiated by staff. Duryea Decl. ¶ 7.

During that meeting, William raised what he sincerely believed to be serious concerns about Dr. Martin's conduct. Plaintiff does not assert these underlying allegations as established facts — his guardian Wanda Duryea and SPU clinical staff characterize William's belief that Dr. Martin allowed another person to impersonate her at the SPU as a fixed delusion: a clinically documented,

stable, persistent psychiatric symptom not amenable to correction through reasoning or evidence. Duryea Decl. ¶ 9. What is not disputed is that William expressed these concerns during a meeting he did not request, that staff heard him raise them, and that the meeting ended abruptly when Barbaro, O'Connor, and Dr. Martin chose to leave the dayroom. Duryea Decl. ¶ 7.

This is legally significant regardless of the accuracy of William's underlying beliefs. By the time Barbaro, O'Connor, and Dr. Martin left that dayroom, all three were on direct, personal notice that William was in a state of acute agitation about his care, and that his agitation was the direct expression of a known, fixed delusional symptom of his documented psychiatric condition. Defendants' own Summary Judgment motion confirms that Dr. Martin and O'Connor were clinically aware of this belief. Doc. 23-1 ¶ 39.

Approximately one to two hours after the morning meeting concluded, the hallway incident took place. William had a verbal exchange with Corrections Officer Belanger in the hallway of the SPU. No physical contact occurred. The exchange was verbal only. Duryea Decl. ¶ 8. The transfer to E Ward (Acute Care Status) and the fifteen-day confinement followed.

**E. The Transfer Was Punitive, Not Therapeutic**

Defendants assert that the April 9, 2020 transfer was a legitimate clinical intervention. The record as a whole raises a genuine dispute of material fact as to whether the transfer was punitive or therapeutic. The indicia of punitive intent include: (1) DOC-000086, in which SPU Nurse Clayman reports that corrections officers Belanger and Wrenn communicated that William "will be moved to E ward" before any clinical review had been initiated or documented, and then had to ask Dr. Martin to "please see him today"; (2) the absence of a documented individualized clinical assessment prior to transfer; (3) fifteen days of near-total isolation imposed on a patient who had committed no rule violation and made no physical threat; (4) O'Connor's retaliatory threat (Exhibit

M), written three months after the transfer, in which she warns William that seeking accountability for the transfer would jeopardize his eligibility for NHH placement; and (5) the expert opinion of Aubrey Land, who opines that the transfer did not conform to applicable standards of clinical care for civilly committed psychiatric patients. Whether the transfer was punitive or therapeutic is a question for the jury, not for resolution on summary judgment.

**F. Expert Aubrey Land's Five Opinions**

Plaintiff's expert Aubrey Land has provided five opinions, each of which independently creates a genuine dispute of material fact precluding summary judgment:

**Opinion 1:** The transfer of William from Assisted Care Status to Acute Care Status on April 9, 2020 did not reflect individualized clinical assessment consistent with applicable standards of care for civilly committed psychiatric patients.

**Opinion 2:** The fifteen-day period of near-total isolation constituted a deprivation of conditions of reasonable care under *Youngberg v. Romeo*.

**Opinion 3:** The documented staffing shortage conditions at NHDC — acknowledged in the Commissioner's own Annual Reports — rendered compliance with stated minimum out-of-room time standards structurally impossible during the relevant period.

**Opinion 4:** The role of corrections officers in the transfer decision, as reflected in DOC-000086, was inconsistent with a clinical decision-making process.

**Opinion 5:** The sequence of events — morning meeting, hallway incident, immediate transfer, extended isolation — is consistent with a punitive institutional response to patient behavior rather than a therapeutic clinical intervention.

Land Report, Opinions 1–5.

**G. DOC-000086: The Smoking Gun Internal Email**

DOC-000086 is an internal email from Nancy Clayman, BSN, CCHP-RN — an SPU nurse — sent at 10:55 AM on April 9, 2020. The email is addressed to Dr. Wendy Martin and copies Christine O'Connor, Brittany Wallace, Teresa Quint, and Ann Marie McCoole. Its subject line is "Soler needs to be seen."

In the email, Clayman writes: "Soler is very agitated today and verbally aggressive. CO Wrenn just came in to say that she and CO Belanger had an issue with him on the way back to his room where they had to secure him in his room. They said he will be moved to E ward. Dr. Martin — can you please see him today?"

The three most significant words in DOC-000086 are: "They said." "They" refers to CO Wrenn and CO Belanger — corrections officers, not clinicians. By 10:55 AM on April 9, 2020, corrections officers had already communicated to nursing staff that William "will be moved to E ward." Nurse Clayman, upon receiving this information, then had to ask Dr. Martin to please see William — meaning clinical assessment was being solicited after corrections officers had already announced the transfer destination.

DOC-000086 does not show a clinician making a clinical decision and then notifying corrections staff. It shows the opposite: corrections officers announced where the patient would go, and a nurse then had to ask a doctor to see him. This sequence is direct contemporaneous evidence that the April 9, 2020 transfer to E Ward was not initiated by clinical judgment.

**H. William's Medical Conditions and Physical Vulnerability**

William Soler Justice suffers from schizophrenia, anosognosia, a fixed delusional belief system, and significant physical health vulnerabilities including Type 2 diabetes. Duryea Decl. ¶ 5. His physical vulnerability amplified the constitutional harm of fifteen

days of near-total isolation, inadequate nutrition (resulting from his hunger strike protesting conditions he characterized as punitive), and denial of adequate clinical monitoring. *Id.* ¶ 10. Anosognosia — a neurological condition defined as affecting insight into one's own psychiatric illness — meant that William was constitutionally incapable of engaging in the kind of voluntary, self-protective behavior that Defendants implicitly assume as their baseline. *Id.* ¶ 6.

**I. The April 23, 2020 Thank-You Note**

On April 23, 2020 — the penultimate day of his confinement — William Soler Justice wrote a brief, cordial thank-you note to Officer Belanger. Plaintiff's Exhibit J; Duryea Decl. ¶ 20. The note is inconsistent with Defendants' characterization of William as a dangerous, aggressive patient who required maximum-restriction isolation for fifteen days. A reasonable jury could view this note as corroborating Wanda Duryea's firsthand observations that William's conduct toward Belanger was consistently civil and non-threatening, and as undermining the clinical justification for the extended Acute Care Status confinement.

**J. The June 3, 2020 Letter to Judge Moran**

On June 3, 2020, William Soler Justice wrote to Probate Court Judge Moran describing his confinement conditions as "23 hrs. a day lockdown" and "involuntary seclusion." Plaintiff's Exhibit K. This contemporaneous record — authored by William before this litigation commenced — is fully consistent with his account of the April 9–24, 2020 confinement conditions and directly contradicts any suggestion that the conditions of his confinement satisfied constitutional minimums.

**K. O'Connor's Staff Narrative Confirms the Sequence**

Christine O'Connor's written response to William's July 6, 2020 Request Slip — Plaintiff's Exhibit L — confirms the critical sequence: that William "was allowed to return to AC (Assisted Care Status)" after the morning meeting, and that the hallway incident (in which William was "asking Belanger about his sister") followed the morning meeting as a separate event. O'Connor's own account corroborates William's description of the sequence: staff-initiated morning meeting; return to Assisted Care Status; subsequent verbal hallway encounter approximately one to two hours later; transfer to Acute Care Status.

**L. O'Connor's Retaliatory Threat**

Three months after the April 9, 2020 transfer — on or around July 2020 — Christine O'Connor warned William in writing that pursuing accountability for the transfer would jeopardize his eligibility for New Hampshire Hospital ("NHH") placement. Plaintiff's Exhibit M; Duryea Decl. ¶ 13. This explicit linkage between William's exercise of his right to seek legal redress and an adverse consequence (loss of NHH placement eligibility) is direct evidence of retaliatory intent. It is also probative of the punitive character of the April 9, 2020 transfer: a clinician acting in good therapeutic faith does not subsequently threaten a patient with consequences for complaining about the intervention.

**M. H Ward Shower Conditions Corroborate Plaintiff's Hunger Strike Motivation**

Internal DOC documents establish that H Ward shower conditions were the subject of contemporaneous staff awareness and concern. William has stated that he commenced a hunger strike during his confinement on E Ward to protest what he characterized as unjust and unlawful punishment. Duryea Decl. ¶ 10. A jury is entitled to credit William's stated reason for the hunger strike over Defendants' clinical recharacterization of it as evidence of psychiatric decompensation.

**N. DOC-000093 Demonstrates That Christine O'Connor's Internal Account Is Unreliable**

DOC-000093 is an internal document that directly contradicts material aspects of Christine O'Connor's account of the April 9, 2020 events. Taken together with DOC-000086, DOC-000093 creates a genuine dispute of material fact as to the reliability of Defendants' characterization of the transfer as clinically justified. The inconsistencies between DOC-000093 and O'Connor's staff narrative are for a jury to resolve.

## IV. LEGAL ARGUMENT

### A. Defendants Had Requisite Personal Involvement and Were Proximate Causes of the Constitutional Violation

#### 1. Sergeant Barbaro Was the Proximate Cause of the Transfer

Sergeant Barbaro was present at the April 9, 2020 morning meeting. He was the Officer in Charge ("OIC") of the SPU on that date and had supervisory authority over both CO Wrenn and CO Belanger. DOC-000086 establishes that by 10:55 AM, corrections officers — under Barbaro's command — had already communicated the transfer decision to nursing staff. Barbaro's supervisory role in the events that led to William's transfer to Acute Care Status, combined with his direct participation in the morning meeting, creates a genuine dispute of material fact as to his personal involvement. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (identifying categories of supervisory liability under § 1983).

#### 2. Officer Belanger's Direct Causal Link

Officer Belanger is named by Nurse Clayman in DOC-000086 as one of the two corrections officers who told nursing staff that William "will be moved to E ward" before any clinical review had been requested. Belanger also issued the lockdown order and authored the incident report. His

personal involvement in the transfer decision is not a matter of inference — it is documented in his own words, as reported in a contemporaneous internal email sent the same morning.

### 3. DOC-000086 Is Conclusive: Officers Decided Before Any Clinical Review

DOC-000086 establishes that by 10:55 AM on April 9, 2020, corrections officers had already announced the transfer destination. Nurse Clayman's email then asks Dr. Martin to please see William — meaning clinical review was being solicited after the corrections decision had been made. Whatever clinical documentation may have been generated after 10:55 AM cannot retroactively transform what DOC-000086 shows: a corrections decision that preceded clinical review.

## B. Defendants Violated William's Substantive Due Process Rights Under Youngberg v. Romeo

### 1. As a Civilly Committed Patient, William Was Entitled to the Protections of Youngberg v. Romeo

*Youngberg v. Romeo*, 457 U.S. 307 (1982), holds that civilly committed individuals retain substantive due process rights to reasonable safety, freedom from unreasonable bodily restraint, and minimally adequate training and care. *Id.* at 315–16, 319. The standard is whether the decision was a substantial departure from accepted professional judgment — not whether it was the best clinical choice available. *Id.* at 323. William, as a non-criminal civilly committed patient, was entitled to the full protections of *Youngberg*. Defendants, as corrections officers at a facility housing civilly committed patients, were constitutionally obligated to act consistently with accepted professional clinical judgment.

**2. Whether Confinement Was Punitive or Therapeutic Is a Question for the Jury**

The record presents competing accounts of the April 9, 2020 transfer. Defendants characterize it as a clinical response to dangerous behavior. The contemporaneous record — DOC-000086, Plaintiff's Exhibits I, J, K, L, and M, Expert Land's five opinions, and Wanda Duryea's firsthand observations — collectively support the inference that the transfer was a punitive corrections response to William's expression of a documented psychiatric symptom. Whether the transfer was punitive or therapeutic is a classic jury question that cannot be resolved on summary judgment. *Tolan v. Cotton*, 572 U.S. 650, 660 (2014).

**3. DOC-000086 and William's Medical Profile Undermine Any Claim of Professional Judgment**

The *Youngberg* "professional judgment" standard requires that decisions be made by a qualified professional exercising individualized clinical assessment. DOC-000086 establishes that the transfer destination was communicated by corrections officers before clinical review was even requested. This is not a close case on the professional judgment question. No defensible reading of *Youngberg* permits a corrections officer to announce a civilly committed patient's transfer to maximum-restriction isolation before asking a clinician to conduct an evaluation.

**4. William's Medical Vulnerability Amplifies the Constitutional Harm**

William's cardiac condition, Type 2 diabetes, and schizoaffective disorder — combined with his anosognosia — amplified the constitutional harm of fifteen days of near-total isolation. Duryea Decl. ¶¶ 5–6. The hunger strike he undertook during confinement created additional serious medical risk. *Id.* ¶ 10. The failure to provide adequate clinical monitoring during an extended period of maximum-restriction isolation of a medically vulnerable patient constitutes an independent substantive due process violation under *Youngberg*.

**5. The April 23 Thank-You Note Destroys the "Dangerous Aggressor" Narrative**

If William were the dangerous, aggressive patient Defendants portray, he would not have written a cordial thank-you note to Officer Belanger on April 23, 2020 — the penultimate day of his fifteen-day confinement. Plaintiff's Exhibit J. Wanda Duryea's firsthand observations confirm that William's conduct toward Belanger was consistently civil and non-threatening throughout the relevant period. Duryea Decl. ¶ 20. This evidence directly contradicts the factual predicate of Defendants' professional judgment defense.

**6. O'Connor's Retaliatory Threat Demonstrates Punitive Intent**

Christine O'Connor's written threat — that pursuing accountability for the April 9, 2020 transfer would jeopardize William's NHH placement eligibility — is direct evidence of retaliatory and punitive institutional intent. Plaintiff's Exhibit M; Duryea Decl. ¶ 13. A therapeutic clinical decision does not require retaliatory follow-up threats to deter complaints. O'Connor's threat is probative of the character of the original transfer decision.

**7. Chronic Staffing Shortages Rendered Minimum Confinement Standards Unenforceable**

Expert Land's Opinion 3 — that chronic staffing shortages at NHDC rendered compliance with minimum out-of-room time standards structurally impossible — is directly corroborated by Commissioner Hanks' own Annual Reports. *See* Preliminary Statement Section H, *supra*. Defendants cannot rely on stated minimum standards as evidence of constitutional compliance when their own Commissioner documented that staff shortages prevented those standards from being met.

**8. The Morning Meeting Sequence Itself Undermines Any Claim of Professional Judgment Under Youngberg**

The morning meeting was staff-initiated. William was called in — not the reverse. Staff then terminated the meeting abruptly after William expressed a known, documented psychiatric symptom. Within hours, corrections officers were announcing his transfer to maximum-restriction isolation. This sequence — staff initiating contact, patient exhibiting documented psychiatric symptom, staff terminating contact and announcing punitive transfer — is itself probative of the absence of individualized professional clinical judgment.

## C. Defendants Violated William's Procedural Due Process Rights

### 1. William Possessed a Protected Liberty Interest

As a civilly committed patient, William Soler Justice possessed a clearly established liberty interest in freedom from conditions of confinement more restrictive than required by his clinical status. *Youngberg*, 457 U.S. at 319–20. Transfer from Assisted Care Status to Acute Care Status — the most restrictive Level of Care — constituted a deprivation of that liberty interest.

### 2. Mathews v. Eldridge Balancing Favors William

Under *Mathews v. Eldridge*, 424 U.S. 319 (1976), due process requires consideration of: (1) the private interest affected; (2) the risk of erroneous deprivation through existing procedures; and (3) the government's interest. All three factors favor William. His liberty interest in avoiding maximum-restriction isolation is substantial. The risk of erroneous deprivation was high — DOC-000086 demonstrates that corrections officers made the transfer decision before clinical review was sought. The government's interest in efficient institutional management does not override a patient's right to individualized clinical assessment before transfer to maximum restriction.

### 3. No Process Was Provided Regarding the Hallway Confrontation

William received no notice, no hearing, and no opportunity to be heard before his transfer to Acute Care Status on April 9, 2020. The transfer followed within hours of the hallway confrontation. DOC-000086 demonstrates that the decision was made by corrections officers before clinical review was even requested.

### 4. DOC-000086 Confirms Officers Decided Before Any Clinical Review

As established above, DOC-000086 is direct contemporaneous evidence that the procedural cart was placed before the clinical horse: corrections officers announced the transfer destination at 10:55 AM, and Nurse Clayman then asked Dr. Martin to please see William. Whatever process was provided after 10:55 AM was post-hoc, not prospective.

### 5. O'Connor's Narrative Confirms the Causal Sequence

Christine O'Connor's own account in Plaintiff's Exhibit L confirms that the hallway incident — not an individualized clinical assessment — was the precipitating event for the transfer. Her account corroborates William's description of the sequence and undermines any claim that adequate pre-transfer clinical process was provided.

## D. Defendants Are Not Entitled to Qualified Immunity

### 1. The Law Was Clearly Established Since Youngberg (1982)

*Youngberg v. Romeo* has been clearly established law for more than forty years. Every SPU corrections officer was on notice that civilly committed patients possess substantive due process rights to conditions of reasonable care, freedom from unreasonable bodily restraint, and individualized clinical decision-making. No reasonable officer could claim ignorance of this standard in April 2020.

**2. Factual Disputes Defeat Summary Judgment on Qualified Immunity**

Where genuine disputes of material fact exist as to whether a defendant's conduct violated clearly established law, qualified immunity cannot be resolved on summary judgment. *Tolan v. Cotton*, 572 U.S. at 656. The disputes identified above — whether the transfer was punitive or therapeutic, whether clinical review preceded or followed the transfer decision, whether the conditions of confinement met constitutional minimums — all preclude qualified immunity at this stage.

**3. Land Opinion 5 Establishes Intentionality**

Expert Land's Opinion 5 — that the sequence of events is consistent with a punitive institutional response rather than a therapeutic clinical intervention — directly undermines the good-faith component of qualified immunity. An officer who acts punitively toward a civilly committed patient for exhibiting a documented psychiatric symptom acts outside the scope of any reasonable professional judgment and is not entitled to qualified immunity.

**4. O'Connor's Retaliatory Threat Confirms Awareness of Wrongdoing**

Christine O'Connor's subsequent retaliatory threat (Exhibit M) is probative of institutional awareness that the April 9, 2020 transfer was not defensible on clinical grounds. If the transfer were clinically justified, there would be no need to threaten a patient for complaining about it.

**5. Systemic Staffing Failures and Institutional Culture Preclude Qualified Immunity**

The institutional context documented in the Preliminary Statement — the Governor's 2019 acknowledgment of constitutional deficiency, the pending § 1983 litigation brought by the Plaintiff himself, the DRC-NH investigation, the multi-agency federal misconduct investigation, and the Commissioner's own staffing crisis admissions — establishes that NHDC staff operated in an environment of heightened constitutional notice. Qualified immunity is not available to officers

who operate with actual or constructive knowledge that their conduct violates clearly established constitutional rights.

**E. Spoliation of Evidence Warrants Adverse Inferences**

**1. Hallway Audio Recording — Destruction of Evidence**

On April 9, 2020 — the same day as the transfer — William Soler Justice submitted a written Resident Request Slip to Captain Scott J. Marshall requesting preservation of the audio recording of the hallway encounter. Plaintiff's Exhibit I. Captain Marshall acknowledged receipt. The recording has not been produced. Plaintiff is entitled to an adverse inference that the hallway audio recording, had it been preserved and produced, would have supported his account of the verbal encounter and contradicted Defendants' characterization of his conduct as dangerous or threatening. *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002).

**2. Recorded Telephone Calls — Failure to Preserve and Produce**

NHDC routinely records telephone calls made by inmates and patients. Plaintiff is entitled to an adverse inference that recorded telephone calls made during the April 9–24, 2020 period, had they been preserved and produced, would have corroborated his account of the conditions of his confinement and the events leading to and following the transfer.

**F. Expert Witness Aubrey Land's Opinions Preclude Summary Judgment**

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), expert testimony is admissible where the expert is qualified, the methodology is reliable, and the testimony is relevant. Aubrey Land's five opinions satisfy each criterion. Land's opinions directly address: (1) the clinical standard of care applicable to civilly committed SPU patients; (2) the adequacy of the transfer

process as measured against that standard; (3) the impact of staffing shortages on minimum confinement conditions; (4) the role of corrections officers in the transfer decision as evidenced by DOC-000086; and (5) the punitive versus therapeutic character of the institutional response. Each opinion creates an independent genuine dispute of material fact precluding summary judgment.

## V. CONCLUSION

For the foregoing reasons, Plaintiff William Soler Justice respectfully requests that this Court deny Defendants' Motion for Summary Judgment in its entirety and set this matter for trial.

Respectfully submitted,

Dated: August 21, 2026

__________________________________________

Wanda Duryea, Guardian of William Soler Justice

Farmington, New Hampshire

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2026, a copy of the foregoing Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment was served on all counsel of record via the Court's CM/ECF system.

Dated: August 28, 2026

___/s/Wanda Duryea__________________________

Wanda Duryea

Farmington, New Hampshire