**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| **WILLIAM SOLER JUSTICE, Plaintiff, v. AARON BELANGER and ERIC BARBARO, Defendants.** | **Civil Action No. 23-cv-00308-SE-AJ** |

# PLAINTIFF'S EXHIBIT A

---

**N.H. Advisory Committee to the U.S. Commission on Civil Rights**

***Solitary Confinement in New Hampshire***

April 27, 2021

**Re:** Secure Psychiatric Unit as “a highly controlled, solitary-confinement environment, where security concerns must take precedent to clinical decisions”; Recommendation to Transfer SPU Oversight to DHHS

*(United States Government Publication — Public Domain — Reproduced in Relevant Part)*

**Authentication:** *See* Preliminary Statement § A; Declaration of Wanda Duryea, ¶ 3

---

***NOTE ON SIGNIFICANCE***

---

*This report was adopted unanimously by the New Hampshire Advisory Committee to the U.S. Commission on Civil Rights on February 8, 2021, and published on April 27, 2021. It was*

*authored based on public hearings held July 20, 2020; August 17, 2020; September 21, 2020; and December 9, 2020 — during the period of William Soler Justice's confinement on E Ward following his April 9, 2020 transfer.*

*The report is relevant to the instant case for three independent reasons: (1) it provides the legal and institutional standard against which Defendants' conduct on April 9, 2020 is measured; (2) it corroborates Plaintiff's account of SPU conditions including isolation, shower access, and lack of clinical independence; and (3) it documents that the problems Plaintiff experienced — security decisions overriding clinical judgment, absence of DHHS oversight, and the punitive character of the SPU — were not isolated incidents but recognized statewide civil rights failures that had been publicly documented by a federal civil rights body.*

***NOTABLE:*** *Wanda Duryea — who served as William Soler Justice's patient advocate during the April 9, 2020 events and is the declarant in this case — is cited in footnote 6 of this very report for her Concord Monitor op-ed co-authored with Beatrice Coulter, RN: "Our Turn: It's Time to Bring Transparency to the Department of Corrections," Concord Monitor, July 4, 2020.*

---

**REPORT IDENTIFICATION**

| | |
|---|---|
| **Full Title:** | ***Solitary Confinement in New Hampshire*** |
| Issuing Body: | New Hampshire Advisory Committee to the U.S. Commission on Civil Rights |
| Date Adopted: | February 8, 2021 (unanimous vote) |
| Date Published: | April 27, 2021 |
| Committee Chair: | JerriAnne E. Boggis, Portsmouth |
| Committee Vice Chair: | Barbara J. Jago, Bedford |
| Project Leader: | Jason P. Sorens, Hanover |
| Intern: | Caitlin Mello (Commission intern, project leadership) |
| Public Hearings: | July 20, 2020; August 17, 2020; September 21, 2020; December 9, 2020 |
| Legal Basis: | 45 C.F.R. § 703.3; 42 U.S.C. § 1975(a) |

| **Full Title:** | ***Solitary Confinement in New Hampshire*** |
|---|---|
| Publication Status: | United States Government publication — public domain under 17 U.S.C. § 105 |

Commissioner Helen Hanks, Commissioner of the New Hampshire Department of Corrections, is specifically recognized in the report's Acknowledgements section for "the volume of information she provided to the Committee, and her responsiveness to the Committee's questions on this topic."

## PART II

## KEY FINDING — THE SPU AS A SOLITARY-CONFINEMENT ENVIRONMENT

Report p. 7 — Section: Policies for Solitary Confinement in New Hampshire: Secure Psychiatric Unit (SPU)

— Verbatim Reproduction —

The following passage is reproduced verbatim from the report (p. 7):

"The Secure Psychiatric Unit has been the subject of multiple lawsuits and consent decrees. At present, the facility, which houses the civilly committed, those found not guilty by reason of insanity, and convicted inmates being treated for serious mental illness, is under the jurisdiction of the New Hampshire Department of Corrections rather than the New Hampshire Department of Health and Human Services and is not accredited for mental health services. The problem of the jurisdiction transfer has been highlighted by numerous social service professionals over the last forty years, when the psychiatric unit was first moved to the New Hampshire State Prison for Men in Concord. Top state officials, including the Commissioner of Corrections, favor moving the

Secure Psychiatric Unit to the New Hampshire Department of Health and Human Services and seeking accreditation from the medical board.

There are also numerous inconveniences associated with housing psychiatric patients in the same building with correctional inmates, including, as already mentioned, disruptions to visitation and to proper administration of medicines. Moreover, the Secure Psychiatric Unit is a highly controlled, solitary-confinement environment, where security concerns must take precedent to clinical decisions. The presence of correctional officers, who are trained to work with individuals who are incarcerated, could be dehumanizing to those seeking mental health services. This setting may not be suitable for most patients."

*N.H. Advisory Committee to the U.S. Commission on Civil Rights, Solitary Confinement in New Hampshire, at 7 (Apr. 27, 2021).*

## PART III

## KEY FINDING — CIVILLY COMMITTED INDIVIDUALS IN A SOLITARY-CONFINEMENT SETTING

Report p. 10 — Section: Civil Rights Implications: Disability Status

The following passage is reproduced verbatim from the report (p. 10):

"Solitary confinement has a particularly negative effect on those suffering from mental health disabilities. Since the Secure Psychiatric Unit is housed on the same campus as the correctional facilities and its patients are considered 'medically segregated,' New Hampshire practices a form of solitary confinement on psychiatric patients. This practice seriously implicates federal civil rights provisions on discrimination on the basis of mental health disability."

*N.H. Advisory Committee to the U.S. Commission on Civil Rights, Solitary Confinement in New Hampshire, at 10 (Apr. 27, 2021).*

## PART IV

## KEY FINDING — DUE PROCESS IMPLICATIONS

Report p. 11 — Section: Civil Rights Implications: U.S. and New Hampshire Constitutions

The following passage is reproduced verbatim from the report (p. 11):

"The U.S. Constitution also highlights the right to due process in the Fifth and Fourteenth Amendments. Within the Secure Psychiatric Unit, civilly committed individuals are placed in a carceral setting and cared for by a combination of psychiatrists and correctional officers. This has implications to their rights to due process, as their actions do not warrant punishment, but instead these individuals require mental health assistance."

*N.H. Advisory Committee to the U.S. Commission on Civil Rights, Solitary Confinement in New Hampshire, at 11 (Apr. 27, 2021).*

## PART V

## KEY FINDING — AMERICANS WITH DISABILITIES ACT IMPLICATIONS

Report p. 11 — Section: Civil Rights Implications: Americans with Disabilities Act

The following passage is reproduced verbatim from the report (p. 11):

"New Hampshire is placing people [who] have never been charged or convicted with a crime, but who have a mental illness, and incarcerating them in the Secure Psychiatric Unit alongside sentenced prisoners."

*N.H. Advisory Committee to the U.S. Commission on Civil Rights, Solitary Confinement in New Hampshire, at 11 (Apr. 27, 2021) (quoting Cushing Testimony, July 2020 Briefing, p. 13).*

## PART VI

**KEY FINDING — ISOLATION CONDITIONS AT THE SPU**

Report pp. 24–25 — Section: The Civilly Committed in the Secure Psychiatric Unit

The following passages are reproduced verbatim from the report (pp. 24–25):

“Focusing specifically on solitary confinement use for the civilly committed, there are cases of isolation currently practiced at the Secure Psychiatric Unit. Individuals can be placed in isolation due to threatening or assaultive behavior or for threatening to harm oneself. These patients on restricted or observation status will remain in their cell for 22 hours a day.”

“‘Most people start on ATC [Acute Care Status] as soon as they arrive, regardless of where they are clinically.’ This means 22 hours in the cell before starting mental health treatment.”

“Unlike the prison system, there are no limits on how long an individual can be placed on observational or restricted status. [This] means laws regarding length of solitary confinement do not apply to those in the Secure Psychiatric Unit, despite the practice looking very similar across facilities.”

*N.H. Advisory Committee to the U.S. Commission on Civil Rights, Solitary Confinement in New Hampshire, at 24–25 (Apr. 27, 2021) (quoting Lockwood Testimony, August 2020 Briefing, pp. 14–15).*

**PART VII**

**KEY FINDING — SHOWER CONDITIONS AT THE SPU AND PRISON UNITS**

Report p. 7 — Section: Health Effects of Solitary Confinement: Physical Health

The following passage is reproduced verbatim from the report (p. 7):

“New Hampshire’s Secure Housing Unit allows inmates under administrative or punitive segregation one hour out of cell a day. The Committee heard testimony that inmates frequently go

without showering because the showering areas are dirty, small, and the heat cannot be controlled. Without adequate exercise, inmates' physical health can degrade during solitary confinement."

*N.H. Advisory Committee to the U.S. Commission on Civil Rights, Solitary Confinement in New Hampshire, at 7 (Apr. 27, 2021) (citing Lascaze Testimony, July 2020 Briefing, pp. 10–11).*

**Significance:** This finding independently corroborates Plaintiff's account of the shower deprivation conditions on H Ward and E Ward that preceded and followed his April 9, 2020 transfer, and corroborates SPU Administrator Robinson's April 16, 2020 admission in DOC-000013 that William's hunger strike "he said was related to not having cold water for a shower."

## PART VIII

## KEY FINDING — STAFFING ISSUES AND CLINICAL FAILURES AT THE SPU

Report p. 8 — Section: Policies for Solitary Confinement: Secure Psychiatric Unit

The following passage is reproduced verbatim from the report (p. 8):

"The Committee heard testimony that there are staffing issues at the Secure Psychiatric Unit. Psychiatric staff in the Secure Psychiatric Unit has been noted to misdiagnose obvious mental health symptoms in patients and cannot always maintain psychiatric medications that may be best practice. The current budget does not allow for sufficient or appropriate staffing."

*N.H. Advisory Committee to the U.S. Commission on Civil Rights, Solitary Confinement in New Hampshire, at 8 (Apr. 27, 2021) (citing Lockwood Testimony, August 2020 Briefing, p. 15; Coulter Statement, at 14–24).*

## PART IX

## KEY RECOMMENDATION — TRANSFER SPU OVERSIGHT FROM DOC TO DHHS

Report pp. 5, 12 — Executive Summary and Recommendations

The following recommendations are reproduced verbatim from the report (pp. 5, 12):

**Executive Summary (p. 5):**

"Recommendations include moving oversight of the Secure Psychiatric Unit from the Department of Corrections to the Department of Health and Human Services; appropriately funding accreditation and staffing efforts within state and local prisons and jails; and including funding for a new psychiatric care unit outside of the New Hampshire Prison for Men's campus."

**Recommendation 1(a) (p. 12):**

"The U.S. Commission on Civil Rights should send this report to the New Hampshire General Court and issue recommendations to:

a. Adopt and pass appropriate legislation to move oversight and authority of the Secure Psychiatric Unit from the Department of Corrections to the Department of Health and Human Services during this legislative term."

**Recommendation 1(e) (p. 12):**

"Adopt and pass appropriate legislation to fund an acute psychiatric hospital outside of the prison campus. In the interim, increase staffing levels in the Secure Psychiatric Unit to ensure better patient care."

**Recommendation 2(a) (p. 12):**

"The U.S. Commission on Civil Rights should issue the following recommendations to the New Hampshire State Governor:

a. Adopt and pass an appropriate budget to fund the development of an acute psychiatric hospital outside of the New Hampshire State Prison for Men campus."

*N.H. Advisory Committee to the U.S. Commission on Civil Rights, Solitary Confinement in New Hampshire, at 5, 12 (Apr. 27, 2021).*

## PART X

## RELEVANCE TO INSTANT CASE

*Justice v. Belanger*, No. 23-cv-00308-SE-AJ

1. **LEGAL STANDARD — SECURITY OVERRIDING CLINICAL JUDGMENT:** The Committee's finding that the SPU is "a highly controlled, solitary-confinement environment, where security concerns must take precedent to clinical decisions" directly corroborates Plaintiff's central argument: that his April 9, 2020 transfer from H Ward to E Ward was a corrections decision, not a clinical one. DOC-000086 — Nurse Clayman's 10:55 AM email — confirms this sequence in real time: corrections officers announced the transfer; the psychiatrist had to be asked to conduct a clinical evaluation afterward.
2. **ISOLATION CONDITIONS CORROBORATED:** The Committee's documented findings — 22-hour lockdown on Acute Care Status, no time limits on restriction, shower access dependent on staffing — directly corroborate Plaintiff's account of conditions during his April 9–24, 2020 confinement on E Ward and F Ward, and corroborate his June 3, 2020 letter to Probate Judge Moran describing "23 hrs. a day lockdown" and "Involuntary Seclusion" (Exhibit K).
3. **SHOWER DEPRIVATION CORROBORATED:** The Committee's finding that "inmates frequently go without showering because the showering areas are dirty, small, and the heat cannot be controlled" directly corroborates Plaintiff's shower protest and hunger strike, and corroborates Robinson's April 16, 2020 admission in DOC-000013 that the hunger strike was related to cold water in the showers.
4. **INSTITUTIONAL NOTICE:** This report was based on testimony gathered in July through December 2020 — during Plaintiff's confinement. The institutional failures it documents were not unknown to Defendants at the time of the April 9, 2020 transfer; they were the subject of active federal civil rights scrutiny contemporaneous with the events of this case.

5. **WANDA DURYEA'S ADVOCACY:** The report cites Wanda Duryea's co-authored *Concord Monitor* op-ed (July 4, 2020) in footnote 6. This confirms that Duryea's public advocacy for transparency at the SPU was active during the period of the phone surveillance operation documented in Exhibit O — and that her advocacy was directed at the same institutional failures this federal civil rights body later found and documented.

---

**Authentication:** *See* Preliminary Statement § A; Declaration of Wanda Duryea, ¶ 3.

**Source:** N.H. Advisory Committee to the U.S. Commission on Civil Rights, *Solitary Confinement in New Hampshire* (Apr. 27, 2021) (United States Government publication — public domain).

# Solitary Confinement in New Hampshire

A Report of the
New Hampshire Advisory Committee to the
U.S. Commission on Civil Rights

April 2021

### Advisory Committees to the U.S. Commission on Civil Rights

By law, the U.S. Commission on Civil Rights has established an advisory committee in each of the 50 states and the District of Columbia. The committees are composed of state citizens who serve without compensation. The committees advise the Commission of civil rights issues in their states that are within the Commission's jurisdiction. More specifically, they are authorized to advise the Commission in writing of any knowledge or information they have of any alleged deprivation of voting rights and alleged discrimination based on race, color, religion, sex, age, disability, national origin, or in the administration of justice; advise the Commission on matters of their state's concern in the preparation of Commission reports to the President and the Congress; receive reports, suggestions, and recommendations from individuals, public officials, and representatives of public and private organizations to committee inquiries; forward advice and recommendations to the Commission, as requested; and observe any open hearing or conference conducted by the Commission in their states.

### Acknowledgements

The New Hampshire Advisory Committee (Committee) thanks each of the speakers who presented to the Committee during their public meetings in connection with this topic and shared their personal stories and experiences. The Committee particularly recognizes New Hampshire Department of Corrections Commissioner Helen Hanks for the volume of information she provided to the Committee, and her responsiveness to the Committee's questions on this topic. The Committee is also grateful to members of the public who spoke during the selected periods of public comment, and those who shared testimony in writing. The Committee appreciates and recognizes the work of Commission intern Caitlin Mello for her leadership and work on this project. The Committee calls attention to the work of Rogers J. Johnson, a devoted Committee member and dedicated civil rights leader for the state of New Hampshire. While he unfortunately passed away before this report was published, the Committee thanks him for his attention to and participation in the Committee's hearings on this topic.

**New Hampshire Advisory Committee to the U.S. Commission on Civil Rights**

This report details civil rights concerns the New Hampshire Advisory Committee to the U.S. Commission on Civil Rights examined regarding solitary confinement in New Hampshire. The Committee submits this report as part of its responsibility to study and report on civil rights issues in the state. The contents of this report are primarily based on testimony the Committee heard during virtual public meetings held on July 20, 2020; August 17, 2020; September 21, 2020; and December 9, 2020. The Committee also reviewed related testimony submitted in writing during the relevant period of public comment.

The report begins with a brief background of the Committee's proposed project, followed by a summary of the testimony the Committee received on this topic. It then identifies primary findings as they emerged from this testimony. Finally, it makes recommendations for addressing related civil rights concerns. While other important topics may have surfaced throughout the Committee's inquiry, matters that are outside the scope of this specific civil rights mandate are left for another discussion.

**New Hampshire Advisory Committee to the U.S. Commission on Civil Rights**

JerriAnne E. Boggis, *Chair,* Portsmouth

Barbara J. Jago, *Vice Chair,* Bedford

Katherine L. Brown, Dover

Joshua C. Elliott-Traficante (recused), Concord

Mahboubul Hassan, Manchester

Seth J. Hipple, Concord

Maureen R. Manning, Manchester

Rafael Rojas, Jr., Hopkington

Rubi O. Simon, Hanover

Jason P. Sorens, Hanover, *Project Leader*

Alejandro J. Urrutia, Hudson

Jacquelyne K. Weatherspoon, Exeter

## TABLE OF CONTENTS

I. Executive Summary ....1
II. Introduction and Background ....10
III. Summary of Panel Testimony ....12
A. Overview of Solitary Confinement 14
1. Historical Context ....14
2. Defined Terms ....16
B. Rationale Behind Solitary Confinement 17
1. Disciplinary Rationale ....17
2. The Civilly Committed in the Secure Psychiatric Unit Operated by the New Hampshire Department of Corrections in Concord ....20
C. Current Context 26
1. Current Demographics of Populations in Segregation ....26
2. Prison Conditions During COVID-19 ....28
D. Impact of Solitary Confinement 29
1. Health ....29
a) Mental Health ....29
b) Physical Health ....34
2. Education and Training Opportunities ....34
E. Current Reform Efforts 36
1. Lawsuits ....36
2. Policy ....38
3. Accreditation ....42
4. Barriers to Reform ....44
F. Panelist Recommendations to Address Solitary Confinement 44
IV. Findings and Recommendations ....49
A. Findings 49
B. Recommendations 55
V. Appendix ....58

# I. EXECUTIVE SUMMARY

In February 2019, the New Hampshire Advisory Committee [Committee] to the U.S. Commission on Civil Rights voted to take up a proposal to study solitary confinement in New Hampshire. In common parlance, "punitive segregation" is often referred to as "solitary confinement," and the Committee sought to understand the civil rights implications of instances where incarcerated individuals are separated from the general prison population in restrictive housing, regardless of the specific terminology used. The Committee's study focused on solitary confinement use within the state, particularly the potential disparate treatment of individuals with mental health concerns and disabilities/conditions and people of color.[1] To better understand issues relating to solitary confinement generally, the Committee also invited speakers with related experience outside the state of New Hampshire to share their recommendations for consideration. The Committee's study was informed through testimony gathered at public briefings, and included discussion relating to solitary confinement use and its history in New Hampshire, the incarceration of those without criminal convictions, particularly those with mental health conditions who are incarcerated within the prison system's Secure Psychiatric Unit.

The Committee received panelist and written testimony urging policy makers to further study and address the use of solitary confinement in the New Hampshire Department of Corrections prisons and psychiatric units. Recommendations include moving oversight of the Secure Psychiatric Unit from the Department of Corrections to the Department of Health and Human Services; appropriately funding accreditation and staffing efforts within state and local prisons and jails; and including funding for a new psychiatric care unit outside of the New Hampshire Prison for Men's campus. Additional recommendations include seeking prison accreditations as well as medical care certifications to comply with industry standards; increasing the use of body cameras on correctional staff wherever possible; providing comprehensive mental health care and crisis training to all correctional staff; increasing data collection capabilities with specific demographic breakdowns of individual units to monitor for disparate treatment by race or mental health status; and ensuring that decisions to place individuals in solitary confinement are made primarily with regard to the safety of staff and individuals rather than as punishment that could better be addressed through reviewing behavioral industry practices. This report and the

---

[1] Under 45 C.F.R. § 703.3, the scope of the subject matter to be dealt with by Advisory Committees shall be those subjects of inquiry or study with which the Commission itself is authorized to investigate, pursuant to 42 U.S.C. 1975(a), which includes studying and reporting on discrimination or denials of equal protection of the laws based on disability status and race and color.

recommendations included within it were adopted unanimously by the Committee on February 8, 2021.

**Findings**

*Health Effects of Solitary Confinement as Practiced in New Hampshire: Mental Health*

Solitary confinement tends to have significant, adverse effects on the psychological well-being of inmates.[2] The fact that one inmate does not mind or may even seek out solitary confinement does not mean that another inmate does not suffer greatly from it. In general, younger inmates and those with pre-existing mental health disabilities suffer most from solitary confinement.[3] Longer periods of solitary confinement have more deleterious effects, with most experts recommending no more than two weeks without human contact at a time.[4] Solitary confinement rarely improves an inmate's behavior and does not rehabilitate.[5] At best, solitary confinement can be a temporary means of separating an abusive inmate from her or his victims.[6]

An inmate or civilly committed individual experiencing a mental health crisis be placed in solitary confinement in the New Hampshire's Secure Psychiatric Unit,[7] which is on the same campus as the prison. The Committee received testimony that some medications that may have been prescribed at the state hospital are not accessible when an individual enters the Secure Psychiatric Unit, as those medicines may be considered high value contraband that could be trafficked within the prison system.[8] While Commissioner Hanks shared that this is not the case,[9] panelists shared that it is important to remember that the Secure Psychiatric Unit is a treatment facility[10] and individuals should continue to have access to the medications they need.

The Committee heard testimony that receiving visitors can be more challenging within the Secure Psychiatric Unit because of the stringent security conditions.[11] Representative Cushing shared an

---

[2] Kapoor Testimony, *August 2020 Briefing*, p. 5

[3] Kapoor Testimony, *August 2020 Briefing*, pp. 7-8.

[4] Edwards Testimony, *July 2020 Briefing*, p. 8.

[5] Lascaze Testimony, *July 2020 Briefing*, pp. 12, 21, 23; Edwards Testimony, *July 2020 Briefing*, p. 9; Kapoor Testimony, *August 2020 Briefing*, p. 5.

[6] Lascaze Testimony, *July 2020 Briefing*, p. 24.

[7] Lockwood Response to Draft Report, at 2.

[8] Cushing Testimony, *July 2020 Briefing*, p. 19.

[9] Helen Hanks Response to Draft Report, at 4.

[10] Courtney Lockwood Response to Draft Report, at 2.

[11] Lockwood Testimony, *August 2020 Briefing*, p. 13; Cushing Testimony, *July 2020 Briefing*, p. 13; Coulter Statement, at 1.

example of a mother, who "could not go and visit her son until she passed a criminal background record check to see if she had a criminal record to go visit her son, her mentally ill son, who she had helped bring to the hospital."[12] It is important to consider whether there is appropriate visitor access to those receiving treatment at the Secure Psychiatric Unit.

*Health Effects of Solitary Confinement as Practiced in New Hampshire: Physical Health*

New Hampshire's Secure Housing Unit allows inmates under administrative or punitive segregation one hour out of cell a day.[13] The Committee heard testimony that inmates frequently go without showering because the showering areas are dirty, small, and the heat cannot be controlled.[14] Without adequate exercise, inmates' physical health can degrade during solitary confinement.

*Policies for Solitary Confinement in New Hampshire: Secure Psychiatric Unit (SPU)*

The Secure Psychiatric Unit has been the subject of multiple lawsuits and consent decrees.[15] At present, the facility, which houses the civilly committed, those found not guilty by reason of insanity, and convicted inmates being treated for serious mental illness, is under the jurisdiction of the New Hampshire Department of Corrections rather than the New Hampshire Department of Health and Human Services and is not accredited for mental health services.[16] The problem of the jurisdiction transfer has been highlighted by numerous social service professionals over the last forty years, when the psychiatric unit was first moved to the New Hampshire State Prison for Men in Concord. Top state officials, including the Commissioner of Corrections, favor moving the Secure Psychiatric Unit to the New Hampshire Department of Health and Human Services and seeking accreditation from the medical board.

There are also numerous inconveniences associated with housing psychiatric patients in the same building with correctional inmates, including, as already mentioned, disruptions to visitation and to proper administration of medicines.[17] Moreover, the Secure Psychiatric Unit is a highly controlled, solitary-confinement environment, where security concerns must take precedent to clinical decisions. The presence of correctional officers, who are trained to work with individuals

[12] Cushing Testimony, *July 2020 Briefing*, p. 19

[13] Lascaze Testimony, *July 2020 Briefing*, p. 10.

[14] Lascaze Testimony, July 2020 Briefing, pp. 10-11.

[15] *Laaman v. Helgemoe*, 437 F. Supp. 269 (D.N.H. 1977); Holliday et al v. Curry, New Hampshire Superior Court, Case No: 04-E-203.

[16] Coulter Statement, at 1; Hanks Testimony, *September 2020 Briefing*, p. 4.

[17] Cushing Testimony, *July 2020 Briefing*, p. 19; Lockwood Testimony, *August 2020 Briefing*, p. 19.

who are incarcerated, could be dehumanizing to those seeking mental health services. This setting may not be suitable for most patients.

The Committee heard testimony that there are staffing issues at the Secure Psychiatric Unit.[18] Psychiatric staff in the Secure Psychiatric Unit has been noted to misdiagnose obvious mental health symptoms in patients and cannot always maintain psychiatric medications that may be best practice.[19] The current budget does not allow for sufficient or appropriate staffing.[20]

*Policies for Solitary Confinement in New Hampshire: Prison System*

The Special Housing Unit is the solitary confinement system for the state men's prison. However, New Hampshire law does not use the term "solitary confinement," instead using the terms "administrative segregation,"[21] "medical segregation,"[22] and "punitive segregation,"[23] all of which can be grouped together under the term "restrictive housing"[24] for the purposes of this report. The Special Housing Unit can be used for all three purposes. Individuals transferring into the Special Housing Unit receive a mental health evaluation.[25] Those that are deemed unable to safely transfer into isolation are directed to mental health services, either through the voluntary Wellness Unit or Residential Treatment Unit or involuntary movement to the Secure Psychiatric Unit.[26]

Panelists highlighted that there is a one-day shift out of restrictive housing every two weeks, however; inmates can be cycled in and out of restrictive housing on that schedule indefinitely.[27] Some inmates have been in the restrictive housing system for months at a time.[28] Panelists shared that state law does not regulate the reasons for which an inmate can be put into punitive segregation, but it has often been imposed for possession of contraband or consumption of drugs.[29]

---

[18] Lockwood Testimony, *August 2020 Briefing*, p. 15.

[19] Coulter Statement, at 14-24.

[20] Lockwood Testimony, *August 2020 Briefing*, p. 15.

[21] N.H. Rev. Stat. Ann § 30-B:8.

[22] NH ADC COR 410.07

[23] NH ADC COR 101.23

[24] Kapoor Testimony, *August 2020 Briefing*, p. 4.

[25] Lockwood Response to Draft Report, at 2.

[26] Ibid.

[27] Lascaze Testimony, *July 20, 2020 Briefing*, pp. 21-22.; Hanks Testimony, *September 2020 Briefing*, p. 4.

[28] Lascaze Testimony, *July 20, 2020 Briefing*, pp. 21-22.

[29] Ibid., 21.

New Hampshire state prisons are not currently accredited by any national accrediting organizations, as funding towards preserving accreditation was redirected towards preserving employees in the early 2010s.[30] Representative Cushing shared that there are goals to seek accreditation in the near future.[31]

Although solitary confinement is sometimes warranted for the safety of inmates and staff,[32] correctional staff can possess a punitive mindset towards isolating prisoners, which, unchecked, can result in subjective and targeted decisions towards moving an inmate in to solitary confinement.[33] When correctional staff develops positive relationships with individuals in prison, it can have significant rehabilitative effects.[34]

*Policies for Solitary Confinement in New Hampshire: County Jails*

Each county jail sets its own policies for restrictive housing, or "lock-ups," and report to County Commissioners instead of the State's Commissioner or Corrections.[35] In Rockingham County, lock-up may not be used for more than 30 days at a time, and there is a sliding scale of offenses for which punishments may be applied.[36] Lock-up is not used for the most minor offenses, such as sanitary violations or unsatisfactory work performance. However, it can be used for offenses such as gambling and possession or use of drugs.[37] The Rockingham jail is audited and certified by the National Commission on Correctional Healthcare, but the other nine county jails reportedly are not.[38] This certification pays extra attention to mental health standards and segregation use.[39]

*Civil Rights Implications of Solitary Confinement in New Hampshire: Disability Status*

---

[30] Hanks Testimony, *September 2020 Briefing*, p. 4; "Time In Prison: Community Safety and Opportunity for Change." The State of New Hampshire Department of Corrections, 2001. https://www.nh.gov/nhdoc/divisions/victim/documents/timeinprison.pdf; Rep. *Performance Audit Report November 2013*. The State of New Hampshire Department of Corrections, n.d; Hanks Testimony, *September 2020 Briefing*, p. 6.

[31] Cushing Testimony, *July 2020 Briefing*, p. 18.

[32] Hanks Testimony, *September 2020 Briefing*, p. 10.

[33] Lascaze Testimony*, July 2020 Briefing*, p. 23; Coulter Statement, at 1.

[34] Lascaze Testimony, *July 20, 2020 Briefing*, p. 23.

[35] N.H. Rev. Stat. § 30-B:4, II.

[36] Church Testimony, *December 2020 Briefing*, p. 9; Rockingham County Department of Corrections Policies and Procedures, pp. 20-21.

[37] Church Testimony, *December 2020 Briefing*, p. 9; Rockingham County Department of Corrections Policies and Procedures, pp. 20-21.

[38] Church Testimony, *December 2020 Briefing*, p. 5.

[39] Ibid., 6.

Solitary confinement has a particularly negative effect on those suffering from mental health disabilities.[40] Since the Secure Psychiatric Unit is housed on the same campus as the correctional facilities and its patients are considered 'medically segregated,' New Hampshire practices a form of solitary confinement on psychiatric patients.[41] This practice seriously implicates federal civil rights provisions on discrimination on the basis of mental health disability. [42]

*Civil Rights Implications of Solitary Confinement in New Hampshire: Race and Ethnicity*

In New Hampshire, racial and ethnic minorities are disproportionately represented within the prison system.[43] The demographic information shared by Commissioner Hanks and Joseph Lascaze stated that the percent of people of color in New Hampshire prisons varied from 14.55% - 14.92% in 2020.[44] This compares with 10.2% of the New Hampshire population being people of color according to the U.S. census in 2019.[45] As a result, there is the potential for solitary confinement to have a disparate impact on racial and ethnic minority inmates. At present, the state Department of Corrections does not collect race and ethnicity data specific to the Special Housing Unit.[46]

*Civil Rights Implications of Solitary Confinement in New Hampshire: U.S. and New Hampshire Constitutions*

Solitary confinement implicates the Eighth Amendment to the U.S. Constitution,[47] which prohibits cruel and unusual punishment, as well as Article 18 of the New Hampshire Constitution,[48] which requires punishments to be proportional to offenses and stipulates that the purpose of punishments is "to reform," and Article 33,[49] which bans excessive bail, fines, and cruel and unusual

---

[40] Kapoor Testimony, *August 2020 Briefing*, p. 4.

[41] Lockwood Testimony, *August 2020 Briefing*, p. 13-14, 18.

[42] Kapoor Testimony, *August 2020 Briefing*, p. 8; Coulter Statement, at 1; Lockwood Testimony, *August 2020 Briefing*, p. 13-14, 18.

[43] Kapoor Testimony, *August 2020 Briefing*, p. 4; Lascaze Testimony, *December 2020 Briefing*, p. 2.

[44] New Hampshire Department of Correction Population Summary, p. 1.

[45] "U.S. Census Bureau QuickFacts: New Hampshire." Census Bureau QuickFacts. United States Census Bureau, 2019. https://www.census.gov/quickfacts/fact/table/NH/HCN010212.

[46] Lascaze Testimony, *December 2020 Briefing*, p. 2.

[47] U.S. CONST. amend. VIII.

[48] N.H. CONST. art. 18.

[49] N.H. CONST. art. 33.

punishments. For context, internationally, segregation during incarceration has been limited as it has been interpreted as inhumane and degrading punishment.[50]

The U.S. Constitution also highlights the right to due process in the Fifth[51] and Fourteenth[52] Amendments. Within the Secure Psychiatric Unit, civilly committed individuals are placed in a carceral setting and cared for by a combination of psychiatrists and correctional officers.[53] This has implications to their rights to due process, as their actions do not warrant punishment, but instead these individuals require mental health assistance.

*Civil Rights Implications of Solitary Confinement in New Hampshire: Americans with Disabilities Act*

Title II of the Americans with Disabilities Act (ADA)[54] and Section 504 of the Rehabilitation Act of 1973 (Section 504)[55] are federal laws that protect people with disabilities, including people who are incarcerated, from discrimination on the basis of their disability including, mental health. Title II of the ADA prohibits discrimination against qualified individuals with disabilities in all programs, activities, and services of public entities. It applies to all state and local governments, their departments and agencies, and any other instrumentalities or special purpose districts of state or local governments. New Hampshire is placing people have never been charged or convicted with a crime, but who have a mental illness, and incarcerating them in the Secure Psychiatric Unit alongside sentenced prisoners."[56]

## Recommendations

Among their duties, advisory committees of the Commission are authorized to advise the Agency (1) concerning matters related to discrimination or a denial of equal protection of the laws under the Constitution and the effect of the laws and policies of the Federal Government with respect to equal protection of the laws, and (2) upon matters of mutual concern in the preparation of reports of the Commission to the President and the Congress.[57] In keeping with these responsibilities, and

---

[50] Vasiliades, Elizabeth. "Solitary Confinement and International Human Rights: Why the US prison system fails global standards." *Am. U. Int'l L. Rev.* 21 (2005): p. 94.

[51] U.S. CONST. amend. V.

[52] U.S. CONST. amend. XIV.

[53] Coulter Statement, at 1.

[54] Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, et seq.

[55] § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a).

[56] Cushing Testimony, *July 2020 Briefing*, p. 13.

[57] 45 C.F.R. § 703.2 (2018).

in light of the testimony heard on this topic, the New Hampshire Advisory Committee submits the following recommendations to the Commission.

1. The U.S. Commission on Civil Rights should send this report to the New Hampshire General Court and issue recommendations to:

    a. Adopt and pass appropriate legislation to move oversight and authority of the Secure Psychiatric Unit from the Department of Corrections to the Department of Health and Human Services during this legislative term.

    b. Adopt and pass appropriate legislation to develop research on solitary confinement effects and legislate the use accordingly.

    c. Adopt and pass appropriate legislation to fund accreditation efforts for New Hampshire state prison and county jails.

    d. Adopt and pass appropriate legislation to fund appropriate staffing levels within the New Hampshire Department of Corrections and county jails.

    e. Adopt and pass appropriate legislation to fund an acute psychiatric hospital outside of the prison campus. In the interim, increase staffing levels in the Secure Psychiatric Unit to ensure better patient care

    f. Codify in statute a prohibition on the use of solitary confinement on juveniles in any detention facility in the state.

2. The U.S. Commission on Civil Rights should issue the following recommendations to the New Hampshire State Governor:

    a. Adopt and pass an appropriate budget to fund the development of an acute psychiatric hospital outside of the New Hampshire State Prison for Men campus.

    b. Review data collection efforts with state and county jails to ensure that race, ethnicity, and disability status are collected for those in restricted housing to monitor for disproportionate treatment.

3. The U.S. Commission on Civil Rights should send this report to the Commissioner of the New Hampshire Department of Corrections and issue the following recommendations to:

    a. Continue seeking appropriate accreditations for prison practices and seek medical care certification within a prison setting.

    b. Increase use of body cameras on correctional staff at state prisons and county jails.

    c. Increase behavioral and mental health crisis training to all correctional staff.

d. Collect data on the race, ethnicity, and disability status of individuals in separate housing units as well as transfers from out of state facilities.

e. Revisit existing policies and procedures to ensure that those that fail a drug test are not placed in the Special Housing Unit punitively.

f. Develop mentorship programs for individuals in segregation with those that have left a prison setting, to encourage supportive relationships and behavioral change.

g. Consider alternatives to solitary confinement for those who fail mental health screenings.

h. Develop relationships with agencies focused on mental health practices and standards, such as NAMI, the New Hampshire National Alliance on Mental Illness, and the Bureau of Student Wellness.

i. Keep, and report to the public, a monthly tally of pretrial detainees and psychiatric patients transferred to the Secure Psychiatric Unit from the New Hampshire Hospital, county jails, and group homes.

## II. INTRODUCTION AND BACKGROUND

The U.S. Commission on Civil Rights (Commission) is an independent, bipartisan agency established by Congress and directed to study and collect information relating to discrimination or a denial of equal protection of the laws under the Constitution because of race, color, religion, sex, age, disability, national origin, or in the administration of justice. The Commission has established advisory committees in each of the 50 states and the District of Columbia. These Advisory Committees advise the Commission of civil rights issues in their states that are within the Commission's jurisdiction.

On February 28, 2019 the New Hampshire Advisory Committee (Committee) to the U.S. Commission on Civil Rights voted to take up a proposal to study solitary confinement in New Hampshire and related civil rights concerns. Several federal and state laws are implicated where disparities in solitary confinement use exist, including:

- The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution "prohibits states from discriminating in the treatment of people based on their race."[1]
- The Eighth Amendment to the U.S. Constitution "prohibits cruel or unusual punishment" when looking at the consequences of isolation for some individuals, especially those with prior mental health concerns.[2]
- Title II of the Americans with Disabilities Act states, "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[3]
- New Hampshire State Code indicates that New Hampshire allows the Commissioner of Corrections to "punish any convict guilty of insolence or ill language to any officer of the prisons or guilty of obstinate and refractory behavior by solitary imprisonment not more than 30 days at one time or by such other reasonable and effective modes of punishment and discipline as the Commissioner of Corrections may from time to time prescribe."[4]
- New Hampshire State Code indicates that within the Secure Psychiatric Unit, "rules pertaining to the population will be developed by the Commissioner of Corrections." These

[1] U.S. CONST. amend. XIV.

[2] U.S. CONST. amend. VIII.

[3] 42 U.S.C. § 12132.

[4] N.H. Rev. Stat. Ann. § 622:14; http://www.gencourt.state.nh.us/rsa/html/lx/622/622-mrg.htm

rules should "retain all individual rights unless safety or security measures necessitate further restriction."[5]

The New Hampshire Advisory Committee studied New Hampshire's compliance with these statutes regarding solitary confinement use and protected classes through inviting speakers with different perspectives to share remarks on this topic. Specifically, the Committee studied the effects of isolating an incarcerated person and the potential disparities in the use of solitary confinement based on race or disability. The Committee invited speakers to share testimony on this topic at public meetings and received written testimony on this topic from interested members of the public as well. The Committee chose to focus on this issue largely due to the growing awareness of potential negative impacts of solitary confinement within prison settings as well as local attention on the Secure Psychiatric Unit. [6]

An article in the Health and Human Rights in a Changing World journal highlights that long-term solitary confinement increases rates of self-harm and suicide among inmates.[7] Another article, by the Human Rights Defense Center, notes that the many prisoners develop mental health issues while in punitive segregation.[8] Finally, the Prison Legal News highlights that the effects of sensory deprivation on the human psyche also impact these isolated individuals.[9] The article continues to note that hallucinations, both visual and auditory, as well as psychotic behavior, paranoia, hypersensitivity to stimuli, and diminished impulse control are all well-documented side effects of extended stays in solitary confinement.[10]

Attitudes towards solitary confinement use across the globe have shifted in contemporary reflections on incarceration and torture.[11] Article 5 of the United Nations Declaration on Human Rights highlights that torture and cruel or degrading punishment should be prohibited.[12] The United Nations' Committee Against Torture stated, "[e]xcept in exceptional circumstances, such

---

[5] N.H. Rev. Stat. Ann. § 622:44; http://www.gencourt.state.nh.us/rsa/html/lx/622/622-mrg.htm

[6] Beatrice Coulter and Wanda Duryea. "Our Turn: It's Time to Bring Transparency to the Department of Corrections." Concord Monitor, July 4, 2020. https://www.concordmonitor.com/Corrections-and-transparency-35055669.

[7] Metzner, Jeffrey L., and Jamie Fellner. "Solitary confinement and mental illness in US prisons: A challenge for medical ethics." *Health Hum. Rights Chang. World* 1 (2013): p. 316.

[8] Ibid.

[9] Clarke, Matthew. "Segregation Rate and Segregated Prisoner Suicide Rate High in Texas," January 7, 2016.Prison Legal News. https://www.prisonlegalnews.org/news/2016/jan/7/segregation-rate-and-segregated-prisoner-suicide-rate-high-texas/.

[10] Ibid.

[11] Assembly, UN General. "Torture and other cruel, inhuman or degrading treatment or punishment: Note by the Secretary-General." *Vienna: UNGA http://solitaryconfinement. org/uploads/SpecRapTortureAug2011.pdf* (2011).

[12] Assembly, UN General. "Universal declaration of human rights." *UN General Assembly* 302, no. 2 (1948). p. 3.

as when the safety of persons or property is involved, the Committee Against Torture has recommended that the use of solitary confinement be abolished, particularly during pre-trial detention, or at least that it should be strictly and specifically regulated by law (maximum duration, etc.) and exercised under judicial supervision."[13] For context, internationally, segregation during incarceration has been limited as it has been interpreted as inhumane and degrading punishment.[14] For example, the Council of Europe's European Committee for the Prevention of Torture highlighted that, "[s]olitary confinement can, in certain circumstances, amount to inhumane and degrading treatment; in any event, all forms of solitary confinement should be as short as possible."[15] The United States has begun to inspect their use of solitary confinement as well, following high profile cases such as Kalief Browder[16] and Albert Woodfox,[17] but more research must be done.

Research on restrictive housing in the United States is limited due to the challenges of investigating the practices on a large scale because of limited research infrastructure within carceral settings.[18] Without this research, the National Institute of Justice shared "[It is impossible] to state with confidence the need for such housing, its effects on inmates or prison systems, or its cost-efficiency."[19] It is in this context that the Committee proposed to examine solitary confinement in New Hampshire.

## III. SUMMARY OF PANEL TESTIMONY

The virtual public meetings (briefings) held on July 20, 2020; August 17, 2020; September 21, 2020; and December 9, 2020 included testimony from medical professionals, researchers, corrections officials, advocates, individuals that were formerly incarcerated, and other relevant stakeholders. Written testimony provided in connection with the Committee's briefings has also been included within the Committee's summary of testimony received. The Committee received testimony from the following individuals:

---

[13] Assembly, UN General. "Torture and other cruel, inhuman or degrading treatment or punishment: Note by the Secretary-General." *Vienna: UNGA http://solitaryconfinement. org/uploads/SpecRapTortureAug2011. pdf* (2011).

[14] Vasiliades, Elizabeth. "Solitary Confinement and International Human Rights: Why the US prison system fails global standards." *Am. U. Int'l L. Rev.* 21 (2005): p. 94.

[15] de Europa, Consejo. "2nd General Report on the CPT's activities covering the period 1 January to 31 December 1991 CPT/Inf (92) 3 [EN]." (1992).

[16] Gonnerman, Jennifer. "Before the law." *The New Yorker* 6 (2014): 26-32.

[17] Woodfox, Albert. *Solitary: Unbroken by Four Decades in Solitary Confinement. My Story of Transformation and Hope*. Text Publishing, 2019.

[18] Garcia, Marie. *Restrictive housing in the US: Issues, challenges, and future directions*. US Department of Justice, Office of Justice Programs, National Institute of Justice, 2016. pp. 282-284.

[19] Ibid., 284.

*Invited Speakers*

**Dr. Valda Crowder** For the past 30 years, Dr. Crowder has been a board certified emergency medicine physician and legal medical expert. She worked at the Arlington County Jail in Virginia as a medical director. The jail houses male and female inmates and she was responsible for the medical care and protocols for over 500 inmates.

**Thomas Edwards** Thomas Edwards is the Special Project Manager for the JC Flowers Foundation Circles of Support, which is a re-entry family engagement organization. They work with people coming home from incarceration. He was formerly incarcerated and spent over 90 days in solitary confinement at Rikers Island Correctional Facility in New York.

**Joseph Lascaze** Joseph Lascaze is the Smart Justice organizer for the American Civil Liberties Union of New Hampshire. He was incarcerated for over 13 years in the New Hampshire correctional system, with a considerable amount of that time in the Secure Housing Unit (SHU).

**Representative Renny Cushing** Representative Cushing is a state legislator representing Rockingham District 21. He is the chair of the Criminal Justice and Public Safety Committee in the New Hampshire State House. He also serves on the Coastal Risk and Hazards Commission, Coastal-Marine Natural Resources and Environmental Commission, New Hampshire State House Bicentennial Commission, National Conference of State Legislatures Law Criminal Justice & Public Safety Committee, and the Commission on Pretrial Detention, Pretrial Scheduling, and Pretrial Services.

**Dr. Reena Kapoor** Dr. Kapoor worked for three years as a psychiatrist within the Department of Corrections in Connecticut. Since leaving that position she has stayed active in prison reform legislative efforts in Pennsylvania, Illinois, Connecticut, and on a federal level. Currently she works as an Associate Professor of Psychiatry in the Law & Psychiatry Division of Yale School of Medicine. At Yale School of Medicine, she works as the Program Director for the Forensic Psychiatry Fellowship.

**Courtney Lockwood** Courtney Lockwood is an Intake Attorney at the Disability Rights Center – NH. She has spent time supporting prisoners with disabilities in New Hampshire’s Secure Psychiatric Unit, monitoring and investigating current systems as an advocate for individuals with disabilities.

**Commissioner Helen Hanks** Commissioner Hanks oversees all state prisons in New Hampshire (three total) as well as three transitional housing units under the Department of Corrections, one transitional work center, and probation and parole throughout the state. She has previously worked as a social worker in a men’s prison and managing the Division of Medical Forensic Services.

**Superintendent Stephen Church** Superintendent Church was the superintendent of the Rockingham County Department of Corrections in Brentwood, New Hampshire. He worked his

way up from a position as a corrections officer over thirty years and has served as chief of security, director of inmate classification, in staff development, and as department investigator, before becoming the Superintendent. He has also worked across New England on anti-gang initiatives within the correctional setting.

***Written Testimony***

**Beatrice Coulter, RN** Ms. Coulter is registered nurse with many years of experience in the treatment of individuals with serious mental illness. In 2015 she worked briefly in the Secure Psychiatric Unit located on the grounds of the NH State Prison for Men located in Concord, NH. She is a co-founder of Advocates for Ethical Mental Health Treatment.

## A. Overview of Solitary Confinement

### *1. Historical Context*

The Committee heard testimony on the history of the prison systems to better understand how solitary confinement began use in current correctional environments. Prison systems in the United States began as a form of punitive isolation.[20] Thomas Edwards, Special Projects Manager for Circles of Support at the JC Flowers Foundation, pointed to the original Pennsylvania prison system, run by Quakers.[21] Within this system, prisoners were kept in cells for 24 hours a day, to eat, sleep, exercise, and pray.[22] He shared that the idea was that prisoners would be left alone to repent on their own. [23] Mr. Edwards added that in a later Quaker System, prisoners could pray in groups, but remained in isolation otherwise.[24] This concept of isolation as a form of punishment carried on as prison systems evolved across the country.[25]

Within New Hampshire, there have been major moments in the state's history of incarceration that shape the current prison system. The Committee heard testimony that the Secure Psychiatric Unit, formerly under the New Hampshire Department of Health and Human Services, moved to the New

[20] Thomas Edwards, testimony, *Briefing Before the New Hampshire Advisory Committee to the U.S. Commission on Civil Rights, Online Briefing*, July 20, 2020, transcript, p. 8 (hereafter cited as *July 2020 Briefing*).

[21] Edwards Testimony, *July 2020 Briefing*, p. 8.

[22] Vasiliades, Elizabeth. "Solitary Confinement and International Human Rights: Why the US prison system fails global standards." *Am. U. Int'l L. Rev.* 21 (2005): 73.

[23] Edwards Testimony, *July 2020 Briefing*, p. 8.

[24] Ibid.

[25]Ibid.

Hampshire Department of Corrections in 1985.[26] The Secure Psychiatric Unit is the state's acute psychiatric facility utilized for individuals at higher risk of violence to the staff or community. [27] Helen Hanks, the Commissioner of Corrections in New Hampshire, mentioned a letter from a psychiatrist requesting that the change in administration not occur. She pointed out that, "in 1985 [they were] talking about the same issues we, the state of New Hampshire, [are] talking about in 2019."[28] Two court cases also played a major role in altering how prisons function in the state: the Laaman[29] and Holliday[30] cases. The Laaman case stated that there needed to be a minimum standard of care in all prisons, related to sanitation, physical facilities, segregation, isolation, food service, medical care, and mental healthcare classifications among other aspects of prison life.[31] The Holliday Court Order later addressed mental health access in prisons and solitary confinement.[32] Specifically, it established a minimum access to health care and mental health care for those in the Special Housing Unit and treatment in the Secure Psychiatric Unit.[33]

Finally, Representative Robert 'Renny' Cushing, Chair of the Criminal Justice and Public Safety Committee in the New Hampshire House of Representatives at the time of the Committee's briefing in 2020, shared that the state has attempted to reinvest in what he described as a "justice reinvestment process" since 2009.[34] This project focuses on rehabilitation instead of just confinement.[35] The goal, as stated by Representative Cushing, is, "to try to be smart on crime, as opposed to just being tough on crime."[36] The state passed a bill in 2010 that focuses on

---

[26] Helen Hanks, testimony, *Briefing Before the New Hampshire Advisory Committee to the U.S. Commission on Civil Rights, Online Briefing*, September 21, 2020, transcript, p. 8 (hereafter cited as *September 2020 Briefing*).; N.H. Rev. Stat. Ann. § 622:41; http://www.gencourt.state.nh.us/rsa/html/lx/622/622-mrg.htm

[27]Beatrice Coulter, *Written Statement for the July 2020 Briefing Before the New Hampshire Advisory Committee to the U.S. Commission on Civil Rights*, July 10, 2020, at 1 (hereafter cited as Coulter Statement).

[28] Hanks Testimony, *September 2020 Briefing*, p. 8.

[29] *Laaman v. Helgemoe*, 437 F. Supp. 269 (D.N.H. 1977).

[30] *Holliday et al v. Curry*, New Hampshire Superior Court, Case No: 04-E-203.

[31] *Laaman*, 437 F. Supp. 269.

[32] Reutter, David. "The Warehousing of New Hampshire's Mentally Ill." Prison Legal News, February 15, 2007. https://www.prisonlegalnews.org/news/2007/feb/15/the-warehousing-of-new-hampshires-mentally-ill/; Holliday et al v. Curry, New Hampshire Superior Court, Case No: 04-E-203.

[33] Reutter, David. "The Warehousing of New Hampshire's Mentally Ill." Prison Legal News, February 15, 2007. https://www.prisonlegalnews.org/news/2007/feb/15/the-warehousing-of-new-hampshires-mentally-ill/.

[34] Renny Cushing, testimony, *Briefing Before the New Hampshire Advisory Committee to the U.S. Commission on Civil Rights, Online Briefing*, July 20, 2020, transcript, p. 13 (hereafter cited as *July 2020 Briefing*).

[35] Cushing Testimony, *July 2020 Briefing*, p. 13.

[36] Ibid.

rehabilitation and ending the cycles of incarceration.[37] Speaking to the changes within the incarceration systems in New Hampshire since that time, Commissioner Hanks pointed to the 9% reduction in the total incarcerated population of New Hampshire over the last five years.[38] She highlighted that there were more than 2,700 individuals incarcerated in 2011, and as of the Committee's study, that number has decreased 2,206 incarcerated individuals in New Hampshire.[39]

### *2. Defined Terms*

While "solitary confinement" is a term often used by members of the public to refer to punitive isolation of incarcerated individuals, prison officials define this confinement use with the terms "administrative segregation," "punitive segregation," "disciplinary confinement," "special needs," "isolation," and/or "protective custody." [40] For the purposes of the Committee's study, "solitary confinement" or "isolation" is used to refer generally to the instances in which an incarcerated individual is separated and isolated from the general population, but the study uses the terms referenced by the panelists in their testimony for specific types of isolation while incarcerated. In the legal context, Courtney Lockwood, Staff Attorney for the Disability Rights Center in New Hampshire, shared that solitary confinement is seen as any time where an individual spends longer than 22 hours a day separated from the general population.[41] Ms. Lockwood pointed to the impact of solitary confinement which can occur whether an individual stays in that space for one day or for fifteen days.[42] Without a standard definition for solitary confinement, Dr. Reena Kapoor, Associate Professor of Psychiatry in the Law and Psychiatry Division at Yale University, stated that it becomes exponentially harder to study the impacts.[43] Since much research on the topic has occurred in labs, does not have control groups, and has the potential for significant bias, quality research was nonexistent for a long time.[44] She shared that within the last five to ten years, this has changed with higher quality studies finally coming out.[45]

---

[37] Cushing Testimony, *July 2020 Briefing*, p. 13; SB 500, Justice Reinvestment Act, NH General Court 2010 Sess. (Nh. 2010).

[38] Hanks Testimony, *September 2020 Briefing*, p. 9.

[39] Ibid.

[40] NH ADC COR 101.23; Kapoor Testimony, *August 2020 Briefing*, p. 4.

[41] Courtney Lockwood, testimony, *Briefing Before the New Hampshire Advisory Committee to the U.S. Commission on Civil Rights, Online Briefing*, August 17, 2020, transcript, p. 13 (hereafter cited as *August 2020 Briefing*).

[42] Lockwood Testimony, *August 2020 Briefing*, p. 13.

[43] Kapoor Testimony, *August 2020 Briefing*, p. 4.

[44] Ibid.

[45] Ibid.

Dr. Kapoor shared that disciplinary confinement in New Hampshire entails 23 hours a day spent in isolation.[46] Individuals will spend a week within disciplinary confinement where they are only receiving one hour outside of the cell. [47] Mr. Joseph Lascaze, a Smart Justice Organizer for the American Civil Liberties Union of New Hampshire, mentioned that this means full isolation, with no contact with others during this time. [48] This environment rapidly becomes negative, according to Mr. Lascaze, because, "[y]ou're on a tier with individuals who are in the exact same position as you. Coming out of your cell once a week is very problematic."[49]

Other phrases highlighted in testimony include the "Secure Housing Unit," also referred to as the "Special Housing Unit" by Commissioner Hanks,[50] and the "Restrictive Housing Unit."[51] Mr. Lascaze shared that individuals are sent to the Secure Housing Unit as a punitive measure, following a meeting with the disciplinary board.[52] Within county jails, the "Secure Housing Unit" is referred to as the "Restrictive Housing Unit."[53] Mr. Lascaze mentioned that Valley Street jail in New Hampshire utilizes "Restrictive Housing Unit" specifically.[54]

## B. Rationale Behind Solitary Confinement

### *1. Disciplinary Rationale*

The Committee heard testimony that frequently touched on the disciplinary rationale behind contemporary solitary confinement use. Both Dr. Kapoor and Mr. Edwards highlighted that there is a need to separate those who are violent and dangerous to others, but concerted reform efforts can help distinguish those who are a danger to others, and those who may need mental and/or behavioral health support. [55] Mr. Edwards believes that most individuals within isolation would

---

[46] Ibid.

[47] Joseph Lascaze, testimony, *Briefing Before the New Hampshire Advisory Committee to the U.S. Commission on Civil Rights, Online Briefing*, July 20, 2020, transcript, p. 10 (hereafter cited as *July 2020 Briefing*).

[48] Lascaze Testimony, *July 2020 Briefing*, p. 10.

[49] Ibid.

[50] Helen Hanks Response to Draft Report, at 1.

[51] Lascaze Testimony, *July 2020 Briefing*, p. 10.

[52] Ibid.

[53] Stephen Church, testimony, *Briefing Before the New Hampshire Advisory Committee to the U.S. Commission on Civil Rights, Online Briefing*, December 9, 2020, transcript, p. 4 (hereafter cited as *December 2020 Briefing*).

[54] Lascaze Testimony, *July 2020 Briefing*, p. 10.

[55] Kapoor Testimony, *August 2020 Briefing*, p. 10; Edwards Testimony, *July 2020 Briefing*, p. 21.

like to fix their behavioral challenges, leave solitary confinement, and address their mental health concerns.[56]

Dr. Kapoor shared the example of a high security prison in Connecticut that used prison segregation reform efforts to reduce those in long-term isolation from 600 to 16. [57] She recalled, "I remember having a discussion with our Commissioner of Correction about getting from 600 to 16 was actually fairly easy. It's getting from 16 to zero that's hard. And that's because you're left with some people who have done some really scary things. They've killed their cell mate, they have escaped or sort of caused major sort of attacks on correctional officers."[58]

While the Committee' focus on solitary confinement is restricted to New Hampshire, Mr. Edwards shared an experience while incarcerated in New York to highlight the different reasons that could be considered for placing an incarcerated individual in solitary confinement.

> What they did was fill those places up with people who had positive urine for drugs in prison. You have all these people with addiction problems put in solitary confinement. Once you get in there, if you get a first dirty urine, it might be 60 days. The next one might be four months. Then the next one may be a year. Instead of getting help, you get punished and you could be in SHU [Secure Housing Unit] with a 45 day sentence and end up spending another three months there for getting up late or for cursing at the officer. There's a number of ways that the officer could use that against you, just because he doesn't like you. Just because he had a rough day at home. SHU [Secure Housing Unit] is rarely the answer. The violent men in prison that need to be separated is a very small percentage, because most people want to get out and want some help. There's very little help, especially when you're dealing with disciplinary and mental health issues in New York State prison at least.[59]

Mr. Lascaze highlighted that the issues Mr. Edwards raised that can result from a corrections officer who has a "punitive mindset." [60] He stated the punitive reasoning in New York are also present specifically in New Hampshire, noting that he was sent to the "closed custody unit" in 2008 when his urine tested positive for marijuana, but his time was prolonged by 60 days for having toiletry items that were considered excessive property.[61]

---

[56] Edwards Testimony, *July 2020 Briefing*, p. 21.

[57] Kapoor Testimony, *August 2020 Briefing*, p. 10.

[58] Ibid.

[59] Edwards Testimony, *July 2020 Briefing*, p. 21.

[60] Lascaze Testimony, *July 20, 2020 Briefing*, p. 21.

[61] Ibid.

Speaking to current practices within the New Hampshire correctional system, Commissioner Hanks stated that restricted housing should focus on managing violent behavior by providing a brief intervention, with the goal of safety for all the individuals in prison in mind. [62]

Commissioner Hanks provided an example of the importance in maintaining space for segregation, stating that if a resident were to physically assault another resident, it would be exponentially more difficult to protect everyone involved without a separate unit.[63] Superintendent Stephen Church, of Rockingham County Jail, pointed to the policies and procedures of their county jail, that allow for isolation in cases of violence, gambling, or drug possession.[64] The Policies and Procedures document of this county jail, available in the appendix, does not allow for solitary confinement over minor infractions, such as sanitation concerns.[65]

Commissioner Hanks continued, noting that solutions without segregation could look like restraints for a long period of time in order to allow the staff time to investigate if an assault was related to mental health or security threat groups, such as gangs within correctional environments.[66] However, she shared that restraints over a long period of time are particularly dangerous.[67]

Commissioner Hanks cautioned against using the space for overflow, arbitrarily, or for long term use as the National Commission on Correctional Health Care has highlighted the danger for mental wellbeing.[68] She acknowledged that the segregation units can at times be used as a waiting space when prisons are particularly cramped.[69] This has become especially relevant during the COVID-19 pandemic, sharing, "[the segregation housing is] actually according to the Centers for Disease Control, structurally, the best units to single room individuals in quarantine for 14 days to help reduce any spread of the virus. That's been a common trend across corrections since March."[70]

---

[62] Hanks Testimony, *September 2020 Briefing*, p. 11.

[63] Hanks Testimony, *September 2020 Briefing*, p. 11.

[64] Church Testimony, *December 2020 Briefing*, p. 9; Rockingham County Department of Corrections Policies and Procedures, pp. 20-21.

[65] Rockingham County Department of Corrections Policies and Procedures, pp. 20-21.

[66] Hanks Testimony, *September 2020 Briefing*, pp. 10-11.

[67] Ibid.

[68] Hanks Testimony, *September 2020 Briefing*, p. 11; Metzner, Jeffrey L. "Mental health considerations for segregated inmates." *Standards for Health Services in Prisons. Chicago, National Commission on Correctional Healthcare* (2003).

[69] Hanks Testimony, *September 2020 Briefing*, p. 10.

[70] Ibid.

### *2. The Civilly Committed in the Secure Psychiatric Unit Operated by the New Hampshire Department of Corrections in Concord*

In the 1980's, the New Hampshire Legislature placed the Secure Psychiatric Unit under the administrative care of the Department of Corrections.[71] According to testimony from Representative Cushing, this transfer of authority was supposed to be until a new hospital could be constructed for acute cases of mental illness.[72] The Secure Psychiatric Unit was promised to be a national model for mental health care in the meantime and receive accreditation from the medical board. [73] It has not to this day according to testimony.[74]

In a written statement to the Committee, Beatrice Coulter, Registered Nurse and Cofounder of Advocates for Ethical Mental Health Treatment, shared that in practice, the Secure Psychiatric Unit transitioning to the Department of Corrections authority meant that civilly committed individuals in need of acute mental health care were transferred from the New Hampshire State Psychiatric Hospital to the New Hampshire State Prison for Men in Concord to comingle with incarcerated individuals also receiving psychiatric help.[75] Commissioner Hanks clarified that Civilly Committed patients are transferred to the Secure Psychiatric Unit through the Secure Psychiatric Unit's own separate entrance.[76] Ms. Lockwood shared with the Committee that this facility is reserved for individuals with mental illness that results in behaviors that require extra security.[77] The state hospital cannot provide those extra measures, so individuals are transferred to the Secure Psychiatric Unit. [78] She clarified that individuals with developmental disabilities are also committed to the Secure Psychiatric Unit under a different legal framework, but are subject to the same rules and policies of patients with mental illness.[79] Representative Cushing mentioned that this includes a transfer of jurisdiction from the Department of Health and Human Services to the Department of Corrections.[80] According to Ms. Coulter, civilly committed individuals that are impacted by this transfer include women, individuals with developmental disabilities, pre-trial detainees, folks designated incompetent to stand trial and those not guilty by reason of insanity.[81]

---

[71] N.H. Rev. Stat. Ann. § 622:41; http://www.gencourt.state.nh.us/rsa/html/lx/622/622-mrg.htm.

[72] Cushing Testimony, *July 2020 Briefing*, p. 19.

[73] Ibid.

[74] Ibid.

[75] Coulter Statement, at 1.

[76] Helen Hanks Response to Draft Report, at 2.

[77] Coulter Statement, at 1.

[78] Lockwood Testimony, *August 2020 Briefing*, p. 18.

[79] Lockwood Response to Draft Report, at 1.

[80] Cushing Testimony, *July 2020 Briefing*, p. 19.

[81] Coulter Statement, at 1.

Ms. Lockwood and Representative Cushing's testimonies confirmed this designation of individuals within the Secure Psychiatric Unit.[82] Ms. Coulter emphasized, "[i]ndividuals who had never committed a crime or had been sentenced by a court were now de facto inmates subject to the same rules and practices as inmates by the Department of Corrections."[83] However, Commissioner Hanks noted in a response to the Committee's draft that the Department of Corrections tracks patient admissions and more than 90% of those in the Secure Psychiatric Unit have a criminal history.[84]

Dr. Valda Crowder, a Senior Consultant for Capital Health Partners, Board Certified Emergency Medicine Physician and former Arlington County Virginia Jail Medical Director, explained the potential reasoning behind placing individuals within a prison setting from her experience in Virginia.[85] She highlighted that many individuals begin at an emergency department for the 72 hour mental illness hold.[86] At this point they have not committed a crime, but they are a harm to themselves or others.[87] Often times there are no beds in mental health facilities, which results in the hospital resigning for another 72 hours at the end of the first hold.[88] That can go on for four to six weeks before hospital administrations and the families of those individuals begin to feel pressure in finding a new bed in a mental health facility.[89] In order to find a bed in a mental health facility, at times that may mean looking towards the jail that has space. [90]

The Secure Psychiatric Unit in New Hampshire is located on the grounds of the New Hampshire State Prison for Men in Concord. According to Ms. Lockwood's testimony, the state considers this a health treatment facility despite being run by the Department of Corrections.[91] It contains a total of 66 beds, 10 for women and 50 for men, and 6 beds in the infirmary for either men or women.[92] The building is separate from the prison, but is located on the campus.[93] The entire facility only

---

[82] Lockwood Testimony, *August 2020 Briefing*, pp. 13-14; Cushing Testimony, *July 2020 Briefing*, p. 13.

[83] Coulter Statement, at 1.

[84] Helen Hanks Response to Draft Report, at 2.

[85] Crowder Testimony, *July 2020 Briefing*, p. 25.

[86] Ibid.

[87] Ibid.

[88] Ibid.

[89] Ibid.

[90] Ibid.

[91] Lockwood Testimony, *August 2020 Briefing*, p. 13.

[92] Ibid.

[93] Ibid.

contains single cell rooms and each ward has a day room which contains a TV and a phone.[94] Residents who are allowed to have their room unlocked have access to this day room.[95] Outside of the locked wards, individuals are able to utilize a small library, a weight room, an exercise room, and a visitor's room that also is utilized as a cafeteria.[96] Despite these recreational facilities, a majority of the time individuals remain in their locked ward and for some, locked in their cell.[97] There is also access to the outdoor spaces, as long as there is staffing available to supervise the residents.[98] They have two recreational decks outside that are fenced in for access to fresh air.[99] Visitors are allowed in the visitor's room if the individual they are visiting is not on a higher restriction.[100] Those on a higher restriction level are allowed visits through the no-contact booth which has a plate of glass between the visitor and resident.[101] They can communicate through a phone. [102] Those on the observation level of restriction are potentially not allowed visits unless it is with an attorney because they are a danger to themselves in Ms. Lockwood's estimate.[103] She expressed that many residents on observational supervision do not have relationships to people in the community so she cannot confirm whether they have those visitation privileges.[104]

The civil rights implications of the Secure Psychiatric Unit located in a prison were emphasized by many panelists in their remarks to the Committee.[105] Representative Cushing stated during his testimony, "I want to draw your attention to what I can see that to be an egregious situation in terms of civil rights that relates to the policy of the state of New Hampshire taking people who've never been convicted or charged with a crime, but have acute mental illness, and transferring them behind the state prison walls, into the secure psychiatric unit of the state prison, where they're commingled with sentenced prisoners."[106] He highlighted that instead of a treatment environment full of social workers and psychiatrists, these individuals are given prison numbers and supervised

---

[94] Ibid.

[95] Ibid.

[96] Ibid.

[97] Lockwood Testimony, *August 2020 Briefing*, p. 13.

[98] Ibid.

[99] Ibid.

[100] Ibid., 19.

[101] Ibid., 19.

[102] Ibid., 19.

[103] Ibid., 19.

[104] Ibid., 19.

[105] Cushing Testimony, *July 2020 Briefing*, p. 13; Coulter Statement, at 1.

[106] Cushing Testimony, *July 2020 Briefing*, p. 13.

by corrections officers. [107] Commissioner Hanks noted that the Department of Corrections does have dedicated licensed psychiatric providers and licensed social workers who work in the Secure Psychiatric Unit.[108]

According to Ms. Coulter, corrections officers have used pepper spray and tasers in an effort to maintain order within the unit. [109] Ms. Coulter also provided the Committee with an affidavit from Dr. Eric L. Brown regarding Secure Psychiatric Unit conditions.[110] Within the affidavit, Dr. Brown describes unethical mental health treatment through ending a prescribed medication and misinterpretations of the subsequent mental health symptoms.[111] Representative Cushing states that some medications that may have been prescribed at the state hospital are not accessible when an individual enters the Secure Psychiatric Unit.[112] This is due to those medicines being considered high value contraband that could be trafficked. [113]

Focusing specifically on solitary confinement use for the civilly committed, there are cases of isolation currently practiced at the Secure Psychiatric Unit.[114] Individuals can be placed in isolation due to threatening or assaultive behavior or for threatening to harm oneself.[115] These patients on restricted or observation status will remain in their cell for 22 hours a day. [116]

With regards to observation status, Ms. Lockwood recalled, "[a] person who is on suicide or safety watch can be on an observation level of one to one, which means a correctional officer is watching them 24/7 through their cell door. Or they can be on 15 minute or 30 minute checks, which means the officer walks by every 15-30 minutes and looks in to make sure they're okay. That means also that the light is on at all times."[117] Individuals can also be placed on observation level for potential violence against others or self-harm, that might not necessarily be related to suicidality. [118] She noted that this results in solitary confinement and loss of property.[119] The only reasons individuals

---

[107] Ibid.

[108] Helen Hanks Response to Draft Report, at 3.

[109] Coulter Statement, at 1.

[110] Ibid., 14-24.

[111] Ibid., 14-18.

[112] Cushing Testimony, *July 2020 Briefing*, p. 19.

[113] Ibid.

[114] Lockwood Testimony, *August 2020 Briefing*, p. 13.

[115] Ibid., 14.

[116] Ibid., 14.

[117] Ibid., 14.

[118] Lockwood Response to Draft Report, at 1.

[119] Ibid.

on observational status are allowed out of their cells is for showers or a mental health treatment appointment.[120] If staffing allows they may be able to go to a recreation deck outdoors alone and under supervision.[121] Ms. Lockwood also shared that those on observation are only allowed a small amount of property.[122] This is a clinical decision, but is based on the concern for suicide.[123] The result is individuals in full isolation remaining in their bare cell with only their clothes and blanket for close to 24 hours a day according to Ms. Lockwood.[124] She also shared that treatment providers frequently meet with individuals on observation in their cell or through the door.[125] Only psychiatric providers can make an exception to this rule.[126] Phone call access is severely limited if allowed at all.[127]

The other means for solitary confinement in practice in in the Secure Psychiatric Unit is on the highest restriction level.[128] Ms. Lockwood shared, "[m]ost people start on ATC [Acute Care Status] as soon as they arrive, regardless of where they are clinically."[129] This means 22 hours in the cell before starting mental health treatment.[130] Ms. Lockwood stated, "[y]ou get out once a day for a shower, although I have heard from talking to some residents that doesn't always happen, especially with the women."[131] This may be due to the need for supervision in the shower.[132] In order for a woman to be supervised in the shower, a female correctional officer must be available, which is not always the case.[133] Access to recreational facilities includes approximately an hour each day on the recreation deck outside dependent on staffing as well as an hour in the day room during the day.[134] Treatment provider meetings should be allowed within the day room and group

[120] Lockwood Testimony, *August 2020 Briefing*, p. 14.

[121] Ibid.

[122] Lockwood Testimony, *August 2020 Briefing*, p. 14.

[123] Ibid.

[124] Ibid.

[125] Ibid.

[126] Ibid.

[127] Ibid.

[128] Ibid.

[129] Ibid., 14-15.

[130] Ibid.

[131] Ibid., 14-15.

[132] Ibid., 15.

[133] Ibid., 15.

[134] Ibid., 15.

sessions are an option for patients according to Ms. Lockwood.[135] However, she stated, "I would say that the majority of people, or at least a large number of people on ATC [Acute Care Status] don't get to go to groups and aren't getting their two hours a day."[136] Since the day room contains a phone, those on the highest restriction level do have access when they need to make a call.[137]

Unlike the prison system, there are no limits on how long an individual can be placed on observational or restricted status.[138] Ms. Lockwood emphasized that this means laws regarding length of solitary confinement do not apply to those in the Secure Psychiatric Unit, despite the practice looking very similar across facilities.[139]

Representative Cushing shared an example from his constituency of the challenges with the Secure Psychiatric Unit location.[140] He spoke about a woman whose son was transferred to the Secure Psychiatric Unit from the state hospital.[141] She was a nurse and the individual's father was a law enforcement officer.[142] In order to visit their son, each parent had to complete a criminal background check.[143] This was particularly difficult because they brought their son to the state hospital for mental health assistance and now had to visit a prison despite no criminal wrongdoing.[144]

Referring to the challenges around leaving the Secure Psychiatric Unit, Ms. Coulter pointed out, "[t]he legal firewalls that exist between civil commitments and prison sentences are non-existent in New Hampshire."[145] She stated that to leave the Secure Psychiatric Unit and move to an acute, licensed psychiatric facility, individuals need a writ of habeas corpus.[146] Ms. Lockwood shared that a recent court decision could ensure the process to leave the Secure Psychiatric Unit will

---

[135] Ibid., 15.

[136] Lockwood Testimony, *August 2020 Briefing*, p. 15.

[137] Ibid.

[138] Ibid.

[139] Ibid.

[140] Cushing Testimony, *July 2020 Briefing*, p. 19.

[141] Ibid.

[142] Ibid.

[143] Ibid.

[144] Ibid.

[145]Coulter Statement, at 1.

[146] Ibid.

change to ensure due process.[147] There will be a clearer path in the future to transfer to another medical facility.[148]

## C. Current Context

### *1. Current Demographics of Populations in Segregation*

Incarcerated individuals in solitary confinement tend to be the most vulnerable members of a prison population according to Dr. Kapoor.[149] Speaking to general trends in the United States, she went on to share that the Department of Corrections statistics show that 10-15% of people in general population have severe mental illness, but many studies done on populations in solitary confinement show twice that percentage.[150] She highlighted that there is a higher prevalence of schizophrenia, bipolar disorder, impulsivity, and other personality pathology in solitary confinement populations. [151] Dr. Kapoor also shared that those with preexisting mental health concerns spend significantly longer in solitary confinement than those who don't have diagnoses.[152]

Age was also listed as a risk factor by panelists within current solitary confinement use. Dr. Kapoor stated that, "[t]he people that we place there tends to be younger, more cognitively limited with lower IQ."[153] The American Academy of Child and Adolescent Psychiatry along with other mental health professionals have agreed that adolescents should not live in restrictive housing besides extreme cases according to Dr. Kapoor. [154] She highlighted that this consensus comes from clinical experience rather than scientific studies due to the challenges in isolating solitary confinement as a risk factor.[155] There was one study referenced from 2014 that looked at minors in prison found a higher risk of suicide among participants, but they were unable to distinguish a statistically significant difference between those in solitary confinement and in general population. [156]

Dr. Kapoor briefly highlighted the disproportionate impact on people of color in solitary confinement across the United States. She said, "[the] same disparities that we've seen in our

---

[147] Lockwood Testimony, *August 2020 Briefing*, p. 18; *Heath v. Hanks*, 2019 D.N.H. 212 (D.N.H. 2019).

[148] Lockwood Testimony, *August 2020 Briefing*, p. 18; *Heath v. Hanks*, 2019 D.N.H. 212 (D.N.H. 2019).

[149] Kapoor Testimony, *August 2020 Briefing*, p. 4.

[150] Ibid.

[151] Ibid.

[152] Ibid.

[153] Ibid.

[154] Ibid., 7.

[155] Ibid., 8.

[156] Ibid., 7-8.

criminal justice system more broadly tend to get replicated in terms of who we place in solitary confinement in prison systems."[157] Mr. Lascaze and Commissioner Hanks shared demographic information specific to New Hampshire.[158] This information stated that the percent of people of color in New Hampshire prisons varied from 14.55% - 14.92% in 2020.[159] This compares with 10.2% of the New Hampshire population being people of color according to the U.S. census in 2019.[160] Mr. Lascaze stated that information specific to the Secure Housing Unit is not accessible at this time because prisons cannot pull inmate's specific unit information at the same time.[161] He mentioned that Commissioner Hanks recognizes the importance of including race and ethnicity data within solitary confinement units and is in the process of finding software or an individual that will be able to audit entire units at any time.[162] Restrictive housing levels are captured as seen in Figure 1, without reference to race or mental health status:[163]

---

[157] Ibid., 4.

[158] Joseph Lascaze, testimony, *Briefing Before the New Hampshire Advisory Committee to the U.S. Commission on Civil Rights, Online Briefing*, December 9, 2020, transcript, p. 2 (hereafter cited as *December 2020 Briefing*); Helen Hanks, Commissioner, Department of Corrections in New Hampshire, Written Statement for the December 2020 Briefing before the New Hampshire Advisory Committee to the U.S. Commission on Civil Rights, 11/30/2020, at 4 (hereinafter Hanks Statement).

[159] New Hampshire Department of Correction Population Summary, p. 1.

[160] "U.S. Census Bureau QuickFacts: New Hampshire." Census Bureau QuickFacts. United States Census Bureau, 2019. https://www.census.gov/quickfacts/fact/table/NH/HCN010212.

[161] Lascaze Testimony, *December 2020 Briefing*, p. 2.

[162] Ibid.

[163] Helen Hanks Response to Questions for the December 2020 Briefing, at 4-5.

**NH DOC Monthly Facility Demographics Summary Report - Male and Female**

| RACE | Dec 1 2019 | Jan 1 2020 | Feb 1 2020 | Mar 1 2020 | Apr 1 2020 | May 1 2020 | Jun 1 2020 | Jul 1 2020 | Aug 1 2020 | Sep 1 2020 | Oct 1 2020 | Nov 1 2020 | Dec 1 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| American Indian or Alaska Native | 10 | 10 | 10 | 9 | 8 | 8 | 7 | 7 | 7 | 8 | 8 | 9 | 8 |
| Asian | 8 | 8 | 7 | 8 | 7 | 6 | 6 | 5 | 6 | 5 | 5 | 5 | 5 |
| Asian-Hispanic | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Black or African American | 174 | 169 | 173 | 175 | 172 | 167 | 161 | 160 | 160 | 166 | 161 | 163 | 165 |
| Black or African American-Hispanic | 12 | 12 | 12 | 12 | 12 | 12 | 11 | 10 | 9 | 9 | 9 | 8 | 8 |
| Other | 33 | 34 | 36 | 37 | 36 | 35 | 35 | 38 | 38 | 39 | 38 | 40 | 39 |
| Other-Hispanic | 93 | 96 | 97 | 96 | 90 | 89 | 87 | 85 | 84 | 81 | 78 | 75 | 74 |
| Unknown | 43 | 44 | 43 | 41 | 40 | 38 | 32 | 33 | 33 | 34 | 33 | 35 | 36 |
| Unknown-Hispanic | 10 | 10 | 11 | 11 | 11 | 11 | 11 | 9 | 9 | 11 | 11 | 11 | 12 |
| White | 2,193 | 2,194 | 2,193 | 2,192 | 2,168 | 2,107 | 2,056 | 2,040 | 2,013 | 1,989 | 1,989 | 1,969 | 1,932 |
| White-Hispanic | 43 | 44 | 43 | 43 | 41 | 39 | 38 | 38 | 39 | 36 | 36 | 35 | 33 |
| **Total NH Sentenced** | **2,620** | **2,622** | **2,626** | **2,625** | **2,586** | **2,513** | **2,445** | **2,426** | **2,399** | **2,379** | **2,369** | **2,351** | **2,313** |
| **CLASSIFICATION LEVEL** | **Dec 1 2019** | **Jan 1 2020** | **Feb 1 2020** | **Mar 1 2020** | **Apr 1 2020** | **May 1 2020** | **Jun 1 2020** | **Jul 1 2020** | **Aug 1 2020** | **Sep 1 2020** | **Oct 1 2020** | **Nov 1 2020** | **Dec 1 2020** |
| Maximum | 59 | 59 | 60 | 61 | 53 | 47 | 48 | 45 | 42 | 40 | 43 | 45 | 41 |
| Maximum-PV | 12 | 11 | 8 | 10 | 7 | 9 | 8 | 8 | 8 | 7 | 10 | 9 | 9 |
| Close | 188 | 180 | 198 | 191 | 170 | 168 | 149 | 156 | 143 | 143 | 149 | 158 | 150 |
| Close-PV | 18 | 20 | 28 | 34 | 29 | 27 | 29 | 23 | 19 | 17 | 18 | 25 | 25 |
| Medium | 1,507 | 1,489 | 1,463 | 1,471 | 1,475 | 1,436 | 1,423 | 1,390 | 1,386 | 1,387 | 1,358 | 1,370 | 1,355 |
| Medium-PV | 257 | 263 | 269 | 257 | 253 | 234 | 191 | 197 | 216 | 224 | 227 | 225 | 234 |
| Minimum | 265 | 266 | 253 | 268 | 290 | 286 | 280 | 279 | 263 | 256 | 243 | 215 | 225 |
| Minimum-PV | 3 | 2 | 3 | 1 | 2 | 4 | 0 | 1 | 0 | 1 | 5 | 3 | 3 |
| Community | 166 | 180 | 186 | 174 | 165 | 161 | 178 | 178 | 174 | 163 | 162 | 156 | 127 |
| Unclassified | 4 | 4 | 8 | 4 | 4 | 2 | 2 | 2 | 2 | 2 | 2 | 3 | 3 |
| Unknown | 141 | 148 | 150 | 154 | 138 | 139 | 137 | 147 | 146 | 139 | 152 | 142 | 141 |
| **Total NH Sentenced** | **2,620** | **2,622** | **2,626** | **2,625** | **2,586** | **2,513** | **2,445** | **2,426** | **2,399** | **2,379** | **2,369** | **2,351** | **2,313** |

**Source: Department of Corrections Current Population Summary**

**Figure 1**

Mr. Lascaze mentioned that in his experience, the population of people of color 'ebbs and flows' in the Secure Housing Unit.[164] He emphasized that this experience was before Commissioner Hanks took her position, in 2019, and she has worked to change this practice through her role as Commissioner.[165]

### *2. Prison Conditions During COVID-19*

The Committee proposed to study solitary confinement in February 2019 but heard testimony from panelists shortly after Covid-19 began impacting the U.S. population generally. Speaking to her experience in Virginia, Dr. Valda Crowder, former Arlington County Jail Medical Director, offered her recommendations for safer incarceration practices that the Committee might consider in New Hampshire.[166] This includes paying attention to the high rate at which Covid-19 spreads

---

[164] Lascaze Testimony, *December 2020 Briefing*, p. 3.

[165] Ibid.

[166] Crowder Testimony, *July 2020 Briefing*, pp. 6-7.

in institutionalized settings and revisiting mask and safety protocols.[167] Dr. Crowder highlighted that correctional medical staff are often not prepared for a pandemic because most are not trained in intensive care, and since infected patients can shift from normal to critical in such a short period of time it is vital to train the staff to recognize early warning signs.[168] According to Dr. Crowder, there must be immediate training of correctional staff and medical personnel for COVID-19 detection and emergency procedures.[169] When isolating people for Covid-19, Dr. Crowder emphasized that it should not look like solitary confinement. According to her, solitary confinement cannot protect airborne spread of the disease, so those testing positive must be located in a separate facility where heating, ventilation, and air conditioning systems are unconnected. [170]

## D. Impact of Solitary Confinement

### *1. Health*

#### *a) Mental Health*

One of the major themes discussed during testimony was the idea that solitary confinement is not the most effective means for behavioral change.[171] Mr. Edwards and Mr. Lascaze both highlighted from their experiences that the environment in isolation feels punitive.[172] Mr. Edwards specifically referenced the separation from staff and mental health services as a major factor in preventing behavioral correction.[173] Drawing on his personal experience of spending two years in solitary confinement, he claimed that it is not an adequate punishment for anyone.[174] Mr. Lascaze shared that prolonged time in isolation conditions individuals to accept worse treatment from others.[175] He recalled a time when he spent 45 days in the Secure Housing Unit for having an extra bar of soap in his cell, sharing, "[a]fter I was released from Secure Housing Unit, the officer who had sent me over there, we had a conversation and I had asked him why I hadn't received a ticket? He said, 'Well, I couldn't get you for a ticket, but I was still going to get hole time out of you one

[167] Crowder Testimony, *July 2020 Briefing*, pp. 6-7.

[168] Ibid., 7.

[169] Ibid., 7.

[170] Ibid., 7.

[171] Edwards Testimony, *July 2020 Briefing*, p. 9; Lascaze Testimony, *July 2020 Briefing*, p. 12; Kapoor Testimony, *August 2020 Briefing*, p. 5.

[172] Edwards Testimony, *July 2020 Briefing*, p. 8; Lascaze Testimony, *July 2020 Briefing*, p. 12.

[173] Edwards Testimony, *July 2020 Briefing*, p. 9.

[174] Ibid.

[175] Ibid., 12.

way.' My response was, 'Well, it was only 45 days, so no worries.'"[176] The high stress environment impacts both inmates and corrections officers in that they only see isolation as punishment, not focusing on rehabilitation.[177]

Within the subject of behavioral change, Dr. Kapoor highlighted several quality studies by criminologists that show limited positive behavioral change from solitary confinement.[178] There is no evidence that solitary confinement reduces violent offenses, non-violent offenses, or drug use within a prison setting.[179] In Dr. Kapoor's opinion, the small amount of literature that supports solitary confinement use points to the slightly different reactions between male and female prisoners.[180] There is a decrease in rates of misconduct for women that have been placed in isolation in some instances.[181] Due to the serious psychological risks, Dr. Kapoor points out that the practice does not accomplish its goal of reducing misconduct and is not an effective punishment.[182]

Reactions to solitary confinement can vary between individuals.[183] Dr. Kapoor testified that some individuals prefer isolation and have strong coping mechanisms for the stress of solitary confinement.[184] Part of the desire to stay in isolation could be related to a comfort that many feel after long periods of time conditioned to the space.[185] Mr. Lascaze shares that the dynamic of comfort can be very detrimental when the individual must return to the general prison population.[186] Dr. Kapoor highlighted the importance of examining motive and mental health that may underline a decision or action to try and stay in isolation.[187] She stated the benefit of safety is not a valid reason to stay in isolation without a deep examination of how paranoia, mental illness, and social factors play into the decision. [188] Dr. Kapoor also drew attention to those who solitary confinement proves catastrophic for mental and physical health. In some cases, individuals with

---

[176] Lascaze Testimony, *July 2020 Briefing*, p. 12.

[177] Ibid.

[178] Kapoor Testimony, *August 2020 Briefing*, p. 5.

[179] Ibid.

[180] Ibid., 11.

[181] Ibid., 11.

[182] Ibid., 5.

[183] Ibid., 6.

[184] Ibid., 6.

[185] Lascaze Testimony, *July 2020 Briefing*, p. 10.

[186] Ibid.

[187] Kapoor Testimony, *August 2020 Briefing*, p. 11.

[188] Ibid.

long histories of isolation can enter a cycle of self-injury and violence.[189] Some of these varied reactions can be due to the purpose of segregation.[190] If the segregation is framed as a benefit to the individual, like in cases of protective custody, it can create a dramatically different reaction from focusing on punitive segregation.[191]

Some psychological effects have been documented as a response to isolation and solitary confinement.[192] Dr. Kapoor highlights that over time depression, anxiety, and generalized psychological distress occurs in individuals in isolation.[193] She points out that while there are debates about how much that change impacts individuals, most studies show that prolonged confinement increase the rates of depression and anxiety.[194] Long term effects of isolation include a minimal data set that shows a correlation between PTSD symptoms and segregation.[195] This impact continues after an individual has left prison.[196] Dr. Kapoor highlighted that many individuals can begin to relate to this sense of isolation due to the COVID-19 pandemic and quarantining at one's house for months.[197] She stated, "[i]f you think about what people in solitary confinement go through it would be like staying in your bathroom, for months and sometimes years on end, and you can imagine what kind of distress that causes in people."[198]

More severe psychological responses to solitary confinement include suicide and self-harm.[199] Dr. Kapoor testified that the rates of suicide and self-harm are significantly higher than the general prison population for individuals in isolation.[200] Despite less than 10% of the prison population remaining in isolation, a vast majority of prison suicides occur there.[201] Some studies show that the risk is close to six times higher in solitary confinement, with one saying the risk is almost 400% higher.[202] While these studies are remarkable, they do not always differentiate between correlation

---

[189] Kapoor Testimony, *August 2020 Briefing*, p. 6.

[190] Ibid., 11.

[191] Ibid., 11.

[192] Ibid., 5.

[193] Ibid., 5.

[194] Ibid., 5.

[195] Ibid., 10.

[196] Ibid., 10.

[197] Ibid., 5.

[198] Ibid., 5.

[199] Ibid., 5.

[200] Ibid., 5.

[201] Ibid., 5.

[202] Ibid., 5.

and causation in Dr. Kapoor's opinion.[203] A potential cause to the higher rates of self-harm and suicide could be that individuals with more severe mental illness are also more likely to be placed in solitary confinement.[204] Dr. Kapoor was sure to emphasize that after leaving a solitary confinement setting, individuals are still at a higher risk for self-injury and suicide.[205] She concluded that isolation could have lasting effects based on this statistic.[206]

Examples of negative reactions to solitary confinement are important to understand the impact on mental health.[207] Mr. Lascaze shared that during his first period in disciplinary confinement he became familiar with the cell and did not want to leave after five days ended.[208] He also shared that his cousin has spent approximately fifteen years in long term isolation.[209] Since arriving at jail, he has developed schizophrenia and now cannot function normally in the general population.[210] Mr. Lascaze highlighted that he cannot last longer than 90 days outside of his isolation cell due to his symptoms.[211] Mr. Edwards recalled an individual at Shawangunk Prison in New York who had spent fourteen years in prison.[212] His behaviors were described as bizarre.[213] Mr. Edwards said, "[h]e could recite the dictionary. He could play chess without a board, but he couldn't carry on a conversation with somebody without just going different places. He had lost a sense of reality because he wasn't faced with a sense of reality in the real world. He was being brutalized in some ways, because of his time up, then he was in a very confrontational situation with them and he had no power. It had a great effect on the socialization as well his mental capacity to be within society I think."[214]

One of the most harmful impacts of spending long stretches of time in solitary is the disconnect from support networks.[215] Mr. Lascaze emphasized this point by sharing a story of an individual who spent four months in the Secure Housing Unit but was cycled out every fifteen days for 24

---

[203] Kapoor Testimony, *August 2020 Briefing*, p. 8.

[204] Ibid.

[205] Ibid., 5.

[206] Ibid., 5.

[207] Lascaze Testimony, *July 2020 Briefing*, p. 10.

[208] Ibid.

[209] Ibid., 23.

[210] Ibid., 23.

[211] Ibid., 23.

[212] Edwards Testimony, *July 2020 Briefing*, p. 16.

[213] Ibid.

[214] Ibid.

[215] Lascaze Testimony, *July 2020 Briefing*, p. 22.

hours.[216] Cutting the individual off from his support network and those that may encourage behavior change proved to be very detrimental for his rehabilitation. [217]

Individuals who fail screenings for solitary confinement are directed to mental health treatment options.[218] Commissioner Hanks shared that all individuals that fail the mental health screening are connected with clinicians who determine next steps.[219] She stated, "[s]o we have the opportunity to place them in the Secure Psychiatric Unit, in the Residential Treatment Unit, and now in our Wellness Unit."[220] Ms. Lockwood highlighted that if an individual is deemed too mentally unstable for safe use of solitary confinement, the Secure Psychiatric Unit is not a safe alternative as individuals will remain in isolation upon arrival at the Unit.[221] She also referred to conversations with inmates in the Secure Housing Unit, stating, "I have no direct knowledge of the screenings at the SHU [Secure Housing Unit] in the prison, but our office has received many reports from inmates at jails that the mental health screening only involves finding out if the person is suicidal or homicidal and is not meant to determine if the person is experiencing other mental health symptoms."[222] Ms. Lockwood also mentioned that the Wellness Unit and Residential Treatment Unit are voluntary, if an inmate chooses to utilize those systems.[223] The Secure Psychiatric Unit is an involuntary commitment, similar to the Secure Housing Unit.[224] Mr. Lascaze highlighted that after the initial screening, seeing a medical professional can be rare in the Secure Housing Unit.[225] He pointed out that medical and behavioral staff walk the tier each day in the Secure Housing Unit facility, but residents must speak up in order to be seen.[226] Many do not want to reach out for assistance and have trouble accessing medical care because of that, unless they are a mental health client going into the Secure Housing Unit.[227]

---

216 Lascaze Testimony, *July 2020 Briefing*, p. 22.

217 Ibid.

218 Hanks Testimony, *September 2020 Briefing*, p. 11.

219 Ibid.

220 Ibid.

221 Lockwood Response to Draft Report, at 2.

222 Ibid.

223 Ibid.

224 Ibid.

225 Lascaze Testimony, *July 2020 Briefing*, p. 11.

226 Ibid.

227 Ibid.

### *b) Physical Health*

Physical health can be negatively impacted in prison, but especially within solitary confinement. Referring to prison conditions generally based on her experiences as a medical director at Arlington County Jail in Virginia, Dr. Crowder highlighted that medical and psychiatric standards need further attention.[228] With regards to solitary confinement in prison, Mr. Lascaze shared that while showering was possible, many did not use the opportunity to leave their cell when he was in prison.[229] He stated, "[t]he reason why is when you are removed from your cell and you are brought to the shower, you are again, brought to another room that even smaller than your cell, and you are locked into that room. There's no windows. The ventilation in there is terrible, and you are in the shower until an officer comes and gets you. So it could be 15 minutes later, it could be an hour later." [230] Mr. Lascaze went on to share that the shower areas were dirty and the water temperature cannot be controlled.[231] This makes the entire experience uncomfortable for individuals and results in some refusing to shower in the future.[232] Without the time outside of a cell to shower, inmates spend 24 hours a day in their cell.[233]

Exercise is also an important part of physical wellbeing and a chance for individuals to leave their cell in solitary confinement. Mr. Edwards, a former inmate at Rikers Island Correctional Center in New York, shared in his testimony that the time for exercise does not always feel like a reprieve from the isolation.[234] Speaking to general prison condition, he highlighted, "[e]ven the exercise, it's just an extension of that cell. And if it's not, you're taken out, for 60 minutes to another cage and then brought right back to that cage."[235]

### *2. Education and Training Opportunities*

Education and training opportunities are a chance for incarcerated individuals to focus on rehabilitation and better oneself in a negative environment. Within solitary confinement, these opportunities can be limited according to testimony about Rikers Island Correctional Facility in New York.[236] In his testimony, Mr. Edwards stated that the higher education programs are already

[228] Crowder Testimony, *July 2020 Briefing*, p. 24.

[229] Lascaze Testimony, *July 2020 Briefing*, pp. 10-11.

[230] Ibid.

[231] Ibid.

[232] Ibid.

[233] Ibid.

[234] Edwards Testimony, *July 2020 Briefing*, p. 9.

[235] Ibid.

[236] Ibid., 25.

rare due to the removal of Pell Grant eligibility for those convicted of a crime.[237] All education, at the time of this testimony in 2020, had be privately funded, resulting in many not having access to college in prison.[238] his was reversed in the December 2020 COVID-19 stimulus bill.[239] Individuals that are incarcerated now have access to Pell Grant funding for higher education.[240] Mr. Edwards emphasized the importance of higher education for prisoners and told the Committee that many individuals that receive a college degree go on to better their community through behavioral science work.[241] He said they often become social workers and advocates that give back to the community.[242] Mr. Edwards also shared that access to education decreases recidivism as many are able to find jobs and network, skills they may not have known about before college.[243]

In New Hampshire state prisons, individuals housed for longer periods of time do have access to educational programming.[244] According to Commissioner Hanks, classes on civics, English grammar, business, American literature, personal finance, economics, algebra, health, career awareness, and more are available to all inmates regardless of their housing facility.[245] There are also Behavioral Health groups that are accessible in every unit.[246] Individuals that are transferred to the Special Housing Unit are able to continue participation in these behavioral groups without delay.[247] Commissioner Hanks also highlighted that as a result of the Holliday Court Order, educational programming is available in the Secure Psychiatric Unit.[248] Within this unit there is a full-time teacher employed with a Department of Education certification in Special Education.[249] This teacher provides regular classes as well as independent study and tutoring for the high school equivalency exam.[250]

---

[237] Edwards Testimony, *July 2020 Briefing*, p. 25.

[238] Ibid.

[239] Consolidated Appropriations Act, 2021, Pub. L. 116-260, 134 Stat. 1182 (2020), at 2003. https://www.congress.gov/116/bills/hr133/BILLS-116hr133enr.pdf.

[240] *Id.*

[241] Edwards Testimony, *July 2020 Briefing*, p. 26.

[242] Ibid.

[243] Ibid.

[244] Hanks Statement, at 1.

[245] Ibid.

[246] Ibid.

[247] Ibid.

[248] Hanks Statement, at 1; Order at 2, *Holliday et al v. Curry*, New Hampshire Superior Court, Case No: 04-E-203.

[249] Hanks Statement, at 1.

[250] Hanks Statement, at 1.

## E. Current Reform Efforts

### *1. Lawsuits*

Lawsuits against the New Hampshire correctional system have shaped many reforms over the past fifty years.[251] The major lawsuits that had a positive impact and furthered reforms are *Laaman v. Helgemoe, Guay v. Powell, and Sullivan v. Cunningham* matters which culminated in a Consent Decree in 1990[252] and *Holiday v. Curry*[253] which resulted in the Holliday Court Order in 2006,[254] according to testimony by Representative Cushing.[255]

In 1978, the Department of Corrections in New Hampshire faced litigation that impacted their practices in dramatic ways.[256] The Laaman Consent Decree, named for the individual who brought the lawsuit,[257] addressed sanitation, physical facilities, segregation, isolation, food service, medical care, mental health classifications, and many other areas around incarceration that lacked an appropriate standard of care according to Commissioner Hanks.[258] Representative Cushing highlighted that the Laaman case originated because of substandard prison conditions.[259] It covered things that greatly shaped the standard of living for those incarcerated and created a minimum standard of care for mental health that was either nonexistent or substandard before the Laaman decision according to Representative Cushing.[260] Commissioner Hanks shared that several

---

[251] Hanks Testimony, *September 2020 Briefing*, p. 5.

[252] Consent Decree, *Laaman v. Powell,* Civil Action No. 75-258*; Guay v. Powell,* Civil Action No. 77-256*; Sullivan v. Cunningham,* 87-301-D, (D.N.H. 1990).

[253]

[254] Order, *Holliday et al v. Curry*, New Hampshire Superior Court, Case No: 04-E-203.

[255] Cushing Testimony, *July 2020 Briefing*, p. 13.

[256] Consent Decree, *supra* note 253, at XX.

[257] *Laaman v. Helgemoe*, 437 F. Supp. 269 (D.N.H. 1977) ("Henceforth, the case concerned not only the lockup, but the medical care, work, education and rehabilitation opportunities, visitation and mail privileges, and a general attack on the conditions of confinement at NHSP.").

[258] Hanks Testimony, *September 2020 Briefing*, p. 3.

[259] Cushing Testimony, *July 2020 Briefing*, p. 15; *Laaman*, 437 F. Supp. at 275.

[260] Cushing Testimony, *July 2020 Briefing*, p. 15; *Laaman*, 437 F. Supp. at 275.

iterations of the lawsuit continued until 2003.[261] In 2005, a new lawsuit took place that further shaped the New Hampshire Department of Corrections, called the Holliday case.[262]

The Holliday case focused more specifically on mental health treatment, group therapy, medication management, and restrictive housing.[263] Here, plaintiffs were inmates in New Hampshire State Prison system. They claimed that prison officials had not complied with certain provisions of the 1990, 2001, and 2003 Laaman Settlement Agreements.[264] This case is particularly applicable to the scope of solitary confinement because it was centered on creating a bare minimum access of health care and mental health treatment in secure housing units.[265] Commissioner Hanks spoke specifically about the reforms resulting from this case.[266] She shared that many aspects of the behavioral health system have shifted and robust changes reshaped the restrictive housing use in 2009 and 2010.[267] Commissioner Hanks shared that since 2010, all those in restrictive housing have access to front end screenings for severe mental health needs, developmental or intellectual challenges, and suicidality.[268] These screenings determine if an individual is able to remain in an isolation setting.[269] If one does not pass a screening they do not enter the special housing unit regardless of the reasoning behind the transfer.[270] Commissioner Hanks also highlighted that every fourteen days individuals in restrictive settings are given an out of cell screening for mental health status as well as engagement in treatment planning and case management.[271] Nursing rounds occur during all three shifts, 24 hours a day, to check on emotional and physical wellbeing.[272] Therapeutic groups are offered in the Special Housing Unit as well as an education group and a

---

[261] *See* Amended Settlement Agreement, *Laaman, et al v. Warden, New Hampshire State Prison*, 237 F. 3d 14 (1st Cir. 2001) (Plaintiffs filed a motion for contempt against defendants in June 1993 for violations of certain sections of the 1978 and 1990 consent decrees); Hanks Testimony, *September 2020 Briefing*, p. 3.

[262] Hanks Testimony, *September 2020 Briefing*, p. 3; Holliday et al v. Curry, New Hampshire Superior Court, Case No: 04-E-203.

[263] Hanks Testimony, *September 2020 Briefing*, p. 3; Holliday et al v. Curry, New Hampshire Superior Court, Case No: 04-E-203.

[264] Order at 1, *Holliday et al v. Curry*, New Hampshire Superior Court, Case No: 04-E-203.

[265] Cushing Testimony, *July 2020 Briefing*, p. 13.

[266] Hanks Testimony, *September 2020 Briefing*, p. 4.

[267] Hanks Testimony, *September 2020 Briefing*, p. 4; .

[268] Ibid.

[269] Ibid.

[270] Ibid.

[271] Ibid.

[272] Ibid., 4-5.

few classes that are accessible.[273] Body cameras are also being deployed in these units when available for corrections staff.[274] These shifts came as a direct result of the Holliday Court Order and continue to improve quality of life within the Special Housing Unit.[275]

### 2. *Policy*

Policy that has driven reform was highlighted by panelists for New Hampshire through considering related practices in New York.[276] In New York, Mr. Edwards shared that over the last eight years there has been a major push to end solitary confinement use in prisons.[277] The results of that push have been a 30 day cap on time spent in isolation, despite growing evidence from psychiatrists that the maximum should be 15 days.[278] Despite the 30 day cap, some prisons have found ways to extend the time someone is in solitary confinement through administrative segregation which has no time limit.[279] Continuing to share his experience at Rikers Island Correctional Center, Mr. Edwards said that there is a hearing process every 60 days, but a person can remain in administrative segregation for up to three years.[280] Another way inmates at Rikers Island Correctional Center remain in isolation longer is through "key lockdown," which is essentially solitary confinement, but does not follow normal procedures according to Mr. Edwards' testimony because individuals are not moved to the Secure Housing Unit.[281] There is a 90 day limit to being "key locked" which ignores the 30 day cap because it does not meet the traditional definition of solitary confinement defined by the legislation.[282] This is something to consider in developing recommendations for solitary confinement in New Hampshire because all forms of isolation must be considered, whether it is "punitive segregation," "administrative isolation," or another form of separation from the general prison population.

Representative Cushing noted that several bills, including H.B. 1507, H.B. 1506, and H.B. 1311 have been discussed recently in New Hampshire's Criminal Justice and Public Safety Committee,

---

[273] Ibid., 4-5.

[274] Ibid., 4-5.

[275] Hanks Testimony, *September 2020 Briefing*, pp. 4-5; Holliday et al v. Curry, New Hampshire Superior Court, Case No: 04-E-203.

[276] Edwards Testimony, *July 2020 Briefing*, p. 8.

[277] Ibid.

[278] Edwards Testimony, *July 2020 Briefing*, p. 8.

[279] Ibid.

[280] Ibid.

[281] Ibid.

[282] Ibid., 21.

and address issues surrounding solitary and punitive confinement.[283] House Bill 1507 concerned restricting the length of time an individual could be held in solitary confinement,[284] and H.B. 1506 concerned forming a committee to study the practice of isolation in prison systems.[285] Representative Cushing shared that there is unfortunately a hesitation by many members of the legislature to research the topic further.[286] He referenced the New Hampshire constitutional mandate that states the purpose of punishment is rehabilitation.[287] The legislature should be more willing to look at the science behind current punishment practices to accomplish this mandate.[288]

This sentiment of hesitation on the part of the legislature was a matter that Representative Cushing emphasized throughout his testimony.[289] Despite some significant steps forward, it has taken lawsuits to change conditions that he feels should be addressed by the legislature.[290] One example he shared was a woman's prison that was "an abomination."[291] The state rebuilt this prison and improved services and programs for female offenders after a lawsuit forced the issue.[292]

Another aspect of the New Hampshire prison system that should be addressed by the legislature is the Secure Psychiatric Unit according to Representative Cushing.[293] He stated that while there are high expectations for a new secure psychiatric hospital outside of the Department of Corrections, the budget that was passed to build it may be affected by the pandemic. [294] Commissioner Hanks also highlighted the work on developing a psychiatric unit under the jurisdiction of the Department

[283] Cushing Testimony, *July 2020 Briefing*, p. 13.

[284]H.B. 1507, Amending the procedures for the use of solitary confinement and establishing a committee to study the use and effectiveness of solitary confinement in New Hampshire, NH General Court 2016 Sess. (Nh. 2016).

[285] H.B. 1506, Establishing a committee to study the use of solitary confinement in New Hampshire, NH General Court 2016 Sess. (Nh. 2016).

[286] Cushing Testimony, *July 2020 Briefing*, p. 14.

[287] Ibid.

[288] Ibid.

[289] Ibid.

[290] Ibid.

[291] Ibid.

[292] Cushing Testimony, *July 2020 Briefing*, p. 14; The New Hampshire Advisory Committee published a 2011 report on the New Hampshire Women's Prison that helped inform local actions to address services and programs in the women's prison, *See* New Hampshire Advisory Committee to the U.S. Commission on Civil Rights. "Unequal Treatment: Women Incarcerated in New Hampshire's State Prison System." *U.S. Commission on Civil Rights*, September 2011, and Joe Watson. "Report Criticizes New Hampshire's Treatment of Female Prisoners; Lawsuit Filed," December 15, 2012. Prison Legal News. https://www.prisonlegalnews.org/news/2012/dec/15/report-criticizes-new-hampshires-treatment-of-female-prisoners-lawsuit-filed/

[293] Cushing Testimony, *July 2020 Briefing*, p. 14.

[294] Ibid.

of Health and Human Services, removing it from the Department of Corrections as it has been for the last fifty years.[295]

New Hampshire State law currently requires the Department of Corrections to make policies regarding prison conditions and restrictive housing use.[296] The same concept applies to County corrections systems, with the county superintendents largely in charge of day to day policy.[297] Commissioner Hanks shared that this was intentional to allow for quick adjustments in procedure outside of a legislative body that may take six to twelve months to make a meaningful change.[298] She believes that anyone examining the policies related to restrictive housing should both look to that legislative statute as well as the policies set in place by the Department.[299]

Commissioner Hanks highlighted many New Hampshire Department of Corrections policy reforms that have altered confinement over the last several years.[300] The most important change shared by Commissioner Hanks was that for those with mental illness, developmental disabilities, or substance use disorder there is another path to discipline that does not include transfer to more restrictive housing.[301] Now those with mental illness or substance use disorder are directed to the residential therapeutic community, the wellness unit, or the focus units as opposed to the Special Housing Unit.[302] This intervention hopes to treat the behavioral problems at the source through incentives and treatment.[303] By centering these identities and trying to prevent further harm, the New Hampshire State prisons hope to work towards their goal of rehabilitation.[304] The Special Housing Unit is predominantly used as a short term space while the corrections staff can investigate violent episodes and determine the best steps forward.[305] According to Commissioner Hanks restrictive housing is no longer meant to be a long term housing solution.[306]

---

[295] Hanks Testimony, *September 2020 Briefing*, p. 8.

[296] N.H. Rev. Stat. Ann. § 622:5; http://www.gencourt.state.nh.us/rsa/html/lx/622/622-mrg.htm

[297]N.H. Rev. Stat. Ann. § 622:5; http://www.gencourt.state.nh.us/rsa/html/lx/622/622-mrg.htm; Church Testimony, p. 5.

[298] Hanks Testimony, *September 2020 Briefing*, p. 18.

[299] Ibid.

[300] Hanks Testimony, *September 2020 Briefing*, p. 5.

[301] Ibid.

[302] Ibid.

[303] Ibid.

[304] Ibid.

[305] Ibid.

[306] Ibid.

Despite the reasoning behind solitary confinement, Commissioner Hanks highlighted the policies that allow individuals to challenge placement in restrictive housing.[307] For individuals in the Special Housing Unit, the first step is to write the warden of the facility as well as the classification administrator.[308] The administrators will move forward by reviewing the letter and case.[309] If they agree with the placement, that individual may reach out to the Commissioner's office.[310] Commissioner Hanks will then review the case and determine whether or not she agrees with the placement.[311] If she agrees with the placement in restrictive housing, that individual can still seek reprieve from a court.[312] The benefit to New Hampshire's smaller size in corrections is that the Commissioner is able be involved with individual cases.[313] They can also adjust policy much more quickly based on new information.[314] This is a benefit for those incarcerated in such a small system according to Commissioner Hanks.[315]

Policies that dictate monitoring of restrictive housing use has become common practice in state prisons according to Commissioner Hanks.[316] In the largest men's prison in the state the use of restrictive housing has gone down under a new warden and during the Commissioner's tenure in charge.[317] She shared the example that two years ago 53 individuals were housed in the Special Housing Unit at this prison, and now that number is around 23.[318] This number does fluctuate, and during her leadership it has gone from 130 to 17 people.[319] Commissioner Hanks emphasized that they only utilize the Special Housing Unit when it is deemed absolutely necessary, which is the case in a limited number of violent situations.[320]

---

[307] Hanks Testimony, *September 2020 Briefing*, p. 17.

[308] Ibid.

[309] Ibid.

[310] Ibid.

[311] Ibid.

[312] Ibid.

[313] Ibid.

[314] Ibid.

[315] Ibid.

[316] Ibid., 10.

[317] Ibid.

[318] Ibid.

[319] Ibid.

[320] Ibid.

With regard to revision of policies related to restrictive housing, Commissioner Hanks shared that this is an ongoing and vital process.[321] The last revision to standards utilized in New Hampshire was in January 2017 based on the principles set forth by the US Department of Justice.[322] Commissioner Hanks shared that those policies are being revised now to continue being on the forefront of best practices in corrections.[323] She hopes that by continuing these revisions, the state prison system can continue centering limits to restrictive housing use, focused on protection of safety for all those in the prison community.[324] Commissioner Hanks highlighted that they will continue to look at the numerous studies coming from Yale Law School and other organizations that inform best practices on isolation.[325] She highlighted the statements made by the National Commission on Correctional Healthcare, a creator of standards in corrections work.[326] The statements and standards address the mental health impacts of restrictive housing.[327] Commissioner Hanks stated that all of this work to change policy is in the mission of, "[continuing] to move that needle forward to rehabilitation, and engagement [with treatment] and adjustments [to] behavior."[328]

### *3. Accreditation*

The Secure Psychiatric Unit is not licensed or accredited by any medical board according to Ms. Coulter's testimony.[329] She claims there is no oversight in practices from agencies outside the Department of Corrections across the state.[330] Commissioner Hanks noted however that New Hampshire State Law requires the Department of Health and Human Services to conduct an audit of the Secure Psychiatric Unit,[331] and highlighted that the Secure Psychiatric Unit is looking for certification from the National Commission on Correctional Health Care over the next few years, and it was included in a legislative package in 2019.[332] COVID-19 has had a financial impact on

---

[321] Hanks Testimony, *September 2020 Briefing*, p. 5.

[322] Ibid.

[323] Ibid.

[324] Ibid.

[325] Ibid., 6.

[326] Ibid., 4.

[327] Ibid.

[328] Hanks Testimony, *September 2020 Briefing*, p. 6.

[329] Coulter Statement, at 1.

[330] Ibid.

[331] N.H. Rev. Stat. Ann § 622:46.

[332] Hanks Testimony, *September 2020 Briefing*, p. 4.

budgets for this year, so while the process is moving forward more funding opportunities must be found before the accreditation will be complete.[333]

New Hampshire's state prisons are not currently accredited by national accrediting organizations, and the state prison's Secure Psychiatric Unit is not medically certified.[334] Commissioner Hanks shared with the Committee that the state prisons are looking for the American Corrections Association accreditation as well as other correctional certifications, especially with regard to behavioral health services.[335] While in the past the state prisons were accredited, this lapse occurred in the early 2010s.[336] The money that historically went to the American Correctional Association Accreditation was transferred to preserve employees during a recession.[337] Moving forward, the Department of Corrections has been directed to seek accreditation by the state legislature and it will be an ongoing effort in the future.[338]

On the county level, Superintendent Church highlighted that Rockingham County Jail is the gold standard nationally for accreditation and certification relating to mental and physical healthcare.[339] He shared that the Rockingham jail, unlike other New Hampshire correctional institutions, is audited and certified by the National Commission on Correctional Healthcare.[340] They are audited every three years to ensure there is a strict set of rules on medical and mental health care.[341] He stated that this certification is more extensive than the accreditation by the American Correctional Association or the American Jail Association with regards to mental health standards, especially with regards to segregation use.[342]

---

[333] Ibid.

[334] Ibid.

[335] Ibid.

[336] "Time In Prison: Community Safety and Opportunity for Change." The State of New Hampshire Department of Corrections, 2001. https://www.nh.gov/nhdoc/divisions/victim/documents/timeinprison.pdf; Rep. *Performance Audit Report November 2013*. The State of New Hampshire Department of Corrections, n.d.

[337] Hanks Testimony, *September 2020 Briefing*, p. 6.

[338] Cushing Testimony, *July 2020 Briefing*, p. 18.

[339] Church Testimony, *December 2020 Briefing*, p. 5.

[340] Ibid.

[341] Ibid.

[342] Ibid., 6.

#### *4. Barriers to Reform*

One of the major barriers to reform is staffing.[343] Ms. Lockwood highlighted that especially in the Secure Psychiatric Unit, the DOC has difficulties in hiring enough correctional officers.[344] The testimony also mentioned that the budget does not allow for as much staff as could be utilized.[345] This issue affects residents and treatment decisions according to Ms. Lockwood.[346]

A barrier to removing the Secure Psychiatric Unit from the Department of Corrections jurisdiction is funding to build a new acute psychiatric unit under the auspices of the Department of Health and Human Services.[347] Initial conversations shared by Representative Cushing, included setting aside $8 million of funding to begin building a 20-25 bed hospital that could be used as the acute psychiatric unit outside the state prison.[348] There has been doubt cast on whether this will still happen due to the ongoing COVID-19 crisis and shifting state budgets as a result.[349]

Another barrier to reform is the misunderstanding of solitary confinement use in individuals who are incarcerated.[350] While in some cases the use is punitive, Ms. Lockwood pointed out that it can be utilized for safety.[351] In many cases isolation is used when someone is displaying self-harm behaviors.[352] Ensuring that every resident sees this distinction is important, so they do not feel as if they are punished for mental health concerns.[353]

### F. Panelist Recommendations to Address Solitary Confinement

With regards to healthcare, Dr. Crowder recommended an outside review of all medical practices within prisons.[354]

---

[343] Lockwood Testimony, *August 2020 Briefing*, p. 15.

[344] Ibid.

[345] Ibid.

[346] Ibid.

[347] Cushing Testimony, *July 2020 Briefing*, p. 18.

[348] Ibid.

[349] Ibid.

[350] Lockwood Testimony, *August 2020 Briefing*, p. 15.

[351] Lockwood Testimony, *August 2020 Briefing*, p. 15.

[352] Ibid.

[353] Ibid.

[354] Crowder Testimony, *July 2020 Briefing*, p. 25.

Mr. Lascaze advocated for a restructuring of disciplinary units.[355] He pointed to the need for isolation spaces to assist correctional staff in protecting individuals in the prison from being victimized by other incarcerated individuals, but believes they should only be used in that service.[356] The Secure Housing Unit should not be utilized for individuals that fail a drug test according to his recommendations because it does not encourage treatment and behavioral change.[357] He noted that there should be a Commissioner-level review for any long term stays in the disciplinary unit, regular reviews of behavioral and mental health needs for any individuals in solitary confinement longer than six months, and that the focus of disciplinary units should be rehabilitation.[358] He recalled that when the Secure Housing Unit is used with a punitive mindset, it is easier for corrections staff to find reasons to keep a person there longer, pointing to his own experiences.[359] He shared that in 2008, he was sent to the Secure Housing Unit for testing positive for marijuana use.[360] He spent four months there at 18 years old.[361] Two weeks before he was to return to general population, a corrections officer he did not get along with wrote him up for having an extra bar of soap in his cell.[362] This resulting in a further 60 days of isolation for a minor disciplinary offense.[363] This story highlighted the need for a rehabilitative focus from correctional staff in order to reduce the use of solitary confinement.[364] By changing the correctional officer's view of disciplinary units, Mr. Lascaze believes it can help individuals housed there to change their destructive behavior.[365] Mr. Edwards also highlighted this point of shifting disciplinary confinement to a rehabilitative focus.[366] He stated that correctional facilities continually use isolation as a punishment and it will take more than changes in the law to dramatically alter the negative impacts.[367] Mr. Lascaze recalled the moment that his negative thought process and behavior changed in 2015 due to a rehabilitative focus by staff.[368] A corrections officer brought

---

355 Lascaze Testimony, *July 2020 Briefing*, p. 12.

356 Ibid., 24.

357 Ibid.

358 Ibid., 21.

359 Ibid.

360 Ibid.

361 Ibid.

362 Ibid.

363 Ibid.

364 Lascaze Testimony, *July 2020 Briefing*, p. 21.

365 Ibid.

366 Edwards Testimony, *July 2020 Briefing*, p. 8.

367 Ibid.

368 Lascaze Testimony, *July 2020 Briefing*, p. 23.

him a book and gave him some words of encouragement when he had a negative mindset.[369] This recentering on education and rehabilitation helped to change his life.[370] Therefore, he recommends focusing efforts on shifting the punitive mindset of correctional staff to better serve the entire correctional community.[371]

Another way to assist in the negative impacts of solitary confinement is through providing more out of cell time and focusing that time on education.[372] Mr. Lascaze recommends highlighting educational opportunities to increase rehabilitation in disciplinary settings.[373]

Finally, positive mentorship was highlighted as a recommendation for the Department of Corrections.[374] Receiving positive feedback from individuals that have a shared history can dramatically alter negative thought processes.[375] One community group that Mr. Lascaze works with has had success in pairing those with similar backgrounds to provide support and encourage others during the challenges associated with incarceration and returning to normal life.[376] He has discussed implementing a similar group with the Department of Corrections for those individuals in isolation.[377] The high stress environment of the Secure Housing Unit is not conducive to behavioral rehabilitation, but a peer to peer mentor group might help to change that in Mr. Lascaze's opinion.[378]

Dr. Kapoor offered recommendations for the New Hampshire Committee based on her experiences as a criminal justice researcher and psychiatrist.[379] Her recommendations highlighted that at the moment prison systems across the country are realizing that, "[t]he current method isn't accomplishing any meaningful objective other than sort of short-term incapacitation of people who the prison finds dangerous, or can't provide services to."[380] She believes that with isolation reform,

---

[369] Ibid.

[370] Ibid.

[371] Ibid.

[372] Ibid., 22.

[373] Ibid., . 22.

[374] Ibid., 23.

[375] Ibid., 23.

[376] Ibid., 23.

[377] Ibid., 23.

[378] Lascaze Testimony, *July 2020 Briefing*, p. 23.

[379] Kapoor Testimony, *August 2020 Briefing*, p. 6.

[380] Ibid.

the first steps should be eliminating solitary confinement use entirely for vulnerable populations.[381] This means juveniles, people with serious mental illness, or people with intellectual or developmental disabilities cannot be in isolation and the practice is common to have these categorical bans.[382] One suggestion is to determine vulnerable populations through a "vulnerability assessment."[383] Dr. Kapoor mentioned that some progressive prison systems already utilize such an assessment to determine if an individual has the coping mechanisms required to handle isolation.[384]

Correct identification of mental health illness and treatment needs is important in the corrections setting.[385] Dr. Kapoor highlighted that while every prison system has a methodology for this, in Connecticut studies have shown it may not provide the most accurate diagnoses for many.[386] One study looked at the rates of mental illness the DOC claims and then how many of those individuals utilized services from the Department of Mental Health in the year prior to incarceration.[387] Overall it showed that mental illness was underdiagnosed in the correctional setting.[388] Improved diagnostic material could improve correctional mental health treatment and potentially reduce solitary confinement use according to Dr. Kapoor.[389]

Another recommendation by Dr. Kapoor to change solitary confinement use was through increasing staff training regarding confinement use.[390] Having consistently respectful interactions between officers is vital to rehabilitation efforts.[391] Dr. Kapoor mentioned two systems that try to provide more reforms to solitary confinement that have worked in the past.[392] She recalled some systems that incorporate more mental health treatment programs, such as providing ten hours of

[381] Ibid.

[382] Ibid.

[383] Ibid., 9.

[384] Ibid., 9.

[385] Ibid., 9.

[386] Ibid., 9.

[387] Ibid., 9.

[388] Ibid., 9.

[389] Ibid., 9.

[390] Kapoor Testimony, *August 2020 Briefing*, p. 6.

[391] Ibid.

[392] Ibid.

structured treatment followed by ten hours of unstructured recreation time outside of the cell.[393] She shared that this can dramatically reduce the negative psychological effects of isolation.[394]

Another solution is creating a behavioral unit to focus on positive and short term incentives for behavioral change.[395] For most men in prison, Dr. Kapoor claims that creating punishment on top of the punishment of prison is not effective in creating sustained behavior shifts.[396]

Finally Dr. Kapoor recommends monthly, quarterly, or even bi-weekly reviews of individuals in isolation by the warden or commissioner of corrections.[397] This review will remind the individuals in power that there are inmates that require new solutions to behavioral concerns.[398] It will prevent inmates from being pushed aside and forgotten.[399] When these solutions are in place, the data shows there is a decrease in use of force, reduced inmate on inmate assaults, and an increased access to rehabilitation and treatment for incarcerated individuals.[400]

Ms. Lockwood highlighted that New Hampshire needs legislative responses to solitary confinement.[401] She pointed to the fact that New Hampshire does not have many laws regarding solitary confinement use in prisons, instead deferring to the Department of Corrections on a majority of corrections standards and regulations.[402] Isolation is utilized in other settings in New Hampshire, such as the New Hampshire Hospital and the Sununu Center for Children, however the law is better at restricting this use outside of prisons.[403] She recommends these extra legal restrictions are carried over to a correctional setting.[404]

Ms. Lockwood, focusing specifically on the Secure Psychiatric Unit, requested increased restrictions on isolation.[405] She stated that in many cases security decisions overtake clinical

393 Ibid.

394 Ibid.

395 Ibid., 7.

396 Ibid.

397 Ibid.

398 Ibid.

399 Ibid.

400 Ibid.

401 Lockwood Testimony, *August 2020 Briefing*, p. 17.

402 Ibid.

403 Lockwood Testimony, *August 2020 Briefing*, p. 16.

404 Ibid.

405 Ibid., 17.

decisions.[406] Since the Secure Psychiatric Unit is under the Department of Corrections, she worried that security overrides everything else, despite the Secure Psychiatric Unit being a treatment center first.[407] Ms. Lockwood emphasized throughout her testimony and subsequent response to the draft report that she does not see value to using isolation, solitary confinement, and stripping individuals of belongings for treatment:[408]

> I see no treatment value in solitary confinement, particular in the way it is used in the SPU with someone who is in a mental health crisis. It is more than the isolation; it is the conditions in which the resident is placed - being stripped of any belongings. As others testified, solitary confinement can cause mental health symptoms in a person without an underlying mental illness. So why use it on someone who we know has a serious and persistent mental illness?

She noted that the observation level needs to be limited to short term stabilization and the Secure Psychiatric Unit should not be utilized for those deemed unable to manage the effects of long term isolation by a mental health screening.[409]

Commissioner Hanks highlighted that reform and rehabilitation must remain the central focus for changing corrections in the future.[410] She stated, "[w]e need to engage people in their rehabilitation and their treatment so that they can, as I said before, be moved to less restrictive housing environments as well as the long term plan to return them to our communities in New Hampshire."[411] This echoed the sentiments of most panelists who participated in the Committee's study of solitary confinement in New Hampshire.

# IV. FINDINGS AND RECOMMENDATIONS

## A. Findings

In keeping with their duty to inform the Commission of (1) matters related to discrimination or a denial of equal protection of the laws; and (2) matters of mutual concern in the preparation of reports of the Commission to the President and the Congress, the New Hampshire Advisory Committee submits the following findings to the Commission regarding solitary confinement in New Hampshire. This report intended to highlight salient civil rights themes as they emerged in testimony during the Committee's inquiry. The following findings result directly from the

---

[406] Ibid., 17.

[407] Ibid.

[408] Lockwood Response to Draft Report, at 2.

[409] Ibid.

[410] Hanks Testimony, *September 2020 Briefing*, p. 5.

[411] Ibid.

testimony received and reflect the views of the cited panelists. While each assertion has not been independently verified by the Committee, panelists were chosen to testify due to their professional experience, academic credentials, subject expertise, and/or firsthand knowledge of the topics at hand. The complete meeting transcripts are included in the Appendix for further reference.

### *1. Health Effects of Solitary Confinement as Practiced in New Hampshire*

#### *a) Mental health effects*

Solitary confinement tends to have significant, adverse effects on the psychological well-being of inmates.[412] The fact that one inmate does not mind or may even seek out solitary confinement does not mean that another inmate does not suffer greatly from it. In general, younger inmates and those with pre-existing mental health disabilities suffer most from solitary confinement.[413] Longer periods of solitary confinement have more deleterious effects, with most experts recommending no more than two weeks without human contact at a time. [414] Solitary confinement rarely improves an inmate's behavior and does not rehabilitate.[415] At best, solitary confinement can be a temporary means of separating an abusive inmate from her or his victims.[416]

An inmate or civilly committed individual experiencing a mental health crisis be placed in solitary confinement in the New Hampshire's Secure Psychiatric Unit,[417]which is on the same campus as the prison. The Committee received testimony that some medications that may have been prescribed at the state hospital are not accessible when an individual enters the Secure Psychiatric Unit, as those medicines may be considered high value contraband that could be trafficked within the prison system. [418] While Commissioner Hanks shared that this is not the case,[419] panelists shared that it is important to remember that the Secure Psychiatric Unit is a treatment facility[420] and individuals should continue to have access to the medications they need.

---

[412] Kapoor Testimony, *August 2020 Briefing*, p. 5

[413] Ibid., 7-8.

[414] Edwards Testimony, *July 2020 Briefing*, p. 8.

[415] Lascaze Testimony, *July 2020 Briefing*, pp. 12, 21, 23; Edwards Testimony, *July 2020 Briefing*, p. 9; Kapoor Testimony, *August 2020 Briefing*, p. 5.

[416] Lascaze Testimony, *July 2020 Briefing*, p. 24.

[417] Lockwood Response to Draft Report, at 2.

[418] Cushing Testimony, *July 2020 Briefing*, p. 19.

[419] Helen Hanks Response to Draft Report, at 4.

[420] Courtney Lockwood Response to Draft Report, at 2.

The Committee heard testimony that receiving visitors can be more challenging within the Secure Psychiatric Unit because of the stringent security conditions.[421] Representative Cushing shared an example of a mother, who "could not go and visit her son until she passed a criminal background record check to see if she had a criminal record to go visit her son, her mentally ill son, who she had helped bring to the hospital."[422] It is important to consider whether there is appropriate visitor access to those receiving treatment at the Secure Psychiatric Unit.

#### *b) Physical health effects*

New Hampshire's Secure Housing Unit allows inmates under administrative or punitive segregation one hour out of cell a day.[423] The Committee heard testimony that inmates frequently go without showering because the showering areas are dirty, small, and the heat cannot be controlled.[424] Without adequate exercise, inmates' physical health can degrade during solitary confinement.

### *2. Policies for Solitary Confinement in New Hampshire*

#### *a) Secure Psychiatric Unit (SPU)*

The Secure Psychiatric Unit has been the subject of multiple lawsuits and consent decrees.[425] At present, the facility, which houses the civilly committed, those found not guilty by reason of insanity, and convicted inmates being treated for serious mental illness, is under the jurisdiction of the New Hampshire Department of Corrections rather than the New Hampshire Department of Health and Human Services and is not accredited for mental health services.[426] The problem of the jurisdiction transfer has been highlighted by numerous social service professionals over the last forty years, when the psychiatric unit was first moved to the New Hampshire State Prison for Men in Concord. Top state officials, including the Commissioner of Corrections, favor moving the Secure Psychiatric Unit to the New Hampshire Department of Health and Human Services and seeking accreditation from the medical board.

There are also numerous inconveniences associated with housing psychiatric patients in the same building with correctional inmates, including, as already mentioned, disruptions to visitation and

---

[421] Lockwood Testimony, *August 2020 Briefing*, p. 13; Cushing Testimony, *July 2020 Briefing*, p. 13; Coulter Statement, at 1.

[422] Cushing Testimony, *July 2020 Briefing*, p. 19

[423] Lascaze Testimony, *July 2020 Briefing*, p. 10.

[424] Ibid., 10-11.

[425] *Laaman v. Helgemoe*, 437 F. Supp. 269 (D.N.H. 1977); Holliday et al v. Curry, New Hampshire Superior Court, Case No: 04-E-203.

[426] Coulter Statement, at 1; Hanks Testimony, *September 2020 Briefing*, p. 4.

to proper administration of medicines.[427] Moreover, the Secure Psychiatric Unit is a highly controlled, solitary-confinement environment, where security concerns must take precedent to clinical decisions. The presence of correctional officers, who are trained to work with individuals who are incarcerated, could be dehumanizing to those seeking mental health services. This setting may not be suitable for most patients.

The Committee heard testimony that there are staffing issues at the Secure Psychiatric Unit.[428] Psychiatric staff in the Secure Psychiatric Unit has been noted to misdiagnose obvious mental health symptoms in patients and cannot always maintain psychiatric medications that may be best practice.[429] The current budget does not allow for sufficient or appropriate staffing.[430]

***b) Prison system***

The Special Housing Unit is the solitary confinement system for the state men's prison. However, New Hampshire law does not use the term "solitary confinement," instead using the terms "administrative segregation,"[431] medical segregation,"[432] and "punitive segregation,"[433] all of which can be grouped together under the term "restrictive housing."[434] The Special Housing Unit can be used for all three purposes. Individuals transferring into the Special Housing Unit receive a mental health evaluation.[435] Those that are deemed unable to safely transfer into isolation are directed to mental health services, either through the voluntary Wellness Unit or Residential Treatment Unit or involuntary movement to the Secure Psychiatric Unit.[436]

Panelists highlighted that there is a one-day shift out of restrictive housing every two weeks, however; inmates can be cycled in and out of restrictive housing on that schedule indefinitely.[437] Some inmates have been in the restrictive housing system for months at a time.[438] State law does

[427] Cushing Testimony, *July 2020 Briefing*, p. 19; Lockwood Testimony, *August 2020 Briefing*, p. 19.

[428] Lockwood Testimony, *August 2020 Briefing*, p. 15.

[429] Coulter Statement, at 14-24.

[430] Lockwood Testimony, *August 2020 Briefing*, p. 15.

[431] N.H. Rev. Stat. Ann § 30-B:8.

[432] NH ADC COR 410.07

[433] NH ADC COR 101.23

[434] Kapoor Testimony, *August 2020 Briefing*, p. 4.

[435] Lockwood Response to Draft Report, at 2.

[436] Ibid.

[437] Lascaze Testimony, *July 20, 2020 Briefing*, pp. 21-22.; Hanks Testimony, *September 2020 Briefing*, p. 4.

[438] Lascaze Testimony, *July 20, 2020 Briefing*, pp. 21-22.

not regulate the reasons for which an inmate can be put into punitive segregation, but it has often been imposed for possession of contraband or consumption of drugs.[439]

New Hampshire state prisons are not currently accredited by any national accrediting organizations, as funding towards preserving accreditation was redirected towards preserving employees in the early 2010s.[440] Representative Cushing shared that there are goals to seek accreditation in the near future.[441]

Although solitary confinement is sometimes warranted for the safety of inmates and staff,[442] correctional staff can possess a punitive mindset towards isolating prisoners, which, unchecked, can result in subjective and targeted decisions towards moving an inmate in to solitary confinement.[443] When correctional staff develops positive relationships with individuals in prison, it can have significant rehabilitative effects.[444]

### *c) County jails*

Each county jail sets its own policies for restrictive housing, or "lock-ups," and report to County Commissioners instead of the State's Commissioner or Corrections.[445] In Rockingham County, lock-up may not be used for more than 30 days at a time, and there is a sliding scale of offenses for which punishments may be applied.[446] Lock-up is not used for the most minor offenses, such as sanitary violations or unsatisfactory work performance.[447] However, it can be used for offenses such as gambling and possession or use of drugs.[448] The Rockingham jail is audited and certified

---

[439] Ibid., 21.

[440] Hanks Testimony, *September 2020 Briefing*, p. 4; "Time In Prison: Community Safety and Opportunity for Change." The State of New Hampshire Department of Corrections, 2001. https://www.nh.gov/nhdoc/divisions/victim/documents/timeinprison.pdf; Rep. *Performance Audit Report November 2013*. The State of New Hampshire Department of Corrections, n.d; Hanks Testimony, *September 2020 Briefing*, p. 6.

[441] Cushing Testimony, *July 2020 Briefing*, p. 18.

[442] Hanks Testimony, *September 2020 Briefing*, p. 10.

[443] Lascaze Testimony, *July 2020 Briefing*, p. 23; Coulter Statement, at 1.

[444] Lascaze Testimony, *July 20, 2020 Briefing*, p. 23.

[445] N.H. Rev. Stat. § 30-B:4, II.

[446] Church Testimony, *December 2020 Briefing*, p. 9; Rockingham County Department of Corrections Policies and Procedures, pp. 20-21.

[447] Church Testimony, *December 2020 Briefing*, p. 9; Rockingham County Department of Corrections Policies and Procedures, pp. 20-21.

[448] Rockingham County Department of Corrections Policies and Procedures, pp. 20-21.

by the National Commission on Correctional Healthcare, but the other nine county jails reportedly are not.[449] This certification pays extra attention to mental health standards and segregation use.[450]

### *3. Civil Rights Implications of Solitary Confinement in New Hampshire*

#### *a) Disability status*

Solitary confinement has a particularly negative effect on those suffering from mental health disabilities.[451] Since the Secure Psychiatric Unit is housed on the same campus as the correctional facilities and its patients are considered 'medically segregated,' New Hampshire practices a form of solitary confinement on psychiatric patients.[452] This practice seriously implicates federal civil rights provisions on discrimination on the basis of mental health disability. [453]

#### *b) Race and ethnicity*

In New Hampshire, racial and ethnic minorities are disproportionately represented within the prison system.[454] The demographic information shared by Commissioner Hanks and Joseph Lascaze stated that the percent of people of color in New Hampshire prisons varied from 14.55% - 14.92% in 2020.[455] This compares with 10.2% of the New Hampshire population being people of color according to the U.S. census in 2019.[456] As a result, there is the potential for solitary confinement to have a disparate impact on racial and ethnic minority inmates. At present, the state Department of Corrections does not collect race and ethnicity data specific to the Special Housing Unit.[457]

#### *c) U.S. and New Hampshire Constitutions*

Solitary confinement implicates the Eighth Amendment to the U.S. Constitution,[458] which prohibits cruel and unusual punishment, as well as Article 18 of the New Hampshire

[449] Church Testimony, *December 2020 Briefing*, p. 5.

[450] Ibid., 6.

[451] Kapoor Testimony, *August 2020 Briefing*, p. 4.

[452] Lockwood Testimony, *August 2020 Briefing*, p. 13-14, 18.

[453] Kapoor Testimony, *August 2020 Briefing*, p. 8; Coulter Statement, at 1; Lockwood Testimony, *August 2020 Briefing*, p. 13-14, 18.

[454] Kapoor Testimony, *August 2020 Briefing*, p. 4; Lascaze Testimony, *December 2020 Briefing*, p. 2.

[455] New Hampshire Department of Correction Population Summary, p. 1.

[456] "U.S. Census Bureau QuickFacts: New Hampshire." Census Bureau QuickFacts. United States Census Bureau, 2019. https://www.census.gov/quickfacts/fact/table/NH/HCN010212.

[457] Lascaze Testimony, *December 2020 Briefing*, p. 2.

[458] U.S. CONST. amend. VIII.

Constitution,[459] which requires punishments to be proportional to offenses and stipulates that the purpose of punishments is "to reform," and Article 33,[460] which bans excessive bail, fines, and cruel and unusual punishments. For context, internationally, segregation during incarceration has been limited as it has been interpreted as inhumane and degrading punishment.[461]

The U.S. Constitution also highlights the right to due process in the Fifth[462] and Fourteenth[463] Amendments. Within the Secure Psychiatric Unit, civilly committed individuals are placed in a carceral setting and cared for by a combination of psychiatrists and correctional officers.[464] This has implications to their rights to due process, as their actions do not warrant punishment, but instead these individuals require mental health assistance.

#### *d) Americans with Disabilities Act*

Title II of the Americans with Disabilities Act (ADA)[465] and Section 504 of the Rehabilitation Act of 1973 (Section 504)[466] are federal laws that protect people with disabilities, including people who are incarcerated, from discrimination on the basis of their disability including, mental health. Title II of the ADA prohibits discrimination against qualified individuals with disabilities in all programs, activities, and services of public entities. It applies to all state and local governments, their departments and agencies, and any other instrumentalities or special purpose districts of state or local governments. New Hampshire is placing people have never been charged or convicted with a crime, but who have a mental illness, and incarcerating them in the Secure Psychiatric Unit alongside sentenced prisoners."[467]

## B. Recommendations

Among their duties, advisory committees of the Commission are authorized to advise the Agency (1) concerning matters related to discrimination or a denial of equal protection of the laws under the Constitution and the effect of the laws and policies of the Federal Government with respect to

---

[459] N.H. CONST. art. 18.

[460] N.H. CONST. art. 33.

[461] Vasiliades, Elizabeth. "Solitary Confinement and International Human Rights: Why the US prison system fails global standards." *Am. U. Int'l L. Rev.* 21 (2005): p. 94.

[462] U.S. CONST. amend. V.

[463] U.S. CONST. amend. XIV.

[464] Coulter Statement, at 1.

[465] Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, et seq.

[466] § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a).

[467] Cushing Testimony, *July 2020 Briefing*, p. 13.

equal protection of the laws, and (2) upon matters of mutual concern in the preparation of reports of the Commission to the President and the Congress.[468] In keeping with these responsibilities, and in light of the testimony heard on this topic, the New Hampshire Advisory Committee submits the following recommendations to the Commission.

1. The U.S. Commission on Civil Rights should send this report to the New Hampshire General Court and issue recommendations to:

    a. Adopt and pass appropriate legislation to move oversight and authority of the Secure Psychiatric Unit from the Department of Corrections to the Department of Health and Human Services during this legislative term.

    b. Adopt and pass appropriate legislation to develop research on solitary confinement effects and legislate the use accordingly.

    c. Adopt and pass appropriate legislation to fund accreditation efforts for New Hampshire state prison and county jails.

    d. Adopt and pass appropriate legislation to fund appropriate staffing levels within the New Hampshire Department of Corrections and county jails.

    e. Adopt and pass appropriate legislation to fund an acute psychiatric hospital outside of the prison campus. In the interim, increase staffing levels in the Secure Psychiatric Unit to ensure better patient care

    f. Codify in statute a prohibition on the use of solitary confinement on juveniles in any detention facility in the state.

2. The U.S. Commission on Civil Rights should issue the following recommendations to the New Hampshire State Governor:

    a. Adopt and pass an appropriate budget to fund the development of an acute psychiatric hospital outside of the New Hampshire State Prison for Men campus.

    b. Review data collection efforts with state and county jails to ensure that race, ethnicity, and disability status are collected for those in restricted housing to monitor for disproportionate treatment.

3. The U.S. Commission on Civil Rights should send this report to the Commissioner of the New Hampshire Department of Corrections and issue the following recommendations to:

---

[468] 45 C.F.R. § 703.2 (2018).

a. Continue seeking appropriate accreditations for prison practices and seek medical care certification within a prison setting.

b. Increase use of body cameras on correctional staff at state prisons and county jails.

c. Increase behavioral and mental health crisis training to all correctional staff.

d. Collect data on the race, ethnicity, and disability status of individuals in separate housing units as well as transfers from out of state facilities.

e. Revisit existing policies and procedures to ensure that those that fail a drug test are not placed in the Special Housing Unit punitively.

f. Develop mentorship programs for individuals in segregation with those that have left a prison setting, to encourage supportive relationships and behavioral change.

g. Consider alternatives to solitary confinement for those who fail mental health screenings.

h. Develop relationships with agencies focused on mental health practices and standards, such as NAMI, the New Hampshire National Alliance on Mental Illness, and the Bureau of Student Wellness.

i. Keep, and report to the public, a monthly tally of pretrial detainees and psychiatric patients transferred to the Secure Psychiatric Unit from the New Hampshire Hospital, county jails, and group homes.

# V. APPENDIX

Materials referenced in this report are available online:[469]

July 20, 2020 Briefing Transcript

July 20, 2020 Briefing Agenda

July 20, 2020 Minutes and Slides

August 17, 2020 Briefing Transcript

August 17, 2020 Briefing Agenda

August 17, 2020 Minutes

September 21, 2020 Briefing Transcript

September 21, 2020 Briefing Agenda

September 21, 2020 Minutes and Related Resources from Helen Hanks

December 9, 2020 Briefing Transcript

December 9, 2020 Briefing Agenda

December 9, 2020 Minutes

Beatrice Coulter Statement and Emails

Courtney Lockwood Response to Draft Report

Helen Hanks Response to Questions for the December 2020 Briefing

Helen Hanks Response to Draft Report

Joseph Lascaze New Hampshire Department of Corrections Population Summary

Solitary Confinement Invited Speakers

Rockingham County Department of Corrections Policies and Procedures

---

[469] Cited documents and meeting records are available at: https://securisync.intermedia.net/us2/s/folder?public_share=409J0xbKeIQ2vuMJBvQond0011ef58&id=L05I. Additional New Hampshire Advisory Committee documents are available at: https://www.facadatabase.gov/FACA/FACAPublicViewCommitteeDetails?id=a10t0000001gzlXAAQ

**New Hampshire Advisory Committee to the United States Commission on Civil Rights**

## U. S. Commission on Civil Rights

Contact: Regional Programs Coordination Unit
U.S. Commission on Civil Rights
230 S. Dearborn St. Suite 2120
Chicago IL, 60604
(312)353-8311

This report is the work of the New Hampshire Advisory Committee to the U.S. Commission on Civil Rights. The report, which may rely on studies and data generated by third parties, is not subject to an independent review by Commission staff. State Advisory Committee reports to the Commission are wholly independent and reviewed by Commission staff only for legal and procedural compliance with Commission policies and procedures. State Advisory Committee reports are not subject to Commission approval, fact-checking, or policy changes. The views expressed in this report and the findings and recommendations contained herein are those of a majority of the State Advisory Committee members and do not necessarily represent the views of the Commission or its individual members, nor do they represent the policies of the U.S. Government. For more information please contact the Regional Programs Coordination Unit.